*Nishijima v. Walmart, Inc.*

# Index of Exhibits

Exh. A:      Original Complaint

Exh. B:      Sheriff's Entry of Service Form

Exh. C:      Courtesy Copy of Complaint and Summons to Walmart Claim Services, Inc.

Exh. D:      USPS Return Receipt

Exh. E:      Walmart Claim Services Inc.'s Special Answer and Jury Demand

Exh. F:      Walmart Claim Services, Inc.'s Motion for a Protective Order

Exh. G:      Plaintiff's Motion to Substitute Party Defendant for Defendant ABC Corp.

Exh. H:      Order from October 31, 2023

Exh. I:      First Amended and Recast Complaint

Exh. J:      Affidavit of Service

Exh. K:      Wal-Mart, Inc.'s Motion to Dismiss

Exh. L:      Plaintiff's Brief in Support of Motion to Add Party Defendant

Exh. M:      Email from Attorney for Defendant Walmart Inc.

Exh. N:      Consent Stipulation and Agreement

Exh. O:      Withdrawal of Wal-Mart Inc.'s Motion to Dismiss

Exh. P:      Order from February 22, 2024

Exh. Q:      Wal-Mart Inc.'s Answer and Jury Trial Demand

Exh. R:      November 18, 2021, letter from Walmart Claim Services

Exh. S:      June 30, 2022, and February 28, 2023, letters from Walmart Claims Services

Exh. T:      July 13, 2023, letter from Walmart Claims Services

Exh. U:      Walmart Inc.'s Annual Report

Exh. V:      Certified Business Records for Walmart Claims Services, Inc.

Exh. W:       Certified Business Records for Walmart Inc.

Exh. X:       Notice of Rejected Service of Process

Exh. Y:       Defendant Walmart Inc.'s Corporate Disclosure Statement

Exh. Z:       Screenshot of walmartclaimsservices.com and Domain Record Information

Exh. AA:      Screenshots of corporate.walmart.com

Exh. BB:      Job listing for Case Manager-Claims on Walmart Inc.'s website

Exh. CC:      Docket Sheet from *Lowe, Lynn v. Walmart Claims Services, Inc.*

Exh. DD:      Original Complaint from *Lowe, Lynn v. Walmart Claims Services, Inc.*

Exh. EE:      Answer from *Lowe, Lynn v. Walmart Claims Services, Inc.*

Exh. FF:      Docket Sheet from *Rose v. Walmart Claims Services, Inc.*

Exh. GG:      Original Complaint from *Rose v. Walmart Claims Services, Inc.*

Exh. HH:      Answer from *Rose v. Walmart Claims Services, Inc.*

Exh. II:      Docket Sheet from *Pinero v. Walmart Claims Services*

Exh. JJ:      Original Complaint *Pinero v. Walmart Claims Services*

Exh. KK:      Answer from *Pinero v. Walmart Claims Services*

Exh. LL:      Mediation Report from *Pinero v. Walmart Claims Services*

Exh. MM:      Motion for Summary Judgment from *Pinero v. Walmart Claims Services*

Exh. NN:      Settlement Stipulation from *Pinero v. Walmart Claims Services*

Exh. OO:      Docket Sheet from *Grant v. Walmart Claims Services*

Exh. PP:      Original Complaint *Grant v. Walmart Claims Services*

Exh. QQ:      Corporate Disclosure Statement from *Grant v. Walmart Claims Services*

Exh. RR:      Stipulation of Dismissal from *Grant v. Walmart Claims Services*

Exh. SS:      Docket Sheet from *Williams v. Walmart Claims Services*

Exh. TT:      Original Complaint *Williams v. Walmart Claims Services*

Exh. UU:      Stipulation of Dismissal from *Williams v. Walmart Claims Services*

# EXHIBIT

# A

## Original Complaint

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**23CV-1200-1**

Judge Jeffrey S. Bagley
JUL 26, 2023 02:36 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

## IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| MARIA NISHIJIMA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| WALMART CLAIMS SERVICES INC., | ) | |
| John Doe and Jane Doe and ABC Corp. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, MARIA NISHIJIMA, hereinafter referred to as "Plaintiff", by and through undersigned counsel, and files this complaint, showing the court as follows:

### PARTIES, VENUE AND JURISDICTION

1.

Plaintiff is a resident of the State of Georgia.

2.

WALMART CLAIMS SERVICES INC ("Defendant") is a corporation registered to do business and doing business in the state of Georgia.

3.

Defendant WALMART CLAIMS SERVICES INC may be served with process by second original through its registered agent, to wit: THE CORPORATION COMPANY.

4.

Defendants John Doe and Jane Doe are individuals responsible for managing and maintaining the premises involved in the subject incident and are subject to the jurisdiction and venue of this Court. Plaintiff incorporates by reference all claims made in this Complaint against

WALMART CLAIMS SERVICES INC ("Defendant") against Defendants John Doe and Jane Doe as well.  Defendants John Doe and Jane Doe will be named and served with the Summons and Complaint once his or her identity is revealed.

5.

Defendants ABC Corp. is an entity that owned, possessed or controlled the premises involved in the subject incident and is subject to the jurisdiction and venue of this Court. Plaintiff incorporates by reference all claims made in this Complaint against Defendant WALMART CLAIMS SECLAIMRVICES INC ("Defendant") against Defendant ABC Corp. as well.  Defendant ABC Corp. will be named and served with the Summons and Complaint once its identity is revealed.

6.

Defendants are subject to the jurisdiction of this Court.

7.

This Court has jurisdiction over the subject matter of this action.

8.

Venue is proper in this Court because WALMART CLAIMS SERVICES INC ("Defendant")has an office in and transacts business in FORSYTH County;

## BACKGROUND

9.

On or about September 22, 2021, Plaintiff was an invitee at the WALMART ("Defendant") branch located at 630 Collins Hill Rd, Lawrenceville, GA 30046 ("the PREMISES").

10.

Defendant WALMART CLAIMS SERVICES INC. ("Defendant") had ownership, possession and control over the PREMISES at all times relevant to this litigation.

11.

Plaintiff was in an open area permitted to patrons of the PREMISES at all relevant times.

12.

Plaintiff was at the PREMISES during normal business hours.

13.

Plaintiff was walking on the PREMISES' concrete walkway.

14.

The walkway was uneven.

15.

Due to the unevenness of the walkway, Plaintiff fell.

16.

Plaintiff suffered serious injury to her ankle as a result of the fall.

17.

Plaintiff incurred medical expenses for treatment of her injuries.

## COUNT I
## NEGLIGENT MAINTENANCE OF PREMISES

18.

Plaintiff re-alleges and adopts all allegations contained in the foregoing paragraphs as if set forth in their entirety herein.

19.

Defendant WALMART CLAIMS SERVICES INC. had actual or constructive knowledge of the hazardous condition of the walkway for patrons of the Bank.

20.

Plaintiff had no knowledge of the hazard despite Plaintiff's exercise of ordinary care.

21.

Defendant WALMART CLAIMS SERVICES INC'S knowledge of the hazardous condition of the premises was superior to that of Plaintiff.

22.

Defendant WALMART CLAIMS SERVICES INC. owed a non-delegable duty of reasonable care in keeping the premises safe for invitees such as Plaintiff.

23.

Defendant WALMART CLAIMS SERVICES INC. was negligent in failing to properly inspect the walkway.

24.

Defendant WALMART CLAIMS SERVICES INC. was negligent in failing to properly maintain the walkway.

25.

Defendant WALMART CLAIMS SERVICES INC. was negligent in failing to take adequate measures to protect invitees from the danger of the walkway and in failing to keep the premises safe for invitees.

26.

Defendant WALMART CLAIMS SERVICES INC. was negligent in failing to warn Plaintiff of the hazardous condition of the premises.

27.

Defendant WALMART CLAIMS SERVICES INC.'S negligence was the proximate cause of Plaintiff's injuries.

## COUNT II
## VICARIOUS LIABILITY

28.

Plaintiff re-alleges and adopts all allegations contained in the foregoing paragraphs as if set forth in their entirety herein.

29.

At all times relevant to this action, the individuals responsible for inspecting and maintaining the area where Plaintiff was injured were employed by Defendant WALMART CLAIMS SERVICES INC. and were acting within the scope of their employment.

30.

Defendant WALMART CLAIMS SERVICES INC. is responsible for the conduct of these individuals under the doctrine of *respondent superior*, vicarious liability, agency or apparent agency.

## COUNT III

## NEGLIGENT TRAINING & SUPERVISION

31.

Plaintiff re-alleges and adopts all allegations contained in the foregoing paragraphs as if set forth in their entirety herein.

32.

Defendant WALMART CLAIMS SERVICES INC was negligent in failing to adopt appropriate policies and procedures to ensure that appropriate inspections and maintenance were performed on the premises and in failing to train its employees and agents concerning safety procedures for inspecting and maintaining the premises.

33.

Defendant WALMART CLAIMS SERVICES INC. was negligent in training and supervising its staff and agents.

34.

As a result of Defendant WALMART CLAIMS SERVICES INC.'s negligence in training and supervising its employees and agents, Plaintiff was injured on the premises.

**IV.**

**NOTICE OF INTENT TO USE CERTIFIED DOCUMENTS AT TRIAL**

35.

Plaintiff hereby gives notice that Plaintiff intends to offer documents, including, but not limited to, medical records into evidence pursuant to O.C.G.A. § 24-9-902.

**V.**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants in the following particulars:

a) An award of general damages to fully compensate Plaintiff for her past, present and future pain and suffering in an amount to be determined by this Honorable Court;

b) An award of special damages to fully compensate Plaintiff for her past, present and future medical expenses;

c) Process be issued requiring the Defendants to answer according to law;

d) Plaintiff be granted such further and other relief as this Court deems just and proper.

Respectfully submitted this 25th of July, 2023.

**770GOODLAW, H.Q. ALEX**
**NGUYEN LAW FIRM, LLC.**

_/s/ Renée E. Taylor_
Stephen J. Valero, Esq.
Georgia Bar No.: 184083
Hung Q. (Alex) Nguyen, Esq.
Georgia Bar No.: 940370
Renée E. Taylor
Georgia Bar No.: 195455
Attorneys for Plaintiff

5495 Jimmy Carter Blvd., Suite B-17
Norcross, GA 30093
(770)409-1529 Office
(770)409-1526 Fax
litigation@770goodlaw.com

# EXHIBIT

# B

**Sheriff's Entry of Service**

⚓ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

Civil Action No. 23CV-1200-1

Date Filed 7/26/2023

Magistrate Court ☐
Superior Court ☒
State Court Forsyth ☐
Georgia, ~~Gwinnett~~ County

Maria Nishijima

**23CV-1200-1**
Judge Jeffrey S. Bagley
AUG 08, 2023 09:58 AM

Greg G. Allen, Clerk
Forsyth County, Georgia

Attorney's Address

770 GOODLAW
5495 Jimmy Carter Blvd, Ste B-17
Norcross, GA 30093

_____ **Plaintiff**

VS.

Walmart Claims Services Inc., et.al.

_____ **Defendant**

Name and Address of party to be served.

Walmart Claims Services Inc.
via registered agent: The Corporation Company
106 Colony Park Drive Ste 800-B
Cumming, GA 30040-2794

_____ **Garnishee**

## Sheriff's Entry Of Service

**Personal** ☐
I have this day served the defendant _____ personally with a copy of the within action and summons.

**Notorious** ☐
I have this day served the defendant ~~The Corporation Com,~~ _____ by leaving a copy of the action and summons at his most notorious place of abode in this County.

Delivered same into hands of _____ described as follows

age, about _____ years; weight, about _____ pounds; height, about _____ feet and _____ inches; domiciled at the residence of defendant.

**Corporation** ☑
Served the defendant The Corporation Company _____ a corporation
by leaving a copy of the within action and summons with Davvon Jackson _____
in charge of the office and place of doing business of said Corporation in this County.

**Tack & Mail** ☐
I have this day served the above styled affidavit and summons on the defendant(s) by posting a copy of the same to the door of the premises designated in said affidavit, and on the same day of such posting by depositing a true copy of same in the United States Mail, First Class in an envelope properly addressed to the defendant(s) at the address shown in said summons, with adequate postage affixed thereon containing notice to the defendant(s) to answer said summons at the place stated in the summons.

**Non Est** ☐
Diligent search made and defendant _____ not to be found in the jurisdiction of this Court.

This _____ 7th _____ day of August, 20 23.

_____
**Deputy**

Sheriff Docket _____ Page _____

~~Gwinnett~~ County, Georgia
Forsyth

WHITE: Clerk     CANARY: Plaintiff / Attorney     PINK: Defendant

SC-2 Rev.3.13

**AMSTATON**    **FORSYTH COUNTY SHERIFF'S OFFICE**    08/15/2023 12:09:40

| | | | Civil Paper - CIVIL PAPER | | | ***CP66189*** |

| Civil ID | Case ID | File/Docket # | | | |
|---|---|---|---|---|---|
| **66189** | | **23CV-1200-1** | | | |

| Officer | | | Location of Original Copy | | Local # |
|---|---|---|---|---|---|
| **BURKE, D. E.** | | | | | |

| PLAINTIFF NAME & ADDRESS | Court | Court Date |
|---|---|---|
| **NISHIJIMA, MARIA** | Date Issued **07/26/2023** | Date Received **08/01/2023** |
| | Disposition **Active** | Disposition Date **08/01/2023** |

### VERSUS

| DEFENDANT NAME & ADDRESS | SERVE TO ADDRESS: |
|---|---|
| **WALMART CLAIMS SERVICES INC.** <br> **106 Colony Park Dr , 800B** <br> **Cumming,GA  30040** | Beat: **S32** <br> District: **STH**     Neighbhd: <br> ReportArea: **COM2**     SubDivsn: |

| Race / Sex / DOB | SSN | DEFENDANT NAME & ADDRESS |
|---|---|---|
| Employer Information | | |
| Home Phone | Work Phone | Notes (for above Defendant) |
| **Alerts** | | |

### SERVICE NOTES

**VIA REG AGENT: THE CORPORATION COMPANY [08/01/2023 12:09, AMSTATON, 3180, FCSO]**

### FIRST ATTEMPT

| Successful ☐ Yes  ☐ No | Date | Time | Officer | Who Served |
|---|---|---|---|---|
| Where Served    **Serve To Address:** | | | Comments (include new address) | |

### SECOND ATTEMPT

| Successful ☐ Yes  ☐ No | Date | Time | Officer | Who Served |
|---|---|---|---|---|
| Where Served | | | Comments (include new address) | |

### THIRD ATTEMPT

| Successful ☐ Yes  ☐ No | Date | Time | Officer | Who Served |
|---|---|---|---|---|
| Where Served | | | Comments (include new address) | |

# EXHIBIT

# C

**Courtesy Copy of Plaintiff's**
Complaint and Summons to
Walmart Claim Services, Inc.

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

Postage
$

Total Postage and Fees
$ 4|1— CC to Adjuster [1.00849]

Postmark
Here

(SH)

Sent To

Street and Apt. No., or PO Box No.

City, State, ZIP+4®

PS Form 3800, April 2015 PSN 7530-02-000-9047    See Reverse for Instructions

7016 3560 0000 0346 6733
7016 3560 0000 0346 6733

CERTIFIED MAIL®

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7016 3560 0000 0346 6733

## SENDER: COMPLETE THIS SECTION

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Walmart Claims Services, Inc.
Attn: Chris Williamson
P.O. Box 14731
Lexington, KY 40512-4731

9590 9402 8334 3094 8927 26

2. Article Number (Transfer from service label)

## COMPLETE THIS SECTION ON DELIVERY

A. Signature

X

☐ Agent
☐ Addressee

B. Received by (Printed Name)

C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053                   Domestic Return Receipt

Top of the page
Case 2:24-cv-00040-SCJ   Document 20-1   Filed 05/08/24   Page 17 of 459
3-Part Multi-Purpose Labels (SDC-3110)



770GOODLAW
ATTN: SARA HELTON
5495 JIMMY CARTER BLVD STE B17
NORCROSS GA 30093-1518

$9.730
US POSTAGE
FIRST-CLASS
FROM 30093
AUG 01 2023
stamps
endicia

WALMART CLAIMS SERVICES, INC.
ATTN: CHRIS WILLIAMSON
PO BOX 14731
LEXINGTON KY 40512-4731

stamps
.com



**(Alex) Hung Q. Nguyen**
*CEO/Managing Partner*
*Alex@770goodlaw.com*

**Thomas Tran**
*Pre-Suit Director*
*Thomas@770goodlaw.com*

**770-GOOD-LAW.**
AUTO ACCIDENT ATTORNEYS
LAW OFFICE OF HUNG Q. NGUYEN & ASSOCIATES, LLC.

**YenHa T. Nguyen**
*Finance Director*
*Yenha@770goodlaw.com*

**Jin K. Oh**
*Client Advocacy*
*Jin@770goodlaw.com*

**5495 Jimmy Carter Blvd, Suite B-17, Norcross Georgia 30093**

8/1/23
**Via Certified U.S. Mail Return: 7016 3560 0000 0346 6733**

Walmart Claims Services, Inc.
Attn: Chris Williamson
P.O. Box 14731
Lexington, KY 40512-4731

        **RE:**    **Maria Nishijima v. Walmart Claims Services, Inc., et al.**
                Civil Action File No.: 23CV-1200-1
                Superior Court of Forsyth County
                Your Claim Number: 9748463
                Date of loss: 09/22/2021

    Dear Chris Williamson:

    Enclosed, for your records and information, please find a copy of Plaintiff's Complaint and Summons for the above captioned case.

    Please take notice that this courtesy copy is being sent to you in accordance with the requirements of O.C.G.A. § 33-7-15. The delivery of this Complaint and Summons via Certified Mail and Return Receipt Request satisfies the requirements set forth in O.C.G.A. § 33-7-15(c).

    It is our continued hope that this firm is able to resolve this matter in an amicable manner. Again, thank you for your courtesy, cooperation, and kindness.

                    Best,
                    **770GOODLAW, H.Q. Alex**
                    **Nguyen Law Firm, LLC.**

                    */s/ Sara Helton*
                    Sara Helton
                    Litigation legal Assistant
                    Cell: 470-287-7708
                    Email: sara@770goodlaw.com

Enclosures:
- Summons
- Complaint

# SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**23CV-1200-1**

Judge Jeffrey S. Bagley
JUL 26, 2023 02:36 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

CIVIL ACTION NUMBER  23CV-1200-1

Nishijima, Maria

**PLAINTIFF**

VS.

Walmart Claims Services Inc.
ABC Corp.
Doe, John
Doe, Jane

**DEFENDANTS**

### SUMMONS

TO: WALMART CLAIMS SERVICES INC.

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

> **Hung Q. Nguyen**
> **770GOODLAW, H. Q. Alex Nguyen Law Firm, LLC**
> **5495 Jimmy Carter Blvd., Ste. B-17**
> **Norcross, Georgia 30093-1518**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

**This 26th day of July, 2023.**

Clerk of Superior Court

Greg G. Allen, Clerk
Forsyth County, Georgia

Page 1 of 1

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**23CV-1200-1**

Judge Jeffrey S. Bagley
JUL 26, 2023 02:36 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

**IN THE SUPERIOR COURT OF FORSYTH COUNTY**
**STATE OF GEORGIA**

|  |  |  |
|---|---|---|
| MARIA NISHIJIMA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO.: |
| | ) | |
| v. | ) | |
| | ) | |
| WALMART CLAIMS SERVICES INC., | ) | |
| John Doe and Jane Doe and ABC Corp. | ) | JURY TRIAL DEMANDED |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW, MARIA NISHIJIMA, hereinafter referred to as "Plaintiff", by and through undersigned counsel, and files this complaint, showing the court as follows:

### PARTIES, VENUE AND JURISDICTION

1.

Plaintiff is a resident of the State of Georgia.

2.

WALMART CLAIMS SERVICES INC ("Defendant") is a corporation registered to do business and doing business in the state of Georgia.

3.

Defendant WALMART CLAIMS SERVICES INC may be served with process by second original through its registered agent, to wit: THE CORPORATION COMPANY.

4.

Defendants John Doe and Jane Doe are individuals responsible for managing and maintaining the premises involved in the subject incident and are subject to the jurisdiction and venue of this Court. Plaintiff incorporates by reference all claims made in this Complaint against

WALMART CLAIMS SERVICES INC ("Defendant") against Defendants John Doe and Jane Doe as well.  Defendants John Doe and Jane Doe will be named and served with the Summons and Complaint once his or her identity is revealed.

5.

Defendants ABC Corp. is an entity that owned, possessed or controlled the premises involved in the subject incident and is subject to the jurisdiction and venue of this Court. Plaintiff incorporates by reference all claims made in this Complaint against Defendant WALMART CLAIMS SECLAIMRVICES INC ("Defendant") against Defendant ABC Corp. as well.  Defendant ABC Corp. will be named and served with the Summons and Complaint once its identity is revealed.

6.

Defendants are subject to the jurisdiction of this Court.

7.

This Court has jurisdiction over the subject matter of this action.

8.

Venue is proper in this Court because WALMART CLAIMS SERVICES INC ("Defendant")has an office in and transacts business in FORSYTH County;

## **BACKGROUND**

9.

On or about September 22, 2021, Plaintiff was an invitee at the WALMART ("Defendant") branch located at 630 Collins Hill Rd, Lawrenceville, GA 30046 ("the PREMISES").

10.

Defendant WALMART CLAIMS SERVICES INC. ("Defendant") had ownership, possession and control over the PREMISES at all times relevant to this litigation.

11.

Plaintiff was in an open area permitted to patrons of the PREMISES at all relevant times.

12.

Plaintiff was at the PREMISES during normal business hours.

13.

Plaintiff was walking on the PREMISES' concrete walkway.

14.

The walkway was uneven.

15.

Due to the unevenness of the walkway, Plaintiff fell.

16.

Plaintiff suffered serious injury to her ankle as a result of the fall.

17.

Plaintiff incurred medical expenses for treatment of her injuries.

## COUNT I
## NEGLIGENT MAINTENANCE OF PREMISES

18.

Plaintiff re-alleges and adopts all allegations contained in the foregoing paragraphs as if set forth in their entirety herein.

19.

Defendant WALMART CLAIMS SERVICES INC. had actual or constructive knowledge of the hazardous condition of the walkway for patrons of the Bank.

20.

Plaintiff had no knowledge of the hazard despite Plaintiff's exercise of ordinary care.

21.

Defendant WALMART CLAIMS SERVICES INC'S knowledge of the hazardous condition of the premises was superior to that of Plaintiff.

22.

Defendant WALMART CLAIMS SERVICES INC. owed a non-delegable duty of reasonable care in keeping the premises safe for invitees such as Plaintiff.

23.

Defendant WALMART CLAIMS SERVICES INC. was negligent in failing to properly inspect the walkway.

24.

Defendant WALMART CLAIMS SERVICES INC. was negligent in failing to properly maintain the walkway.

25.

Defendant WALMART CLAIMS SERVICES INC. was negligent in failing to take adequate measures to protect invitees from the danger of the walkway and in failing to keep the premises safe for invitees.

26.

Defendant WALMART CLAIMS SERVICES INC. was negligent in failing to warn Plaintiff of the hazardous condition of the premises.

27.

Defendant WALMART CLAIMS SERVICES INC.'S negligence was the proximate cause of Plaintiff's injuries.

## COUNT II
## VICARIOUS LIABILITY

28.

Plaintiff re-alleges and adopts all allegations contained in the foregoing paragraphs as if set forth in their entirety herein.

29.

At all times relevant to this action, the individuals responsible for inspecting and maintaining the area where Plaintiff was injured were employed by Defendant WALMART CLAIMS SERVICES INC. and were acting within the scope of their employment.

30.

Defendant WALMART CLAIMS SERVICES INC. is responsible for the conduct of these individuals under the doctrine of *respondent superior*, vicarious liability, agency or apparent agency.

## COUNT III

## NEGLIGENT TRAINING & SUPERVISION

31.

Plaintiff re-alleges and adopts all allegations contained in the foregoing paragraphs as if set forth in their entirety herein.

32.

Defendant WALMART CLAIMS SERVICES INC was negligent in failing to adopt appropriate policies and procedures to ensure that appropriate inspections and maintenance were performed on the premises and in failing to train its employees and agents concerning safety procedures for inspecting and maintaining the premises.

33.

Defendant WALMART CLAIMS SERVICES INC. was negligent in training and supervising its staff and agents.

34.

As a result of Defendant WALMART CLAIMS SERVICES INC.'s negligence in training and supervising its employees and agents, Plaintiff was injured on the premises.

**IV.**

**NOTICE OF INTENT TO USE CERTIFIED DOCUMENTS AT TRIAL**

35.

Plaintiff hereby gives notice that Plaintiff intends to offer documents, including, but not limited to, medical records into evidence pursuant to O.C.G.A. § 24-9-902.

**V.**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants in the following particulars:

a) An award of general damages to fully compensate Plaintiff for her past, present and future pain and suffering in an amount to be determined by this Honorable Court;

b) An award of special damages to fully compensate Plaintiff for her past, present and future medical expenses;

c) Process be issued requiring the Defendants to answer according to law;

d) Plaintiff be granted such further and other relief as this Court deems just and proper.

Respectfully submitted this 25th of July, 2023.

**770GOODLAW, H.Q. ALEX NGUYEN LAW FIRM, LLC.**

*/s/ Renée E. Taylor*
Stephen J. Valero, Esq.
Georgia Bar No.: 184083
Hung Q. (Alex) Nguyen, Esq.
Georgia Bar No.: 940370
Renée E. Taylor
Georgia Bar No.: 195455
Attorneys for Plaintiff

5495 Jimmy Carter Blvd., Suite B-17
Norcross, GA 30093
(770)409-1529 Office
(770)409-1526 Fax
litigation@770goodlaw.com

# EXHIBIT

# D

USPS Return Receipt

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Walmart Claims Services, Inc.
Attn: Chris Williamson
P.O. Box 14731
Lexington, KY 40512-4731

9590 9402 8334 3094 8927 26

2. Article Number *(Transfer from service label)*

7016 3560 0000 0346 6733

PS Form **3811**, July 2020 PSN 7530-02-000-9053

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X DK

☐ Agent
☐ Addressee

B. Received by *(Printed Name)*          C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

AUG 18 2023

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

Domestic Return Receipt



USPS TRACKING #

9590 9402 8334 3094 8927 26

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

**United States
Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

770 GOODLAW
5495 Jimmy Carter Blvd, Ste B-17
Norcross, GA 30093

411- CC to Adjuster [100B494] (SH)

# EXHIBIT

# E

Walmart Claims Services, **Inc.'s Special Answer and** Jury Trial Demand

FORSYTH COUNTY, GEORGIA
FILED IN THIS OFFICE
9/6/2023 11:11 AM
GREG G. ALLEN
CLERK OF THE SUPERIOR COURTS
23CV-1200-1
JUDGE Bagley, Jeffrey S.

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

| | |
|---|---|
| MARIA NISHIJIMA | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action File |
| vs. | ) No. 23CV-1200-1 |
| | ) |
| WALMART CLAIMS SERVICES INC., | ) |
| John Doe and Jane Doe and ABC Corp. | ) |
| | ) |
| Defendants. | ) |

**WALMART CLAIMS SERVICES, INC.'S SPECIAL
ANSWER AND JURY TRIAL DEMAND**

Defendant Walmart Claims Services, Inc. (hereinafter, "Walmart"), by and through counsel of record, files this Special Answer to Plaintiff's Complaint and shows as follows:

**FIRST DEFENSE**

This Court lacks personal jurisdiction over Walmart.

**SECOND DEFENSE**

Venue is improper.

**THIRD DEFENSE**

Service of process is insufficient.

**FOURTH DEFENSE**

Plaintiff has failed to specifically state items of special damages sought in this action pursuant to O.C.G.A. § 9-11-9(g).

**FIFTH DEFENSE**

Plaintiff fails to state a claim upon which relief can be granted for attorney's fees and expenses of litigation.

**SIXTH DEFENSE**

Plaintiff fails to state a claim upon which relief can be granted for punitive damages.

## SEVENTH DEFENSE

Responding to the specific allegations of the numbered paragraphs of Plaintiff's Complaint, Walmart answers:

1.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

2.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

3.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

4.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

5.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

6.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint as stated.

7.

Walmart admits the allegations contained within this paragraph of Plaintiff's Complaint.

8.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint as stated.

9.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint as stated.

10.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

11.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

12.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

13.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

14.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

15.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

16.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

17.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

18.

Walmart adopts, and incorporates by reference, all preceding paragraphs.

19.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

20.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

21.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

22.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

23.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

24.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

25.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

26.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

27.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

28.

Walmart adopts, and incorporates by reference, all preceding paragraphs.

29.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

30.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

31.

Walmart adopts, and incorporates by reference, all preceding paragraphs.

32.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

33.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

34.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

35.

This paragraph of Plaintiff's Complain contains a statement to which no response is required. To the extent a response is required, Walmart denies the allegations contained therein.

36.

Any allegation, language, or paragraph of Plaintiff's Complaint not hereinbefore responded to is specifically denied by Walmart.

WHEREFORE, having fully answered Plaintiff's complaint, Walmart prays:

a) that Plaintiff's Complaint be dismissed;

b) that Walmart has judgment in its favor;

c) that Walmart has a trial by jury of twelve persons; and

d) that Walmart has all other proper relief.

This 06 day of September, 2023.

**[SIGNATURE ON NEXT PAGE]**

WALDON ADELMAN CASTILLA
MCNAMARA & PROUT

/s/ Matthew J. Hurst
Matthew J. Hurst
Georgia Bar No. 480267
Attorney for Walmart Claims Services, Inc.

900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(770) 953-1710
mhurst@waldonadelman.com

# EXHIBIT

# F

## Walmart Claim Services, Inc.'s

## Motion for a Protective Order

FORSYTH COUNTY, GEORGIA
FILED IN THIS OFFICE
9/21/2023 4:24 PM
GREG G. ALLEN
CLERK OF THE SUPERIOR COURTS
23CV-1200-1
JUDGE Bagley, Jeffrey S.

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| MARIA NISHIJIMA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File |
| vs. | ) | No. 23CV-1200-1 |
| | ) | |
| WALMART CLAIMS SERVICES INC., | ) | |
| John Doe and Jane Doe and ABC Corp. | ) | |
| | ) | |
| Defendants. | ) | |

**WALMART CLAIMS SERVICES, INC. MOTION FOR A PROTECTIVE ORDER**

COMES NOW Walmart Claims Services, Inc. (hereinafter, "Walmart"), Defendant in the above-styled Civil action, by and through counsel, moves this Court for a protective order relieving it from having to respond to Plaintiff's discovery requests. Walmart shows Plaintiff has failed to perfect service upon Walmart. Accordingly, Walmart is under no obligation to respond to Plaintiff's discovery requests until such time as Walmart is properly served with process.

Respectfully submitted this 21 of September, 2023.

WALDON ADELMAN CASTILLA
MCNAMARA & PROUT

/s/ Matthew J. Hurst
Matthew J. Hurst
Georgia Bar No. 480267
Attorney for Walmart Claims Services, Inc.

900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(770) 953-1710
mhurst@waldonadelman.com

FORSYTH COUNTY, GEORGIA
FILED IN THIS OFFICE
9/21/2023 4:27 PM
GREG G. ALLEN
CLERK OF THE SUPERIOR COURTS
23CV-1200-1
JUDGE Bagley, Jeffrey S.

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| MARIA NISHIJIMA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File |
| vs. | ) | No. 23CV-1200-1 |
| | ) | |
| WALMART CLAIMS SERVICES INC., | ) | |
| John Doe and Jane Doe and ABC Corp. | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF WALMART CLAIMS SERVICES, INC.'S
MOTION FOR PROTECTIVE ORDER**

In support of its motion for protective order, Walmart Claims Services, Inc. (hereinafter, "Walmart") shows the Court as follows:

Plaintiff has filed suit to recover for damages arising out of an incident occurring on September 22, 2021. See Complaint, at ¶9-16. On August 8, 2023, a Sheriff's Entry of Service was filed showing Walmart was served on August 7, 2023. (Sheriff's Entry of Service, Attached as Exhibit "A"). Per the Sheriff's Entry of Service, Walmart was purportedly served "via registered agent: The Corporation Company." (Exhibit "A").

Though the Sheriff's Entry of Service may constitute prima face evidence of service, such evidence is not absolute. Where a party presents sufficient evidence disproving a return of service, the return of service is properly set aside. Jones v. Lopez-Hernandez, 308 Ga. App. 81, 82 (2011).

It is impossible for Walmart to have been served as claimed in the August 8, 2023, return of service, as The Corporation Company was not (and is not) authorized to accept such service of process for Walmart. (See Affidavit of Tamara Kling, Attached as Exhibit "B"). On August 7, 2023, when service of process purportedly occurred, the documents to be served were rejected

due to The Corporation Company not being authorized to accept service of process. (Exhibit "B"). Walmart further shows certified copies of the State of Georgia Secretary of State Certificate of Withdrawal confirming that, as of September 12, 2022, Walmart's business status has been "dissolved." (See State of Georgia Secretary of State: Certificate of Withdrawal (09/12/2022) (certified), Attached as Exhibit "C").

The sworn affidavit of Tamara Kling, coupled with the certified records of the Secretary of State, is just the type of evidence which justifies the setting aside of the August 8, 2023, return of service. To date, Walmart has not been served with a copy of the Summons and Complaint as is required by law. In connection with this lack of service and inasmuch as the Plaintiff has not perfected service, Walmart is under no obligation to respond to Plaintiff's discovery requests until such time as it is served with process.  Traver v. McKnight, 208 Ga. App. 278, 279 (1993). See also Palmer v. Constantin, 256 Ga. App. 233 (2002).

For the aforementioned reasons, Walmart respectfully requests that this Court grant its Motion for a Protective Order.  Specifically, Walmart requests an Order relieving it from having to respond to Plaintiff's discovery requests until such time as service has been perfected on Walmart.

Respectfully submitted this 21 of September, 2023.

WALDON ADELMAN CASTILLA
MCNAMARA & PROUT

/s/ Matthew J. Hurst
Matthew J. Hurst
Georgia Bar No. 480267
Attorney for Walmart Claims Services, Inc.

900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(770) 953-1710
mhurst@waldonadelman.com

# EXHIBIT

# G

**Plaintiff's Motion to Substitute** Party for Defendant ABC Corp.

🖳 EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**23CV-1200-1**
**Judge Jeffrey S. Bagley**
**SEP 26, 2023 10:32 AM**

Greg G. Allen, Clerk
Forsyth County, Georgia

**IN THE SUPERIOR COURT OF FORSYTH COUNTY**
**STATE OF GEORGIA**

MARIA NISHIJIMA,                            )
                                            )
     Plaintiff,                            )
                                            )
v.                                          )        Civil Action File No.: 23CV-1200-1
                                            )
WALMART CLAIMS SERVICES, INC.,              )
JOHN DOE'S 1-2, ABC CORP., and              )
XYZ CORP.,                                  )
                                            )
     Defendant(s).                         )

## PLAINTIFF'S MOTION TO SUBSTITUTE PARTY FOR DEFENDANT ABC CORP.

COMES NOW, MARIA NISHIJIMA, Plaintiff, and files this *Plaintiff's Motion to Substitute a Party Defendant*, pursuant to O.C.G.A. § 9-11-15(c), 9-11-21, for the purpose of adding WALMART INC. as Defendant in place of ABC CORP., and shows this honorable court as follows:

## STATEMENT OF FACTS

**1.**

On September 29, 2021, Maria Nishijima ("Plaintiff"), a licensee at a Walmart retail store, was involved in a slip and fall incident that led to injuries to her neck, right foot, lower back, and hip.

**2.**

Plaintiff filed suit against Walmart Claims Services, Inc. on July 26th, 2023, alleging damages for the aforementioned slip and fall. See Exhibit A; Summons and Complaint.

**3.**

Plaintiff Served Walmart Claims Services, Inc. at its registered agent Corporation Company at 106 Colony Park Drive, Suite 800-B, Cumming, Georgia 30040 on August 7th, 2023. See Exhibit B; Sheriffs Entry of Service.

**4.**

Thereafter, Plaintiff realized that Walmart Inc., may also be a liable party.

**5.**

Walmart Inc. shares the same registered agent as Walmart Claims Services, Inc. See Exhibit C; Secretary of State filings for Walmart Claims Services, Inc. and Walmart, Inc.

## CITATION OF AUTHORITY

"[P]arties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just." O.C.G.A. § 9-11-21. The section must be read *in pari material* with O.C.G.A. § 9-11-15(a), the statute relating to amendments, Guhl v. Tuggle, 249 S.E.2d 219, 221 (Ga. 1978). The criteria for allowing the addition of an additional party would seem to be simply, "on such terms as are just," Id.

Under O.C.G.A. § 9-11-15(c), whenever an amended pleading arises out of the conduct, transaction, or occurrence set forth in the original pleading the amendment changing the party against whom a claim is asserted relates back to the date of the original pleadings if the following requirements are met: (1) the party has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or

should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him. O.C.G.A. § 9-11-15(c) applies to motions to add a party as well as to substitute a party. Cobb v. Stephens, 368 S.E.2d 341 (Ga. App. 1988).

Delay in naming the party is not a factor. Fontaine v. Home Depot, Inc., 550 S.E.2d 691, 694 (Ga. App. 2001) (Plaintiff waited nine months after discovering he had sued wrong defendant and ten months after the applicable statute of limitations had run). Denying the addition of a party based on delay alone is an abuse of discretion. Shiver v. Norfolk-S Ry. Co., 469 S.E.2d 769 (Ga. App. 1996).

Here, Plaintiff filed suit against Walmart Claims Services, Inc. on July 26th, 2023, asserting claims on behalf of Plaintiff for injuries sustained in a slip and fall, which occurred in a Wal-Mart retail store on Collins Hill Road in Lawrenceville, Georgia. Plaintiff timely served Walmart Claims Services, Inc. on August 7th, 2023, via its registered agent the Corporation Company at 106 Colony Park Drive, Suite 800-B, Cumming, Georgia 30040. Thereafter, Plaintiff discovered that Walmart Inc. was an additionally potentially liable party. Walmart Inc. shares the same registered agent as Walmart Claims Services, Inc., Corporation Company at 106 Colony Park Drive, Suite 800-B, Cumming, Georgia 30040. Therefore Walmart, Inc. will not be prejudiced in maintaining a defense on the merits. Additionally, Walmart Inc. based on its position as a manager/owner/occupier of retail stores, and specifically the manager/owner/occupier of the retail store at the center of this action, should have known that but for a mistake concerning the identity of the proper party this action would have been brought against it.

WHEREFORE, Plaintiff moves the court for an order directing that Walmart Inc be added to this action as a party Defendant in place of ABC CORP.

Respectfully submitted this September 26, 2023,

**770GOODLAW, H.Q. ALEX**
**NGUYEN LAW FIRM, LLC.**

*/s/ Hung Q. Nguyen*
Hung Q. (Alex) Nguyen, Esq.
Georgia Bar No.: 940370
Stephen J. Valero, Esq.
GA State Bar No. 184083
Attorneys for Plaintiff

5495 Jimmy Carter Blvd., Suite B-17
Norcross, GA 30093
(770)409-1529 Office
(770)409-1526 Fax
Litigation@770goodlaw.com

# EXHIBIT

# H

## Order

FORSYTH COUNTY, GEORGIA
FILED IN THIS OFFICE
10/31/2023 2:10 PM
GREG G. ALLEN
CLERK OF THE SUPERIOR COURTS
23CV-1200-1
JUDGE Bagley, Jeffrey S.

# IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

---------------------------------------------X
MARIA NISHIJIMA,                     :

      Plaintiff,                      :

      v.                              :

WALMART CLAIMS SERVICES, :
INC.; JOHN DOE; JANE DOE;     :
and ABC CORP.                        :

      Defendants.                     :
---------------------------------------------X

CIVIL ACTION
FILE NO.: 23CV-1200-1

## ORDER

The above-styled action came before the Court on 26 October 2023 for a noticed hearing on Walmart Claims Services, Inc.'s *Motion for a Protective Order* filed on 21 September 2023. Having considered the relevant record evidence and the parties' oral arguments, the Court ORDERS as follows:

### A.   Procedural Posture

The Plaintiff alleges that on 22 September 2021 she was a business invitee at "Walmart" located at 630 Collins Hill Road in Lawrenceville. The Plaintiff alleges that while she was on "Walmart's" premises, she slipped and fell and suffered injuries. The Plaintiff thereafter commenced this action against Walmart Claims Services, Inc. on 26 July 2023.

On 6 September 2023, Walmart Claims Services, Inc. filed a *Special Answer* asserting defenses which included lack of personal

jurisdiction and insufficient service of process. The Plaintiff served discovery requests upon Walmart Claims Services, Inc. resulting in the filing of the instant *Motion for a Protective Order*.

After the Court issued its *Rule Nisi* to consider the *Motion for a Protective Order*, the Plaintiff filed a *Motion to Substitute Party Defendant*. That motion is premised upon the application of OCGA §§ 9-11-15 (a), -(c) and 9-11-21. Because these two motions are interrelated, it is necessary for the Court to consider both motions, simultaneously.

B.   <u>Legal Analysis</u>

The civil action file contains a sheriff's return of service indicating that The Corporation Company, also referred to in the record as The Corporation Trust Company, via employee Dayvon Jackson, was provided with a copy of the *Summons* and *Complaint* on 7 August 2023. The return further contends that the deputy perfected "corporate service" upon Walmart Claims Services, Inc.

In a letter dated 1 September 2023, The Corporation Trust Company informed the Plaintiff's counsel that it was not, in fact, the registered agent for service of process for Walmart Claims Services, Inc.

Record evidence shows that: (1) The Corporation Trust Company was not the registered agent for service on behalf of Walmart Claims Services, Inc. on 7 August 2023; and (2) Walmart Claims Services, Inc. did not maintain a license to conduct business in the State of Georgia since as early as 12 September 2022. Thus, the Court concludes that Walmart Claims Services, Inc. was not served with process, as a matter of law, on 7 August 2023.

Notwithstanding the lack of service upon the named corporate Defendant, Walmart Claims Services, Inc., in her *Motion to Substitute*

*Party Defendant*, the Plaintiff contends that she should be allowed to substitute Walmart, Inc. for Walmart Claims Services, Inc. The Plaintiff contends that this is procedurally correct because Walmart Claims Services, Inc. and Walmart, Inc. are so closely aligned that service upon one amounts to service on the other. Additionally, the Plaintiff recognizes that the two-year statute of limitations has expired and therefore also seeks to relate back the service on Walmart Claims Services, Inc. to Walmart, Inc.

The Court finds that the Plaintiff, as of 26 October 2023, *failed* to perfect service of process upon *either* Walmart Claims Services, Inc. or Walmart, Inc. The unrefuted evidence clearly shows that The Corporation Trust Company was not, in fact, the registered agent for service of process for Walmart Claims Services, Inc. on 7 August 2023.

In order to allow substitution of a party, the Plaintiff must satisfy three conditions. Oconee County v. Cannon, 310 Ga. 728, 733 (2021). Most relevant is whether "the proposed defendant [Walmart, Inc.], before the statute of limitations expired, knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against [Walmart, Inc.]" Id. The Plaintiff has provided no evidence to satisfy this condition. First, that argument presupposes that The Corporation Trust Company notified Walmart Claims Services, Inc. of the lawsuit on or before 29 September 2023. There is no evidence of record to support that finding. Second, the record also fails to show that if Walmart Claims Services, Inc. received timely notice of the lawsuit that it then informed Walmart, Inc. of the lawsuit.

Page 3 of 5

The Plaintiff cites to the case of <u>Fontaine v. Home Depot, Inc.</u>, 250 Ga. App. 123 (2003) and <u>Shiver v. Norfolk-S Ry. Co.</u>, 220 Ga. App. 483 (1996) in support of her position. In those cited cases, however, the corporate parties sought to be replaced were actually served with process. Again, service has not occurred on either Walmart Claims Services, Inc. or Walmart, Inc. This is the missing link in the Plaintiff's relation-back theory. Cf <u>Tanner's Rome v. Ingram</u>, 236 Ga. App. 275, 276 (1999) (where filing of tort action within period of limitations occurred but service of process on wrong corporation occurred after expiration of limitations period against sister corporation service deemed to relate back); see also <u>Rich's, Inc. v. Snyder</u>, 134 Ga. App. 889, 891 (1975) (where plaintiff was allowed to substitute one corporation for another even though service was perfected on wrong affiliated corporation *after* the expiration of the statute of limitation). It cannot be ignored that in both <u>Tanner's Rome</u> and <u>Rich's Inc.</u>, the wrong corporate defendant was actually served with process according to law. This did not happen in this case.

The Court concludes that it does not have personal jurisdiction over Walmart Claims Services, Inc. The Court **DENIES** the Plaintiff's *Motion to Substitute Party Defendant*. The Court **GRANTS** Walmart Claims Services, Inc.'s oral motion to dismiss this action for insufficient service of process. This action therefore stands dismissed as to Walmart Claims Services, Inc.[1]

---

[1] The Court declines to address whether the Plaintiff's claims are time barred as against Walmart, Inc. Walmart, Inc. has not been served in this action and did not appear before the Court on 26 October 2023. Moreover, Walmart Claims Services, Inc. disclaimed that notice to the

It is so ORDERED this $\underline{31}^{\text{st}}$ day of October, 2023.


_____
Jeffrey S. Bagley, Chief Judge
Superior Court of Forsyth County
Bell-Forsyth Judicial Circuit


Distribution List

Original:   Clerk of Court

cc:         Renée E. Taylor, Esq.
            Hung Q. (Alex) Nguyen, Esq.
            Stephen J. Valero, Esq.
            Matthew Hurst, Esq.

_____

former is notice to the later. Nevertheless, the Court acknowledges that
the Plaintiff commenced this lawsuit within the requisite limitations
period. The Court finds that it would not be appropriate to dismiss this
action, as a whole, as other unidentified Defendants remain unserved
and Walmart Claims Services, Inc. only asserted an insufficiency of
service defense at to itself. Cf Rich's, Inc., supra. Accordingly, the
question remains whether Walmart, Inc. can still be served in this case
if proof of corporate affiliation is ultimately proven to satisfy the
requirements of Oconee County, supra. If this issue arises, it will need
to be addressed in a separate proceeding; otherwise, to close this case as
a whole, at this procedural juncture, would be premature.

# EXHIBIT

# I

## First Amended and Recast Complaint

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**23CV-1200-1**

Judge Jeffrey S. Bagley
NOV 01, 2023 12:24 PM

Greg G. Allen, Clerk
Forsyth County, Georgia

## IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| MARIA NISHIJIMA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO.: |
| v. | ) | 23-CV-1200-1 |
| | ) | |
| WALMART INC.,John Doe and | ) | |
| Jane Doe and ABC Corp. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## FIRST AMENDED AND RECAST COMPLAINT

COMES NOW, MARIA NISHIJIMA, hereinafter referred to as "Plaintiff", by and through undersigned counsel, and files this complaint, showing the court as follows:

### PARTIES, VENUE AND JURISDICTION

1.

Plaintiff is a resident of the State of Georgia.

2.

Walmart Inc ("Defendant") is a corporation registered to do business and doing business in the state of Georgia.

3.

Defendant Walmart Inc may be served with process by second original through its registered agent, to wit: THE CORPORATION COMPANY.

4.

Defendants John Doe and Jane Doe are individuals responsible for managing and maintaining the premises involved in the subject incident and are subject to the jurisdiction and venue of this Court. Plaintiff incorporates by reference all claims made in this Complaint against

Walmart Inc ("Defendant") against Defendants John Doe and Jane Doe as well.   Defendants John Doe and Jane Doe will be named and served with the Summons and Complaint once his or her identity is revealed.

5.

Defendants ABC Corp. is an entity that owned, possessed or controlled the premises involved in the subject incident and is subject to the jurisdiction and venue of this Court. Plaintiff incorporates by reference all claims made in this Complaint against Defendant Walmart Inc ("Defendant") against Defendant ABC Corp. as well.   Defendant ABC Corp. will be named and served with the Summons and Complaint once its identity is revealed.

6.

Defendants are subject to the jurisdiction of this Court.

7.

This Court has jurisdiction over the subject matter of this action.

8.

Venue is proper in this Court because Walmart Inc ("Defendant")has an office in and transacts business in FORSYTH County;

**BACKGROUND**

9.

On or about September 22, 2021, Plaintiff was an invitee at the Walmart Inc. ("Defendant") branch located at 630 Collins Hill Rd, Lawrenceville, GA 30046 ("the PREMISES").

10.

Defendant Walmart Inc. ("Defendant") had ownership, possession and control over the PREMISES at all times relevant to this litigation.

11.

Plaintiff was in an open area permitted to patrons of the PREMISES at all relevant times.

12.

Plaintiff was at the PREMISES during normal business hours.

13.

Plaintiff was walking on the PREMISES' concrete walkway.

14.

The walkway was uneven.

15.

Due to the unevenness of the walkway, Plaintiff fell.

16.

Plaintiff suffered serious injury to her ankle as a result of the fall.

17.

Plaintiff incurred medical expenses for treatment of her injuries.

## COUNT I
## NEGLIGENT MAINTENANCE OF PREMISES

18.

Plaintiff re-alleges and adopts all allegations contained in the foregoing paragraphs as if set forth in their entirety herein.

19.

Defendant Walmart Inc. had actual or constructive knowledge of the hazardous condition of the walkway for patrons of the Bank.

20.

Plaintiff had no knowledge of the hazard despite Plaintiff's exercise of ordinary care.

21.

Defendant Walmart Inc's knowledge of the hazardous condition of the premises was superior to that of Plaintiff.

22.

Defendant Walmart Inc. owed a non-delegable duty of reasonable care in keeping the premises safe for invitees such as Plaintiff.

23.

Defendant Walmart Inc. was negligent in failing to properly inspect the walkway.

24.

Defendant Walmart Inc. was negligent in failing to properly maintain the walkway.

25.

Defendant Walmart Inc. was negligent in failing to take adequate measures to protect invitees from the danger of the walkway and in failing to keep the premises safe for invitees.

26.

Defendant Walmart Inc. was negligent in failing to warn Plaintiff of the hazardous condition of the premises.

27.

Defendant Walmart Inc.'S negligence was the proximate cause of Plaintiff's injuries.

## COUNT II
## VICARIOUS LIABILITY

28.

Plaintiff re-alleges and adopts all allegations contained in the foregoing paragraphs as if set forth in their entirety herein.

29.

At all times relevant to this action, the individuals responsible for inspecting and maintaining the area where Plaintiff was injured were employed by Defendant Walmart Inc. and were acting within the scope of their employment.

30.

Defendant Walmart Inc. is responsible for the conduct of these individuals under the doctrine of *respondent superior*, vicarious liability, agency or apparent agency.

## COUNT III

## NEGLIGENT TRAINING & SUPERVISION

31.

Plaintiff re-alleges and adopts all allegations contained in the foregoing paragraphs as if set forth in their entirety herein.

32.

Defendant Walmart Inc was negligent in failing to adopt appropriate policies and procedures to ensure that appropriate inspections and maintenance were performed on the premises and in failing to train its employees and agents concerning safety procedures for inspecting and maintaining the premises.

33.

Defendant Walmart Inc. was negligent in training and supervising its staff and agents.

34.

As a result of Defendant Walmart Inc.'s negligence in training and supervising its employees and agents, Plaintiff was injured on the premises.

**IV.**

**NOTICE OF INTENT TO USE CERTIFIED DOCUMENTS AT TRIAL**

35.

Plaintiff hereby gives notice that Plaintiff intends to offer documents, including, but not limited to, medical records into evidence pursuant to O.C.G.A. § 24-9-902.

**V.**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants in the following particulars:

a) An award of general damages to fully compensate Plaintiff for her past, present and future pain and suffering in an amount to be determined by this Honorable Court;

b) An award of special damages to fully compensate Plaintiff for her past, present and future medical expenses;

c) Process be issued requiring the Defendants to answer according to law;

d) Plaintiff be granted such further and other relief as this Court deems just and proper.

**[SIGNATURE ON FOLLOWING PAGE]**

Respectfully submitted this 1st of <u>November</u>, 2023.

**770GOODLAW, H.Q. ALEX NGUYEN LAW FIRM, LLC.**

<u>/s/ Renée E. Taylor</u>
Stephen J. Valero, Esq.
Georgia Bar No.: 184083
Hung Q. (Alex) Nguyen, Esq.
Georgia Bar No.: 940370
Renée E. Taylor
Georgia Bar No.: 195455
Attorneys for Plaintiff

5495 Jimmy Carter Blvd., Suite B-17
Norcross, GA 30093
(770)409-1529 Office
(770)409-1526 Fax
litigation@770goodlaw.com

# EXHIBIT

# J

## Affidavit of Service

EFILED IN OFFICE
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**23CV-1200-1**

Judge Jeffrey S. Bagley
NOV 07, 2023 09:25 AM

Greg G. Allen, Clerk
Forsyth County, Georgia

## IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

Maria Nishijima,

      Plaintiff(s),                    Case No.: 23-CV-1200-1

vs.

Walmart Inc., John Doe and Jane Doe and ABC Corp.,

      Defendant(s).

_____/

### AFFIDAVIT OF SERVICE

      Personally appeared before me the undersigned officer duly authorized to administer oaths, Rodney McClellan, who, after being duly sworn, deposes and states the following:

1.

      Affiant states that he/she is appointed by this Court to serve process. The statements made are true and correct and are based upon my personal knowledge.

2.

      I served Walmart Inc. with a Summons, First Amended and Recast Complaint, Plaintiff's First Continuing Interrogatories to Defendant, Plaintiff's First Request for Production of Documents to Defendant, and Plaintiff's First Request for Admissions to Defendant by leaving the documents with Dravon Jackson, agent at The Corporation Company, Registered Agent of Walmart Inc. at said person's place of employment/place of business located at 106 Colony Park Drive Ste. 800-B, Cumming, GA 30040 on November 03, 2023 at 10:27 AM.

Signed and sworn to before me on
this _6_ day of _November_, 20_23_
by an affiant who is personally known to me
or produced identification.



**Rodney McClellan**
Express Legal Services LLC
860 Johnson Ferry Rd.
Atlanta, GA 30342
(678) 648-6330

_____
Notary Public

SAVANNAH PALMER
NOTARY
EXPIRES
GEORGIA
September 22, 2026
PUBLIC
FORSYTH COUNTY

[1008494]





*5149157*

# EXHIBIT

# K

## Wal-**Mart, Inc.'s Motion to** Dismiss

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

MARIA NISHIJIMA                          )
                                         )
         Plaintiff,                      )
                                         )        Civil Action File
vs.                                      )        No. 23CV-1200-1
                                         )
WALMART INC., John Doe, Jane Doe, and )
ABC Corp.                                )
                                         )
         Defendants.                     )

## WAL-MART, INC.'S MOTION TO DISMISS

COMES NOW, Wal-Mart, Inc. (hereinafter, "Walmart"), incorrectly identified as Walmart Inc., an improperly joined Defendant in the above-styled Civil action, by and through counsel, moves this Court to dismiss this case. Specifically, Walmart moves for this case to be dismissed on the basis that Walmart, the only "real" and non-fictitious Defendant, has been improperly joined as a Defendant in this matter, and that Plaintiff is unable to prosecute her claims against the fictitious entities.

Respectfully submitted this 01 of December, 2023.

WALDON ADELMAN CASTILLA
MCNAMARA & PROUT

/s/ Matthew J. Hurst
Matthew J. Hurst
Georgia Bar No. 480267
Attorney for Wal-Mart, Inc.

900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(770) 953-1710
mhurst@waldonadelman.com

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

MARIA NISHIJIMA                        )
                                       )
        Plaintiff,                     )
                                       )        Civil Action File
vs.                                    )        No. 23CV-1200-1
                                       )
WALMART INC., John Doe, Jane Doe, and )
ABC Corp.                              )
                                       )
        Defendants.                    )

**BRIEF IN SUPPORT OF WAL-MART, INC.'S MOTION TO DISMISS**

In support of its motion to dismiss, Wal-Mart, Inc. (hereinafter, "Walmart"), incorrectly

identified as Walmart Inc., shows the Court as follows:

On July 26, 2023, Plaintiff filed suit against Walmart Claims Services Inc. in connection

with an incident occurring on September 22, 2021. See Complaint, Attached as Exhibit "A," at

¶9-16. On October 26, 2023, the parties appeared before the Court at a hearing at which they

presented arguments on various issues. On October 31, 2023, the Court issued an Order in which

Walmart Claims Services, Inc.'s oral motion to dismiss was GRANTED. See Order, Attached as

Exhibit "B".

The very next day, November 1, 2023, Plaintiff filed her First Amended and Recast

Complaint, in which she impermissibly added Walmart, Inc. as an additional named Defendant.

Generally, parties are free to amend their pleadings any time prior to the entry of a pre-trial

order. O.C.G.A. § 9-11-15(a). This freedom to amend pleadings is not absolute, and where a

party seeks to add (or drop) a party, they must first obtain leave of Court to do so. See Degussa

Wall Systems, Inc. v. Sharp, 286 Ga. App. 349, 351 (2007) ("In order for an additional party to

be added to an existing suit by amendment pursuant to OCGA § 9–11–15, leave of court *must*

first be sought and obtained pursuant to OCGA § 9–11–21.") (Emphasis in original); Harding v.

Godwin, 238 Ga. App. 432 (1999) certiorari denied; Sargent v. Department of Human Resources, 202 Ga. App. 874 (1992); Aircraft Radio Systems, Inc. v. Von Schlegell, 168 Ga. App. 109 (1983); Horne v. Carswell, 167 Ga. App. 229 (1983). Where Plaintiff, without first obtaining leave of Court, attempts to add a party by amending a Complaint, the amendment is a nullity and is of no effect. See Connie v. Garnett, 360 Ga. App. 24, 25 (2021). Where Plaintiff fails to obtain leave of Court before filing an amended pleading which purportedly joins a new party Defendant, the dismissal of that new Defendant is proper. See Pascoe Steel Corp. v. Turner County Board of Education., 139 Ga. App. 87 (1976).

Here, Walmart Claims Services, Inc. was dismissed due to Plaintiff negligently failing to perfect service. Immediately thereafter, Plaintiff filed her First Amended and Recast Complaint, in which she added Walmart, Inc. as a new party Defendant. Plaintiff's earlier motion to substitute party Defendant evidences that her instant attempt to add Walmart, Inc. is not merely an attempt to remedy a misnomer, but is instead a deliberate attempt to add a party. Plaintiff did not seek (much less obtain) leave of Court to add Walmart, Inc. as a party Defendant. As such, Walmart's motion to dismiss should be granted.

Respectfully submitted this 01 of December, 2023.

WALDON ADELMAN CASTILLA
MCNAMARA & PROUT

/s/ Matthew J. Hurst
Matthew J. Hurst
Georgia Bar No. 480267
Attorney for Wal-Mart, Inc.

900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(770) 953-1710
mhurst@waldonadelman.com

# EXHIBIT

# L

**Plaintiff's Brief in Support of**

Motion to Add Party

Defendant

**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
FORSYTH COUNTY, GEORGIA

**23CV-1200-1**
**Judge Jeffrey S. Bagley**
**DEC 29, 2023 04:14 PM**

Greg G. Allen, Clerk
Forsyth County, Georgia

**IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA**

| | |
|---|---|
| **MARIA NISHIJIMA**, *Plaintiff*, | |
| *v.* | **Civil Action File No**: <u>23-CV-1200-1</u> |
| **WALMART INC.,** **JOHN DOE, JANE DOE, and ABC CORP.,** *Defendants*. | **JURY TRIAL DEMANDED** |

<u>**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO
ADD PARTY DEFENDANT PURSUANT TO O.C.G.A. § 9-11-21**</u>

**COMES NOW**, Maria Nishijima ("Plaintiff") in the above-styled action, by and through undersigned counsel, and files this Brief in Support of Plaintiff's Motion to Add Party Defendant Pursuant to O.C.G.A. § 9-11-21 showing this Court as follows:

<u>**INTRODUCTION**</u>

Defendant Walmart Inc. (hereinafter "Defendant Walmart") has moved to dismiss based on an assertion that Walmart, the only real Defendant has not been properly joined as a Defendant and that Plaintiff is unable to prosecute claims against Defendant Walmart Claims Services, Inc. In response, Plaintiff files this Motion to Add Party Defendant and prays that the Court finds that Walmart Inc. is a proper party to this action and that the claims against Walmart Inc. relate back to the date of the original pleadings pursuant to O.C.G.A. § 9-11-15(c).

<u>**STATEMENT OF FACTS AND PROCEDURAL HISTORY**</u>

This action stems from slip and fall that occurred on September 22, 2021, at a Walmart retail store located on Collins Hill Road in Georgia. The Plaintiff was an invitee on the premises controlled by Walmart Inc.. The Plaintiff slipped and fell on the premises and was significantly injured as a result.

As a result of Plaintiff's injuries, Plaintiff was compelled to file suit, filing the original action on July 26, 2023, in the Superior Court of Forsyth County against Defendants Walmart Claims Service, Inc., John Doe and Jane Doe, and ABC Corp. On August 08, 2023, about a month prior to the expiration of the statute of limitations, Plaintiff attempted service on Walmart Claims Services Inc. through their former registered agent and current registered agent for Walmart, The Corporation Company, at 106 Colony Park Drive, Ste 800-B, Cumming, GA 30040-2794.   In addition, a courtesy copy of the complaint was mailed via certified mail to Walmart Claims Services, Inc. adjuster, Chris Williamson on August 01, 2023, prior to the expiration of the statute of limitations. The green card was stamped accepted on August 18, 2023.  On September 8, 2023, Defendant Walmart Claims Services, Inc. filed an Answer, referring to themselves as "improperly named defendant."

In an attempt to remedy the "improperly named defendant" as raised in the Defendant Walmart Claims Services, Inc. answer, Plaintiff provides the following procedural history (on the record) that has transpired prior to filing of this motion and up until Defendant Walmart's current Motion to Dismiss Plaintiff's Complaint:

(1) On July 26, 2023, Plaintiff filed a Complaint with Defendant, Walmart Claims Service, Inc. (Walmart Claims Services, Inc.) John Doe and Jane Doe, and ABC Corp.

(2) On September 6, 2023, Defendant Walmart Claims Services, Inc. filed and Answer and Jury Trial Demand.

(3) On September 26, 2023, Plaintiff's Motion Substitute Party Defendant for ABC Corp.

(4)     On October 26, 2023, the parties appeared before the Court to present arguments regarding process of service on Walmart Claims Services, Inc.

(5)     On October 31, 2023, the Court issued an Order in which Walmart Claims Services, Inc.'s oral motion to dismiss was granted.

(6)     On November 1, 2023, Plaintiff filed a First Amended and Recast Complaint, pursuant to O.C.G.A. § 9-10-132 for the purpose of correcting Walmart Claims Service, Inc. serving Defendant Walmart with said complaint on November 6, 2023.

(7)     On December 1, 2023, Defendant Walmart responded to Plaintiff's Motion asserting that Plaintiff was attempting to add an entirely new party to the action.

## ARGUMENT AND CITATION OF AUTHORITY

Plaintiff Maria Nishijima, by and through undersigned counsel and pursuant to O.C.G.A. §§ 9-11-15 and 9-11-21, seeks an Order from this Court permitting the Plaintiff to add Walmart Inc. as a party to this action.

Because all of the requirements of O.C.G.A. § 9-11-15 and *Oconee County v. Cannon* are met this Court should permit the Plaintiff to add Walmart Inc. to this action. *Oconee Cty. v. Cannon*, 310 Ga. 728, 854 S.E.2d 531 (2021).

**A.**     **Plaintiff Should be Permitted to Add Walmart Inc. by Motion and the Pleadings Should Relate Back to the Date of the Original Pleading**

Pursuant to O.C.G.A. § 9-11-21 "[p]arties may be dropped or added by order of the Court on motion of any party or of its own initiative at any stage of the action and on such terms as are just." GA Code § 9-11-21 (2021). However, when such a motion is made after the statute of limitations, the relation-back statute, O.C.G.A. § 9-11-15(c) will also apply. O.C.G.A. § 9-11-15(c) "should be liberally construed to effect its purpose of ameliorating the impact of the statute of limitations" *Hunter v. Emory-Adventist, Inc.*, 323 Ga. App. 537, 542 (2013) citing *Herndon v. Heard*, 262 Ga. App. 334, 337 (2003). "O.C.G.A. § 9-11-15(c) applies to motions to add a party as well as to substitute a party." *Fontaine v. Home Depot, Inc.*, 250 GA. App. 123, 124 (2001). O.C.G.A. § 9-11-15(c) provides the following:

> **Relation back of amendments**. Whenever the claim or defense asserted in the amended pleading arises out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back to the date of the original pleadings if the foregoing provisions are satisfied, and if within the period provided by law for commencing the action against him the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him.

In *Oconee County v. Cannon*, the Supreme Court held that the application of the relation back doctrine, O.C.G.A. § 9-11-15(c), "depends on whether the proper defendant knew or should have known that the action would have been brought against him but for the plaintiff's mistake not on what the plaintiff knew or should have known and not on whether the plaintiff's mistake was legal or factual." *Oconee Cty.*, supra at 854. Additionally, under O.C.G.A. § 9-11-15(c), when determining if a plaintiff can add a party

after a claim would otherwise be barred by the statute of limitations, the Supreme Court

provides that three conditions must be met:

> (1)  the claim "arises out of the conduct, transaction, or occurrence set forth …
> in the original pleading,"
>
> (2)  the proposed defendant, before the statute of limitations expired, "received
> such notice of the institution of the action that he will not be prejudiced in
> maintaining his defense on the merits,"
>
> (3)  the proposed defendant, before the statute of limitations expired, "knew or
> should have known that, but for a mistake concerning the identity of the
> proper party, the action would have been brought against him."

*Id*. at 733.

Plaintiff's cause of action meets all three conditions under O.C.G.A. § 9-11-15(c)

where this addition relates back to the date of the original pleading and is not barred by the

statute of limitations as discussed below.

### A.   Plaintiff's Claim against Walmart Inc. "Arises Out of the Conduct, Transaction, or Occurrence Set Forth … in the Original Pleading."

As evidenced by Plaintiff's Amended Complaint. The claims that were initially asserted

against Walmart Claims Services Inc. are now being asserted against Walmart Inc. The facts

asserted in the original pleading are the same facts that form the basis for Plaintiff's claim against

Walmart Inc. Therefore, the first requirement is meant as there is no modification at all of the claim

being asserted as it arises out of the same slip and fall and injuries as the original pleading.

### B.   Before the Statute of Limitations Expired, Walmart Inc. "Received Such Notice of the Institution of the Action [and Walmart Inc.] Will Not Be Prejudiced in Maintaining [Walmart Inc.]'s Defense on the Merits."

Service of Process is not the only method by which the notice requirement of O.C.G.A. §

9-11-15(c) can be satisfied. *See McNeil v. McCollum*, 276 Ga. App. 882, 886-87 (2005) (holding

that two letters mailed to the Defendant and its insurance carrier prior to the expiration statute of

5

limitations satisfied the notice requirement of O.C.G.A. § 9-11-15(c) and thus the trial court properly denied that Defendants' motion contending the claims against them were time barred). Additionally, Notice can be found under O.C.G.A. § 9-11-15(c) where a company that is significantly intertwined with the proper party receives notice of the initiation of a lawsuit. *See Leary v. Perdue Farms, Inc.*, 359 Ga. App. 123, 123, 127-28 (2021) (holding that the notice requirement of O.C.G.A. § 9-11-15(c) was met where the actual party to the suit and the proper party shared a principle office address and registered agent, and a shared insurance adjuster for the proper party and the actual party to the lawsuit sought information about the lawsuit from Plaintiff, which illustrated actual knowledge of the lawsuit's initiation); *Fontaine*, supra at 126 (holding when corporations are intertwined notice upon one can sufficiently affect notice upon the other and the prejudice that would have otherwise existed does not). Notice as contemplated by the statute is notice of the institution of the action, and not notice of the incident which gave rise to the action. *See Harrison v. Golden*, 219 Ga. App. 772, 773 (1995). Furthermore, the prejudice to a party that the statute of limitations attempts to ameliorate does not exist when a sufficiently intertwined party has received notice of the initiation of the lawsuit within the statute of limitations. *See Fontaine*, supra at 125-26 (holding that there must be prejudice not merely the passage of time to find an amendment changing the party against which a claim is asserted improper).

Here, Plaintiff provided notice of the lawsuit to Walmart Inc. prior to the expiration of the statute of limitations by providing notice to the sufficiently intertwined party Walmart Claims Services, Inc. (hereinafter "Walmart Claims Services"). Plaintiff slipped and fell at a Walmart supermarket on September 22, 2021. Plaintiff retained counsel shortly after the fall, and in response to Plaintiff's counsel's letter of representation Walmart Claims Services began communicating with counsel. *See* November 18, 2021, letter from Walmart Claims Services

attached hereto as Exhibit A. In this letter, Walmart Claims Services states that they have "administered retail customer injury and property damage claims for Walmart and its related companies and their insurance companies since 1993." *See* Exhibit A[1].  Walmart Claims Services again makes this statement on letters to Plaintiff's counsel dated June 30, 2022, and February 28, 2023. *See* June 30, 2022, and February 28, 2023, letters from Walmart Claims Services attached hereto as Exhibit B. On July 13, 2023, Walmart Claims Services denies Plaintiff's claim, makes a formal request for a courtesy copy of the file stamped complaint, and states that it "administers claims on the behalf of the Walmart family of brands and their insurers." *See* July 13, 2023, letter from Walmart Claims Services attached hereto as Exhibit C.[2] On Walmart Inc.'s annual report for 2023 to their shareholders they state that "the Company self-insures a number of a number of risks including . . . general liability . . . ." *See* Walmart Inc.'s annual report attached hereto as Exhibit E at 62, available online at   https://corporate.walmart.com/content/dam/corporate/documents/ esgreport/reporting-data/tcfd/walmart-inc-2023-annual-report.pdf.

Moreover, Walmart Claims Services and Walmart Inc. share a principal business address, and have shared a registered agent at numerous points in the past and present. Walmart Claims Services initially registered with the Georgia Secretary of State in 2001. *See* Certified Business Records for Walmart Claims Services attached hereto as Exhibit F. Walmart Inc. originally registered with the Georgia Secretary of State in 1999. *See* Certified Business Records for Walmart Inc. attached hereto as Exhibit G. From 2001 to 2016, Walmart Claims Services and Walmart Inc.

---

[1] In this letter Walmart Claims Services makes their first request for a courtesy copy of a lawsuit in the event that one is initiated. Exhibit A.

[2] Additionally, of note is the fact that every single one of the letters contained in Plaintiff's Exhibits A-C contain the email address of the handling representative from Walmart Claims Service and every single email address ends in "@walmart.com." Plaintiff's counsel's office corresponded via email with at least one of the representatives, and did receive a response. *See* July 12, 2023, email from Chris Williamson attached hereto as Exhibit D.

shared a principal address location, with a brief departure in 2016, and 2018. *See* Exhibit F and Exhibit G. Additionally, the entities shared the same principal address in 2017, and from 2019 to 2022, when Walmart Claims Services withdrew from Georgia. *See id.* For all available records until Walmart Claims Services reregistered with the Georgia Secretary of State, the entities shared a registered agent for the following years:

> 2001-2003: Csc of Gwinnett; Corporation Service Company[3];
>
> 2004: CT Corporation System, and Corporation Process Company[4];
>
> 2007-2017: Corporation Process Company;
>
> 2019-2022: The Corporation Company.

*See id.*

Finally, both companies used the same authorized signer on their annual registrations in 2007, 2011 through 2022. *See id.* In 2007, both companies had the signature of one Claire Babineux-Fontenot as their authorized signature on their annual registration filings. *Id.* From 2011 to 2022, both companies had the signatures of Michelle Donato, and Kelly Lettmann both representatives from Wolters Kluwer, as indicated by their email addresses. *Id.* Furthermore, in 2011, the first year that either company listed an email address for the filer of their annual registrations, both companies listed state.compliance@wal-mart.com as the email address for their filer. *Id.* Also of note, after Plaintiff attempted service on Walmart Claims Services and received a rejection of said service, the watermark of Wolters Kluwer is clearly visible on top of the rejection. *See* Exhibit H.

---

[3] Although the names listed on the annual registration are different, the two share the same address of 4845 Jimmy Carter Blvd., Norcross, GA 30093. *See* Exhibit F and Exhibit G.
[4] Both entities switched their registered agents between the two entities listed in 2004. *See id.*

Walmart Claims Services withdrew its registration in 2022, but then reregistered in 2023. *See* Exhibit F; Business Records of Walmart Claims Services 2023 attached hereto as Exhibit I. On Walmart Claims Services newest filing, although the authorized signer and registered agent are now different, the principal address remains the same as Walmart Inc. *See* Exhibit F and Exhibit I.[5]

There are several other indications that two companies are sufficiently intertwined found in their websites. Walmart Claims Services operates a website at the URL www.walmartclaimsservices.com. The domain for www.walmartclaimsservices.com was set up by Wal-Mart Stores Inc. the former name of Walmart Inc. *See* screen shot of walmartclaimsservices.com and domain record information attached hereto as Exhibit J; *see also* Exhibit G. Additionally, the privacy notice for Walmart Claims Services appears on corporate.walmart.com, this website also contains, under the leadership tab, the corporate officers for Walmart inc. listed on their most recent annual registration with the Georgia Secretary of State. *See* screen shots of corporate.walmart.com attached hereto as Exhibit K; *see also* Exhibit G. Walmart also lists Case Manager-Claims as a position for which it is hiring on its website. *See* Job listing for Case Manager-Claims on Walmart Inc.'s website attached hereto as Exhibit L, available online at https://careers.walmart.com/us/jobs/WD1555650-case-manager-claims.

Plaintiff filed suit on July 26, 2023, and the statute of limitations ran on September 22, 2023. *See* Plaintiff's Complaint attached hereto as Exhibit M. Plaintiff attempted service on

---

[5]  Plaintiff notes for the Court that after Plaintiff attempted service in this matter on Walmart Claims Services, Plaintiff received a rejection of service from CT Corporation. Plaintiff attempted service on the Corporation Company, which was the last registered agent for Walmart Claims Services, and not on CT Corporation. Due to this fact Plaintiff is skeptical that the Corporation Company (Walmart Inc.'s current registered agent) and CT Corporation (Walmart Claims Services' registered agent as of 2023) are actually different entities. *See* Exhibit H.

Walmart Claims Services on August 7, 2023, this Court has since found that service to be invalid. On August 1, 2023, Plaintiff mailed a copy of the complaint and summons in this action to Walmart Claims Services, exactly in the manner its representatives requested, via certified mail, receiving a green card in return indicating delivery occurred on August 18, 2023. *See* Mailed courtesy copy to Walmart Claims Services and associated green card attached hereto as Exhibit N. Moreover, after filing the amended complaint in this action, that complaint along with discovery requests were served upon Walmart Inc. on November 6, 2023. *See* Affidavit of Service attached hereto as Exhibit O.

a. **Plaintiff's Delivery of a Courtesy Copy was Actual Notice and the Lack of Formal Service of Process is Not Dispositive**

As in *McNeil*, Plaintiff did not serve the proper party to the action, Walmart Inc., prior to the expiration of the statute of limitations on September 22, 2023, however she did deliver a copy of the complaint and summons to Walmart Claims Services on August 18, 2023. *See McNeil*, supra at 887. *McNeil* stands for the proposition that actual notice of the suit and not formal service of process is sufficient for purposes of satisfying O.C.G.A. § 9-11-15(c)'s notice requirement. *See id.* Plaintiff in this case did notify Walmart Claims Services of the complaint prior to the statute of limitations expiration by providing a copy of the summons and complaint, and Walmart Claims Services, as Plaintiff will address below, is sufficiently intertwined with Walmart Inc. and the Court should rule that notice to one is in fact notice on the other.

b. **Walmart Claims Services and Walmart Inc. are sufficiently intertwined so as to find that notice given to one is notice given to the other.**

The case at hand is similar to the factual scenario presented by *Leary v. Purdue Farms, Inc.*, there Perdue Farms, Inc. was the named and served defendant and the plaintiff sought to amend his complaint to substitute Perdue Foods, LLC. *Leary*, supra at 123. Leary sought to amend

his complaint on March 31, 2020, when the statute of limitations expired on November 2, 2019. *See id.* at 124. The Court of Appeals, reviewing the trial court's denial of the motion to amend, held that the fact that Perdue Farms, Inc. and Perdue Foods, LLC shared a registered agent, principal office address, and that was enough to raise an inference that the two entities were intertwined. *See id.* at 127-28. The Court of Appeals also considered a letter sent to the Leary from a claims adjuster with Broadspire Services, Inc. seeking information about the suit and stating that Broadspire was the claims administrator for Perdue Farms and its subsidiaries to be strong evidence that the two corporations were intertwined. *See id.* at 124, 127-28. The Court of Appeals held that this evidence cumulatively was enough to show that the Perdue Foods had knowledge of the suit and would not be prejudiced on the merits.  *See id.* at 128.

Here, Plaintiff, as discussed above, provided actual notice to Walmart Claims Services of the filing of the complaint. *See* Exhibit N. Walmart Claims Services and Walmart Inc. share more than just a principal office address and registered agent. Walmart Claims Services holds itself out as having "administered retail customer injury and property damage claims for Walmart and its related companies and their insurance companies since 1993." Exhibit A.  This is the first indicator that the two corporations are closely linked and demonstrates the likelihood that Walmart Claims Services is a subsidiary of the larger Walmart Inc. As discussed above the two entities have shared a principal office address for at least 21 (twenty-one) years based on their filings with the Georgia Secretary of State. *See* Exhibit F and Exhibit G. The two entities have shared a registered agent for at least 18 (eighteen) years based on their filings with the Georgia Secretary of State. *See* id. Finally, the same individual has signed their annual registrations with the Georgia Secretary of State at least 12 (twelve) years. *See id.* As outlined above, the companies are thoroughly

interconnected through their websites as well. *See* Exhibit J; Exhibit K; and Exhibit L. The companies have also shared counsel in the instant action.

As in *Leary*, where Perdue Farms, Inc., and Perdue Foods, LLC were found to be sufficiently connected, the connection between Walmart Inc. and Walmart Claims Services are numerous and demonstrate that Walmart Inc. had knowledge of the lawsuit before the statute of limitations expired. Hence, Walmart Inc. will not be prejudiced by maintaining a defense on the merits because they have been aware since at least August 18, 2023, of the lawsuit's initiation. Therefore, Plaintiff submits that this Court should find that the notice of the lawsuit sent by way of certified mail to Walmart Claims Services was sufficient to satisfy the notice requirement of O.C.G.A. § 9-11-15(c).

> **c.   The litigation history of Walmart Claims Services and Walmart Inc. reflects their close relationship.**

The relationship between Walmart, Inc. and Walmart Claims Services, Inc. has been a frequent source of confusion in the courts. The Walmart entities' response when such confusion has arisen speaks to how deeply the two are intertwined.

Where the two entities have been sued together, they have filed a single, joint answer and otherwise responded as a unit. See, e.g., *Lowe, Lynn v. Walmart Claims Services, Inc*., Case 3:21-cv-00214, W.D.Wisc (2021); (docket available at https://ecf.wiwd.uscourts.gov/cgi-bin/DktRpt.pl?47418; docket sheet, original complaint, Doc. 1-1, and answer, Doc. 2, attached as Exhibits P, Q, and R, respectively); *Rose v. Walmart Claims Services, Inc.*, Case 1:23-cv-00044, S.D.Ala. (Docket available at https://ecf.alsd.uscourts.gov/cgi-bin/DktRpt.pl?71373; docket sheet, original complaint, Doc. 1-2, and answer, Doc. 2, attached as Exhibits S, T, and U, respectively).

Where, as here, only Walmart Claims Services has been named as a defendant, it has repeatedly appeared and litigated the case as though it were its parent company.

In *Pinero v. Walmart Claims Services*, the plaintiff brought a premises liability claim in Florida state court for an injury occurring in a Walmart store. Case No. 1:21-cv-23458, S.D.Fl. (2021) (Docket available at https://ecf.flsd.uscourts.gov/cgi-bin/DktRpt.pl?600788; docket sheet and original complaint, Doc. 1-1, attached as Exhibit V and W, respectively). Walmart Claims Services was the sole defendant. Following the case's removal to federal court, Walmart Claims Services filed an answer, identifying itself as "Walmart Claims Services, Inc. ('Wal-Mart')". *Pinero* Doc. 6, at 1 (attached as Exhibit X). Walmart Claims Services litigated the case through mediation (see *Pinero* Doc. 34, attached as Exhibit Y), summary judgment motions (*Pinero* Doc. 38, attached as Exhibit Z), and settlement (*Pinero* Doc. 65, attached as Exhibit AA) as though it was its parent entity.

Walmart Claims Services did likewise in another premises liability case, *Grant v. Walmart Claims Services, Inc.*. Case No. 2:22-cv-00428, E.D.Wisc. (2022) (Docket available at https://ecf.wied.uscourts.gov/cgi-bin/DktRpt.pl?98722; docket sheet and original complaint, Doc. 1-1, attached as Exhibits BB and CC, respectively). In *Grant*, as in *Pinero*, Walmart Claims Services was the sole named defendant. After removing the case from Wisconsin state court, Walmart Claims Services filed a corporate disclosure statement pursuant to Fed. R. Civ. P. 7.1. (*Grant* Doc. 2, attached as Exhibit DD). In its disclosure, Walmart Claims Services alleges that it was "incorrectly identified as Walmart Claims Services, Inc." and that "[t]he correct name of Defendant in this matter is Walmart, Inc.". Nowhere, however, did Walmart Claims Services claim to be the incorrect *party*—it merely informed the court that it was incorrectly *named*. Aside from this claim of misnomer, Walmart Claims Services raised no other objections to its corporate identity, continuing to litigate the case as "Walmart Claims Services, Inc." for more than a year. When the matter settled, Walmart Claims Services' counsel signed the stipulation of dismissal,

identifying itself as "Attorney for Defendants [sic], Walmart Claims Services, Inc." (*Grant* Doc. 28, at 2, attached as Exhibit EE).

In *Williams v. Walmart Claims Services Inc.*, Walmart Claims Services once again found itself the sole named defendant in a premises liability case. Case 2:21-cv-00580, E.D.Wisc. (2021) (Docket available at https://ecf.wied.uscourts.gov/cgi-bin/DktRpt.pl?94857; docket sheet and original complaint, Doc. 1-1, attached as Exhibits FF and GG, respectively). As before, Walmart Claims Services litigated the case as though it were the parent company, ultimately filing a stipulation of dismissal signed by "Attorneys for Defendants, Walmart Claims Services, Inc.". (*Williams* Doc. 7, attached as Exhibit HH).

In prior litigation, Walmart Claims Services, Inc. and Walmart, Inc. have acted in close concert. At times the former has gone so far as to simply assume the role of the latter. Given deeply entangled relationship, notice to one should be imputed to the other.

      **C.**    <u>**Walmart Inc. Knew or Should Have Known Before the Statute of Limitations Expired that Plaintiff Would Have Brought the Subject Litigation Against Walmart Inc. But For Plaintiff's Mistake Concerning the Identity of the Proper Party**</u>

For the third condition of the aforementioned test, there must be two inquiries made, as follows: (1) whether the Plaintiff made a mistake concerning the identity of the proper party, and (2) whether Defendant knew or should have been known before the statute of limitations expired that he would have been named as the Defendant in the original lawsuit but for the Plaintiff's mistake. *Oconee Cty.*, supra at 736. With regards to the third condition, in *Oconee Cty.*, the Supreme Court emphasized that "both legal and factual mistakes can be mistakes concerning the identity of the proper party." *Id*.  The Supreme Court also made clear that the "most natural reading of O.C.G.A. § 9-11-15(c)(2) *emphasizes the extent of the defendant's knowledge, not the nature of the plaintiff's mistake*[.]" *Id.* at 731.

Here, neither Party can deny that Plaintiff made a mistake concerning the identity of the proper party because Walmart Inc., and its predecessor in this action Walmart Claims Services, have made motions to dismiss using that fact in support of its motions. Additionally, it does not matter whether Plaintiff made a legal or factual mistake concerning the identity of the proper party, it is critical just that Plaintiff actually made a mistake. Plaintiff did not commence this litigation against Walmart Claims Services as some strategic maneuver; Plaintiff did so because Plaintiff originally believed that Walmart Claims Services was the proper name, not knowing originally that Walmart Inc. was in fact in control of the premises. Nevertheless, but for Plaintiff's mistake, an intertwined corporation, Walmart Claims Services, was provided with notice before the expiration of the statute of limitations. Accordingly, if Walmart Inc. knows that Walmart Claims Services controls no retail stores and that it itself controls many, it should have undoubtedly knew, not just should have known, that Walmart Inc. would have been named in the original lawsuit had Plaintiff known the correct name.

Therefore, the Plaintiff for the reasons above respectfully requests that the Court in the alternative grant Plaintiff's Motion to Add a Party Defendant.

## **CONCLUSION**

For the foregoing reasons, Plaintiff prays that this Court grants this Motion to Add Walmart Inc. as a Party Defendant and for an Order stating that the claims against Walmart Inc. relate back to the date of the original pleadings.

Respectfully submitted this December 29, 2023.

15

**H.Q. ALEX NGUYEN LAW FIRM, LLC**
**770-GOOD-LAW**

/s/Hung Q. Nguyen

5495 Jimmy Carter Boulevard, Suite B-17
Norcross, Georgia 30093

Hung Q. Nguyen
Georgia Bar No. 940370
litigation@770goodlaw.com

(770) 409-1529  PHONE
(770) 409-1526  FAX

*Attorney for Plaintiff*

# EXHIBIT

# M

Email from Attorney for Defendant Walmart Inc.

**Alex Nguyen**

| | |
|---|---|
| **From:** | Matt Hurst <mhurst@WaldonAdelman.com> |
| **Sent:** | Thursday, January 4, 2024 5:30 PM |
| **To:** | Alex Nguyen |
| **Subject:** | 'EXTERNAL'Nishijima v. Walmart |

[You don't often get email from mhurst@waldonadelman.com. Learn why this is important at https://aka.ms/LearnAboutSenderIdentification ]

Caution: External Email

Alex,

Hope you are doing well and that you had a good holiday break. If you have a chance, give me a call tomorrow so that we can discuss this case. I think that between the two of us we might be able to figure out a way to move this thing towards the merits, a little bit faster than having the court weeded through every motion and opposition.

Thanks.
Sent from my iPhone

# EXHIBIT

# N

## Consent Stipulation and Agreement

FORSYTH COUNTY, GEORGIA
FILED IN THIS OFFICE
2/5/2024 3:00 PM
GREG G. ALLEN
CLERK OF THE SUPERIOR COURTS
23CV-1200-1
JUDGE Bagley, Jeffrey S.

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| MARIA NISHIJIMA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File |
| vs. | ) | No. 23CV-1200-1 |
| | ) | |
| John Doe, Jane Doe, and ABC Corp. | ) | |
| | ) | |
| Defendants. | ) | |

## CONSENT STIPULATION AND AGREEMENT

COMES NOW, Plaintiff Maria Nishijima and Non-Party Walmart, Inc., by and through their respective counsel of record, and file this Consent Stipulation and Agreement regarding Plaintiff's pending motion to add Walmart, Inc. as a party Defendant.

WHEREBY, Plaintiff and Walmart, Inc. have consented to Walmart, Inc. being added as a party Defendant per the below specified terms:

1.

In being added as a party Defendant, Walmart, Inc. reserves the right to raise all defenses that could otherwise be raised other than the defenses of lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of service of process.

2.

Plaintiff consents and agrees that Plaintiff's recovery in this matter may not exceed Five Hundred Fifty Thousand and 00/100 Dollars ($550,000.00). Plaintiff consents and agrees that if a verdict or award is returned which exceeds $550,000.00, the verdict or award will be reduced to $550,000.00.

Respectfully submitted this 05 of February, 2024.

**[SIGNATURES ON NEXT PAGE]**

Consented to by:

/s/ Matthew J. Hurst
Matthew J. Hurst, Esq.
Georgia Bar No. 480267
WALDON ADELMAN CASTILLA
MCNAMARA & PROUT
900 Circle 75 Pkwy, Suite 1040
Atlanta, GA 30339
(770) 675-8478
mhurst@waldonadelman.com
Attorney for Walmart, Inc.

/s/  Renee Taylor
Hung Q. Nguyen, Esq.
(State Bar No.  940370)
Stephen J. Valero, Esq,
(State Bar No.  184083)
Renée E. Taylor, Esq.
(State Bar No.  195455)
[Signed with express permission by MJH]
770Goodlaw, H.Q. Alex Nguyen Law Firm,
LLC.
5495 Jimmy Carter Blvd.
Suite B-17
Norcross, GA  30093
(770) 409-1529
steve@770goodlaw.com
alex@770goodlaw.com
renee@770goodlaw.com
Attorneys for Plaintiff

# EXHIBIT

# O

# Withdrawal of Wal-**Mart, Inc.'s** Motion to Dismiss

FORSYTH COUNTY, GEORGIA
FILED IN THIS OFFICE
2/5/2024 4:12 PM
GREG G. ALLEN
CLERK OF THE SUPERIOR COURTS
23CV-1200-1
JUDGE Bagley, Jeffrey S.

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

| | | |
|---|---|---|
| MARIA NISHIJIMA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File |
| vs. | ) | No. 23CV-1200-1 |
| | ) | |
| John Doe, Jane Doe, and ABC Corp. | ) | |
| | ) | |
| Defendants. | ) | |

## **WITHDRAWAL OF WAL-MART, INC.'S MOTION TO DISMISS**

COMES NOW, Wal-Mart, Inc. (hereinafter, "Walmart"), and hereby withdraws its December 1, 2023, Motion to Dismiss.

This <u>05</u> of February, 2024.

WALDON ADELMAN CASTILLA
MCNAMARA & PROUT

<u>/s/ Matthew J. Hurst</u>
Matthew J. Hurst
Georgia Bar No. 480267
Attorney for Wal-Mart, Inc.

900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(770) 953-1710
mhurst@waldonadelman.com

# EXHIBIT

# P

## Order

FORSYTH COUNTY, GEORGIA
FILED IN THIS OFFICE
2/22/2024 11:23 AM
GREG G. ALLEN
CLERK OF THE SUPERIOR COURTS
23CV-1200-1
JUDGE Bagley, Jeffrey S.

# IN THE SUPERIOR COURT OF FORSYTH COUNTY
## STATE OF GEORGIA

----------------------------------------------X

MARIA NISHIJIMA,                    :        CIVIL ACTION
                                    :        FILE NO.:  23CV-1200-1
      Plaintiff,                    :
                                    :
    v.                                :
                                    :
JOHN DOE; JANE DOE;                 :
and ABC CORP.                       :
                                    :
      Defendants.                  :

----------------------------------------------X

## <u>ORDER</u>

Pursuant to *Consent Stipulation and Agreement* filed 5 February 2024, the Court hereby adds Walmart, Inc. as a party-defendant. The Clerk of Court shall amend the style of this action as follows:

----------------------------------------------X

MARIA NISHIJIMA,                    :        CIVIL ACTION
                                    :        FILE NO.:  23CV-1200-1
      Plaintiff,                    :
                                    :
    v.                                :
                                    :
WALMART, INC., JOHN DOE;            :
JANE DOE and ABC CORP.              :
                                    :
      Defendants.                  :

----------------------------------------------X

It is so ORDERED this 21ˢᵗ of February, 2024, *nunc pro tunc* to 5 February 2024.

_____
Jeffrey S. Bagley, Chief Judge
Superior Court of Forsyth County
Bell-Forsyth Judicial Circuit

Distribution List

Original:   Clerk of Court

cc:         Renee E. Taylor, Esq.
            Matthew Hurst, Esq.

# EXHIBIT

# Q

## Wal-**Mart Inc.'s Answer and** Jury Trial Demand

FORSYTH COUNTY, GEORGIA
FILED IN THIS OFFICE
2/22/2024 3:58 PM
GREG G. ALLEN
CLERK OF THE SUPERIOR COURTS
23CV-1200-1
JUDGE Bagley, Jeffrey S.

IN THE SUPERIOR COURT OF FORSYTH COUNTY
STATE OF GEORGIA

MARIA NISHIJIMA                      )
                                     )
    Plaintiff,                       )
                                     )          Civil Action File
vs.                                  )          No. 23CV-1200-1
                                     )
WALMART INC., John Doe,              )
Jane Doe, and ABC Corp.              )
                                     )
    Defendants.                      )

## WAL-MART INC.'S ANSWER AND JURY TRIAL DEMAND

COMES NOW, Wal-Mart Inc. (hereinafter, "Walmart"), by and through counsel of record, files this Answer to Plaintiff's First Amended and Recast Complaint and shows as follows:

### FIRST DEFENSE

Plaintiff's claims are barred by the expiration of the statute of limitations.

### SECOND DEFENSE

Plaintiff has failed to specifically state items of special damages sought in this action pursuant to O.C.G.A. § 9-11-9(g).

### THIRD DEFENSE

Plaintiff fails to state a claim upon which relief can be granted for attorney's fees and expenses of litigation.

### FOURTH DEFENSE

Plaintiff fails to state a claim upon which relief can be granted for punitive damages.

### FIFTH DEFENSE

Plaintiff's claims are barred by her assumption of the risk.

### SIXTH DEFENSE

Plaintiff's claims are barred due to her contributory and/or comparative negligence.

## SEVENTH DEFENSE

Responding to the specific allegations of the numbered paragraphs of Plaintiff's Complaint, Walmart answers:

1.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

2.

Walmart admits the allegations contained within this paragraph of Plaintiff's Complaint.

3.

Walmart admits the allegations contained within this paragraph of Plaintiff's Complaint.

4.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

5.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

6.

Walmart admits the allegations contained within this paragraph of Plaintiff's Complaint.

7.

Walmart admits the allegations contained within this paragraph of Plaintiff's Complaint.

8.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint as stated.

9.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

10.

Walmart admits the allegations contained within this paragraph of Plaintiff's Complaint.

11.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

12.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

13.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

14.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

15.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

16.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

17.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

18.

Walmart adopts, and incorporates by reference, all preceding paragraphs.

19.

Defendant denies the allegations contained within this paragraph of Plaintiff's Complaint.

20.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

21.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

22.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint as stated.

23.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

24.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

25.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

26.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

27.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

28.

Walmart adopts, and incorporates by reference, all preceding paragraphs.

29.

Walmart is without knowledge sufficient to admit or deny the allegations contained within this paragraph of Plaintiff's Complaint.

30.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

31.

Walmart adopts, and incorporates by reference, all preceding paragraphs.

32.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

33.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

34.

Walmart denies the allegations contained within this paragraph of Plaintiff's Complaint.

35.

This paragraph of Plaintiff's Complaint contains a statement to which no response is required. To the extent a response is required, Walmart denies the allegations contained therein.

36.

Any allegation, language, or paragraph of Plaintiff's Complaint not hereinbefore responded to is specifically denied by Walmart.

WHEREFORE, having fully answered Plaintiff's complaint, Walmart prays:

a) that Plaintiff's Complaint be dismissed;

b) that Walmart has judgment in its favor;

c) that Walmart has a trial by jury of twelve persons; and

d) that Walmart has all other proper relief.

This 22 day of February, 2024.

WALDON ADELMAN CASTILLA
MCNAMARA & PROUT

/s/ Matthew J. Hurst
Matthew J. Hurst
Georgia Bar No. 480267
Attorney for Wal-Mart Inc.

900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(770) 953-1710
mhurst@waldonadelman.com

# EXHIBIT

# R

November 18, 2021, letter
from Walmart Claims Services



November 18, 2021


|Catherine Bruce
Law Office of Hung Q. Nguyen & Associates, LLC
5495 Jimmy Carter Blvd. Suite B 17
Norcross, GA  30093|


RE:          Maria Vargas
File Number:   9748463
Date of Loss:   09/22/2021
Facility #:     548
Entity Name:   Walmart Inc.

Dear Ms.  Bruce:

Walmart Claims Services (WCS) has administered retail customer injury and property damage claims for Walmart and its related companies and their insurance companies since 1993. Our company believes in treating customers fairly and in providing excellent customer service. We have been informed that you represent the customer referenced above in a liability claim against one of the Walmart family of retail brands.

Our investigation of this claim is currently ongoing. As part of that investigation, I would like the opportunity to conduct a recorded interview via telephone conference call with your client, yourself, and Walmart Claims Services on the line. This interview is an important part of our investigation.  Please contact your client and determine a mutually agreeable time for the telephone interview. Because our investigation is time sensitive, please respond to this request within seven (7) business days of receiving this letter.  If you are unable to agree to my request for a phone interview, please notify me.

Also, please inform us if your client is eligible for, or a recipient of: Medicare, Medicaid, or Tri-Care at your earliest convenience.  Additionally, I want to inform you that if a decision to make payment arises, our settlement release will include a confidentiality clause from both the customer and the customer's attorney.

If we are unable to resolve the matter and your client wishes to pursue the matter in court, we request that a courtesy copy of the complaint be sent to our attention.

If you have any questions concerning this matter, please feel free to contact me.  Thank you for your assistance with our investigation.

Sincerely,


**Kristyn Smith** - *Case Manager I*
Phone: 800-527-0566+57784
Fax: 877-219-0742
Email: Kristyn.Smith@walmart.com


**Walmart Claims Services, Inc.** - P. O. Box 14731, Lexington,  KY  – 40512-4731

*Walmart Claims Services, Inc. is the administrator for the Walmart family of brands and for certain insurers, including: Walmart Inc..*

# EXHIBIT

# S

June 30, 2022, and February 28, 2023, letters from Walmart Claims Services



# Walmart Claims Services

February 28, 2023

|Catherine Bruce
Law Office of Hung Q. Nguyen & Associates, LLC
5495 Jimmy Carter Blvd. Suite B 17
Norcross, GA  30093|

RE:             Maria Vargas
File #:          9748463
Date of Loss:    09/22/2021
Facility #:       548
Entity Name:    Walmart Inc.

Dear Catherine:

Walmart Claims Services (WCS) has administered retail customer injury and property damage claims for Walmart and its related companies and their insurance companies since 1993. Our company believes in treating customers fairly and in providing excellent customer service. We have been informed that you represent the customer referenced above in a liability claim against one of the Walmart family of retail brands.

The above referenced file has been transferred to me. In order to move forward to resolve this claim in a timely manner, I would like to speak with you at your earliest convenience.

Thank you for your cooperation and assistance in bringing this matter to a close.

Sincerely,

Christine Williamson - Case Manager III
Phone: 800-527-0566+57987
Fax: 877-219-0742
Email: Chris.Williamson@walmart.com

---



**Walmart** Claims Services

June 30, 2022


|Catherine Bruce
Law Office of Hung Q. Nguyen & Associates, LLC
5495 Jimmy Carter Blvd. Suite B 17
Norcross, GA  30093|


RE:            Maria Vargas
File #:        9748463
Date of Loss:  09/22/2021
Facility #:    548
Entity Name:   Walmart Inc.

Dear Ms. Bruce:

Walmart Claims Services (WCS) has administered retail customer injury and property damage claims for Walmart and its related companies and their insurance companies since 1993. Our company believes in treating customers fairly and in providing excellent customer service. We have been informed that you represent the customer referenced above in a liability claim against one of the Walmart family of retail brands.

The above referenced file has been transferred to me. In order to move forward to resolve this claim in a timely manner, I would like to speak with you at your earliest convenience.

Thank you for your cooperation and assistance in bringing this matter to a close.

Sincerely,


**Erica Arciniega** - *Case Manager II*
Phone: 479-269-5498
Fax: 877-219-0742
Email: Erica.Arciniega@walmart.com

**Walmart Claims Services, Inc.** - P. O. Box 14731, Lexington,  KY  – 40512-4731

*Walmart Claims Services, Inc. is the administrator for the Walmart family of brands and for certain insurers, including:
Walmart Inc..*

# EXHIBIT

# T

July 13, 2023, letter from
Walmart Claims Services



# Walmart Claims Services

Thursday, July 13, 2023

| Law Office of Hung Q. Nguyen & Associates, LLC
Steve   Valero
5495 Jimmy Carter Blvd. Suite B 17
Norcross , GA   30093 |

RE: Maria   Vargas Nishijima
File Number: 9748463
Date of Loss:  9/22/2021
Facility #: 548
Entity Name: Walmart Inc.

Dear Steve:

As you know, Walmart Claims Services (WCS) administers liability claims on the behalf of the Walmart family of brands and their insurers. I want to thank you for the courtesy that you extended to me as I investigated and evaluated the claim arising from your client's injury.

In assessing your client's claim, WCS has carefully reviewed the facts relating to the incident and the information you have provided to WCS. WCS's investigation and evaluation of this claim indicate that the storekeeper was not at fault for your client's injury. Therefore, we must respectfully deny your client's claim for liability payment.

If you have any additional information or other facts that you feel may change our decision, please provide such facts to us for review. WCS reserves the right to continue its investigation and to consider any and all facts revealed in that investigation.

Should your client pursue litigation, WCS hereby formally requests that a courtesy copy of the file stamped complaint be sent to our attention within ten days of filing.

If you have any questions concerning my decision, please contact me at your convenience.

Sincerely,
Chris

Chris Williamson
Case Manager III

Phone:  800-527-0566+57987
Fax:  877-219-0742
Email:  Chris.Williamson@walmart.com

**WCS**
**P.O. Box 14731 Lexington, KY 40512-4731**

Walmart Claims Services, Inc.
PO BOX 14731
Lexington, KY 40512-4731

 Law Office of Hung Q. Nguyen & Associates, LLC
Steve   Valero
5495 Jimmy Carter Blvd. Suite B 17
Norcross , GA   30093

2



# EXHIBIT

# U

# Walmart Inc.'s Annual Report



**Annual Report**





## A message from our CEO

"We started this new year with momentum across the business through strength in our omnichannel model and by living our purpose every day. Our customers and members expect to shop with us when and how they choose, and that's what we do for them. We're thankful to our associates that create a seamless experience that's uniquely Walmart."

*Doug*

**Doug McMillon**
President and Chief Executive Officer
Walmart Inc.

**Read the full report and Doug's letter here:**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 10-K

---

☒  **Annual report pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934**

For the fiscal year ended January 31, 2023, or

☐  **Transition report pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934**

Commission file number 001-06991.

---

# WALMART INC.

**(Exact name of registrant as specified in its charter)**

---

| | |
|---|---|
| **DE** | **71-0415188** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **702 S.W. 8th Street** | |
| **Bentonville,  AR** | **72716** |
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (479) 273-4000**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.10 per share | WMT | NYSE |
| 2.550% Notes Due 2026 | WMT26 | NYSE |

Securities registered pursuant to Section 12(g) of the Act: None

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.

Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.

Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for at least the past 90 days.

Yes  ☒   No  ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).

Yes  ☒   No  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company.  See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large Accelerated Filer | ☒ | Accelerated Filer | ☐ |
| Non-Accelerated Filer | ☐ | Smaller Reporting Company | ☐ |
| | | Emerging Growth Company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.  ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements.  ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b).  ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).

Yes  ☐   No  ☒

As of July 31, 2022, the aggregate market value of the voting common stock of the registrant held by non-affiliates of the registrant, based on the closing sale price of those shares on the New York Stock Exchange reported on July 29, 2022, was $186,168,142,989.  For the purposes of this disclosure only, the registrant has assumed that its directors, executive officers (as defined in Rule 3b-7 under the Exchange Act) and the beneficial owners of 5% or more of the registrant's outstanding common stock are the affiliates of the registrant.

The registrant had 2,695,655,933 shares of common stock outstanding as of March 15, 2023.

## DOCUMENTS INCORPORATED BY REFERENCE

| Document | Parts Into Which Incorporated |
| --- | --- |
| Portions of the registrant's Proxy Statement for the Annual Meeting of Shareholders to be held May 31, 2023 (the "Proxy Statement") | Part III |

**Walmart Inc.**
**Form 10-K**
**For the Fiscal Year Ended January 31, 2023**

## Table of Contents

|  |  | Page |
|---|---|---|
| **Part I** | | |
| Item 1 | Business | 6 |
| Item 1A | Risk Factors | 15 |
| Item 1B | Unresolved Staff Comments | 27 |
| Item 2 | Properties | 28 |
| Item 3 | Legal Proceedings | 31 |
| Item 4 | Mine Safety Disclosures | 32 |
| | | |
| **Part II** | | |
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 33 |
| Item 6 | Reserved | 34 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 35 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 48 |
| Item 8 | Financial Statements and Supplementary Data | 50 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 81 |
| Item 9A | Controls and Procedures | 81 |
| Item 9B | Other Information | 81 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 81 |
| | | |
| **Part III** | | |
| Item 10 | Directors, Executive Officers and Corporate Governance | 82 |
| Item 11 | Executive Compensation | 82 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 82 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 82 |
| Item 14 | Principal Accounting Fees and Services | 82 |
| | | |
| **Part IV** | | |
| Item 15 | Exhibits, Financial Statement Schedules | 83 |
| Item 16 | Form 10-K Summary | 85 |
| | Signatures | 86 |

## WALMART INC.

## ANNUAL REPORT ON FORM 10-K
## FOR THE FISCAL YEAR ENDED JANUARY 31, 2023

All references in this Annual Report on Form 10-K, the information incorporated into this Annual Report on Form 10-K by reference to information in the Proxy Statement of Walmart Inc. for its Annual Shareholders' Meeting to be held on May 31, 2023 and in the exhibits to this Annual Report on Form 10-K to "Walmart Inc.," "Walmart," "the Company," "our Company," "we," "us" and "our" are to the Delaware corporation named "Walmart Inc." and, except where expressly noted otherwise or the context otherwise requires, that corporation's consolidated subsidiaries.

### PART I

**Cautionary Statement Regarding Forward-Looking Statements**

This Annual Report on Form 10-K and other reports, statements, and information that Walmart Inc. (which individually or together with its subsidiaries, as the context otherwise requires, is referred to as "we," "Walmart" or the "Company") has filed with or furnished to the Securities and Exchange Commission ("SEC") or may file with or furnish to the SEC in the future, and prior or future public announcements and presentations that we or our management have made or may make, include or may include, or incorporate or may incorporate by reference, statements that may be deemed to be "forward-looking statements" within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended (the "Act"), that are intended to enjoy the protection of the safe harbor for forward-looking statements provided by the Act as well as protections afforded by other federal securities laws.

Nature of Forward-Looking Statements

Such forward-looking statements are not statements of historical facts, but instead express our estimates or expectations for our consolidated, or one of our segment's, economic performance or results of operations for future periods or as of future dates or events or developments that may occur in the future or discuss our plans, objectives or goals. These forward-looking statements may relate to:

- macroeconomic, geopolitical, and business conditions, trends and events around the world and in the markets in which we operate, including inflation or deflation, generally and in certain product categories, the impact of supply chain challenges, and recessionary pressures;
- the growth of our business or change in our competitive position in the future or in or over particular periods, both generally and with respect to particular markets, segments or lines of business, including, but not limited to, advertising, fulfillment, healthcare, and financial services;
- the amount, number, growth, increase, reduction or decrease in or over certain periods, of or in certain financial items or measures or operating measures, including our earnings per share, net sales, comparable store and club sales, our eCommerce sales, liabilities, expenses of certain categories, expense leverage, operating income, returns, capital and operating investments or expenditures of particular types and new store and club openings, inventory levels and associated costs, product mix and demand for certain merchandise, consumer confidence, disposable income, credit availability, spending levels, shopping patterns and debt levels;
- our increasing investments in eCommerce, technology, automation, supply chain, new stores and clubs as well as remodels and other omni-channel customer initiatives, such as same day pickup and delivery;
- investments and capital expenditures we will make and how certain of those investments and capital expenditures are expected to be financed;
- our workforce strategy, including the availability of necessary personnel to staff our stores, clubs and other facilities and the potential impact of changes to the costs of labor;
- volatility in currency exchange rates affecting our consolidated, or one or more of our segments' results of operations;
- the Company continuing to provide returns to shareholders through share repurchases and dividends, the use of share repurchase authorization over a certain period or the source of funding of a certain portion of our share repurchases;
- our sources of liquidity, including our cash, continuing to be adequate or sufficient to fund our operations, finance our global investment and expansion activities, pay dividends and fund share repurchases;
- cash flows from operations, our current cash position and access to capital markets or credit will continue to be sufficient to meet our anticipated operating cash needs;
- the reclassification of amounts related to our derivatives;
- our effective tax rate for certain periods and the realization of certain net deferred tax assets and the effects of resolutions of tax-related matters;
- the adoption or creation of new, and modification of existing, governmental policies, programs, initiatives and actions in the markets in which we operate and elsewhere and actions with respect to such policies, programs and initiatives (including, but not limited to, changes in the enforcement priorities of regulatory authorities);

- the effect of adverse decisions in, or settlement of, litigation or other proceedings or investigations to which we are subject;
- the effect on the Company's results of operations or financial position of the Company's adoption of certain new, or amendments to existing, accounting standards; or
- our commitments, intentions, plans or goals related to environmental, social, and governance ("ESG") priorities, including, but not limited to, the sustainability of our environment and supply chains, the promotion of economic opportunity or other societal initiatives.

Our forward-looking statements may also include statements of our strategies, plans and objectives for our operations, including areas of future focus in our operations, and the assumptions underlying any of the forward-looking statements we make.  The forward-looking statements we make can typically be identified by the use therein of words and phrases such as "aim," "anticipate," "believe," "could be," "could increase," "could occur," "could result," "continue," "estimate," "expansion," "expect," "expectation," "expected to be," "focus," "forecast," "goal," "grow," "guidance," "intend," "invest," "is expected," "may continue," "may fluctuate," "may grow," "may impact," "may result," "objective," "plan," "priority," "project," "strategy," "to be," "we'll," "we will," "will add," "will allow," "will be," "will benefit," "will change," "will come in at," "will continue," "will decrease," "will grow," "will have," "will impact," "will include," "will increase," "will open," "will remain," "will result," "will stay," "will strengthen," "would be," "would decrease" and "would increase," variations of such words or phrases, other phrases commencing with the word "will" or similar words and phrases denoting anticipated or expected occurrences or results.

The forward-looking statements that we make or that are made by others on our behalf are based on our knowledge of our business and our operating environment and assumptions that we believe to be or will believe to be reasonable when such forward-looking statements were or are made.  As a consequence of the factors described above, the other risks, uncertainties and factors we disclose below and in the other reports as mentioned above, other risks not known to us at this time, changes in facts, assumptions not being realized or other circumstances, our actual results may differ materially from those discussed in or implied or contemplated by our forward-looking statements.  Consequently, this cautionary statement qualifies all forward-looking statements we make or that are made on our behalf, including those made herein and incorporated by reference herein.  We cannot assure you that the results or developments expected or anticipated by us will be realized or, even if substantially realized, that those results or developments will result in the expected consequences for us or affect us, our business, our operations or our operating results in the manner or to the extent we expect.  We caution readers not to place undue reliance on such forward-looking statements, which speak only as of their dates.  We undertake no obligation to revise or update any of the forward-looking statements to reflect subsequent events or circumstances except to the extent required by applicable law.

**ITEM 1.**      **BUSINESS**

**General**

Walmart Inc. ("Walmart," the "Company" or "we") is a people-led, technology-powered omni-channel retailer dedicated to help people around the world save money and live better – anytime and anywhere – by providing the opportunity to shop in both retail stores and through eCommerce, and to access our other service offerings.  Through innovation, we strive to continuously improve a customer-centric experience that seamlessly integrates our eCommerce and retail stores in an omni-channel offering that saves time for our customers.  Each week, we serve approximately 240 million customers who visit more than 10,500 stores and numerous eCommerce websites in 20 countries.

Our strategy is to make every day easier for busy families, operate with discipline, sharpen our culture and become more digital, and make trust a competitive advantage.  Making life easier for busy families includes our commitment to price leadership, which has been and will remain a cornerstone of our business, as well as increasing convenience to save our customers time. By leading on price, we earn the trust of our customers every day by providing a broad assortment of quality merchandise and services at everyday low prices ("EDLP").  EDLP is our pricing philosophy under which we price items at a low price every day so our customers trust that our prices will not change under frequent promotional activity.  Everyday low cost ("EDLC") is our commitment to control expenses so our cost savings can be passed along to our customers.

Our operations comprise three reportable segments: Walmart U.S., Walmart International and Sam's Club.  Our fiscal year ends on January 31 for our United States ("U.S.") and Canadian operations.  We consolidate all other operations generally using a one-month lag and on a calendar year basis.  Our discussion is as of and for the fiscal years ended January 31, 2023 ("fiscal 2023"), January 31, 2022 ("fiscal 2022") and January 31, 2021 ("fiscal 2021").  During fiscal 2023, we generated total revenues of $611.3 billion, which was comprised primarily of net sales of $605.9 billion.

We maintain our principal offices in Bentonville, Arkansas.  Our common stock trades on the New York Stock Exchange under the symbol "WMT."

**The Development of Our Company**

The businesses conducted by our founders began in 1945 when Sam M. Walton opened a franchise Ben Franklin variety store in Newport, Arkansas.  In 1946, his brother, James L. Walton, opened a similar store in Versailles, Missouri.  Until 1962, our founders' business was devoted entirely to the operation of variety stores. In 1983, we opened our first Sam's Club, and in 1988, we opened our first supercenter.  In 1998, we opened our first Walmart Neighborhood Market.  In 1991, we began our first international initiative when we entered into a joint venture in Mexico and, as of January 31, 2023, our Walmart International segment conducted business in 19 countries.

In 2000, we began our first eCommerce initiative by creating both walmart.com and samsclub.com.  Since then, our eCommerce presence has continued to grow.  In 2007, leveraging our physical stores, walmart.com launched its Site to Store service, enabling customers to make a purchase online and pick up merchandise in stores.  To date, we now have over 8,100 pickup and approximately 7,000 delivery locations globally.  In recent years, we have heavily invested in omni-channel and eCommerce innovation, which has enabled us to leverage technology, talent and expertise, incubate digitally-native brands, and expand our assortment and service offerings. We have also continued to enhance our eCommerce initiatives, such as with our acquisition of a majority stake in Flipkart Private Limited ("Flipkart"), which is our ecosystem in India that includes eCommerce platforms of Flipkart and Myntra, as well as with our majority stake in PhonePe Private Limited ("PhonePe"), a digital transaction platform.

We are enhancing our ecosystem with our omni-channel capabilities, stores, service offerings, eCommerce websites and marketplaces as well as our supply chain combined with approximately 2.1 million associates as of January 31, 2023 to better serve our customers.  Together, we believe these elements produce a flywheel effect which creates relationships where customers view Walmart as their primary destination.  In the U.S., our Walmart+ membership incorporates several service offerings which provide enhanced omni-channel shopping experiences and benefits for members.  As we execute on our strategy globally, our flywheel is accelerating through offerings such as our Walmart Connect advertising business, Walmart Fulfillment Services, providing access to quality, affordable healthcare via Walmart Health and Flipkart Health+, and our financial services businesses.  These offerings represent mutually reinforcing pieces of our flywheel centered around our customers around the world who are increasingly seeking convenience.

**Information About Our Segments**

We are engaged in global operations of retail, wholesale and other units, as well as eCommerce, located throughout the U.S., Africa, Canada, Central America, Chile, China, India and Mexico.  We also previously operated in Argentina prior to the sale of Walmart Argentina in fiscal 2021 and operated in the United Kingdom and Japan prior to the sale of those operations in the first quarter of fiscal 2022.  Refer to Note 12 to our Consolidated Financial Statements for information on these divestitures.  Our operations are conducted in three reportable segments: Walmart U.S., Walmart International and Sam's Club, which are further described below.  Each segment contributes to the Company's operating results differently.  However, each has generally maintained a consistent contribution rate to the Company's net sales in recent years other than minor changes to the contribution rate for the Walmart International segment due to the exit of certain markets and fluctuations in currency exchange rates.  Additional information on our operating segments and geographic information is contained in Note 13 to our Consolidated Financial Statements.

**Walmart U.S. Segment**

Walmart U.S. is our largest segment and operates in the U.S., including in all 50 states, Washington D.C. and Puerto Rico.  Walmart U.S. is a mass merchandiser of consumer products, operating under the "Walmart" and "Walmart Neighborhood Market" brands, as well as walmart.com and other eCommerce brands.  Walmart U.S. had net sales of $420.6 billion for fiscal 2023, representing 69% of our fiscal 2023 consolidated net sales, and had net sales of $393.2 billion and $370.0 billion for fiscal 2022 and 2021, respectively.  Of our three segments, Walmart U.S. has historically had the highest gross profit as a percentage of net sales ("gross profit rate").  In addition, Walmart U.S. has historically contributed the greatest amount to the Company's net sales and operating income.

**Omni-channel.** Walmart U.S. provides an omni-channel experience to customers, integrating retail stores and eCommerce, through services such as pickup and delivery, in-home delivery, ship-from-store, and digital pharmacy fulfillment options.  As of January 31, 2023, we had more than 4,600 pickup locations and more than 3,900 same-day delivery locations.  Our Walmart+ membership offering provides enhanced omni-channel shopping benefits including unlimited free shipping on eligible items with no order minimum, unlimited delivery from store, fuel discounts, access to Paramount+ streaming service, and mobile scan & go for a streamlined in-store shopping experience.  We have several eCommerce websites, the largest of which is walmart.com.  We define eCommerce sales as sales initiated by customers digitally and fulfilled by a number of methods including our dedicated eCommerce fulfillment centers and leveraging our stores, as well as certain other business offerings that are part of our flywheel strategy, such as our Walmart Connect advertising business.  The following table provides the approximate size of our retail stores as of January 31, 2023:

|  | Minimum Square Feet | Maximum Square Feet | Average Square Feet |
|---|---|---|---|
| Supercenters (general merchandise and grocery) | 69,000 | 260,000 | 178,000 |
| Discount stores (general merchandise and limited grocery) | 30,000 | 206,000 | 105,000 |
| Neighborhood markets[1] (grocery) | 28,000 | 65,000 | 42,000 |

[1]   Excludes other small formats.

**Merchandise.** Walmart U.S. does business primarily in three strategic merchandise units, listed below:

- Grocery consists of a full line of grocery items, including dry grocery, snacks, dairy, meat, produce, deli & bakery, frozen foods, alcoholic and nonalcoholic beverages, as well as consumables such as health and beauty aids, pet supplies, household chemicals, paper goods and baby products;
- General merchandise includes:
  - Entertainment (e.g., electronics, toys, seasonal merchandise, wireless, video games, movies, music and books);
  - Hardlines (e.g., automotive, hardware and paint, sporting goods, outdoor living and stationery);
  - Apparel (e.g., apparel for men, women, girls, boys and infants, as well as shoes, jewelry and accessories); and
  - Home (e.g., housewares and small appliances, bed & bath, furniture and home organization, home furnishings, home decor, fabrics and crafts).
- Health and wellness includes pharmacy, over-the-counter drugs and other medical products, optical services and other clinical services.

Other categories in the Walmart U.S. business include an in-house advertising offering via Walmart Connect, supply chain and fulfillment capabilities to online marketplace sellers via Walmart Fulfillment Services, and newer initiatives such as B2B last mile delivery services via Walmart GoLocal, and a suite of data products for merchants and suppliers via Walmart Luminate.  Additional service offerings include fuel, financial services and related products (including through our digital channels, stores and our fintech venture, ONE), such as money orders, prepaid access, money transfers, check cashing, bill payment, and certain types of installment lending.

Brand name merchandise represents a significant portion of the merchandise sold in Walmart U.S. We also market lines of merchandise under our private brands, including brands such as: "Allswell," "Athletic Works," "Eloquii Elements," "Equate," "Free Assembly," "Freshness Guaranteed," "George," "Great Value," "Holiday Time," "Hyper Tough," "Mainstays," "Marketside," "No Boundaries," "onn.," "Ozark Trail," "Parent's Choice," "Sam's Choice," "Scoop," "Spring Valley," "Time and Tru," "Way to Celebrate" and "Wonder Nation." The Company also markets lines of merchandise under licensed brands, some of which include: "Avia," "Love & Sports," "Better Homes & Gardens," "Pioneer Woman" and "Sofia Jeans by Sofia Vergara."

Periodically, revisions are made to the categorization of the components comprising our strategic merchandise units. When revisions are made, the previous periods' presentation is adjusted to maintain comparability.

**Operations.** Walmart U.S. is available to customers through supercenters, discount stores and neighborhood markets, as well as online or through the mobile application 24 hours a day. Consistent with its strategy, Walmart U.S. continues to develop technology tools and services to better serve customers and help stores operate more efficiently, such as pickup and delivery, Walmart+, ship-from-store and other initiatives which provide convenient and seamless omni-channel shopping experiences.

**Seasonal Aspects of Operations.** Walmart U.S.'s business is seasonal to a certain extent due to calendar events and national and religious holidays, as well as different weather patterns. Historically, its highest sales volume has occurred in the fiscal quarter ending January 31.

**Competition.** Walmart U.S. competes with brick and mortar, eCommerce, and omni-channel retailers operating discount, department, retail and wholesale grocers, drug, dollar, variety and specialty stores, supermarkets, hypermarkets and supercenter-type stores, social commerce platforms, as well as companies that offer services in digital advertising, fulfillment and delivery services, health and wellness, and financial services. Each of these landscapes is highly competitive and rapidly evolving, and new business models and the entry of new, well-funded competitors continue to intensify this competition. Some of our competitors have longer histories in these lines of business, more customers, and greater brand recognition. They may be able to obtain more favorable terms from suppliers and business partners and to devote greater resources to the development of these businesses. In addition, for eCommerce and other internet-based businesses, newer or smaller businesses may be better able to innovate and compete with us.

Our ability to develop and operate units at the right locations and to deliver a customer-centric omni-channel experience largely determines our competitive position within the retail industry. We compete in a variety of ways, including the prices at which we sell our merchandise, merchandise and selection availability, services offered to customers, location, store hours, in-store amenities, the shopping convenience and overall shopping experience we offer, the attractiveness and ease of use of our digital platforms, cost and speed of and options for delivery to customers of merchandise purchased through our digital platforms or through our omni-channel integration of our physical and digital operations. We employ many strategies and programs designed to meet competitive pressures within our industry. These strategies include the following:

- EDLP: our pricing philosophy under which we price items at everyday low prices so our customers trust that our prices will not change under frequent promotional activity;

- EDLC: everyday low cost is our commitment to control expenses so our cost savings can be passed along to our customers;

- Omni-channel offerings such as pickup and delivery and our Walmart+ membership offering, all of which enhance convenience and seek to serve customers in the ways they want to be served; and

- Expanding our flywheel and the products and services we offer in areas such as digital advertising, fulfillment services, health and wellness, and financial services to provide our customers a broader set of offerings to meet expanding needs.

**Distribution.** We continue to invest in supply chain automation and utilize a total of 163 distribution facilities which are located strategically throughout the U.S. For fiscal 2023, the majority of Walmart U.S.'s purchases of store merchandise were shipped through these facilities, while most of the remaining store merchandise we purchased was shipped directly from suppliers. General merchandise and dry grocery merchandise is transported primarily through the segment's private truck fleet; however, we contract with common carriers to transport the majority of our perishable grocery merchandise. We ship merchandise purchased by customers on our eCommerce platforms by a number of methods from multiple locations including from our 34 dedicated eCommerce fulfillment centers, as well as leveraging our ability to ship or deliver directly from more than 3,900 stores.

**Walmart International Segment**

Walmart International is our second largest segment and operated in 19 countries outside of the U.S. as of January 31, 2023. Walmart International operates through our wholly-owned subsidiaries in Canada, Chile, China, and Africa (which includes Botswana, Kenya, Lesotho, Malawi, Mozambique, Namibia, South Africa, Swaziland, and Zambia), and our majority-owned subsidiaries in India, as well as Mexico and Central America (which includes Costa Rica, El Salvador, Guatemala, Honduras and Nicaragua). Walmart International previously operated in Argentina prior to the sale of Walmart Argentina in fiscal 2021 and operated in the United Kingdom and Japan prior to the sale of those operations in the first quarter of fiscal 2022. Refer to Note 12 to our Consolidated Financial Statements for discussion of recent divestitures.

Walmart International includes numerous formats divided into two major categories: retail and wholesale. These categories consist of many formats, including: supercenters, supermarkets, hypermarkets, warehouse clubs (including Sam's Clubs) and cash & carry, as well as eCommerce through walmart.com.mx, walmart.ca, flipkart.com, walmart.cn and other sites. Walmart International had net sales of $101.0 billion for fiscal 2023, representing 17% of our fiscal 2023 consolidated net sales, and had net sales of $101.0 billion and $121.4 billion for fiscal 2022 and 2021, respectively. The gross profit rate is lower than that of Walmart U.S. primarily because of its format mix.

Walmart International's strategy is to create strong local businesses powered by Walmart which means being locally relevant and customer-focused in each of the markets it operates. We are being deliberate about where and how we choose to operate and continue to re-shape the portfolio to best enable long-term, sustainable and profitable growth. As such, we have taken certain strategic actions to strengthen our Walmart International portfolio for the long-term, which include the following highlights over the last three years:

- Divested of Walmart Argentina in November 2020.

- Divested of Asda Group Limited ("Asda"), our retail operations in the U.K., in February 2021.

- Divested of a majority stake in Seiyu, our retail operations in Japan, in March 2021.

- Bought out the noncontrolling interest shareholders of our Massmart subsidiary in November 2022 and exited operations in certain countries in Africa in December 2022.

- Increased our ownership in PhonePe, our digital transaction platform in India, as part of the separation from Flipkart in December 2022.

**Omni-channel.** Walmart International provides an omni-channel experience to customers, integrating retail stores and eCommerce, such as through pickup and delivery services in most of our markets and our marketplaces such as Flipkart in India. Our financial services offerings continue to expand with our digital transaction platform anchored in payments at PhonePe in India. We have expanded our marketplace in Mexico and Canada, which unlocks fulfillment and advertising services, and in China, our partnerships with JD.com and JD Daojia continue to drive ecommerce growth.

Generally, retail units' selling areas range in size from 1,400 square feet to 186,000 square feet. Our wholesale stores' selling areas generally range in size from 24,000 square feet to 158,000 square feet. As of January 31, 2023, Walmart International had over 2,900 pickup and approximately 2,500 delivery locations.

**Merchandise.** The merchandising strategy for Walmart International is similar to that of our operations in the U.S. in terms of the breadth and scope of merchandise offered for sale. While brand name merchandise accounts for a majority of our sales, we have both leveraged U.S. private brands and developed market specific private brands to serve our customers with high quality, low priced items. Along with the private brands we market globally, such as "Equate," "George," "Great Value," "Holiday Time," "Mainstays," "Marketside" and "Parent's Choice," our international markets have developed market specific brands including "Aurrera," "Lider," and "PhonePe." In addition, we have developed and continue to grow our relationships with regional and local suppliers in each market to ensure reliable sources of quality merchandise that is equal to national brands at low prices.

Consistent with its strategy, Walmart International continues to build mutually reinforcing businesses in areas such as advertising, marketplace and fulfillment services, healthcare and financial services. Our businesses in Mexico and Canada, for example, offer prepaid cards and money transfers, and our PhonePe business in India continues to grow, providing a platform that offers mobile and bill payment, person-to-person (P2P) payment, investment and insurance solutions, financial services and advertising. In Mexico, we also offer a value-based internet and telephone service allowing customers to enjoy digital connectivity, and in India we launched Flipkart Health+ enabling us to increase access to affordable care in that country. Combined, these offerings did not represent a significant portion of annual segment revenues.

**Operations.** The hours of operation for operating units in Walmart International vary by country and by individual markets within countries, depending upon local and national ordinances governing hours of operation. Consistent with its strategy, Walmart International continues to develop technology tools and services to better serve customers and help its various formats operate more efficiently, as well as to provide convenient and seamless omni-channel shopping experiences.

**Seasonal Aspects of Operations.** Walmart International's business is seasonal to a certain extent.  Historically, its highest sales volume has occurred in the fourth quarter of our fiscal year.  The seasonality of the business varies by country due to different national and religious holidays, festivals and customs, as well as different weather patterns.

**Competition.** Walmart International competes with brick and mortar, eCommerce, and omni-channel retailers who operate department, drug, discount, variety and specialty stores, supermarkets, hypermarkets and supercenter-type stores, wholesale clubs, home-improvement stores, specialty electronics stores, cash & carry operations and convenience stores, and eCommerce retailers, as well as companies that offer services in digital advertising, fulfillment services, health and wellness, and financial services.  Our ability to develop and operate units at the right locations and to deliver a customer-centric omni-channel experience largely determines our competitive position within the retail industry.  We believe price leadership is a critical part of our business model and we continue to focus on moving our markets towards an EDLP approach.  Additionally, our ability to operate food departments effectively has a significant impact on our competitive position in the markets where we operate.  Each of these landscapes is highly competitive and rapidly evolving, and new business models and the entry of new, well-funded competitors continue to intensify this competition.  Some of our competitors have longer histories in these lines of business, more customers, and greater brand recognition.  They may be able to obtain more favorable terms from suppliers and business partners and to devote greater resources to the development of these businesses.  In addition, for eCommerce and other internet-based businesses, newer or smaller businesses may be better able to innovate and compete with us.

**Distribution.** We utilize a total of 188 distribution facilities located in Canada, Central America, Chile, China, India, Mexico and South Africa.  Through these facilities, we process and distribute both imported and domestic products to the operating units of the Walmart International segment.  During fiscal 2023, the majority of Walmart International's purchases passed through these distribution facilities.  Suppliers ship the remainder of Walmart International's purchases directly to our stores in the various markets in which we operate.  Across the segment, we have efficient networks connecting physical stores and distribution and fulfillment centers which facilitate the movement of goods to where our customers live.  We ship merchandise purchased by customers on our eCommerce platforms by a number of methods from multiple locations including from our 100 dedicated eCommerce fulfillment centers, more than 3,600 eCommerce sort centers and last-mile delivery facilities in India, as well as our physical retail stores.

**Sam's Club Segment**

Sam's Club operates in 44 states in the U.S. and in Puerto Rico.  Sam's Club is a membership-only warehouse club that also operates samsclub.com.  Sam's Club had net sales of $84.3 billion for fiscal 2023, representing 14% of our consolidated fiscal 2023 net sales, and had net sales of $73.6 billion and $63.9 billion for fiscal 2022 and 2021, respectively.  As a membership-only warehouse club, membership income is a significant component of the segment's operating income.  Sam's Club operates with a lower gross profit rate and lower operating expenses as a percentage of net sales than our other segments.

**Membership.** The following two options are available to members:

|  | Plus Membership | Club Membership |
| --- | --- | --- |
| Annual Membership Fee | $110 | $50 |
| Number of Add-on Memberships ($45 each) | Up to 16 | Up to 8 |

All memberships include a spouse/household card at no additional cost.  Plus Members are also eligible for free shipping on the majority of merchandise, with no minimum order size, and receive discounts on prescriptions and glasses.  Beginning in fiscal 2023, Sam's Club launched a single loyalty rewards currency called Sam's Cash which merges and replaces existing Cash Rewards for Plus members and Cash Back for Sam's Club Mastercard holders.  Members may redeem Sam's Cash on purchases in the club and online, to pay for membership fees or for cash in clubs.  Sam's Cash does not expire and is available for monthly redemption.

**Omni-channel.** Sam's Club provides an omni-channel experience to members, integrating warehouse clubs and eCommerce through such services as Curbside Pickup, mobile Scan & Go, ship-from-club, and delivery-from-club.  Members have access to a broad assortment of merchandise and services, including those not found in our clubs, online at samsclub.com and through our mobile commerce applications.  The warehouse facility sizes generally range between 32,000 and 168,000 square feet, with an average size of approximately 134,000 square feet.

**Merchandise.** Sam's Club offers merchandise in the following five merchandise categories:

- Grocery and consumables includes dairy, meat, bakery, deli, produce, dry, chilled or frozen packaged foods, alcoholic and nonalcoholic beverages, floral, snack foods, candy, other grocery items, health and beauty aids, paper goods, laundry and home care, baby care, pet supplies and other consumable items;
- Fuel, tobacco and other categories;

- Home and apparel includes home improvement, outdoor living, gardening, furniture, apparel, jewelry, tools and power equipment, housewares, toys, seasonal items, mattresses, and tire and battery centers;
- Health and wellness includes pharmacy, optical and hearing services and over-the-counter drugs; and
- Technology, office and entertainment includes consumer electronics and accessories, software, video games, office supplies, appliances, and third-party gift cards.

Within the categories above, the Member's Mark private label brand continues to expand its assortment and deliver member value.

**Operations.** Sam's Club is available to members through warehouse club locations, as well as online or through the mobile application 24 hours a day.  Club locations offer Plus Members the ability to shop before regular operating hours.  Consistent with its strategy, Sam's Club continues to develop technology tools to drive a great member experience.  Curbside Pickup is available at all clubs to help provide fast, easy and contact-free shopping for members.  Sam's Club also offers "Scan & Go," a mobile checkout and payment solution, which allows members to bypass the checkout line.

**Seasonal Aspects of Operations.** Sam's Club's business is seasonal to a certain extent due to calendar events and national and religious holidays, as well as different weather patterns.  Historically, its highest sales volume has occurred in the fiscal quarter ending January 31.

**Competition.** Sam's Club competes with other membership-only warehouse clubs, the largest of which is Costco, as well as with discount retailers, retail and wholesale grocers, general merchandise wholesalers and distributors, gasoline stations as well as omni-channel and eCommerce retailers and catalog businesses.  At Sam's Club, we provide value at members-only prices, a quality merchandise assortment, and bulk sizing to serve both our Plus and Club members.  Our eCommerce website and mobile commerce applications have increasingly become important factors in our ability to compete.

**Distribution.** We utilize 29 dedicated distribution facilities located strategically throughout the U.S., as well as some of the Walmart U.S. segment's distribution facilities which service the Sam's Club segment for certain items.  During fiscal 2023, the majority of Sam's Club's non-fuel club purchases were shipped from these facilities, while the remainder of our purchases were shipped directly to Sam's Club locations by suppliers.  Sam's Club ships merchandise purchased on samsclub.com and through its mobile commerce applications by a number of methods including shipments made directly from clubs, 13 dedicated eCommerce fulfillment centers and other distribution centers.

Sam's Club uses a combination of our private truck fleet, as well as common carriers, to transport perishable and non-perishable merchandise from distribution facilities to clubs.

### Intellectual Property

We regard our trademarks, service marks, copyrights, patents, domain names, trade dress, trade secrets, proprietary technologies, and similar intellectual property as important to our success, and with respect to our associates, customers and others, we rely on trademark, copyright, and patent law, trade-secret protection, and confidentiality and/or license agreements to protect our proprietary rights.  We have registered, or applied for the registration of, a number of U.S. and international domain names, trademarks, service marks and copyrights.  Additionally, we have filed U.S. and international patent applications covering certain of our proprietary technology.  We have licensed in the past, and expect that we may license in the future, certain of our proprietary rights to third parties.

**Suppliers and Supply Chain**

As a retailer and warehouse club operator, we utilize a global supply chain that includes both U.S. and international suppliers from whom we purchase the merchandise that we sell in our stores, clubs and online. In many instances, we purchase merchandise from producers located near the stores and clubs in which such merchandise will be sold, particularly products in the "fresh" category. Consistent with applicable laws, we offer our suppliers the opportunity to efficiently sell significant quantities of their products to us. These relationships enable us to obtain pricing that reflects the volume, certainty and cost-effectiveness these arrangements provide to such suppliers, which in turn enables us to provide low prices to our customers. Our suppliers are subject to standards of conduct, including requirements that they comply with local labor laws, local worker safety laws and other applicable laws. Our ability to acquire from our suppliers the assortment and volume of products we wish to offer to our customers, to receive those products within the required time through our supply chain and to distribute those products to our stores and clubs, determines, along with other supply chain logistics matters (such as containers or port access for example), in part, our in-stock levels in our stores and clubs and the attractiveness of our merchandise assortment we offer to our customers and members.

**Government Regulation**

As a company with global operations, we are subject to the laws of the United States and multiple foreign jurisdictions in which we operate and the rules and regulations of various governing bodies, which may differ among jurisdictions. For additional information, see the risk factors herein in "Item 1A. Risk Factors" under the sub-caption "Legal, Tax, Regulatory, Compliance, Reputational and Other Risks."

**Environmental, Social and Governance ("ESG") Priorities**

Our ESG strategy is centered on the concept of creating shared value: we believe we maximize long-term value and create competitive advantage for the Company by serving our stakeholders, including our customers, associates, shareholders, suppliers, business partners, and communities. We believe that addressing such societal needs builds the value of our business, including by enhancing customer and associate trust, creating new revenue streams, managing cost and risk, building capabilities for future advantage, and strengthening the underlying systems on which Walmart and our stakeholders rely.

We prioritize the ESG issues that offer the greatest potential for Walmart to create shared value: issues that rank high in relevance to our business and stakeholders and which Walmart is positioned to make a positive impact. Our current ESG priorities are categorized into four broad themes: opportunity, sustainability, community, and ethics and integrity.

- **Opportunity**. Retail can be a powerful engine for inclusive economic opportunity. We aim to advance diversity, equity, and inclusion, and create opportunity for Walmart associates (as further described in the Human Capital Management section below), our suppliers and workers in supply chains, and the communities in which we operate. Doing so helps us fulfill our customer mission, strengthens our business and helps people build a better life for themselves and their families.

- **Sustainability**. Walmart's sustainability efforts focus on our ability to create and preserve long-term value for both people and planet. With respect to people, our sustainability efforts include sourcing responsibly, helping prevent forced labor, empowering women, creating inclusive economic opportunity and selling safer, healthier products. With respect to the planet, our efforts aim to enhance the sustainability of product supply chains by reducing emissions, protecting and restoring nature, and reducing waste. To help address the effects of climate change, Walmart has set science-based targets for emissions reduction, including our goal to achieve zero emissions in our operations by 2040 —without offsets—and to reduce or avoid one billion metric tons of emissions in our value chain by 2030 under our Project Gigaton™ initiative.

- **Community**. Walmart aims to serve and strengthen communities by operating our business in a way that meets the needs of our customer and community stakeholder groups, including by providing safer, healthier and more affordable food and other products, disaster support, associate volunteerism, local grant programs and community cohesion initiatives.

- **Ethics and Integrity**. At every level of our Company, we work to create a culture that inspires trust among our associates, with our customers, and in the communities we serve.

We periodically publish information on our ESG priorities, strategies, and progress on our corporate website and may update those disclosures from time to time. Nothing on our website, including our ESG reporting, documents or sections thereof, shall be deemed incorporated by reference into this Annual Report on Form 10-K or incorporated by reference into any of our other filings with the Securities and Exchange Commission.

**Human Capital Management**

At Walmart, we're committed to help people save money and live better around the world. This mission is delivered by our associates who make the difference for our millions of customers and members every day. As of the end of fiscal 2023, we

employed approximately 2.1 million associates worldwide, with approximately 1.6 million associates in the U.S. and approximately 0.5 million associates internationally.  In the U.S., approximately 93% of our associates are hourly and approximately 70% of our associates are full-time.

We know the success and progress we've seen this year and throughout our Company's history is because of our associates who work every day to fulfill our mission.  That's why we're focused on providing opportunities for associates to grow and learn.  For some, we are a foundational entry point to develop critical skills that are relevant for a variety of careers, and for others a place where associates can grow their careers across our global omni-channel business. No matter the role or location, we're focused on developing, rewarding, and retaining associates in an ever-changing environment. As customer expectations and technology change the nature of work, we know it's our people – our humanity – that will differentiate us from the competition, so this must be a top priority.

Our workforce strategy includes the following strategic priorities: belonging, well-being, growth and digital.

**Belonging** - *Build a Walmart for everyone: a diverse, equitable and inclusive company, where associates' ideas and opinions matter.*  We are focused on having an inclusive culture where everyone feels they belong.  We publish our diversity representation twice yearly, and hold ourselves accountable to providing recurring culture, diversity, equity, and inclusion updates to senior leadership, including our President and CEO, and members of the Board of Directors.  Of the approximately 2.1 million associates employed worldwide, 52% identify as women.  In the U.S., 50% of the approximately 1.6 million associates identify as people of color.

We review our processes regarding our commitment to fair-pay practices.  We are committed to creating a performance culture where associates are rewarded based on meaningful factors such as qualifications, experience, performance, and the work they do.

To build a company where associates feel engaged, valued and heard, we gather and respond to associates' feedback in a variety of ways, including but not limited to our annual associate engagement survey, our Open Door process, and one-on-one interactions.  Management reviews the results of feedback obtained from our formal associate engagement survey.

**Well-being** - *Focus on the physical, emotional, and financial well-being of our associates.*  We invest in our associates by offering competitive wages, as well as a broad range of benefits that vary based on customary local practices and statutory requirements. In the U.S., we offer affordable healthcare coverage to our full-time and eligible part-time associates as well as company paid benefits such as 401(k) match, family building support, maternity leave, a paid parental leave program to all full-time associates, paid time off, Associate Stock Purchase Plan match, life insurance, behavioral and mental health services, and a store discount card or Sam's Club membership.  Additional information about how we invest in our associates' well-being, including wage structure and pay, can be found in our Human Capital brief in our most recent ESG reporting, which is available on our corporate website.  Nothing on our website, including our ESG reporting documents, or sections thereof, shall be deemed incorporated by reference into this Annual Report on Form 10-K or incorporated by reference into any of our other filings with the Securities and Exchange Commission.  Certain information relating to retirement-related benefits we provide to our associates is included in Note 11 to our Consolidated Financial Statements.

**Growth** - *Provide ongoing growth, development and learning opportunities for associates and continue to attract talent with new skills.*  We are invested in the growth of our associates in support of our business and their success by offering good jobs that lead to great careers and better lives.  We launched the global Walmart Academy to help associates build and grow their careers, creating one of the largest learning ecosystems in the world. The global Walmart Academy offers training for on-the-job retail skills, leadership courses, and well-being training, serving associates through combination of  digital and in-person offerings. The global focus builds on moving much more to a learning in the flow of work approach.

We also provide access to educational opportunities for our part-time and full-time frontline eligible associates in the U.S. through our Live Better U program, which provides access to earn a high school diploma or a college degree. Walmart pays 100% of associates' college tuition, books and fees. Our Live Better U program aligns education offerings with Walmart's own areas of growth, providing opportunities for associates to become great at the job they have today and prepare for the job of tomorrow. Approximately 75% of our U.S. salaried store, club and supply chain management started their careers in hourly positions.  Our focus on providing a path of opportunity for our associates through robust training, competitive wages and benefits, and career advancement creates a strong associate value proposition and strengthens our workforce.

**Digital** - *Accelerate digital transformation and ways of working to improve the associate experience and drive business results.*  To deliver a seamless customer and associate experience, we continue to invest in digital tools like Me@Walmart, MyClub and Me@Campus to improve associate productivity, engagement, and performance. The MyFeedback app was developed to capture real-time associate feedback. Walmart supports associates who are on the U.S. Medical Plan with free virtual visits which include visits for medical doctor urgent care, along with mental health care with psychiatrist and psychologists.

**Information About Our Executive Officers**

The following chart names the executive officers of the Company as of the date of the filing of this Annual Report on Form 10-K with the SEC, each of whom is elected by and serves at the pleasure of the Board of Directors.  The business experience shown for each officer has been his or her principal occupation for at least the past five years, unless otherwise noted.

| Name | Business Experience | Current Position Held Since | Age |
|------|--------------------|----------------------------|-----|
| Daniel J. Bartlett | Executive Vice President, Corporate Affairs, effective June 2013. From November 2007 to June 2013, he served as the Chief Executive Officer and President of U.S. Operations at Hill & Knowlton, Inc., a public relations company. | 2013 | 51 |
| Rachel Brand | Executive Vice President, Global Governance, Chief Legal Officer and Corporate Secretary, effective April 2018.  From May 2017 to February 2018, she served as Associate Attorney General in the United States Department of Justice. | 2018 | 49 |
| David M. Chojnowski | Senior Vice President and Controller effective January 2017.  From October 2014 to January 2017, he served as Vice President and Controller, Walmart U.S. | 2017 | 53 |
| John Furner | Executive Vice President, President and Chief Executive Officer, Walmart U.S. effective November 2019. From February 2017 until November 2019, he served as President and Chief Executive Officer, Sam's Club. | 2019 | 48 |
| Suresh Kumar | Executive Vice President, Global Chief Technology Officer and Chief Development Officer effective July 2019. From February 2018 until June 2019, Mr. Kumar was Vice President and General Manager at Google LLC. | 2019 | 58 |
| Judith McKenna | Executive Vice President, President and Chief Executive Officer, Walmart International, effective February 2018.  From February 2015 to January 2018, she served as Executive Vice President and Chief Operating Officer of Walmart U.S. | 2018 | 56 |
| Kathryn McLay | Executive Vice President, President and Chief Executive Officer, Sam's Club effective November 15, 2019. From February 2019 to November 2019, she served as Executive Vice President, Walmart U.S. Neighborhood Markets. From December 2015 until February 2019, she served as Senior Vice President, U.S. Supply Chain. | 2019 | 49 |
| C. Douglas McMillon | President and Chief Executive Officer, effective February 2014. From February 2009 to January 2014, he served as Executive Vice President, President and Chief Executive Officer, Walmart International. | 2014 | 56 |
| Donna Morris | Executive Vice President, Global People, and Chief People Officer, effective February 2020.  From April 2002 to January 2020, she worked at Adobe Inc. in various roles, including most recently, Chief Human Resources Officer and Executive Vice President, Employee Experience. | 2020 | 55 |
| John David Rainey | Executive Vice President and Chief Financial Officer, effective June 2022. From September 2016 to June 2022, he served as Chief Financial Officer and Executive Vice President, Global Customer Operations for PayPal Holdings, Inc. | 2022 | 52 |

**Our Website and Availability of SEC Reports and Other Information**

Our corporate website is located at www.stock.walmart.com.  We file with or furnish to the SEC Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, amendments to those reports, proxy statements and annual reports to shareholders, and, from time to time, other documents.  The reports and other documents filed with or furnished to the SEC are available to investors on or through our corporate website free of charge as soon as reasonably practicable after we electronically file them with or furnish them to the SEC.  The SEC maintains a website that contains reports, proxy and information statements and other information regarding issuers, such as the Company, that file electronically with the SEC. The address of that website is www.sec.gov.  Our SEC filings, our Reporting Protocols for Senior Financial Officers and our Code of Conduct can be found on our website at www.stock.walmart.com.  These documents are available in print to any shareholder who requests a copy by writing or calling our Investor Relations Department, which is located at our principal offices.

A description of any substantive amendment or waiver of Walmart's Reporting Protocols for Senior Financial Officers or our Code of Conduct for our chief executive officer, our chief financial officer and our controller, who is our principal accounting officer, will be disclosed on our website at www.stock.walmart.com under the Corporate Governance section.  Any such description will be located on our website for a period of 12 months following the amendment or waiver.

## ITEM 1A.    RISK FACTORS

The risks described below could, in ways we may or may not be able to accurately predict, materially and adversely affect our business, results of operations, financial position and liquidity.  Our business operations could also be affected by additional factors that apply to all companies operating in the U.S. and globally. The following risk factors do not identify all risks that we may face.

### Strategic Risks

**Failure to successfully execute our omni-channel strategy and the cost of our investments in eCommerce and technology may materially adversely affect our market position, net sales and financial performance.**

The retail business continues to rapidly evolve and consumers increasingly embrace digital shopping.  As a result, the portion of total consumer expenditures with retailers and wholesale clubs occurring through digital platforms is increasing and the pace of this increase could continue to accelerate.

Our strategy, which includes investments in eCommerce, technology, talent, supply chain automation, acquisitions, joint ventures, store remodels and other customer initiatives, may not adequately or effectively allow us to continue to grow our eCommerce business, increase comparable sales, maintain or grow our overall market position or otherwise offset the impact on the growth of our business of a moderated pace of new store and club openings.  The success of this strategy will depend in large measure on our ability to continue building and delivering a seamless omni-channel shopping experience and interconnected ecosystem for our customers that deepens and maintains our relationships with our customers across our various businesses and partnerships and reinforces our overall enterprise strategy. The success of this strategy is further subject to the related risks discussed in this Item 1A.  With the interconnected components of this enterprise strategy and an increasing allocation of capital expenditures focused on these initiatives, changes in customer or member perceptions about our reputation or our failure to successfully execute on individual components of this strategy may adversely affect our market position, net sales and financial performance which could also result in impairment charges to intangible assets or other long-lived assets.  In addition, a greater concentration of eCommerce sales, including increasing online grocery sales, could result in a reduction in the amount of traffic in our stores and clubs, which would, in turn, reduce the opportunities for cross-store or cross-club sales of merchandise that such traffic creates and could reduce our sales within our stores and clubs and materially adversely affect our financial performance.

Furthermore, the cost of certain investments in eCommerce, technology, talent, automation, including any operating losses incurred, will adversely impact our financial performance in the short-term and failure to realize the benefits of these investments may adversely impact our financial performance over the longer term.

**If we do not timely identify or effectively respond to consumer trends or preferences, it could negatively affect our relationship with our customers, demand for the products and services we sell, our market share and the growth of our business.**

It is difficult to predict consistently and successfully the products and services our customers will demand and changes in their shopping patterns.  The success of our business depends in part on how accurately we predict consumer demand, availability of merchandise, the related impact on the demand for existing products and services and the competitive environment.  Price transparency, assortment of products, customer experience, convenience, ease and the speed and cost of shipping are of primary importance to customers and continue to increase in importance, particularly as a result of digital tools and social media available to consumers and the choices available to consumers for purchasing products.  Our failure to adequately or effectively respond to changing consumer tastes, preferences (including those related to ESG issues) and shopping patterns, or any other failure on our part to timely identify or effectively respond to changing consumer tastes, preferences and shopping patterns could negatively affect our reputation and relationship with our customers, the demand for the products we sell or services we offer, our market share and the growth of our business.

**We face strong competition from other retailers, wholesale club operators, omni-channel retailers, and other businesses which could materially adversely affect our financial performance.**

Each of our segments competes for customers, employees, digital prominence, products and services and in other important aspects of its business with many other local, regional, national and global physical, eCommerce and omni-channel retailers, social commerce platforms, wholesale club operators and retail intermediaries, as well as companies that offer services in digital advertising, fulfillment and delivery services, health and wellness, and financial services.  The omni-channel retail landscape is highly competitive and rapidly evolving, and the entry of new, well-funded competitors may increase competitive

pressures. In addition, for eCommerce and other internet-based businesses, newer or smaller businesses may be better able to innovate and compete with us.

We compete in a variety of ways, including the prices at which we sell our merchandise, merchandise selection and availability, services offered to customers, location, store hours, in-store amenities, the shopping convenience and overall shopping experience we offer, the attractiveness and ease of use of our digital platforms, cost and speed of and options for delivery to customers of merchandise purchased through our digital platforms or through our omni-channel integration of our physical and digital operations.

A failure to respond effectively to competitive pressures and changes in the retail and other markets in which we operate, omni-channel innovations and omni-channel ecosystems developed by our competitors or delays or failure in execution of our strategy could materially adversely affect our financial performance.  See "Item 1. Business" above for additional discussion of the competitive situation of each of our reportable segments.

Certain segments of the retail industry are undergoing consolidation or substantially reducing operations, whether due to bankruptcy, consolidation or other factors. Such consolidation, or other business combinations or alliances, competitive omni-channel ecosystems, or reductions in operations may result in competitors with greatly improved financial resources, improved access to merchandise, greater market penetration and other improvements in their competitive positions.  Such business combinations or alliances could allow these companies to provide a wider variety of products and services at competitive prices, which could adversely affect our financial performance.

**General or macro-economic factors, both domestically and internationally, may materially adversely affect our financial performance.**

General economic conditions and other economic factors, globally or in one or more of the markets we serve, may adversely affect our financial performance.  Higher interest rates, lower or higher prices of petroleum products, including crude oil, natural gas, gasoline, and diesel fuel, higher costs for electricity and other energy, weakness in the housing market, inflation, deflation, increased costs of essential services, such as medical care and utilities, higher levels of unemployment, decreases in consumer disposable income, unavailability of consumer credit, higher consumer debt levels, changes in consumer spending and shopping patterns, fluctuations in currency exchange rates, higher tax rates, imposition of new taxes or other changes in tax laws, changes in healthcare laws, other regulatory changes, the imposition of tariffs or other measures that create barriers to or increase the costs associated with international trade, overall economic slowdown or recession and other economic factors in the U.S. or in any of the other markets in which we operate could adversely affect consumer demand for the products and services we sell in the U.S. or such other markets, change the mix of products we sell to one with a lower average gross margin, cause a slowdown in discretionary purchases of goods, adversely affect our net sales and result in slower inventory turnover and greater markdowns of inventory, or otherwise materially adversely affect our operations and operating results and could result in impairment charges to intangible assets, goodwill or other long-lived assets.

In addition, the economic factors listed above, any other economic factors or circumstances resulting in higher transportation, labor, insurance or healthcare costs or commodity prices, including energy prices, and other economic factors in the U.S. and other countries in which we operate can increase our cost of sales and operating, selling, general and administrative expenses and otherwise materially adversely affect our operations and operating results.

The economic factors that affect our operations may also adversely affect the operations of our suppliers, which can result in an increase in the cost to us of the goods we sell to our customers or, in more extreme cases, in certain suppliers not producing goods in the volume typically available to us for sale.

**The performance of strategic alliances and other business relationships to support the expansion of our business could materially adversely affect our financial performance.**

We may enter into strategic alliances and other business relationships in the countries in which we have existing operations or in other markets to expand our business.  These arrangements (such as ONE, our fintech joint venture, and our healthcare initiative with UnitedHealth Group) may not generate the level of sales we anticipate when entering into the arrangement or may otherwise adversely impact our business and competitive position relative to the results we could have achieved in the absence of such alliance.  In addition, any investment we make in connection with a strategic alliance, business relationship or in certain of our recently divested markets, could materially adversely affect our financial performance.

**Operational Risks**

**Global or regional health pandemics or epidemics, including COVID-19, could negatively impact our business, financial position and results of operations.**

The emergence, severity, magnitude and duration of global or regional pandemics or epidemics are uncertain and difficult to predict.  A pandemic, such as COVID-19, or other epidemic could impact our business operations, demand for our products and services, in-stock positions, costs of doing business, access to inventory, supply chain operations, the extent and duration of measures to try to contain the spread of a virus or other disease (such as travel bans and restrictions, quarantines, shelter-in-place orders, business and government shutdowns, and other restrictions on retailers), our ability to predict future performance, exposure to litigation, and our financial performance, among other things.  Customer behaviors changed rapidly during the course of the COVID-19 pandemic.  In the event of a resurgence of infections or future mutations, variants or related strains of the virus become prevalent, customer demand for certain products may fluctuate and customer behaviors may change, which may challenge our ability to anticipate and/or adjust inventory levels to meet that demand. These factors may result in higher demand for certain products and less demand for others, as well as out-of-stock positions in certain products, along with delays in delivering these products (due to supply chain and transportation issues) and could impact inventory levels in the future.  Other factors and uncertainties may include, but are not limited to: the severity and duration of the pandemic, including whether there are additional outbreaks or spikes in the number of cases, future mutations or related strains of the virus in areas in which we and our suppliers operate; further increased operational costs; evolving macroeconomic factors, including general economic uncertainty, unemployment rates, and recessionary pressures; unknown consequences on our business performance and initiatives stemming from the substantial investment of time, capital and other resources to the pandemic response; the effectiveness and extent of administration of vaccinations and medical treatments, including for any variants; the pace of recovery when the pandemic subsides; and the long-term impact of the pandemic or epidemic on our business, including consumer behaviors.  These risks and their impacts are difficult to predict and could otherwise disrupt and adversely affect our operations and our financial performance.

To the extent that the COVID-19 pandemic continues to adversely affect the U.S. and the global economy, or a future pandemic or epidemic occurs, such events may also heighten other risks described in this section, including but not limited to those related to consumer behavior and expectations, competition, our reputation, implementation of strategic initiatives, cybersecurity threats, payment-related risks, technology systems disruption, supply chain disruptions, labor availability and cost, litigation, and regulatory requirements.

**Natural disasters, climate change, geopolitical events, global health epidemics or pandemics, catastrophic and other events could materially adversely affect our financial performance.**

The occurrence of one or more natural disasters, such as hurricanes, tropical storms, floods, fires, earthquakes, tsunamis, cyclones, typhoons; weather conditions such as major or extended winter storms, droughts and tornadoes, whether as a result of climate change or otherwise; geopolitical tensions or events; regional or global health epidemics or pandemics or other contagious outbreaks (such as COVID-19); and catastrophic and other events, such as war, civil unrest (including theft, looting or vandalism), terrorist attacks or other acts of violence, including active shooter situations (such as those that have occurred in our U.S. stores), or the loss of merchandise as a result of shrink or theft in countries in which we operate, in which our suppliers are located, or in other areas of the world (such as in Ukraine where a war currently exists between Ukraine and Russia) could adversely affect our operations and financial performance.

Such events could result in physical damage to, or the complete loss of, one or more of our properties, the closure of one or more stores, clubs and distribution or fulfillment centers, limitations on store or club operating hours, the lack of an adequate work force in a market, the inability of customers and associates to reach or have transportation to our stores and clubs affected by such events, the evacuation of the populace from areas in which our stores, clubs and distribution and fulfillment centers are located, the unavailability of our digital platforms to our customers, changes in the purchasing patterns of consumers (including the frequency of visits by consumers to physical retail locations, whether as a result of limitations on large gatherings, travel and movement limitations or otherwise) and in consumers' disposable income, the temporary or long-term disruption in the supply of products from some suppliers, the disruption in the transport of goods from overseas, the disruption or delay in the delivery of goods to our distribution and fulfillment centers or stores within a country in which we are operating, the reduction in the availability of products in our stores, increases in the costs of procuring products as a result of either reduced availability or economic sanctions, increased transportation costs (whether due to fuel prices, fuel supply, or otherwise), the disruption (whether directly or indirectly) of critical infrastructure systems, banking systems, utility services or energy availability to our stores, clubs and our facilities, and the disruption in our communications with our stores, clubs and our other facilities.

Furthermore, the long-term impacts of climate change, whether involving physical risks (such as extreme weather conditions, drought, or rising sea levels) or transition risks (such as regulatory or technology changes) are expected to be widespread and unpredictable.  Certain impacts of physical risk may include: temperature changes that increase the heating and cooling costs at stores, clubs, and distribution or fulfillment centers; extreme weather patterns that affect the production or sourcing of certain commodities; flooding and extreme storms that damage or destroy our buildings and inventory; and heat and extreme weather

events that cause long-term disruption or threats to the habitability of the communities in which Walmart operates. Relative to transition risk, certain impacts may include: changes in energy and commodity prices driven by climate-related weather events; prolonged climate-related events affecting macroeconomic conditions with related effects on consumer spending and confidence; stakeholder perception of our engagement in climate-related policies; and new regulatory requirements resulting in higher compliance risk and operational costs.

We bear the risk of losses incurred as a result of physical damage to, or destruction of, any stores, clubs and distribution or fulfillment centers; theft, loss or spoilage of inventory; and business interruption caused by such events. These events and their impacts could otherwise disrupt and adversely affect our operations and could materially adversely affect our financial performance. Moreover, our operations in the U.S. comprise a significant portion of our financial and operational performance. Therefore, any of the above matters that uniquely impact or are specifically concentrated in the U.S. could materially adversely affect our financial and operational performance.

**Risks associated with our suppliers could materially adversely affect our financial performance.**

The products we sell are sourced from a wide variety of domestic and international suppliers.  Global sourcing of many of the products we sell is an important factor in our financial performance.  We expect our suppliers to comply with applicable laws, including labor, safety, anti-corruption and environmental laws, and to otherwise meet our required supplier standards of conduct.  Our ability to find qualified suppliers who uphold our standards, and to access products in a timely and efficient manner and in the large volumes we may demand, is a significant challenge, especially with respect to suppliers located and goods sourced outside the U.S.

Political and economic instability, as well as other impactful events and circumstances in the countries in which our suppliers and their manufacturers are located (such as the COVID-19 pandemic), the financial instability of suppliers, suppliers' failure to meet our terms and conditions or our supplier standards (including our responsible sourcing standards), labor problems experienced by our suppliers and their manufacturers, the availability of raw materials to suppliers, merchandise safety and quality issues, disruption or delay in the transportation of merchandise from the suppliers and manufacturers to our stores, clubs, and other facilities, including as a result of labor slowdowns at any port at which a material amount of merchandise we purchase enters into the markets in which we operate, currency exchange rates, transport availability and cost, transport security, inflation and other factors relating to the suppliers and the countries in which they are located are beyond our control (such as, for example, the factors that occurred with respect to the availability of supply for baby formula during the prior fiscal year).

In addition, U.S. and international trade policies, tariffs and other restrictions on the exportation and importation of goods, trade sanctions imposed between certain countries and entities, the limitation on the exportation or importation of certain types of goods or of goods containing certain materials from other countries and other factors relating to foreign trade are beyond our control.  These and other factors affecting our suppliers and our access to products could adversely affect our operations and financial performance.

**If the products we sell are not safe or otherwise fail to meet our customers' expectations, we could lose customers, incur liability for any injuries suffered by customers using or consuming a product we sell or otherwise experience a material impact to our brand, reputation and financial performance.  We are also subject to reputational and other risks related to third-party sales on our digital platforms.**

Our customers count on us to provide them with safe products.  Concerns regarding the safety of food and non-food products that we source from our suppliers or that we prepare and then sell could cause customers to avoid purchasing certain products from us, or to seek alternative sources of supply for all of their food and non-food needs, even if the basis for the concern is outside of our control.  Any lost confidence on the part of our customers would be difficult and costly to reestablish and such products also expose us to product liability or food safety claims.  As such, any issue regarding the safety of any food or non-food items we sell, regardless of the cause, could adversely affect our brand, reputation and financial performance.  In addition, third-parties sell goods on some of our digital platforms, which we refer to as marketplace transactions.  Whether laws related to these marketplace transactions, including, but not limited to, intellectual property and products liability laws, apply to us is currently unsettled and any unfavorable changes or interpretations could expose us to liability, loss of sales, reduction in transactions and deterioration of our competitive position.  In addition, we may face reputational, financial and other risks, including liability, for third-party sales of goods that are controversial, counterfeit, pirated, or stolen, or otherwise fail to comply with applicable law or the proprietary rights of others.  Although we have marketplace compliance controls and impose contractual terms on sellers to prohibit sales of certain type of products, we may not be able to detect certain prohibited items, enforce such terms, or collect sufficient damages for breaches. Any of these events could have a material adverse impact on our business and results of operations and impede the execution of our eCommerce growth and enterprise strategy.

**We rely extensively on information and financial systems to process transactions, summarize results and manage our business.  Disruptions in our systems could harm our ability to conduct our operations.**

Given the number of individual transactions we have each year, it is crucial that we maintain uninterrupted operation of our business-critical information systems.  Our information systems are subject to damage or interruption from power outages, computer and telecommunications failures, computer viruses, worms, other malicious computer programs, denial-of-service attacks, security incidents and breaches (including through cyberattacks, which may be from cybercriminals or sophisticated state-sponsored threat actors), catastrophic events such as fires, major or extended winter storms, tornadoes, earthquakes and hurricanes, usage errors by our associates or contractors, civil or political unrest, or armed hostilities.  Our information systems are essential to our business operations, including the processing of transactions, management of our associates, facilities, logistics, inventories, physical stores and clubs and our online operations.  Our information systems are not fully redundant and our disaster recovery planning cannot account for all eventualities.  If our systems are damaged, breached, attacked, interrupted, or otherwise cease to function properly, we may have to make a significant investment to repair or replace them, and may experience loss or corruption of critical data as well as suffer interruptions in our business operations in the interim.  Any interruption to our information systems may have a material adverse effect on our business or results of operations.  In addition, we frequently update our information technology hardware, software, processes and systems.  The risk of system disruption is increased when significant system changes are undertaken.  If we fail to timely or successfully integrate and update our information systems and processes, we may fail to realize the cost savings or operational benefits anticipated to be derived from these initiatives. For example, during the first quarter of fiscal year ending January 31, 2024, we initiated an upgrade to our existing financial system, including our general ledger and other applications. If we are unable to implement this upgrade as planned, the effectiveness of our internal control over financial reporting could be adversely affected; our ability to assess those controls adequately could be delayed; and our reputation, business, results of operations, financial condition and cash flows could be negatively impacted.

**If the technology-based systems that give our customers the ability to shop with us online and enable us to deliver products and services do not function effectively, our operating results, as well as our ability to grow our omni-channel business globally, could be materially adversely affected.**

Increasingly, customers are using computers, tablets, and smart phones to shop with us and with our competitors and to do comparison shopping.  We use social media, online advertising, and email to interact with our customers and as a means to enhance their shopping experience.  As a part of our omni-channel sales strategy, we offer various pickup, delivery and shipping programs including options where many products available for purchase online can be picked up by the customer or member at a local Walmart store or Sam's Club, which provides additional customer traffic at such stores and clubs.  Omni-channel retailing is a rapidly evolving part of the retail industry and of our operations around the world, and we continue to make investments in supply chain automation to support our omni-channel strategy. We must anticipate and meet our customers' changing expectations while adjusting for technology investments and developments in our competitors' operations through focusing on the building and delivery of a seamless shopping experience across all channels by each operating segment.  Moreover, some of the various technology systems and services on which we rely are provided and managed by third-party service providers. To the extent either our or such other third-party systems and services do not perform or function as anticipated, whether because of an inherent flaw in the technology or a faulty implementation, such failure can significantly interfere with our ability to meet our customers' changing expectations. Any disruption or failure on our part to provide attractive, user-friendly, and secure digital platforms that offer a wide assortment of merchandise and services at competitive prices and with low cost and rapid delivery options and that continually meet the changing expectations of online shoppers and developments in online and digital platform merchandising and related technology in a cost-efficient manner could place us at a competitive disadvantage, result in the loss of eCommerce and other sales, harm our reputation with customers, have a material adverse impact on the growth of our eCommerce business globally and have a material adverse impact on our business and results of operations.

Our digital platforms, which are increasingly important to our business and continue to grow in complexity and scope, and the systems on which they run, including those applications and systems used in our acquired eCommerce, technology or other businesses, are regularly subject to cyberattacks.  Those attacks involve attempts to gain unauthorized access to our eCommerce websites (including marketplace platforms) or mobile commerce applications to obtain and misuse customers' or members' information including personal information and/or payment information and related risks discussed in this Item 1A. Such attacks, if successful, in addition to potential data misuse and/or loss, may also create denials of service or otherwise disable, degrade or sabotage one or more of our digital platforms or otherwise significantly disrupt our customers' and members' shopping experience, our supply chain integrity and continuity, and our ability to efficiently operate our business.  If we are unable to maintain the security of our digital platforms and keep them operating within acceptable parameters, we could suffer loss of sales, reductions in transactions, reputational damage and deterioration of our competitive position and incur liability for any damage to customers, members or others whose personal or confidential information is unlawfully obtained and misused, any of which events could have a material adverse impact on our business and results of operations and impede the execution of our strategy for the growth of our business.

**Any failure to maintain the privacy or security of the information relating to our company, customers, members, associates, business partners and vendors, whether as a result of cyberattacks on our information systems or otherwise, could damage our reputation, result in litigation or other legal actions against us, result in fines, penalties, and liability, cause us to incur substantial additional costs, and materially adversely affect our business and operating results.**

Like most retailers, we receive and store in our information systems personal information and/or payment information about our customers and members, and we also receive and store information concerning our associates and vendors.  In addition, our health and wellness business operations, the Walmart Health locations, and third-party service providers who handle information on our behalf, store and maintain personal health information.  Some of this information is stored digitally in connection with the digital platforms and technologies that we use to conduct and facilitate our various businesses.  We utilize third-party service providers for a variety of reasons, including, without limitation, for digital storage technology, content delivery to customers and members, back-office support, and other functions.  Such providers may have access to information we hold about our customers, members, associates, business partners or vendors.  In addition, our eCommerce operations depend upon the secure transmission of confidential information over public networks, including information permitting cashless payments.

Cyber threats are rapidly evolving and those threats and the means for obtaining access to information in digital and other storage media are becoming increasingly sophisticated and frequent.  Attacks against information systems and devices, whether our own or those of our third-party service providers, create risk of cybersecurity incidents, including ransomware, malware, or phishing incidents. We expect to continue to experience such attempted attacks in the future.  Cyberattacks and threat actors can be sponsored by particular countries or sophisticated criminal organizations or be the work of hackers with a wide range of motives and expertise. We and the businesses with which we interact have experienced and continue to experience threats to data and systems, including by perpetrators of random or targeted malicious cyberattacks, computer viruses, phishing incidents, worms, bot attacks, ransomware or other destructive or disruptive software and attempts to misappropriate customer information, including credit card and payment information, and cause system failures and disruptions. Mitigation and remediation recommendations continue to evolve, and addressing vulnerabilities is a priority for us.  The increased use of remote work infrastructure in recent years has also increased the possible attack surfaces. Some of our systems and third-party service providers' systems have experienced security incidents or breaches and although they have not had a material adverse effect on our operating results, there can be no assurance of a similar result in the future.

Associate error or malfeasance, faulty password management, social engineering or other vulnerabilities and irregularities may also result in a defeat of our or our third-party service providers' security measures and a compromise or breach of our or their information systems.  Moreover, hardware, software or applications we use may have inherent vulnerabilities or defects of design, manufacture or operations or could be inadvertently or intentionally implemented or used in a manner that could compromise information security.

Any compromise of our data security systems or of those of businesses with which we interact, which results in confidential information being accessed, obtained, damaged, disclosed, destroyed, modified, lost or used by unauthorized persons could harm our reputation and expose us to regulatory actions (including, with respect to health information, liability under the Health Insurance Portability and Accountability Act of 1996, or "HIPAA"), customer attrition, remediation expenses, and claims from customers, members, associates, vendors, financial institutions, payment card networks and other persons, any of which could materially and adversely affect our business operations, financial position and results of operations. Because the techniques used to obtain unauthorized access, disable or degrade service, or sabotage systems change frequently and may not immediately produce signs of a compromise, we may be unable to anticipate these techniques or to implement adequate preventative measures and we or our third-party service providers may not discover any security event, breach, vulnerability or compromise of information for a significant period of time after the security incident occurs. To the extent that any cyberattack, ransomware or incursion in our or one of our third-party service provider's information systems results in the loss, damage, misappropriation or other compromise of information, we may be materially adversely affected by claims from customers, members, financial institutions, regulatory authorities, payment card networks and others.

Our compliance programs, information technology, and enterprise risk management efforts cannot eliminate all systemic risk. Disruptions in our systems caused by security incidents, breaches or cyberattacks – including attacks on those parties we do business with (such as strategic partners, suppliers, banks, or utility companies) – could harm our ability to conduct our operations, which may have a material effect on us, may result in losses that could have a material adverse effect on our financial position or results of operations, or may have a cascading effect that adversely impacts our partners, third-party service providers, customers, members, financial services firms, and other third parties that we interact with on a regular basis.

Our reputation with our customers and members is important to the success of our enterprise strategy, which combines traditional retail, membership models, marketplaces, financial services, healthcare, and other customer and business services into a series of interconnected assets to make it seamless for customers to interact with us. Security-related events could be widely publicized and could materially adversely affect our reputation with our customers, members, associates, vendors and shareholders, could harm our competitive position particularly with respect to our eCommerce operations, and could result in a material reduction in our net sales in our eCommerce operations, as well as in our stores thereby materially adversely affecting

our operations, net sales, results of operations, financial position, cash flows and liquidity.  Such events could also result in the release to the public of confidential information about our operations and financial position and performance and could result in litigation or other legal actions against us or the imposition of penalties, fines, fees or liabilities, which may not be covered by our insurance policies.  Moreover, a security compromise or ransomware event could require us to devote significant management resources to address the problems created by the issue and to expend significant additional resources to upgrade further the security measures we employ to guard personal and confidential information against cyberattacks and other attempts to access or otherwise compromise such information and could result in a disruption of our operations, particularly our digital operations.

We accept payments using a variety of methods, including cash, checks, credit and debit cards, electronic benefits transfer (EBT) cards, mobile payments, and our private label credit cards and gift cards, and we may offer new payment options over time, which may have information security risk implications.  As a retailer accepting debit and credit cards for payment, we are subject to various industry data protection standards and protocols, such as payment network security operating guidelines and the Payment Card Industry Data Security Standard.  We cannot be certain that the security measures we maintain to protect all of our information technology systems are able to prevent, contain or detect cyberattacks, cyberterrorism, security incidents, breaches, or other compromises from known malware or ransomware or other threats that may be developed in the future.  In certain circumstances, our contracts with payment card processors and payment card networks (such as Visa, Mastercard, American Express and Discover) generally require us to adhere to payment card network rules which could make us liable to payment card issuers and others if information in connection with payment cards and payment card transactions that we process is compromised, which liabilities could be substantial.

Additionally, through various financial service partners and our ONE fintech joint venture, we offer various services such as money transfers, digital payment platforms, bill payment, money orders, check cashing, prepaid access, co-branded credits cards, installment lending, and earned wage access. These products and services require us to comply with legal and regulatory requirements, including privacy, authentication and tokenization, global anti-money laundering and sanctions laws and regulations as well as international, federal and state consumer financial laws and regulations. Failure to comply with these laws and regulations could result in fines, sanctions, penalties and harm to our reputation.

The Company also has compliance obligations associated with privacy laws enacted to protect and regulate the collection, use, retention, disclosure and transfer of personal information, which include liability for security and privacy breaches.  Among other obligations, breaches may trigger obligations under international, federal and state laws to notify affected individuals, government agencies and the media.  Consequently, cybersecurity attacks that cause a data breach could subject us to fines, sanctions and other legal liability and harm our reputation.

**Changes in type or scope of offerings of our health and wellness business or the Walmart Health business could adversely affect our overall results of operations, cash flows and liquidity.**

Walmart has retail pharmacy operations in our Walmart U.S. and Sam's Club segments across the U.S. and in various of our international markets such as Canada and Mexico. We also provide management services to Walmart Health centers that offer medical, dental, behavioral health and other health services in a number of states, as well as a national telehealth service provider. In addition, Walmart's 10-year collaboration with UnitedHealth Group includes agreements for Walmart Health to provide value-based care to patients in certain areas of the U.S., among other initiatives.

A large majority of our retail pharmacy net sales are generated by filling prescriptions for which we receive payment through established contractual relationships with third-party payers and payment administrators, such as private insurers, governmental agencies and pharmacy benefit managers ("PBMs"). Our retail pharmacy operations are subject to numerous risks, including: reductions in the third-party reimbursement rates for drugs; changes in our payer mix (i.e., shifts in the relative distribution of our pharmacy customers across drug insurance plans and programs toward plans and programs with less favorable reimbursement terms); changes in third-party payer drug formularies (i.e., the schedule of prescription drugs approved for reimbursement or which otherwise receive preferential coverage treatment); growth in, and our participation in or exclusion from, pharmacy payer network arrangements including exclusive and preferred pharmacy network arrangements operated by PBMs and/or any insurance plan or program; increases in the prices we pay for brand name and generic prescription drugs we sell; increases in the administrative burdens associated with seeking third-party reimbursement; changes in the frequency with which new brand name pharmaceuticals become available to consumers; introduction of lower cost generic drugs as substitutes for existing brand name drugs for which there was no prior generic drug competition; changes in drug mix (i.e., the relative distribution of drugs customers purchase at our pharmacies between brands and generics); changes in the health insurance market generally; changes in the scope of or the elimination of Medicare Part D or Medicaid drug programs; increased competition from other retail pharmacy operations including competitors offering online retail pharmacy options and/or home delivery options; further consolidation and strategic alliances among third-party payers, PBMs or purchasers of drugs; overall economic conditions and the ability of our pharmacy customers to pay for drugs prescribed for them to the extent the costs are not reimbursed by a third-party; failure to meet any performance or incentive thresholds to which our level of third-party reimbursement may be subject; changes in laws or regulations or the practices of third-party payers and PBMs related to the use of third-party financial assistance to assist our pharmacy customers with paying for drugs prescribed for them; and any

additional changes in the state or federal regulatory environment for the retail pharmacy industry and the pharmaceutical industry, including as a result of health reform efforts, and other changes to or novel interpretations of existing state or federal laws, rules and regulations that affect our retail pharmacy business.

If the supply of certain pharmaceuticals provided by one or more of our vendors were to be disrupted for any reason, our pharmacy operations could be severely affected until at least such time as we could obtain a new supplier for such pharmaceuticals. Any such disruption could cause reputational damage and result in a significant number of our pharmacy customers transferring their prescriptions to other pharmacies.

Walmart Health clinical operations are also subject to numerous risks, including but not limited to: reductions in the third-party reimbursement rates for services; changes in our payer mix; changes in the health insurance market generally; our inability to retain and negotiate favorable contracts with private third-party payers, including managed care plans; competition for patients from other healthcare providers, including those that offer telehealth services; changes to healthcare provider utilization practices and treatment methodologies; trends toward value-based purchasing and price transparency; overall economic conditions and the ability of patients to pay for services; staffing challenges, including retention of a sufficient number and quality of healthcare professionals; compliance with the complex and extensive laws and regulations governing the healthcare industry; changes in laws and regulations, including as a result of health reform efforts; and healthcare technology initiatives, including those related to patient data and interoperability; and public health conditions.

One or a combination of the factors above may adversely affect the volumes of brand name and generic pharmaceuticals we sell, our cost of sales associated with our retail pharmacy operations, and the net sales and gross margin of those operations or result in the loss of cross-store or cross-club selling opportunities. In addition, these and other factors may adversely affect the type, volume and mix of services we provide, the reimbursement we receive for health and wellness services rendered, and the scope and pace of expansion of Walmart Health and related offerings. Any of these developments could, in turn, adversely affect our overall net sales, other results of operations, cash flows and liquidity.

**Our failure to attract and retain qualified associates, increases in wage and benefit costs, changes in laws and other labor issues could materially adversely affect our financial performance.**

Our ability to continue to conduct and expand our operations depends on our ability to attract and retain a large and growing number of qualified associates globally. Our ability to meet our labor needs, including our ability to find qualified personnel to fill positions that become vacant at our existing stores, clubs, distribution and fulfillment centers and corporate offices, while controlling our associate wage and related labor costs, is generally subject to numerous external factors, including the availability of a sufficient number of qualified persons in the work force of the markets in which we operate, unemployment levels within those markets, prevailing wage rates, changing demographics, health and other insurance costs and adoption of new or revised employment and labor laws and regulations. Additionally, our ability to successfully execute organizational changes, including our enterprise strategy and management transitions within the Company's senior leadership, and to effectively motivate and retain associates are critical to our business success. We compete for talent with other retail and non-retail businesses, including, for example, technology, health and wellness, and fintech businesses, and invest significant resources in training and motivating our associates. Increased competition among potential employers at all levels, including senior management and executive levels, could result in increased associate costs or make it more difficult to recruit and retain associates. If we are unable to locate, attract or retain qualified personnel, or manage leadership transition successfully, the quality of service we provide to our customers may decrease and our financial performance may be adversely affected.

In addition, if our costs of labor or related costs increase for other reasons or if new, revised, or novel interpretations of existing labor laws, rules or regulations or healthcare laws are adopted or implemented that further increase our labor costs, our financial performance could be materially adversely affected.

<u>Financial Risks</u>

**Failure to meet market expectations for our financial performance could adversely affect the market price and volatility of our stock.**

We believe that the price of our stock generally reflects high market expectations for our future operating results. Any failure to meet or delay in meeting these expectations, including our consolidated net sales, consolidated operating income, capital expenditures, comparable store and club sales growth rates, eCommerce growth rates, gross margin, or earnings and adjusted earnings per share could cause the market price of our stock to decline, as could changes in our dividend or stock repurchase programs or policies, changes in our effective tax rates, changes in our financial estimates and recommendations by securities analysts or, failure of Walmart's performance to compare favorably to that of other retailers may have a negative effect on the price of our stock.

**Fluctuations in foreign exchange rates may materially adversely affect our financial performance and our reported results of operations.**

Our operations in countries other than the U.S. are conducted primarily in the local currencies of those countries.  Our Consolidated Financial Statements are denominated in U.S. dollars, and to prepare those financial statements we must translate the amounts of the assets, liabilities, net sales, other revenues and expenses of our operations outside of the U.S. from local currencies into U.S. dollars using exchange rates for the current period.  In recent years, fluctuations in currency exchange rates that were unfavorable have had adverse effects on our reported results of operations.

As a result of such translations, fluctuations in currency exchange rates from period-to-period that are unfavorable to us may also result in our Consolidated Financial Statements reflecting significant adverse period-over-period changes in our financial performance or reflecting a period-over-period improvement in our financial performance that is not as robust as it would be without such fluctuations in the currency exchange rates.  Such unfavorable currency exchange rate fluctuations will adversely affect the reported performance of our Walmart International operating segment and have a corresponding adverse effect on our reported consolidated results of operations.

We may pay for products we purchase for sale in our stores and clubs around the world with a currency other than the local currency of the country in which the goods will be sold.  When we must acquire the currency to pay for such products and the exchange rates for the payment currency fluctuate in a manner unfavorable to us, our cost of sales may increase and we may be unable or unwilling to change the prices at which we sell those goods to address that increase in our costs, with a corresponding adverse effect on our gross profit.  Consequently, unfavorable fluctuations in currency exchange rates have and may continue to adversely affect our results of operations.

**Legal, Tax, Regulatory, Compliance, Reputational and Other Risks**

**Our international operations subject us to legislative, judicial, accounting, legal, regulatory, tax, political and economic risks and conditions specific to the countries or regions in which we operate, which could materially adversely affect our business or financial performance.**

In addition to our U.S. operations, we operate retail and eCommerce businesses in Africa, Canada, Central America, Chile, China, India and Mexico.

During fiscal 2023, our Walmart International operations generated approximately 17% of our consolidated net sales.  Walmart International's operations in various countries also source goods and services from other countries.  Our future operating results in these countries could be negatively affected by a variety of factors, most of which are beyond our control.  These factors include political conditions, including political instability, local and global economic conditions, legal and regulatory constraints (such as regulation of product and service offerings including regulatory restrictions (such as foreign ownership restrictions) on eCommerce and retail operations in international markets, such as India), restrictive governmental actions (such as trade protection measures or nationalization), antitrust and competition law regulatory matters (such as the competition investigations currently underway in Mexico related to our subsidiary Wal-Mart de Mexico, in Canada related to our subsidiary Wal-Mart Canada and competition proceedings in India related to our Flipkart subsidiary), local product safety and environmental laws, tax regulations, local labor laws, anti-money laundering laws and regulations, trade policies, foreign exchange or currency regulations, laws and regulations regarding consumer and data protection, and other matters in any of the countries or regions in which we operate, now or in the future.

The economies of some of the countries in which we have operations have in the past suffered from high rates of inflation and currency devaluations, which, if they occurred again, could adversely affect our financial performance.  Other factors which may impact our international operations include foreign trade, monetary and fiscal policies of the U.S. and of other countries, laws, regulations and other activities of foreign governments, agencies and similar organizations, and risks associated with having numerous facilities located in countries that have historically been less stable than the U.S.  Additional risks inherent in our international operations generally include, among others, the costs and difficulties of managing international operations, adverse tax consequences and greater difficulty in enforcing intellectual property rights in countries other than the U.S.  The various risks inherent in doing business in the U.S. generally also exist when doing business outside of the U.S., and may be exaggerated by the difficulty of doing business in numerous sovereign jurisdictions due to differences in culture, geopolitical tensions or events, laws and regulations.

In foreign countries in which we have operations, a risk exists that our associates, contractors or agents could, in contravention of our policies, engage in business practices prohibited by U.S. laws and regulations applicable to us, such as the Foreign Corrupt Practices Act or the laws and regulations of other countries.  We maintain a global policy prohibiting such business practices and have in place a global anti-corruption compliance program designed to ensure compliance with these laws and regulations.  Nevertheless, we remain subject to the risk that one or more of our associates, contractors or agents, including those based in or from countries where practices that violate such U.S. laws and regulations or the laws and regulations of other countries may be customary, will engage in business practices that are prohibited by our policies, circumvent our compliance

23

programs and, by doing so, violate such laws and regulations.  Any such violations, even if prohibited by our internal policies, could adversely affect our business or financial performance and our reputation.

**Changes in tax and trade laws and regulations could materially adversely affect our financial performance.**

In fiscal 2023, our Walmart U.S. and Sam's Club operating segments generated approximately 83% of our consolidated net sales. Significant changes in tax and trade policies, including tariffs and government regulations affecting trade between the U.S. and other countries where we source many of the products we sell in our stores and clubs could have an adverse effect on our business and financial performance. A significant portion of the general merchandise we sell in our U.S. stores and clubs is manufactured in other countries.  Any such actions including the imposition of further tariffs on imports could increase the cost to us of such merchandise (whether imported directly or indirectly) and cause increases in the prices at which we sell such merchandise to our customers, which could materially adversely affect the financial performance of our U.S. and international operations as well as our business.

We are subject to income taxes and other taxes in both the U.S. and the foreign jurisdictions in which we currently operate or have historically operated.  The determination of our worldwide provision for income taxes and current and deferred tax assets and liabilities requires judgment and estimation.  Our income taxes could be materially adversely affected by earnings being lower than anticipated in jurisdictions that have lower statutory tax rates and higher than anticipated in jurisdictions that have higher statutory tax rates, by changes in the valuation of our deferred tax assets and liabilities, or by changes in worldwide tax laws, tax rates, regulations or accounting principles.

We are also exposed to future tax legislation, as well as the issuance of future regulations and changes in administrative interpretations of existing tax laws, any of which can impact our current and future years' tax provision. The effect of such changes in tax law could have a material effect on our business, financial position and results of operations. In the U.S., the Tax Cuts and Jobs Act of 2017 (the "Tax Act") significantly changed federal income tax laws that affect U.S. corporations. As further guidance is issued by the U.S. Treasury Department, the IRS, and other standard-setting bodies, any resulting changes in our estimates will be treated in accordance with the relevant accounting guidance. Compliance with the Tax Act and any other new tax rules, regulations, guidance, and interpretations, including collecting information not regularly produced by the Company or unexpected changes in our estimates, may require us to incur additional costs and could affect our results of operations.

In addition, legislatures and taxing authorities in many jurisdictions in which we operate may enact changes to or seek to enforce novel interpretations of their tax rules. These changes could include modifications that have temporary effect and more permanent changes.  For example, the Organization for Economic Cooperation and Development (the "OECD"), the European Union and other countries (including countries in which we operate) have committed to enacting substantial changes to numerous long-standing tax principles impacting how large multinational enterprises are taxed. In particular, the OECD's Pillar Two initiative introduces a 15% global minimum tax applied on a country-by-country basis and for which many jurisdictions have now committed to an effective enactment date starting January 1, 2024.  The impact of these potential new rules as well as any other changes in domestic and international tax rules and regulations could have a material effect on our effective tax rate.

Furthermore, we are subject to regular review and audit by both domestic and foreign tax authorities as well as subject to the prospective and retrospective effects of changing tax regulations and legislation.  Although we believe our tax estimates are reasonable, the ultimate tax outcome may materially differ from the tax amounts recorded in our Consolidated Financial Statements and may materially affect our income tax provision, net income, or cash flows in the period or periods for which such determination and settlement is made.

**Changes in and/or failure to comply with other laws, regulations, and interpretations of such laws and regulations specific to the businesses and jurisdictions in which we operate could materially adversely affect our reputation, market position, or our business and financial performance.**

We operate in complex regulated environments in the U.S. and in other countries in which we operate and could be materially adversely affected by changes to existing legal requirements including the related interpretations and enforcement practices, new legal requirements and/or any failure to comply with applicable regulations.  In addition, the degree of regulatory, political, and media scrutiny we face increases the likelihood that our efforts to adhere our practices and procedures to comply with these laws and legal requirements may be subject to frequent or increasing challenges.

Our health and wellness operations in the U.S. and the operations of the Walmart Health locations are subject to numerous federal, state and local laws and regulations including, but not limited to, those related to: licensing, reimbursement arrangements, and other requirements and restrictions; registration and regulation of pharmacies; dispensing and sale of controlled substances and products containing pseudoephedrine; governmental and commercial reimbursement (including Medicare and Medicaid); data privacy and security and the sharing and interoperability of data, including obligations and restrictions related to health information (such as those imposed under HIPAA); billing and coding for healthcare services and properly handling overpayments; debt collection; necessity and adequacy of healthcare services; relationships with referral sources and referral recipients and other fraud and abuse issues, such as those addressed by anti-kickback and false claims laws and patient inducement regulations; qualification of healthcare practitioners; quality and standards of medical services and

24

equipment; and the practice of the professions of pharmacy, medical, dental, and behavioral healthcare services, including limitations on the corporate practice of medicine in certain states.

Health-related legislation at the federal and state level may have an adverse effect on our business or require us to modify certain aspects of our operations.  For example, in the U.S., the Drug Enforcement Administration ("DEA") and various other regulatory authorities regulate the purchase, distribution, maintenance and dispensing of pharmaceuticals and controlled substances.  We are required to hold valid DEA and state-level licenses, meet various security and operating standards and comply with the federal and various state controlled substance acts and related regulations governing the sale, dispensing, disposal and holding of controlled substances.  The DEA, the U.S. Food and Drug Administration and state regulatory authorities have broad enforcement powers, including the ability to seize or recall products and impose significant criminal, civil and administrative sanctions for violations of these laws and regulations. In addition, there has been recent heightened governmental and public scrutiny of pharmaceutical product pricing, which has resulted in federal and state legislation and regulations, executive orders and other initiatives and proposals designed to increase transparency in pharmaceutical product pricing and reform government program reimbursement methodologies (for example, the Inflation Reduction Act, which includes, among other matters, policies designed to impact drug prices and reduce drug spending by the federal government). Other health reform efforts at the federal and state levels may also impact our business or require us to modify certain aspects of our operations. We may not be able to predict the nature or success of reform initiatives, and the resulting uncertainties may have an adverse effect on our business.

We are also governed by foreign, national and state laws and regulations of general applicability, including laws and regulations related to competition and antitrust matters; protection of the environment and health and safety matters, including exposure to, and the management and disposal of, hazardous substances; food and drug safety, including drug supply chain security requirements; trade, consumer protection, and safety, including the availability, sale, price label accuracy, advertisement, and promotion of products we sell and the financial services we offer (including through our digital channels, stores and clubs as well as our ONE fintech joint venture); anti-money laundering prohibitions; consumer financial protection laws; economic, trade, and other sanctions matters; licensure, certification, and enrollment with government programs; data privacy and security and the sharing and interoperability of data; working conditions, health and safety, equal employment opportunity, employee benefit and other labor and employment matters; and health and wellness related regulations for our pharmacy operations outside of the U.S.  In addition, certain financial services we offer or make available are subject to legal and regulatory requirements, including those intended to help detect and prevent money laundering, fraud and other illicit activity as well as consumer financial protections laws and U.S. sanctions.  Increasing governmental and societal attention to ESG matters, including expanding mandatory and voluntary reporting diligence, and disclosure topics such as climate change, sustainability (including with respect to our supply chain), natural resources, waste reduction, energy, human capital, and risk oversight could expand the nature, scope, and complexity of matters that we are required to control, assess, and report.

Moreover, we are also subject to data privacy and protection laws regulating the collection, use, retention, disclosure, transfer and processing of personal information, such as the California Consumer Privacy Act ("CCPA"), which was significantly modified by the California Privacy Rights Act ("CPRA"), new comprehensive privacy legislation passed in Connecticut (the Connecticut Data Protection Act), Colorado (the Colorado Privacy Act), Utah (the Utah Privacy Act) and Virginia (the Consumer Data Protection Act), each of which go into effect in 2023, as well as other laws and regulations such as the Illinois Biometric Information Privacy Act,  the European Union's General Data Protection Regulation ("GDPR"), the United Kingdom's General Data Protection Regulation (which implements the GDPR into U.K. law), China's Personal Information Protection Act, and similar legislation in Quebec (An Act to modernize legislative provisions as regards the protection of personal information, SQ 2021, c 25). The potential effects of these laws are far-reaching, continue to evolve, and may require us to modify our data processing practices and policies and to incur substantial costs and expenses to comply. These and other privacy and cybersecurity laws may carry significant potential penalties for noncompliance. For example, in the case of non-compliance with a material provision of the GDPR (such as non-adherence to the core principles of processing personal data), regulators have the authority to levy a fine in an amount that is up to the greater of €20 million or 4% of global annual turnover in the prior year. These administrative fines are discretionary and based, in each case, on a multi-factored approach.  Residents in jurisdictions with comprehensive privacy laws have expanded rights to access, correct and require deletion of their personal information, opt out of certain personal information sharing and receive detailed information about how their personal information is used. Laws such as those in California, Connecticut, Colorado, Illinois, Utah, and Virginia may allow civil penalties for violations, and CCPA and CPRA provide a private right of action for data breaches.  Furthermore, our marketing and customer engagement activities are subject to communications privacy laws such as the Telephone Consumer Protection Act. We may be subjected to penalties and other consequences for noncompliance, including changing some portions of our business.  Even an unsuccessful challenge by customer or regulatory authorities of our activities could result in adverse publicity, impact our reputation and could require a costly response from and defense by us.

The impact of new laws, regulations and policies and the related interpretations, as well as changes in enforcement practices or regulatory scrutiny as to existing laws and regulations (including, but not limited to, in the U.S., shifting enforcement priorities for existing antitrust, competition, and pricing laws, as well as proposed new rules and regulations) generally cannot be predicted, and changes in applicable laws, regulations and policies and the related interpretations and enforcement practices of

existing laws and regulations may require extensive system and operational changes, be difficult to implement, increase our operating costs, require significant capital expenditures, or adversely impact the cost or attractiveness of the products or services we offer, or result in adverse publicity and harm our reputation. If we fail to predict or respond adequately to changes, including by implementing strategic and operational initiatives, or do not respond as effectively as our competitors, our business, operations, and financial performance may be adversely affected.

In addition, we may face audits or investigations by one or more government agencies relating to our compliance with applicable laws and regulations. The regulatory, political, and media scrutiny we face, which may continue, amplifies these risks. To the extent a regulator or court disagrees with our interpretation of these laws and determines that our practices are not in compliance with applicable laws and regulations, we could be subject to civil and criminal penalties that could adversely affect the continued operation of our businesses, including: suspension of payments from government programs; loss of required licenses and certifications; loss of authorizations to participate in or exclusion from government programs, including the Medicare and Medicaid programs in the U.S.; termination from contractual relationships, including those with our drug suppliers and third-party payers; and significant fines or monetary damages. Failure to comply with applicable legal or regulatory requirements in the U.S. or in any of the countries in which we operate could result in significant legal and financial exposure, damage to our reputation, and have a material adverse effect on our business operations, financial position and results of operations.

**We are subject to risks related to litigation and other legal proceedings that may materially adversely affect our results of operations, financial position and liquidity.**

We operate in a highly regulated and litigious environment. We are involved in legal proceedings, including litigation, arbitration and other claims, and investigations, inspections, audits, claims, inquiries and similar actions by pharmacy, healthcare, tax, environmental and other governmental authorities. We may also have indemnification obligations for legal commitments of certain businesses we have divested. Legal proceedings, in general, and securities, derivative action and class action and multi-district litigation, in particular, can be expensive and disruptive. Some of these suits may purport or may be determined to be class actions and/or involve parties seeking large and/or indeterminate amounts, including punitive or exemplary damages, and may remain unresolved for several years. For example, we are currently a defendant in a number of cases containing class or collective-action allegations, or both, in which the plaintiffs have brought claims under federal and state wage and hour laws, as well as a number of cases containing class-action allegations in which the plaintiffs have brought claims under federal and state consumer laws.

The Company has been responding to subpoenas, information requests and investigations from governmental entities related to nationwide controlled substance dispensing and distribution practices involving opioids and also is a defendant in numerous litigation proceedings related to opioids, including the consolidated multidistrict litigation entitled In re National Prescription Opiate Litigation (MDL No. 2804) currently pending in the U.S. District Court for the Northern District of Ohio. Similar cases that name the Company also have been filed in state courts by state, local and tribal governments, healthcare providers and other plaintiffs. Plaintiffs are seeking compensatory and punitive damages, as well as injunctive relief including abatement. The Company cannot predict the number of such claims that may be filed, and cannot reasonably estimate any loss or range of loss that may arise from such claims and the related opioid matters. In addition, in July 2021, the Directorate of Enforcement in India issued a show cause notice to Flipkart and other parties requesting the recipients show cause as to why further proceedings under India's Foreign Direct Investment rules and regulations should not be initiated against them based on alleged violations that related to a period prior to the Company's acquisition of a majority stake in Flipkart in 2018. The Company can provide no assurance as to the scope or outcome of any proceeding that might result from the notice, the amount of proceeds the Company may receive in indemnification, and can provide no assurance as to whether there will be a material adverse effect to its business or its consolidated financial statements. The Company is also a defendant in litigation with the Federal Trade Commission regarding the Company's money transfer agent services and is also cooperating with and responding to subpoenas issued by the U.S Attorney's Office for the Middle District of Pennsylvania on behalf of the U.S. Department of Justice regarding the Company's consumer fraud prevention program and anti-money laundering compliance related to the Company's money transfer services, where Walmart is an agent. The Company is unable to predict the outcome of the litigation or investigations or any other related actions by governmental entities regarding these matters and can provide no assurance as to the scope and outcome of these matters and whether its business, financial position, results of operations or cash flows will not be materially adversely affected. We discuss in more detail these cases and other litigation to which we are party below under the caption "Item 3. Legal Proceedings" and in Note 10 in the "Notes to our Consolidated Financial Statements," which are part of this Annual Report on Form 10-K.

**Our amended and restated bylaws designate the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by our shareholders, which could increase the costs for our shareholders to bring claims, discourage our shareholders from bringing claims, or limit our shareholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, associates or shareholders in such capacity.**

Our bylaws provide that, unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will, to the fullest extent permitted by law, be the sole and exclusive forum for claims, including derivative claims that are based upon a violation of a duty by a current or former director, officer, associate or shareholder in such capacity or as to which the Delaware General Corporation Law confers jurisdiction upon the Court of Chancery. The exclusive forum provision may increase the costs for a shareholder to bring a claim or limit a shareholder's ability to bring a claim in a judicial forum that the shareholder finds favorable for disputes with us or our directors, officers, associates or shareholders in such capacity, which may discourage such lawsuits against us and such persons. Alternatively, if a court were to find these provisions of our bylaws inapplicable to, or unenforceable in respect of, the claims as to which they are intended to apply, then we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business, financial position or results of operations. While the exclusive forum provision applies to state and federal law claims, our shareholders will not be deemed to have waived our compliance with, and the exclusive forum provision will not preclude or contract the scope of exclusive federal or concurrent jurisdiction for actions brought under, the federal securities laws, including the Securities Exchange Act of 1934, as amended, or the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

**Our reputation may be adversely affected if we are not able to achieve our ESG goals.**

We strive to deliver shared value through our business and our diverse stakeholders expect us to make significant progress in certain ESG priority issue areas. From time to time, we announce certain aspirations and goals relevant to our priority ESG issues. We periodically publish information about our ESG priorities, strategies, and progress on our corporate website and update our ESG reporting from time to time. Achievement of these aspirations and goals is subject to risks and uncertainties, many of which are outside of our control, and it is possible that we may fail, or be perceived to have failed, in the achievement of our ESG goals or that certain of our customers, associates, shareholders, investors, suppliers, business partners, government agencies, and non-governmental organizations might not be satisfied with our goals or our efforts toward achieving those goals. Certain challenges we face in the achievement of our ESG objectives are also captured within our ESG reporting, which is not incorporated by reference into and does not form any part of this Annual Report on Form 10-K. A failure or perceived failure to meet our goals could adversely affect public perception of our business, associate morale or customer or shareholder support.

## ITEM 1B.   UNRESOLVED STAFF COMMENTS

None.

ITEM 2.       PROPERTIES

**United States**

The Walmart U.S. and Sam's Club segments comprise the Company's operations in the U.S.  As of January 31, 2023, unit counts for Walmart U.S. and Sam's Club are summarized by format for each state and territory as follows:

| State or Territory | Walmart U.S. | | | Sam's Club | |
|---|---|---|---|---|---|
| | Supercenters | Discount Stores | Neighborhood Markets and other small formats | Clubs | Grand Total |
| Alabama | 101 | 1 | 29 | 13 | 144 |
| Alaska | 7 | 2 | — | — | 9 |
| Arizona | 83 | 2 | 28 | 12 | 125 |
| Arkansas | 76 | 5 | 36 | 9 | 126 |
| California | 144 | 68 | 78 | 30 | 320 |
| Colorado | 70 | 4 | 18 | 17 | 109 |
| Connecticut | 12 | 20 | 1 | 1 | 34 |
| Delaware | 6 | 3 | — | 1 | 10 |
| Florida | 233 | 9 | 98 | 46 | 386 |
| Georgia | 154 | 2 | 35 | 24 | 215 |
| Hawaii | — | 10 | — | 2 | 12 |
| Idaho | 23 | — | 3 | 1 | 27 |
| Illinois | 139 | 15 | 11 | 25 | 190 |
| Indiana | 97 | 6 | 11 | 13 | 127 |
| Iowa | 58 | 2 | — | 9 | 69 |
| Kansas | 58 | 2 | 15 | 9 | 84 |
| Kentucky | 77 | 7 | 9 | 9 | 102 |
| Louisiana | 88 | 2 | 34 | 14 | 138 |
| Maine | 19 | 3 | — | 3 | 25 |
| Maryland | 31 | 16 | 3 | 11 | 61 |
| Massachusetts | 27 | 21 | 4 | — | 52 |
| Michigan | 90 | 3 | 9 | 23 | 125 |
| Minnesota | 65 | 3 | 1 | 12 | 81 |
| Mississippi | 65 | 3 | 11 | 7 | 86 |
| Missouri | 112 | 9 | 18 | 19 | 158 |
| Montana | 14 | — | — | 2 | 16 |
| Nebraska | 35 | — | 7 | 5 | 47 |
| Nevada | 30 | 2 | 11 | 7 | 50 |
| New Hampshire | 19 | 7 | — | 2 | 28 |
| New Jersey | 35 | 27 | 1 | 8 | 71 |
| New Mexico | 35 | 2 | 9 | 7 | 53 |
| New York | 82 | 16 | 9 | 12 | 119 |
| North Carolina | 143 | 6 | 45 | 22 | 216 |
| North Dakota | 14 | — | — | 3 | 17 |
| Ohio | 138 | 5 | 2 | 27 | 172 |
| Oklahoma | 81 | 7 | 34 | 13 | 135 |
| Oregon | 29 | 7 | 10 | — | 46 |
| Pennsylvania | 116 | 19 | 3 | 24 | 162 |
| Puerto Rico | 13 | 5 | — | 7 | 25 |
| Rhode Island | 5 | 4 | — | — | 9 |
| South Carolina | 83 | — | 26 | 13 | 122 |
| South Dakota | 15 | — | — | 2 | 17 |
| Tennessee | 117 | 1 | 19 | 14 | 151 |
| Texas | 391 | 18 | 110 | 82 | 601 |
| Utah | 41 | — | 11 | 8 | 60 |
| Vermont | 3 | 3 | — | — | 6 |
| Virginia | 110 | 4 | 22 | 15 | 151 |
| Washington | 52 | 9 | 5 | — | 66 |
| Washington D.C. | 3 | — | 2 | — | 5 |
| West Virginia | 38 | — | 1 | 5 | 44 |
| Wisconsin | 83 | 4 | 2 | 10 | 99 |
| Wyoming | 12 | — | — | 2 | 14 |
| **U.S. total** | **3,572** | **364** | **781** | **600** | **5,317** |
| **Square feet** *(in thousands)* | **634,615** | **38,226** | **28,885** | **80,351** | **782,076** |

**International**

The Walmart International segment comprises the Company's operations outside of the U.S.  Unit counts as of January 31, 2023[1] for Walmart International are summarized by major category for each geographic market as follows:

| Geographic Market | Retail | Wholesale | Total | Square feet[2] |
|---|---|---|---|---|
| Africa[3] | 289 | 86 | 375 | 20,939 |
| Canada | 402 | — | 402 | 52,557 |
| Central America[4] | 882 | — | 882 | 13,996 |
| Chile | 379 | 13 | 392 | 17,688 |
| China | 322 | 43 | 365 | 60,331 |
| India | — | 28 | 28 | 1,527 |
| Mexico | 2,694 | 168 | 2,862 | 106,412 |
| **International total** | 4,968 | 338 | 5,306 | 273,450 |

[1] Walmart International unit counts, with the exception of Canada, are as of December 31, 2022, to correspond with the balance sheet date of the related geographic market.  Canada unit counts are as of January 31, 2023.
[2] Square feet reported in thousands.
[3] Africa unit counts primarily reside in South Africa, with other locations in Botswana, Kenya, Lesotho, Malawi, Mozambique, Namibia, Swaziland, and Zambia.
[4] Central America unit counts reside in Costa Rica, El Salvador, Guatemala, Honduras and Nicaragua.

**Owned and Leased Properties**

The following table provides further details of our retail units and distribution facilities, including return facilities and dedicated eCommerce fulfillment centers, as of January 31, 2023[1]:

| | Owned | Leased[2] | Total |
|---|---|---|---|
| **U.S. properties** | | | |
| Walmart U.S. retail units | 4,057 | 660 | 4,717 |
| Sam's Club retail units | 513 | 87 | 600 |
| **Total U.S. retail units** | 4,570 | 747 | 5,317 |
| Walmart U.S. distribution facilities | 110 | 53 | 163 |
| Sam's Club distribution facilities | 12 | 17 | 29 |
| **Total U.S. distribution facilities** | 122 | 70 | 192 |
| **Total U.S. properties** | **4,692** | **817** | **5,509** |
| | | | |
| **International properties** | | | |
| Africa | 33 | 342 | 375 |
| Canada | 124 | 278 | 402 |
| Central America | 380 | 502 | 882 |
| Chile | 205 | 187 | 392 |
| China | 2 | 363 | 365 |
| India | 2 | 26 | 28 |
| Mexico | 710 | 2,152 | 2,862 |
| **Total International retail units** | 1,456 | 3,850 | 5,306 |
| International distribution facilities | 23 | 165 | 188 |
| **Total International properties** | 1,479 | 4,015 | 5,494 |
| **Total properties** | **6,171** | **4,832** | **11,003** |
| | | | |
| **Total retail units** | 6,026 | 4,597 | 10,623 |
| **Total distribution facilities** | 145 | 235 | 380 |
| **Total properties** | **6,171** | **4,832** | **11,003** |

[1] Walmart International properties, with the exception of Canada, are as of December 31, 2022, to correspond with the balance sheet date of the related geographic market. Canada unit counts are as of January 31, 2023.
[2] Also includes U.S. and international distribution facilities which are third-party owned and operated.

We own office facilities in Bentonville, Arkansas, that serve as our principal office and own and lease office facilities throughout the U.S. and internationally for operations as well as for field and market management.  The land on which our stores are located is either owned or leased by the Company.  We use independent contractors to construct our buildings.  All store leases provide for annual rentals, some of which escalate during the original lease or provide for additional rent based on sales volume.  Substantially all of the Company's store and club leases have renewal options, some of which include rent escalation clauses. For further information on our distribution centers, see the caption "Distribution" provided for each of our segments under "Item 1. Business."

**ITEM 3.**      **LEGAL PROCEEDINGS**

**I. SUPPLEMENTAL INFORMATION:** We discuss certain legal proceedings in Note 10 to our Consolidated Financial Statements included in "Item 8. Financial Statements and Supplementary Data," which is captioned "Contingencies," under the sub-caption "Legal Proceedings."  We refer you to that discussion for important information concerning those legal proceedings, including the basis for such actions and, where known, the relief sought.  We provide the following additional information concerning those legal proceedings, including the name of the lawsuit, the court in which the lawsuit is pending, and the date on which the petition commencing the lawsuit was filed.

**Prescription Opiate Litigation:** *In re National Prescription Opiate Litigation* (MDL No. 2804) (the "MDL"). The MDL is pending in the U.S. District Court for the Northern District of Ohio and includes over 2,000 cases as of March 3, 2023. The liability phase of a single, two-county trial in one of the MDL cases against a number of parties, including the Company, regarding opioid dispensing claims resulted in a jury verdict on November 23, 2021, finding in favor of the plaintiffs as to the liability of all defendants, including the Company. The abatement phase of the single, two-county trial resulted in a judgment on August 17, 2022, that ordered all three defendants, including the Company, to pay an aggregate amount of approximately $651 million over fifteen years, on a joint and several liability basis, and granted the plaintiffs injunctive relief. The Company has filed an appeal with the Sixth Circuit Court of Appeals. The monetary aspect of the judgment is stayed pending appeal, and the injunctive portion of the judgment went into effect on February 20, 2023. The MDL has designated five additional single-county cases as bellwethers to proceed through discovery. In addition, there are over 300 other cases pending in state and federal courts throughout the country as of March 3, 2023. The case citations and currently scheduled trial dates, where applicable, are listed on Exhibit 99.1 to this Form 10-K.

**Opioid Settlement Framework:** On November 15, 2022, the Company announced that it had agreed to a Settlement Framework to resolve substantially all opioids-related lawsuits filed against the Company by states, political subdivisions, and Native American tribes (other than the single, two-county trial on appeal to the Sixth Circuit Court of Appeals as described above), as described in more detail in Note 10 to the Consolidated Financial Statements. The Company now has settlement agreements with all 50 states, including four states that previously settled with the Company, as well as the District of Columbia, Puerto Rico, and three other U.S. territories, that are intended to resolve substantially all opioids-related lawsuits brought by state and local governments against the Company. The settlement will take effect if a sufficient number of political subdivisions also join.

**DOJ Opioid Civil Litigation:** A civil complaint pending in the U.S. District Court for the District of Delaware has been filed by the U.S. Department of Justice (the "DOJ") against the Company, in which the DOJ alleges violations of the Controlled Substances Act related to nationwide distribution and dispensing of opioids. U.S. v. Walmart Inc., et al., USDC, Dist. of DE, 12/22/20. The Company filed a motion to dismiss the DOJ complaint on February 22, 2021. After the parties had fully briefed the Company's motion to dismiss, the DOJ filed an amended complaint on October 7, 2022. On November 7, 2022, the Company filed a partial motion to dismiss the amended complaint. The motion remains pending.

**Opioids Related Securities Class Actions and Derivative Litigation**: Three derivative complaints and two securities class actions drawing heavily on the allegations of the DOJ complaint have been filed in Delaware naming the Company and various current and former directors and certain current and former officers as defendants. The plaintiffs in the derivative suits (in which the Company is a nominal defendant) allege, among other things, that the defendants breached their fiduciary duties in connection with oversight of opioids dispensing and distribution and that the defendants violated Section 14(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and are liable for contribution under Section 10(b) of the Exchange Act in connection with the Company's disclosures about opioids. Two of the derivative suits have been filed in the U.S. District Court in Delaware and those suits have been stayed pending further developments in other opioids litigation matters. The other derivative suit has been filed in the Delaware Court of Chancery. The defendants in the derivative suit pending in the Delaware Court of Chancery moved to dismiss and/or to stay that case on December 21, 2021; the plaintiffs responded by filing an amended complaint on February 22, 2022. On April 20, 2022, the defendants moved to dismiss and/or stay proceedings on the amended complaint. The court held a hearing on that motion on September 26, 2022; a ruling remains pending. The securities class actions, alleging violations of Sections 10(b) and 20(a) of the Exchange Act regarding the Company's disclosures with respect to opioids, purport to be filed on behalf of a class of investors who acquired Walmart stock from March 30, 2016, through December 22, 2020. On May 11, 2021, the U.S. District Court in Delaware consolidated the class actions and appointed a lead plaintiff and lead counsel. The defendants moved to dismiss the consolidated securities class action on October 8, 2021. On October 14, 2022, plaintiffs filed an amended complaint, which revised the applicable putative class of investors to those who acquired Walmart stock from March 31, 2017, through December 22, 2020. On November 16, 2022, the Company moved to dismiss the amended complaint. That motion remains pending.

**Derivative Lawsuits:** *Abt v. Alvarez et al.*, USDC, Dist. of DE, 2/9/21; *Nguyen v. McMillon et al.,* USDC, Dist. of DE, 4/16/21: *Ontario Provincial Council of Carpenters' Pension Trust Fund et al. v. Walton et al.,* DE Court of Chancery, 9/27/21.

**Securities Class Actions:** *Stanton v. Walmart Inc. et al.*, USDC, Dist. of DE, 1/20/21 and *Martin v. Walmart Inc. et al.,* USDC, Dist. of DE, 3/5/21, consolidated into *In re Walmart Inc. Securities Litigation*, USDC, Dist. of DE, 5/11/21.

**ASDA Equal Value Claims:** Ms S Brierley & Others v. ASDA Stores Ltd (2406372/2008 & Others – Manchester Employment Tribunal); Abbas & Others v Asda Stores limited (KB-2022-003243); and Abusubih & Others v Asda Stores limited (KB-2022-003240).

**Money Transfer Agent Services Litigation:** Federal Trade Commission v. Walmart Inc. (CV-3372), USDC, N. Dist. Of Ill, 6/28/22.

## II. CERTAIN OTHER MATTERS:

**Foreign Direct Investment Matters:** In July 2021, the Directorate of Enforcement in India issued a show cause notice to Flipkart Private Limited and one of its subsidiaries ("Flipkart"), and to unrelated companies and individuals, including certain current and former shareholders and directors of Flipkart. The notice requests the recipients to show cause as to why further proceedings under India's Foreign Direct Investment rules and regulations (the "Rules") should not be initiated against them based on alleged violations during the period from 2009 to 2015, prior to the Company's acquisition of a majority stake in Flipkart in 2018. The notice is an initial stage of proceedings under the Rules which could, depending upon the conclusions at the end of the initial stage, lead to a hearing to consider the merits of the allegations described in the notice. If a hearing is initiated and if it is determined that violations of the Rules occurred, the regulatory authority has the authority to impose monetary and/or non-monetary relief. Flipkart has begun the process of responding to the notice and, if the matter progresses to a consideration of the merits of the allegations described in the notice is initiated, Flipkart intends to defend against the allegations vigorously. Due to the fact that this process is in an early stage, the Company is unable to predict whether the notice will lead to a hearing on the merits or, if it does, the final outcome of the resulting proceedings. While the Company does not currently believe that this matter will have a material adverse effect on its business, financial condition, results of operations or cash flows, the Company can provide no assurance as to the scope or outcome of any proceeding that might result from the notice, the amount of the proceeds the Company may receive in indemnification from individuals and entities that sold shares to the Company under the 2018 agreement pursuant to which the Company acquired its majority stake in Flipkart, and can provide no assurance as to whether there will be a material adverse effect to its business or its consolidated financial statements.

**III. ENVIRONMENTAL MATTERS:** Item 103 of SEC Regulation S-K requires disclosure of certain environmental matters when a governmental authority is a party to the proceedings and such proceedings involve potential monetary sanctions that the Company reasonably believes will exceed an applied threshold not to exceed $1 million.

In December 2021, the Office of the Attorney General of the State of California filed suit against the Company, bringing enforcement claims regarding Walmart's management of waste consumer products at its California facilities that are alleged to be hazardous. The suit was filed in Superior Court of Alameda County, California, Case No. 21CV004367, People v. Walmart Inc., and a trial date has been scheduled for April 22, 2024. The Company believes the suit is without merit and is vigorously defending this litigation matter. While the Company cannot predict the ultimate outcome of this matter, the potential for penalties or settlement costs could exceed $1 million. Although the Company does not believe that this matter will have a material adverse effect on its business, financial position, results of operations, or cash flows, the Company can provide no assurance as to the scope and outcome of this matter and no assurance as to whether there will be a material adverse effect to its business or its consolidated financial statements.

**ITEM 4.**      **MINE SAFETY DISCLOSURES**

Not applicable.

**PART II**

**ITEM 5.     MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

**Market for Common Stock**

The principal market on which Walmart's common stock is listed for trading is the New York Stock Exchange.  The common stock trades under the symbol "WMT."

**Holders of Record of Common Stock**

As of March 15, 2023, there were 205,465 holders of record of Walmart's common stock.

**Stock Performance Chart**

This graph compares the cumulative total shareholder return on Walmart's common stock during the five fiscal years ended through fiscal 2023 to the cumulative total returns on the S&P 500 Retailing Index and the S&P 500 Index.  The comparison assumes $100 was invested on February 1, 2018 in shares of our common stock and in each of the indices shown and assumes that all of the dividends were reinvested.



**COMPARISON OF 5 YEAR CUMULATIVE TOTAL RETURN\***
**Among Walmart Inc., the S&P 500 Index**
**and S&P 500 Retailing Index**
**(Fiscal Years Ended January 31)**

**\*Assumes $100 Invested on February 1, 2018**
**Assumes Dividends Reinvested**
**Fiscal Year ended January 31, 2023**

| | Fiscal Years Ended January 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Walmart Inc. | $    100.00 | $    92.03 | $    112.17 | $    139.96 | $    141.50 | $    147.89 |
| S&P 500 Index | 100.00 | 97.69 | 118.87 | 139.37 | 171.83 | 157.71 |
| S&P 500 Retailing Index | 100.00 | 108.42 | 127.45 | 180.19 | 195.77 | 160.10 |

**Issuer Repurchases of Equity Securities**

From time to time, the Company repurchases shares of our common stock under share repurchase programs authorized by the Company's Board of Directors.  All repurchases made during the fiscal year prior to November 21, 2022 were made under the plan in effect at the beginning of fiscal 2022.  In November 2022, the Company approved a new $20.0 billion share repurchase program which, beginning on November 21, 2022, replaced the previous share repurchase program.  As of January 31, 2023, authorization for $19.3 billion of share repurchases remained under the share repurchase program.  Any repurchased shares are constructively retired and returned to an unissued status.

Share repurchase activity under our share repurchase programs, on a trade date basis, for each month in the quarter ended January 31, 2023, was as follows:

| Fiscal Period | Total Number of Shares Repurchased | Average Price Paid per Share (in dollars) | Total Number of Shares Repurchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Repurchased Under the Plans or Programs[1] (in billions) |
|---|---|---|---|---|
| November 1-30, 2022 | 3,972,269 | $ 144.52 | 3,972,269 | $ 19.9 |
| December 1-31, 2022 | 2,035,515 | 145.82 | 2,035,515 | 19.6 |
| January 1-31, 2023 | 2,108,707 | 143.15 | 2,108,707 | 19.3 |
| **Total** | 8,116,491 | | 8,116,491 | |

[1]  Represents the approximate dollar value of shares that could have been repurchased under the current plan at the end of the month. The approximate dollar value of shares that could still have been purchased under the plan in effect at the beginning of fiscal 2022, as of November 21, 2022, when such plan was replaced, was $1.4 billion.

## ITEM 6.    RESERVED

<u>ITEM 7.</u>       <u>MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS</u>

**Overview**

This discussion, which presents our results for the fiscal years ended January 31, 2023 ("fiscal 2023"), January 31, 2022 ("fiscal 2022") and January 31, 2021 ("fiscal 2021"), should be read in conjunction with our Consolidated Financial Statements and the accompanying notes.  We intend for this discussion to provide the reader with information that will assist in understanding our financial statements, the changes in certain key items in those financial statements from period to period and the primary factors that accounted for those changes.  We also discuss certain performance metrics that management uses to assess the Company's performance.  Additionally, the discussion provides information about the financial results of each of the three segments to provide a better understanding of how each of those segments and its results of operations affect the financial position and results of operations of the Company as a whole.

Throughout this Item 7, we discuss segment operating income, comparable store and club sales and other measures.  Management measures the results of the Company's segments using each segment's operating income, including certain corporate overhead allocations, as well as other measures.  From time to time, we revise the measurement of each segment's operating income and other measures as determined by the information regularly reviewed by our chief operating decision maker.

Management also measures the results of comparable store and club sales, or comparable sales, a metric that indicates the performance of our existing stores and clubs by measuring the change in sales for such stores and clubs, for a particular period from the corresponding period in the previous year.  Walmart's definition of comparable sales includes sales from stores and clubs open for the previous 12 months, including remodels, relocations, expansions and conversions, as well as eCommerce sales.  We measure the eCommerce sales impact by including all sales initiated digitally, including omni-channel transactions which are fulfilled through our stores and clubs as well as certain other business offerings that are part of our flywheel strategy, such as our Walmart Connect advertising business.  Sales at a store that has changed in format are excluded from comparable sales when the conversion of that store is accompanied by a relocation or expansion that results in a change in the store's retail square feet of more than five percent.  Sales related to divested businesses are excluded from comparable sales, and sales related to acquisitions are excluded until such acquisitions have been owned for 12 months.  Comparable sales are also referred to as "same-store" sales by others within the retail industry.  The method of calculating comparable sales varies across the retail industry.  As a result, our calculation of comparable sales is not necessarily comparable to similarly titled measures reported by other companies.

In discussing our operating results, the term currency exchange rates refers to the currency exchange rates we use to convert the operating results for countries where the functional currency is not the U.S. dollar into U.S. dollars.  We calculate the effect of changes in currency exchange rates as the difference between current period activity translated using the current period's currency exchange rates and the comparable prior year period's currency exchange rates.  Additionally, no currency exchange rate fluctuations are calculated for non-USD acquisitions until owned for 12 months.  Throughout our discussion, we refer to the results of this calculation as the impact of currency exchange rate fluctuations.  Volatility in currency exchange rates may impact the results, including net sales and operating income, of the Company and the Walmart International segment in the future.

We have taken certain strategic actions to strengthen our portfolio, primarily in the Walmart International segment, including the following highlights over the last three years:

- In November 2020, we completed the sale of Walmart Argentina and recorded a pre-tax non-cash loss in fiscal 2021 of $1.0 billion, primarily due to cumulative foreign currency translation losses.  Refer to <u>Note 12</u>.

- In February 2021, we completed the sale of Asda for net consideration of $9.6 billion, for which we recognized an estimated pre-tax loss in fiscal 2021 of $5.5 billion, and an incremental loss of $0.2 billion in fiscal 2022 upon closing of the transaction.  Refer to <u>Note 11</u> and <u>Note 12</u>.

- In March 2021, we completed the sale of Seiyu for net consideration of $1.2 billion, for which we recognized an estimated pre-tax loss in fiscal 2021 of $1.9 billion, and an incremental loss of $0.2 billion in fiscal 2022 upon closing of the transaction.  Refer to <u>Note 12</u>.

- In November 2022, we completed the buyout of the noncontrolling interest shareholders of our Massmart subsidiary (Refer to <u>Note 3</u>) and in December 2022, we exited operations in certain countries in Africa.

- In December 2022, we increased our ownership in PhonePe as part of the separation from our majority-owned Flipkart subsidiary.  Refer to <u>Note 3</u>.

We operate in a highly competitive omni-channel retail industry in all of the markets we serve.  We face strong sales competition from other discount, department, drug, dollar, variety and specialty stores, warehouse clubs and supermarkets, as well as eCommerce, health and wellness, financial services, advertising, and data service businesses.  Many of these competitors are national, regional or international chains or have a national or international omni-channel or eCommerce

presence. We compete with a number of companies for attracting and retaining quality associates. We, along with other retail companies, are influenced by a number of factors including, but not limited to: catastrophic events, weather and other risks related to climate change, global health epidemics, including the COVID-19 pandemic, competitive pressures, consumer disposable income, consumer debt levels and buying patterns, consumer credit availability, disruptions in supply chain, inventory management, cost and availability of goods, currency exchange rate fluctuations, customer preferences, inflation, deflation, fuel and energy prices, general economic conditions, insurance costs, interest rates, labor availability and costs, tax rates, the imposition of tariffs, cybersecurity attacks and unemployment. Further information on the factors that can affect our operating results and on certain risks to our Company and an investment in its securities can be found herein under "Item 1A. Risk Factors."

We are committed to helping customers save money and live better through everyday low prices, supported by everyday low costs. However, like other retail companies, we have seen supply chain disruptions contributing to higher than normal inventory levels throughout the year. In addition, our merchandise costs for the fiscal year ended January 31, 2023 have been impacted by high inflation, greater than what we have experienced in recent years. The impact to our net sales and gross profit margin is influenced in part by our pricing and merchandising strategies in response to cost increases. Those pricing strategies include, but are not limited to: absorbing cost increases instead of passing those cost increases on to our customers and members; reducing prices in certain merchandise categories; focusing on opening price points for certain food categories; and when necessary, passing cost increases on to our customers and members. Merchandising strategies include, but are not limited to: working with our suppliers to reduce product costs and share in absorbing cost increases; focusing on private label brands and smaller pack sizes; earlier-than-usual purchasing and in greater volumes or moderating purchasing in certain categories; and securing ocean carrier and container capacity. These strategies have and may continue to impact gross profit as a percentage of net sales.

We expect continued uncertainty in our business and the global economy due to pressure from inflation; swings in macroeconomic conditions and their effect on consumer confidence; volatility in employment trends; supply chain pressures; and ongoing uncertainties related to global health epidemics or pandemics, any of which may impact our results. For a detailed discussion on results of operations by reportable segment, refer to "Results of Operations" below.

## Company Performance Metrics

We are committed to helping customers save money and live better through everyday low prices, supported by everyday low costs. At times, we adjust our business strategies to maintain and strengthen our competitive positions in the countries in which we operate. We define our financial framework as:

- strong, efficient growth;
- consistent operating discipline; and
- strategic capital allocation.

As we execute on this financial framework, we believe our returns on capital will improve over time.

### Strong, Efficient Growth

Our objective of prioritizing strong, efficient growth means we will focus on the most productive growth opportunities, increasing comparable store and club sales through increasing membership at Sam's Club and through Walmart+, accelerating eCommerce sales growth and expanding omni-channel initiatives that complement our flywheel strategy. At times, we make strategic investments which are focused on the long-term growth of the Company.

Comparable sales is a metric that indicates the performance of our existing stores and clubs by measuring the change in sales for such stores and clubs, including eCommerce sales, for a particular period over the corresponding period in the previous year. The retail industry generally reports comparable sales using the retail calendar (also known as the 4-5-4 calendar). To be consistent with the retail industry, we provide comparable sales using the retail calendar in our quarterly earnings releases. However, when we discuss our comparable sales below, we are referring to our calendar comparable sales calculated using our fiscal calendar, which may result in differences when compared to comparable sales using the retail calendar.

Calendar comparable sales, including the impact of fuel, for fiscal 2023 and 2022, were as follows:

| | Fiscal Years Ended January 31, | | | |
| | 2023 | 2022 | 2023 | 2022 |
| | With Fuel | | Fuel Impact | |
|---|---|---|---|---|
| Walmart U.S. | 7.0% | 6.4% | 0.4% | 0.3% |
| Sam's Club | 14.6% | 15.0% | 4.2% | 5.5% |
| Total U.S. | 8.2% | 7.7% | 1.0% | 1.2% |

Comparable sales in the U.S., including fuel, increased 8.2% and 7.7% in fiscal 2023 and 2022, respectively, when compared to the previous fiscal year. Walmart U.S. comparable sales increased 7.0% and 6.4% in fiscal 2023 and 2022, respectively. For

fiscal 2023, comparable sales growth was driven by growth in average ticket, including strong food sales and higher inflation impacts in certain merchandise categories, as well as growth in transactions. For fiscal 2022, comparable sales growth was driven driven by growth in average ticket and transactions, which included strong consumer spending from government stimulus and some higher inflation impacts in certain merchandise categories compared to recent years. Walmart U.S. eCommerce sales positively contributed approximately 0.7% to comparable sales for both fiscal 2023 and 2022 as we continue to focus on a seamless omni-channel experience for our customers.

Comparable sales at Sam's Club increased 14.6% and 15.0% in fiscal 2023 and 2022, respectively. For fiscal 2023, Sam's Club comparable sales benefited from growth in transactions and average ticket and included higher inflation impacts in certain merchandise categories. Sam's Club comparable sales for fiscal 2022 benefited from growth in transactions and average ticket and was aided by consumer spending due to government stimulus, and also included some higher inflation impacts in certain merchandise categories compared to recent years. The growth in comparable sales was partially offset by our decision to remove tobacco from certain club locations. Sam's Club eCommerce sales positively contributed approximately 0.8% and 1.3% to comparable sales for fiscal 2023 and 2022, respectively.

**Consistent Operating Discipline**

We operate with discipline by managing expenses, optimizing the efficiency of how we work and creating an environment in which we have sustainable lowest cost to serve. We invest in technology and process improvements to increase productivity, manage inventory and reduce costs. We measure operating discipline through expense leverage, which we define as net sales growing at a faster rate than operating, selling, general and administrative ("operating") expenses.

| | | Fiscal Years Ended January 31, | |
|---|---|---|---|
| *(Amounts in millions, except unit counts)* | | **2023** | **2022** |
| Net sales | $ | 605,881 | $ 567,762 |
| Percentage change from comparable period | | 6.7 % | 2.3 % |
| Operating, selling, general and administrative expenses | $ | 127,140 | $ 117,812 |
| Percentage change from comparable period | | 7.9 % | 1.3 % |
| Operating, selling, general and administrative expenses as a percentage of net sales | | 21.0 % | 20.8 % |

For fiscal 2023, operating expenses as a percentage of net sales increased 23 basis points when compared to the previous fiscal year. Operating expenses as a percentage of net sales were impacted by charges of $3.3 billion related to opioid-related legal settlements and charges of $0.8 billion related to the reorganization and restructuring of certain businesses in the Walmart International segment. These charges were partially offset by growth in net sales and lower incremental COVID-19 costs.

For fiscal 2022, operating expenses as a percentage of net sales decreased 19 basis points when compared to the previous fiscal year. Operating expenses as a percentage of net sales benefited from growth in comparable sales and lower incremental COVID-19 related costs of $2.5 billion as compared to the previous year, partially offset by increased wage investments primarily in the Walmart U.S. segment.

**Strategic Capital Allocation**

Our strategy includes improving our customer-facing initiatives in stores and clubs and creating a seamless omni-channel experience for our customers. As such, we continue to allocate more capital to supply chain, omni-channel initiatives, technology and store remodels and less to new store and club openings. The following table provides additional detail:

| | | Fiscal Years Ended January 31, | |
|---|---|---|---|
| *(Amounts in millions)* | | | |
| **Allocation of Capital Expenditures** | | **2023** | **2022** |
| Supply chain, customer-facing initiatives and technology | $ | 9,209 | $ 7,197 |
| Store and club remodels | | 4,990 | 3,278 |
| New stores and clubs, including expansions and relocations | | 33 | 134 |
| **Total U.S.** | $ | 14,232 | $ 10,609 |
| Walmart International | | 2,625 | 2,497 |
| **Total capital expenditures** | $ | 16,857 | $ 13,106 |

**Returns**

As we execute our financial framework, we believe our return on capital will improve over time. We measure return on capital with our return on assets, return on investment and free cash flow metrics. We also provide returns in the form of share repurchases and dividends, which are discussed in the Liquidity and Capital Resources section.

*Return on Assets and Return on Investment*

We include Return on Assets ("ROA"), the most directly comparable measure based on our financial statements presented in accordance with generally accepted accounting principles in the U.S. ("GAAP"), and Return on Investment ("ROI") as metrics

to assess returns on assets. While ROI is considered a non-GAAP financial measure, management believes ROI is a meaningful metric to share with investors because it helps investors assess how effectively Walmart is deploying its assets. Trends in ROI can fluctuate over time as management balances long-term strategic initiatives with possible short-term impacts. ROA was 4.6% and 5.6% for fiscal 2023 and 2022, respectively. The decrease in ROA was primarily due to the decrease in net income, which was driven by lower operating income, partially offset by lapping debt extinguishment charges. ROI was 12.7% and 14.9% for fiscal 2023 and 2022, respectively, which was primarily due to a decrease in operating income which included charges associated with opioid-related legal settlements as well as reorganization and restructuring expenses, all recorded in fiscal 2023.

We define ROI as adjusted operating income (operating income plus interest income, depreciation and amortization, and rent expense) for the trailing twelve months divided by average invested capital during that period. We consider average invested capital to be the average of our beginning and ending total assets, plus average accumulated depreciation and average amortization, less average accounts payable and average accrued liabilities for that period.

Our calculation of ROI is considered a non-GAAP financial measure because we calculate ROI using financial measures that exclude and include amounts that are included and excluded in the most directly comparable GAAP financial measure. For example, we exclude the impact of depreciation and amortization from our reported operating income in calculating the numerator of our calculation of ROI. As mentioned above, we consider ROA to be the financial measure computed in accordance with GAAP most directly comparable to our calculation of ROI. ROI differs from ROA (which is consolidated net income for the period divided by average total assets for the period) because ROI: adjusts operating income to exclude certain expense items and adds interest income; and adjusts total assets for the impact of accumulated depreciation and amortization, accounts payable and accrued liabilities to arrive at total invested capital. Because of the adjustments mentioned above, we believe ROI more accurately measures how we are deploying our key assets and is more meaningful to investors than ROA. Although ROI is a standard financial measure, numerous methods exist for calculating a company's ROI. As a result, the method used by management to calculate our ROI may differ from the methods used by other companies to calculate their ROI.

The calculation of ROA and ROI, along with a reconciliation of ROI to the calculation of ROA, the most comparable GAAP financial measure, is as follows:

| | Fiscal Years Ended January 31, | |
| --- | --- | --- |
| *(Amounts in millions)* | **2023** | **2022** |
| **CALCULATION OF RETURN ON ASSETS** | | |
| **Numerator** | | |
| Consolidated net income | $ 11,292 | $ 13,940 |
| **Denominator** | | |
| Average total assets[1] | $ 244,029 | $ 248,678 |
| **Return on assets (ROA)** | 4.6 % | 5.6 % |
| | | |
| **CALCULATION OF RETURN ON INVESTMENT** | | |
| **Numerator** | | |
| Operating income | $ 20,428 | $ 25,942 |
| + Interest income | 254 | 158 |
| + Depreciation and amortization | 10,945 | 10,658 |
| + Rent | 2,306 | 2,274 |
| ROI operating income | $ 33,933 | $ 39,032 |
| | | |
| **Denominator** | | |
| Average total assets[1] | $ 244,029 | $ 248,678 |
| + Average accumulated depreciation and amortization[1] | 106,249 | 98,199 |
| - Average accounts payable[1] | 54,502 | 52,201 |
| - Average accrued liabilities[1] | 28,593 | 32,013 |
| Average invested capital | $ 267,183 | $ 262,663 |
| **Return on investment (ROI)** | 12.7 % | 14.9 % |

[1] The average is based on the addition of the account balance at the end of the current period to the account balance at the end of the prior period and dividing by 2.

| | As of January 31, | | |
| --- | --- | --- | --- |
| | **2023** | **2022** | **2021** |
| **Certain Balance Sheet Data** | | | |
| Total assets | $ 243,197 | $ 244,860 | $ 252,496 |
| Accumulated depreciation and amortization | 110,286 | 102,211 | 94,187 |
| Accounts payable | 53,742 | 55,261 | 49,141 |
| Accrued liabilities | 31,126 | 26,060 | 37,966 |

*Free Cash Flow*

Free cash flow is considered a non-GAAP financial measure.  Management believes, however, that free cash flow, which measures our ability to generate additional cash from our business operations, is an important financial measure for use in evaluating the Company's financial performance.  Free cash flow should be considered in addition to, rather than as a substitute for, consolidated net income as a measure of our performance and net cash provided by operating activities as a measure of our liquidity.  See "Liquidity and Capital Resources" for discussions of GAAP metrics including net cash provided by operating activities, net cash used in investing activities and net cash used in financing activities.

We define free cash flow as net cash provided by operating activities in a period minus payments for property and equipment made in that period.  We had net cash provided by operating activities of $28.8 billion, $24.2 billion and $36.1 billion for fiscal 2023, 2022 and 2021, respectively.  We generated free cash flow of $12.0 billion, $11.1 billion and $25.8 billion for fiscal 2023, 2022 and 2021, respectively.  Net cash provided by operating activities for fiscal 2023 increased when compared to fiscal 2022. The increase is primarily due to moderated levels of inventory purchases, partially offset by a decline in operating income and the timing of certain payments.  Free cash flow for fiscal 2023 increased when compared to fiscal 2022 due to the increase in operating cash flows described above, partially offset by an increase of $3.8 billion in capital expenditures to support our investment strategy.  Net cash provided by operating activities for fiscal 2022 decreased when compared to fiscal 2021 primarily due to an increase in inventory costs and purchases to support strong sales and lapping the impact of accelerated inventory sell-through in fiscal 2021, as well as timing and payment of wages. Free cash flow for fiscal 2022 decreased when compared to fiscal 2021 due to the same reasons as the decrease in net cash provided by operating activities, as well as $2.8 billion in increased capital expenditures.

Walmart's definition of free cash flow is limited in that it does not represent residual cash flows available for discretionary expenditures due to the fact that the measure does not deduct the payments required for debt service and other contractual obligations or payments made for business acquisitions.  Therefore, we believe it is important to view free cash flow as a measure that provides supplemental information to our Consolidated Statements of Cash Flows.

Although other companies report their free cash flow, numerous methods may exist for calculating a company's free cash flow. As a result, the method used by management to calculate our free cash flow may differ from the methods used by other companies to calculate their free cash flow.

The following table sets forth a reconciliation of free cash flow, a non-GAAP financial measure, to net cash provided by operating activities, which we believe to be the GAAP financial measure most directly comparable to free cash flow, as well as information regarding net cash used in investing activities and net cash used in financing activities.

| | **Fiscal Years Ended January 31,** | | | | | |
|---|---|---|---|---|---|---|
| *(Amounts in millions)* | **2023** | | **2022** | | **2021** | |
| Net cash provided by operating activities | $ | 28,841 | $ | 24,181 | $ | 36,074 |
| Payments for property and equipment | | (16,857) | | (13,106) | | (10,264) |
| **Free cash flow** | $ | 11,984 | $ | 11,075 | $ | 25,810 |
| | | | | | | |
| Net cash used in investing activities[1] | $ | (17,722) | $ | (6,015) | $ | (10,071) |
| Net cash used in financing activities | | (17,039) | | (22,828) | | (16,117) |

[1] "Net cash used in investing activities" includes payments for property and equipment, which is also included in our computation of free cash flow.

**Results of Operations**

*Consolidated Results of Operations*

| (Amounts in millions, except unit counts) | | **Fiscal Years Ended January 31,** | | | | |
|---|---|---|---|---|---|---|
| | | **2023** | | **2022** | | **2021** |
| Total revenues | $ | 611,289 | $ | 572,754 | $ | 559,151 |
| Percentage change from comparable period | | 6.7 % | | 2.4 % | | 6.7 % |
| Net sales | $ | 605,881 | $ | 567,762 | $ | 555,233 |
| Percentage change from comparable period | | 6.7 % | | 2.3 % | | 6.8 % |
| Total U.S. calendar comparable sales increase | | 8.2 % | | 7.7 % | | 8.7 % |
| Gross profit rate | | 23.5 % | | 24.4 % | | 24.3 % |
| Operating income | $ | 20,428 | $ | 25,942 | $ | 22,548 |
| Operating income as a percentage of net sales | | 3.4 % | | 4.6 % | | 4.1 % |
| Loss on extinguishment of debt | $ | — | $ | 2,410 | $ | — |
| Other (gains) and losses | $ | 1,538 | $ | 3,000 | $ | (210) |
| Consolidated net income | $ | 11,292 | $ | 13,940 | $ | 13,706 |
| Unit counts at period end[1] | | 10,623 | | 10,593 | | 11,443 |
| Retail square feet at period end[1] | | 1,056 | | 1,060 | | 1,121 |

[1]  Unit counts and associated retail square feet are presented for stores and clubs generally open as of period end, and reflects the removal of stores in the U.K. and Japan subsequent to closing the divestitures in fiscal 2022.  Permanently closed locations are not included in these metrics.

Our total revenues, which includes net sales and membership and other income, increased $38.5 billion or 6.7% and $13.6 billion or 2.4% for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year.  These increases in revenues were primarily due to increases in net sales, which increased $38.1 billion or 6.7% and $12.5 billion or 2.3% for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year.  For fiscal 2023, the increase was primarily due to strong positive comparable sales for the Walmart U.S. and Sam's Club segments which was driven by growth in average ticket, including strong food sales and higher inflation impacts in certain merchandise categories, as well as growth in transactions, along with positive comparable sales in all of our international markets.  Additionally, net sales were negatively impacted by a decrease of $5.0 billion related to the divestiture of our operations in the U.K. and Japan, which closed in the first quarter of fiscal 2022 and $3.7 billion of fluctuations in currency exchange rates during fiscal 2023.  For fiscal 2022, the increase was primarily due to strong positive comparable sales for the Walmart U.S. and Sam's Club which benefited from strong U.S. consumer spending and some inflation, along with positive comparable sales in most of our remaining international markets.  The increase was partially offset by a $32.6 billion net sales decrease primarily related to the divestiture of our operations in the U.K. and Japan, which closed in the first quarter of fiscal 2022. Net sales also benefited from a $4.5 billion positive impact of fluctuations in currency exchange rates during fiscal 2022.

Our gross profit rate decreased 98 and increased 14 basis points for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year.  For fiscal 2023, the decrease was primarily due to markdowns and merchandise mix in the U.S., higher supply chain costs and inflation related LIFO charges in the Sam's Club segment.  For fiscal 2022, the increase was primarily due to price management in the Walmart U.S. segment driven by cost inflation as well as merchandise mix, partially offset by increased supply chain costs.

For fiscal 2023, operating expenses as a percentage of net sales increased 23 basis points when compared to the previous fiscal year.  Operating expenses as a percentage of net sales were impacted by charges of $3.3 billion related to opioid-related legal settlements and charges of $0.8 billion related to the reorganization and restructuring of certain businesses in the Walmart International segment.  These charges were partially offset by growth in net sales and lower incremental COVID-19 costs.  For fiscal 2022, operating expenses as a percentage of net sales decreased 19 basis points when compared to the previous fiscal year.  Operating expenses as a percentage of net sales benefited from growth in comparable sales and lower incremental COVID-19 related costs of $2.5 billion as compared to the previous year, partially offset by increased wage investments primarily in the Walmart U.S. segment.

Loss on extinguishment of debt was $2.4 billion in fiscal 2022 due to the early retirement of certain higher rate long-term debt to reduce interest expense in future periods.

Other gains and losses consist of certain non-operating items, such as the change in the fair value of our investments and gains or losses on business dispositions, which by their nature can fluctuate from period to period.  Other gains and losses consisted of a net loss of $1.5 billion and $3.0 billion for fiscal 2023 and 2022, respectively.  The net loss in fiscal 2023 primarily consists of: (a) net losses associated with the fair value changes of our equity and other investments; (b) a gain of $0.4 billion recognized on the sale of our remaining equity method investment in Brazil; and (c) a $0.2 billion dividend from one of our investments.  The net loss in fiscal 2022 primarily consists of net losses associated with the fair value changes of our equity investments, as well as $0.4 billion in incremental losses associated with the divestitures of our operations in the U.K. and Japan, which closed in the first quarter of fiscal 2022.

Our effective income tax rate was 33.6% for fiscal 2023, 25.4% for fiscal 2022, and 33.3% for fiscal 2021, respectively.  The increase in our effective tax rate for fiscal 2023 as compared to fiscal 2022 is primarily due to the tax impact of the business reorganization resulting in the full separation of PhonePe from Flipkart. The decrease in our effective tax rate for fiscal 2022 as compared to fiscal 2021 is primarily due to the $8.3 billion loss related to the divestiture of certain international operations classified as held for sale or sold in fiscal 2021, which provided minimal realizable tax benefit.  Our effective income tax rate may also fluctuate as a result of various factors, including changes in our assessment of unrecognized tax benefits, valuation allowances, changes in tax law, outcomes of administrative audits, the impact of discrete items and the mix and size of earnings among our U.S. operations and international operations, which are subject to statutory rates that are generally higher than the U.S. statutory rate. The reconciliation from the U.S. statutory rate to the effective income tax rates for fiscal 2023, 2022 and 2021 is presented in Note 9.

As a result of the factors discussed above, we reported $11.3 billion and $13.9 billion of consolidated net income for fiscal 2023 and 2022, respectively, which represents a decrease of $2.6 billion and an increase of $0.2 billion for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year.  Diluted net income per common share attributable to Walmart ("EPS") was $4.27, $4.87 and $4.75 for fiscal 2023, 2022 and 2021, respectively.

### Walmart U.S. Segment

| | Fiscal Years Ended January 31, | | | | | |
|---|---|---|---|---|---|---|
| *(Amounts in millions, except unit counts)* | **2023** | | **2022** | | **2021** | |
| Net sales | $ | 420,553 | $ | 393,247 | $ | 369,963 |
| Percentage change from comparable period | | 6.9 % | | 6.3 % | | 8.5 % |
| Calendar comparable sales increase | | 7.0 % | | 6.4 % | | 8.7 % |
| Operating income | $ | 20,620 | $ | 21,587 | $ | 19,116 |
| Operating income as a percentage of net sales | | 4.9 % | | 5.5 % | | 5.2 % |
| Unit counts at period end | | 4,717 | | 4,742 | | 4,743 |
| Retail square feet at period end | | 702 | | 703 | | 703 |

Net sales for the Walmart U.S. segment increased $27.3 billion or 6.9% and $23.3 billion or 6.3% for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year.  The increases in net sales were primarily due to increases in comparable sales of 7.0% and 6.4% for fiscal 2023 and 2022, respectively.  Comparable sales in fiscal 2023 were driven by growth in average ticket, including strong food sales and higher inflation impacts in certain merchandise categories, as well as growth in transactions.  Comparable sales in fiscal 2022 were driven by growth in average ticket and transactions, which included strong consumer spending from government stimulus and some higher inflation impacts in certain merchandise categories compared to recent years.  Walmart U.S. eCommerce sales positively contributed approximately 0.7% to comparable sales for both fiscal 2023 and 2022, as we continue to focus on a seamless omni-channel experience for our customers.

Gross profit rate decreased 85 basis points for fiscal 2023 and increased 51 basis points for fiscal 2022, when compared to the respective previous fiscal year.  The decrease in fiscal 2023 gross profit rate was primarily due to net markdowns and product mix shifts into lower margin categories and increased supply chain costs, partially offset by price management impacts driven by cost inflation.  Gross profit rate for fiscal 2022 benefited from price management driven by cost inflation as well as merchandise mix, which includes lapping the temporary closures of our Auto Care and Vision Centers and growth in our advertising business, partially offset by increased supply chain costs.

Operating expenses as a percentage of segment net sales decreased 25 basis points for fiscal 2023 when compared to the previous fiscal year primarily driven by strong sales growth and lower incremental COVID-19 related costs, partially offset by increased wage costs.  For fiscal 2022, operating expenses as a percentage of segment net sales increased 31 basis points primarily due to investments in wages, partially offset by lower incremental COVID-19 related costs of $1.9 billion.

As a result of the factors discussed above, segment operating income decreased $1.0 billion and increased $2.5 billion for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year.

*Walmart International Segment*

| *(Amounts in millions, except unit counts)* | Fiscal Years Ended January 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2023** | | **2022** | | **2021** | |
| Net sales | $ | 100,983 | $ | 100,959 | $ | 121,360 |
| Percentage change from comparable period | | — % | | (16.8)% | | 1.0 % |
| Operating income | $ | 2,965 | $ | 3,758 | $ | 3,660 |
| Operating income as a percentage of net sales | | 2.9 % | | 3.7 % | | 3.0 % |
| Unit counts at period end | | 5,306 | | 5,251 | | 6,101 |
| Retail square feet at period end | | 273 | | 277 | | 337 |

Net sales for the Walmart International segment were flat and decreased $20.4 billion or 16.8% for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year. For fiscal 2023, net sales benefited from positive comparable sales in all of our international markets, offset by the impacts of a decrease of $5.0 billion related to the divestiture of our operations in the U.K. and Japan, which closed in the first quarter of fiscal 2022, as well as $3.7 billion of fluctuations in currency exchange rates during fiscal 2023. For fiscal 2022, the reduction in net sales was driven by a $32.6 billion decrease primarily related to the divestitures of our operations in the U.K. and Japan, which closed during the first quarter of fiscal 2022. This decrease was partially offset by positive comparable sales in most of our remaining markets, as well as positive fluctuations in currency exchange rates of $4.5 billion.

Gross profit rate decreased 50 basis points and 55 basis points for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year. For fiscal 2023, the decrease was primarily driven by continued growth in lower margin formats and channels in China and category mix shifts into lower margin categories. For fiscal 2022, the decrease was primarily driven by shifts into lower margin formats and the impact related to our divested markets.

Operating expenses as a percentage of segment net sales increased 41 basis points and decreased 71 basis points for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year. The increase in operating expenses as a percentage of segment net sales for fiscal 2023 was primarily due to business reorganization and restructuring charges incurred related to Flipkart and Massmart during the fourth quarter. For fiscal 2022, the decrease was primarily due to impacts from the divested markets and $0.4 billion of lower incremental COVID-19 related costs. Operating expenses as a percentage of net sales benefited from depreciation and amortization expense not having been recorded for our operations in the U.K. and Japan subsequent to their held for sale classification at the end of fiscal 2021 and prior to closing during the first quarter of fiscal 2022.

As a result of the factors discussed above, segment operating income decreased $0.8 billion and increased $0.1 billion for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year.

*Sam's Club Segment*

| *(Amounts in millions, except unit counts)* | Fiscal Years Ended January 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2023** | | **2022** | | **2021** | |
| ***Including Fuel*** | | | | | | |
| Net sales | $ | 84,345 | $ | 73,556 | $ | 63,910 |
| Percentage change from comparable period | | 14.7 % | | 15.1 % | | 8.7 % |
| Calendar comparable sales increase | | 14.6 % | | 15.0 % | | 8.7 % |
| Operating income | $ | 1,964 | $ | 2,259 | $ | 1,906 |
| Operating income as a percentage of net sales | | 2.3 % | | 3.1 % | | 3.0 % |
| Unit counts at period end | | 600 | | 600 | | 599 |
| Retail square feet at period end | | 80 | | 80 | | 80 |
| | | | | | | |
| ***Excluding Fuel*** [1] | | | | | | |
| Net sales | $ | 71,665 | $ | 64,860 | $ | 59,184 |
| Percentage change from comparable period | | 10.5 % | | 9.6 % | | 12.1 % |
| Operating income | $ | 1,352 | $ | 1,923 | $ | 1,645 |
| Operating income as a percentage of net sales | | 1.9 % | | 3.0 % | | 2.8 % |

[1] We believe the "Excluding Fuel" information is useful to investors because it permits investors to understand the effect of the Sam's Club segment's fuel sales on its results of operations, which are impacted by the volatility of fuel prices. Volatility in fuel prices may continue to impact the operating results of the Sam's Club segment in the future. Management uses such information to better measure underlying operating results in the segment.

Net sales for the Sam's Club segment increased $10.8 billion or 14.7% and $9.6 billion or 15.1% for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year. For fiscal 2023, the increase was primarily due to comparable sales growth, including fuel, of 14.6%. Comparable sales benefited from growth in transactions and average ticket and included higher inflation impacts in certain merchandise categories. Sam's Club eCommerce sales positively contributed approximately 0.8% to comparable sales which was primarily driven by ship to home and curbside pickup. For fiscal 2022, the increase was primarily due to comparable sales growth, including fuel, of 15.0%. Comparable sales benefited from growth in transactions and average ticket due to increased consumer spending, which was aided by government stimulus, and also includes some

higher inflation impacts in certain merchandise categories. The growth in comparable sales was partially offset by our decision to remove tobacco from certain club locations. Sam's Club eCommerce sales positively contributed approximately 1.3% to comparable sales.

Gross profit rate decreased 155 basis points and 68 basis points for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year. For fiscal 2023, the decrease in gross profit rate was primarily due to inventory write-downs, elevated supply chain and eCommerce fulfillment costs and inflation related LIFO charges. For fiscal 2022, gross profit rate decreased primarily due to increased fuel sales which have lower margins, cost inflation, and higher supply chain costs, partially offset by favorable sales mix, including reduced tobacco sales.

Membership and other income increased 7.0% and 13.1% for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year. For fiscal 2023 and 2022, the increase was primarily due to increases in new member sign-ups and Plus member penetration.

Operating expenses as a percentage of segment net sales decreased 97 basis points and 82 basis points for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year. Fiscal 2023 operating expenses as a percentage of net sales decreased primarily due to higher sales. Fiscal 2022 operating expenses as a percentage of net sales decreased primarily due to higher sales as well as a benefit from $0.2 billion of lower incremental COVID-19 related costs, partially offset by reduced tobacco sales.

As a result of the factors discussed above, segment operating income decreased $0.3 billion and increased $0.4 billion for fiscal 2023 and 2022, respectively, when compared to the previous fiscal year.

**Liquidity and Capital Resources**

<u>Liquidity</u>

The strength and stability of our operations have historically supplied us with a significant source of liquidity. Our cash flows provided by operating activities, supplemented with our long-term debt and short-term borrowings, have been sufficient to fund our operations while allowing us to invest in activities that support the long-term growth of our operations. Generally, some or all of the remaining available cash flow has been used to fund dividends on our common stock and share repurchases. We believe our sources of liquidity will continue to be sufficient to fund operations, finance our global investment activities, pay dividends and fund our share repurchases for at least the next 12 months and thereafter for the foreseeable future.

*Net Cash Provided by Operating Activities*

| | Fiscal Years Ended January 31, | | |
| --- | --- | --- | --- |
| *(Amounts in millions)* | **2023** | **2022** | **2021** |
| Net cash provided by operating activities | $    28,841 | $    24,181 | $    36,074 |

Net cash provided by operating activities was $28.8 billion, $24.2 billion and $36.1 billion for fiscal 2023, 2022 and 2021, respectively. Net cash provided by operating activities for fiscal 2023 increased when compared to the previous fiscal year. The increase is primarily due to moderated levels of inventory purchases, partially offset by a decline in operating income and the timing of certain payments. The decrease in net cash provided by operating activities for fiscal 2022, when compared to the previous fiscal year, was primarily due to an increase in inventory costs and purchases to support strong sales and lapping the impact of accelerated inventory sell-through in fiscal 2021, as well as timing and payment of wages.

*Cash Equivalents and Working Capital Deficit*

Cash and cash equivalents were $8.6 billion and $14.8 billion as of January 31, 2023 and 2022, respectively. Our working capital deficit, defined as total current assets less total current liabilities, was $16.5 billion and $6.3 billion as of January 31, 2023 and 2022, respectively. The increase in our working capital deficit increased primarily driven by a decrease in cash and cash equivalents and an increase in accrued liabilities. We generally operate with a working capital deficit due to our efficient use of cash in funding operations, consistent access to the capital markets and returns provided to our shareholders in the form of payments of cash dividends and share repurchases.

We use intercompany financing arrangements in an effort to ensure cash can be made available in the country in which it is needed with the minimum cost possible. Additionally, from time-to-time, we repatriate earnings and related cash from jurisdictions outside of the U.S. Historically, U.S. taxes were due upon repatriation of foreign earnings. Due to the enactment of U.S. tax reform, repatriations of foreign earnings will generally be free of U.S. federal tax, but may incur other taxes such as withholding or state taxes. We do not expect current local laws, other existing limitations on anticipated future repatriations of cash amounts held outside the U.S. to have a material effect on our overall liquidity, financial position or results of operations.

As of January 31, 2023 and 2022, cash and cash equivalents of $2.9 billion and $4.3 billion, respectively, may not be freely transferable to the U.S. due to local laws or other restrictions or are subject to the approval of the noncontrolling interest shareholders.

*Net Cash Used in Investing Activities*

| | Fiscal Years Ended January 31, | | |
|---|---|---|---|
| *(Amounts in millions)* | **2023** | **2022** | **2021** |
| Net cash used in investing activities | $ (17,722) | $ (6,015) | $ (10,071) |

Net cash used in investing activities was $17.7 billion, $6.0 billion and $10.1 billion for fiscal 2023, 2022 and 2021, respectively, and generally consisted of capital expenditures.  Net cash used in investing activities increased $11.7 billion for fiscal 2023 when compared to the previous fiscal year primarily due to the result of lapping the net proceeds received from the divestitures of our operations in the U.K. and Japan and an increase in capital expenditures to support our investment strategy. Net cash used in investing activities decreased $4.1 billion for fiscal 2022 when compared to the previous fiscal year, primarily due to the net proceeds received from the divestitures of our operations in the U.K. and Japan, partially offset by increased capital expenditures.

*Capital expenditures*

Refer to the "Strategic Capital Allocation" section in our Company Performance Metrics for capital expenditure detail for fiscal 2023 and 2022.  For the fiscal year ending January 31, 2024 ("fiscal 2024"), we project capital expenditures will be approximately $17 billion to $18 billion, with a focus on technology, supply chain, and customer-facing initiatives.

*Net Cash Used in Financing Activities*

| | Fiscal Years Ended January 31, | | |
|---|---|---|---|
| *(Amounts in millions)* | **2023** | **2022** | **2021** |
| Net cash used in financing activities | $ (17,039) | $ (22,828) | $ (16,117) |

Net cash from financing activities generally consists of debt transactions, dividends paid, repurchases of Company stock and transactions with noncontrolling interest shareholders.  Fiscal 2023 net cash used in financing activities decreased $5.8 billion when compared to the previous fiscal year.  The decrease is primarily due to repayments of long-term debt and related payment of premiums for the early extinguishment of certain notes in the prior fiscal period, partially offset by the equity funding from the sale of subsidiary stock in the prior fiscal period.  Fiscal 2022 net cash used in financing activities increased $6.7 billion when compared to the previous fiscal year.  The increase was primarily due to repayments of long-term debt and related payment of premiums for the early extinguishment of certain notes, as well as increased share repurchases, partially offset by long-term debt issuances and equity funding from the sale of subsidiary stock.

*Purchase and Sale of Subsidiary Stock*

In the fourth quarter of fiscal 2023, the Company completed a $0.4 billion buyout of the noncontrolling interest shareholders of the Company's Massmart subsidiary. This transaction increased the Company's ownership of Massmart from approximately 53% to 100%.  Additionally, the Company completed a $0.4 billion acquisition of Alert Innovation, which was previously consolidated as a variable interest entity and resulted in the Company becoming a 100% owner.

During fiscal 2022, the Company received $3.2 billion primarily related to a new equity funding for the Company's majority-owned Flipkart subsidiary, which reduced the Company's ownership from approximately 83% as of January 31, 2021 to approximately 75%.

*Short-term Borrowings*

We generally utilize the liquidity provided by short-term borrowings to provide funding for our operations, dividend payments, share repurchases, capital expenditures and other cash requirements. The following table includes additional information related to the Company's short-term borrowings for fiscal 2023, 2022 and 2021:

| | Fiscal Years Ended January 31, | | |
|---|---|---|---|
| *(Amounts in millions)* | **2023** | **2022** | **2021** |
| Maximum amount outstanding at any month-end | $ 11,432 | $ 716 | $ 4,048 |
| Average daily short-term borrowings | 7,250 | 626 | 1,577 |
| Annual weighted-average interest rate | 2.4 % | 3.7 % | 3.1 % |

Short-term borrowings as of January 31, 2023 and 2022 were $0.4 billion, with weighted-average interest rates of 6.6% and 2.9%, respectively.  We also have $15.0 billion of various undrawn committed lines of credit in the U.S. as of January 31, 2023 that provide additional liquidity, if needed.  Additionally, we maintain access to various credit facilities outside of the U.S. to further support our Walmart International segment operations, as needed.

As of January 31, 2023, we have $2.1 billion of syndicated and fronted letters of credit available, of which $1.8 billion was drawn and represents an unrecorded current obligation.

*Long-term Debt*

The following table provides the changes in our long-term debt for fiscal 2023:

| *(Amounts in millions)* | Long-term debt due within one year | | Long-term debt | | Total | |
|---|---|---|---|---|---|---|
| **Balances as of February 1, 2022** | $ | 2,803 | $ | 34,864 | $ | 37,667 |
| Proceeds from issuance of long-term debt | | — | | 5,041 | | 5,041 |
| Repayments of long-term debt | | (2,689) | | — | | (2,689) |
| Reclassifications of long-term debt | | 4,197 | | (4,197) | | — |
| Currency and other adjustments | | (120) | | (1,059) | | (1,179) |
| **Balances as of January 31, 2023** | $ | 4,191 | $ | 34,649 | $ | 38,840 |

Our total outstanding long-term debt increased $1.2 billion during fiscal 2023, primarily due to the issuance of new long-term debt in September 2022, partially offset by the maturities of certain long-term debt.  Refer to Note 6 to our Consolidated Financial Statements for details on the issuances of long-term debt.

Estimated contractual interest payments associated with our long-term debt amount to $18.8 billion, with approximately $1.7 billion expected to be paid in fiscal 2024.  Estimated interest payments are based on our principal amounts and expected maturities of all debt outstanding as of January 31, 2023 and assumes interest rates remain at current levels for our variable rate instruments.

*Dividends*

Our total dividend payments were $6.1 billion, $6.2 billion and $6.1 billion for fiscal 2023, 2022 and 2021, respectively.  Effective February 21, 2023, the Company approved the fiscal 2024 annual dividend of $2.28 per share, an increase over the fiscal 2023 annual dividend of $2.24 per share.  For fiscal 2024, the annual dividend will be paid in four quarterly installments of $0.57 per share, according to the following record and payable dates:

| Record Date | Payable Date |
|---|---|
| March 17, 2023 | April 3, 2023 |
| May 5, 2023 | May 30, 2023 |
| August 11, 2023 | September 5, 2023 |
| December 8, 2023 | January 2, 2024 |

*Company Share Repurchase Program*

From time to time, the Company repurchases shares of its common stock under share repurchase programs authorized by the Company's Board of Directors.  All repurchases made during the fiscal year prior to November 21, 2022 were made under the plan in effect at the beginning of fiscal 2022.  In November 2022, the Company approved a new $20.0 billion share repurchase program which, beginning on November 21, 2022, replaced the previous share repurchase program.  As of January 31, 2023, authorization for $19.3 billion of share repurchases remained under the share repurchase program.  Any repurchased shares are constructively retired and returned to an unissued status.

We regularly review share repurchase activity and consider several factors in determining when to execute share repurchases, including, among other things, current cash needs, capacity for leverage, cost of borrowings, our results of operations and the market price of our common stock.  We anticipate that a majority of the ongoing share repurchase program will be funded through the Company's free cash flow.

The following table provides, on a settlement date basis, the number of shares repurchased, average price paid per share and total amount paid for share repurchases for fiscal 2023, 2022 and 2021:

| *(Amounts in millions, except per share data)* | Fiscal Years Ended January 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2023** | | **2022** | | **2021** | |
| Total number of shares repurchased | | 73.9 | | 69.7 | | 19.4 |
| Average price paid per share | $ | 134.17 | $ | 140.45 | $ | 135.20 |
| Total amount paid for share repurchases | $ | 9,920 | $ | 9,787 | $ | 2,625 |

*Material Cash Requirements*

Material cash requirements from operating activities primarily consist of inventory purchases, employee related costs, taxes, interest and other general operating expenses, which we expect to be primarily satisfied by our cash from operations.  Other material cash requirements from known contractual and other obligations include opioid and other legal settlements, short-term borrowings, long-term debt and related interest payments, leases, purchases of subsidiary stock and purchase obligations.  See Note 3, Note 6 and Note 7 to our Consolidated Financial Statements for information regarding purchase of subsidiary stock, outstanding short-term borrowings and long-term debt, and leases, respectively.

As of January 31, 2023, the Company has $33.3 billion of unrecorded purchase obligations outstanding, of which $11.6 billion is due within one year. Purchase obligations include legally binding contracts, such as firm commitments for inventory and utility purchases, as well as commitments to make capital expenditures, software acquisition and license commitments and legally binding service contracts. Contractual obligations for the purchase of goods or services are defined as agreements that are enforceable and legally binding and that specify all significant terms, including: fixed or minimum quantities to be purchased; fixed, minimum or variable price provisions; and the approximate timing of the transaction. Contracts that specify the Company will purchase all or a portion of its requirements of a specific product or service from a supplier, but do not include a fixed or minimum quantity, are excluded from the obligations quantified above. Accordingly, purchase orders for inventory are also excluded as purchase orders represent authorizations to purchase rather than binding agreements. Our purchase orders are based on our current inventory needs and are fulfilled by our suppliers within short time periods. We also enter into contracts for outsourced services; however, the obligations under these contracts are not significant and the contracts generally contain clauses allowing for cancellation without significant penalty. Timing of payments and actual amounts paid may be different depending on the timing of receipt of goods or services or changes to agreed-upon amounts for some obligations.

## Capital Resources

We believe our cash flows from operations, current cash position, short-term borrowings and access to capital markets will continue to be sufficient to meet our anticipated cash requirements and contractual obligations, which includes funding seasonal buildups in merchandise inventories and funding our capital expenditures, acquisitions, dividend payments and share repurchases.

We have strong commercial paper and long-term debt ratings that have enabled and should continue to enable us to refinance our debt as it becomes due at favorable rates in capital markets. As of January 31, 2023, the ratings assigned to our commercial paper and rated series of our outstanding long-term debt were as follows:

| Rating agency | Commercial paper | Long-term debt |
|---|---|---|
| Standard & Poor's | A-1+ | AA |
| Moody's Investors Service | P-1 | Aa2 |
| Fitch Ratings | F1+ | AA |

Credit rating agencies review their ratings periodically and, therefore, the credit ratings assigned to us by each agency may be subject to revision at any time. Accordingly, we are not able to predict whether our current credit ratings will remain consistent over time. Factors that could affect our credit ratings include changes in our operating performance, the general economic environment, conditions in the retail industry, our financial position, including our total debt and capitalization, and changes in our business strategy. Any downgrade of our credit ratings by a credit rating agency could increase our future borrowing costs or impair our ability to access capital and credit markets on terms commercially acceptable to us. In addition, any downgrade of our current short-term credit ratings could impair our ability to access the commercial paper markets with the same flexibility that we have experienced historically, potentially requiring us to rely more heavily on more expensive types of debt financing. The credit rating agency ratings are not recommendations to buy, sell or hold our commercial paper or debt securities. Each rating may be subject to revision or withdrawal at any time by the assigning rating organization and should be evaluated independently of any other rating. Moreover, each credit rating is specific to the security to which it applies.

**Other Matters**

In Note 10 to our Consolidated Financial Statements, which is captioned "Contingencies" and appears in Part II of this Annual Report on Form 10-K under the caption "Item 8. Financial Statements and Supplementary Data," we discuss, under the sub-captions "*Settlement Framework Regarding Multidistrict and State or Local Opioid Related Litigation*," and "*Other Opioid Related Litigation*" the Prescription Opiate Litigation, the Settlement Framework, and other matters, including certain risks arising therefrom.  In that Note 10, we also discuss under the sub-caption "*Asda Equal Value Claims*" the Company's indemnification obligation for the Asda Equal Value Claims matter as well as under the sub-caption "*Money Transfer Agent Services Matters*", a United States Federal Trade Commission complaint related to money transfers and the Company's anti-fraud program and a government investigation by the U.S. Attorney's Office for the Middle District of Pennsylvania into the Company's consumer fraud prevention and anti-money laundering compliance related to the Company's money transfer agent services.  We discuss various legal proceedings related to the Federal and State Prescription Opiate Litigation, the Settlement Framework, DOJ Opioid Civil Litigation and Opioids Related Securities Class Actions and Derivative Litigation in Part I of this Annual Report on Form 10-K under the caption "Item 3. Legal Proceedings," under the sub-caption "I. Supplemental Information." We also discuss items related to the Asda Equal Value Claims matter, the Money Transfer Agent Services Matters and the Foreign Direct Investment matters in Part I of this Annual Report on Form 10-K under the caption "Item 3. Legal Proceedings," under the sub-caption "II. Certain Other Matters."  We also discuss an environmental matter with the State of California in Part I of this Annual Report on Form 10-K under the caption "Item 3. Legal Proceedings," under the sub-caption "III. Environmental Matters."  The foregoing matters and other matters described elsewhere in this Annual Report on Form 10-K represent contingent liabilities of the Company that may or may not result in the incurrence of a material liability by the Company upon their final resolution.

**Summary of Critical Accounting Estimates**

Management strives to report our financial results in a clear and understandable manner, although in some cases accounting and disclosure rules are complex and require us to use technical terminology.  In preparing the Company's Consolidated Financial Statements, we follow accounting principles generally accepted in the U.S.  These principles require us to make certain estimates and apply judgments that affect our financial position and results of operations as reflected in our financial statements.  These judgments and estimates are based on past events and expectations of future outcomes.  Actual results may differ from our estimates.

Management continually reviews our accounting policies including how they are applied and how they are reported and disclosed in our financial statements.  Following is a summary of our critical accounting estimates and how they are applied in preparation of the financial statements.

*Inventories*

The Walmart U.S. segment comprises the largest portion of our inventory and is primarily accounted for under the retail inventory method of accounting to determine inventory cost, using the last-in, first-out ("LIFO") valuation method.  The majority of the Sam's Club segment inventories are accounted for and valued using the weighted-average cost LIFO method.  When necessary, we record a LIFO provision for the estimated annual effect of inflation, and these estimates are adjusted to actual results determined at year-end.  As a measure of sensitivity, an incremental 1% inflationary impact to the cost of our inventory purchases would not have resulted in a material increase to the LIFO provision recorded during fiscal 2023.

*Indefinite-Lived Intangible Assets*

Intangible assets acquired in a business combination are stated at the fair value acquired as determined by a valuation technique commensurate with the intended use of the related asset.  Significant estimates in valuing certain intangible assets include, but are not limited to, the amount and timing of future cash flows, growth rates, discount rates and useful lives.  Indefinite-lived acquired intangible assets are not amortized but are evaluated for impairment annually and whenever events or changes in circumstances indicate that the value of the asset may be impaired.  Generally, this evaluation begins with a qualitative assessment to determine whether a quantitative impairment test is necessary.  If we determine, after performing an assessment based on qualitative factors, that the fair value of the indefinite-lived acquired intangible asset is more likely than not less than the carrying amount, then a quantitative impairment test would be performed.  The quantitative test for impairment requires management to make judgments relating to future cash flows, growth rates and economic and market conditions.  Our indefinite-lived acquired intangible assets have historically generated sufficient returns to recover their cost.  Because of the nature of the factors used in these tests, if different conditions occur in future periods, future operating results could be materially impacted.

*Contingencies*

We are involved in a number of legal proceedings and certain regulatory matters. We record a liability when it is probable that a loss has been incurred and the amount is reasonably estimable. We also perform an assessment of the materiality of loss contingencies where a loss is either reasonably possible or it is reasonably possible that a loss could be incurred in excess of

amounts accrued. If a loss or an additional loss has at least a reasonable possibility of occurring and the impact on the financial statements would be material, we provide disclosure of the loss contingency in the footnotes to our financial statements. We review all contingencies at least quarterly to determine whether the likelihood of loss has changed and to assess whether a reasonable estimate of the loss or the range of the loss can be made. Although we are not able to predict the outcome or reasonably estimate a range of possible losses in certain matters described in Note 10 to our Consolidated Financial Statements and have not recorded an associated accrual related to these matters, an adverse judgment or negotiated resolution in any of these matters could have a material adverse effect on our business, reputation, financial position, results of operations or cash flows.

### *Income Taxes*

Income taxes have a significant effect on our net earnings. We are subject to income taxes in the U.S. and numerous foreign jurisdictions. Accordingly, the determination of our provision for income taxes requires judgment, the use of estimates in certain cases and the interpretation and application of complex tax laws. Our effective income tax rate is affected by many factors, including changes in our assessment of unrecognized tax benefits, increases and decreases in valuation allowances, changes in tax law, outcomes of administrative audits, the impact of discrete items and the mix of earnings among our U.S. and international operations where the statutory rates are generally higher than the U.S. statutory rate, and may fluctuate as a result.

Our tax returns are routinely audited and settlements of issues raised in these audits sometimes affect our tax provisions. The benefits of uncertain tax positions are recorded in our financial statements only after determining a more likely than not probability that the uncertain tax positions will withstand challenge, if any, from taxing authorities. When facts and circumstances change, we reassess these probabilities and record any changes in the financial statements as appropriate. We account for uncertain tax positions by determining the minimum recognition threshold that a tax position is required to meet before being recognized in the financial statements. This determination requires the use of judgment in evaluating our tax positions and assessing the timing and amounts of deductible and taxable items.

Deferred tax assets represent amounts available to reduce income taxes payable on taxable income in future years. Such assets arise because of temporary differences between the financial reporting and tax bases of assets and liabilities, as well as from net operating loss and tax credit carryforwards. Deferred tax assets are evaluated for future realization and reduced by a valuation allowance to the extent that a portion is not more likely than not to be realized. Many factors are considered when assessing whether it is more likely than not that the deferred tax assets will be realized, including recent cumulative earnings, expectations of future taxable income, carryforward periods and other relevant quantitative and qualitative factors. The recoverability of the deferred tax assets is evaluated by assessing the adequacy of future expected taxable income from all sources, including reversal of taxable temporary differences, forecasted operating earnings and available tax planning strategies. This evaluation relies on estimates.

As guidance is issued by the U.S. Treasury Department, the IRS, and other standard-setting bodies, any resulting changes to our estimates will be treated in accordance with the relevant accounting guidance.

### ITEM 7A.    QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

### Market Risk

In addition to the risks inherent in our operations, we are exposed to certain market risks, including changes in interest rates, currency exchange rates and the fair values of certain equity and equity method investments measured on a recurring basis.

The analysis presented below for each of our market risk sensitive instruments is based on a hypothetical scenario used to calibrate potential risk and does not represent our view of future market changes. The effect of a change in a particular assumption is calculated without adjusting any other assumption. In reality, however, a change in one factor could cause a change in another, which may magnify or negate other sensitivities.

### *Interest Rate Risk*

We are exposed to changes in interest rates as a result of our short-term borrowings and long-term debt. We hedge a portion of our interest rate risk by managing the mix of fixed and variable rate debt and by entering into interest rate swaps. For fiscal 2023, the net fair value of our interest rate swaps decreased $0.6 billion primarily due to fluctuations in market interest rates.

The table below provides information about our financial instruments that are sensitive to changes in interest rates. For long-term debt, the table represents the principal cash flows and related weighted-average interest rates by expected maturity dates. For interest rate swaps, the table represents the contractual cash flows and weighted-average interest rates by the contractual maturity date, unless otherwise noted. The notional amounts are used to calculate contractual cash flows to be exchanged under the contracts. The weighted-average variable rates are based upon prevailing market rates as of January 31, 2023.

|  | Expected Maturity Date | | | | | | |
|---|---|---|---|---|---|---|---|
| *(Amounts in millions)* | Fiscal 2024 | Fiscal 2025 | Fiscal 2026 | Fiscal 2027 | Fiscal 2028 | Thereafter | Total |
| **Liabilities** | | | | | | | |
| **Short-term borrowings:** | | | | | | | |
| Variable rate | $ 372 | $ — | $ — | $ — | $ — | $ — | $ 372 |
| Weighted-average interest rate | 6.6 % | — % | — % | — % | — % | — % | 6.6 % |
| **Long-term debt[1]:** | | | | | | | |
| Fixed rate | $ 4,191 | $ 3,516 | $ 2,604 | $ 2,737 | $ 1,817 | $ 23,975 | $ 38,840 |
| Weighted-average interest rate | 3.2 % | 2.9 % | 3.8 % | 2.0 % | 3.5 % | 4.3 % | 3.8 % |
| **Interest rate derivatives** | | | | | | | |
| **Interest rate swaps:** | | | | | | | |
| Fixed to variable | $ 1,750 | $ 1,500 | $ — | $ — | $ — | $ 4,771 | $ 8,021 |
| Weighted-average pay rate | 5.2 % | 5.9 % | — % | — % | — % | 5.8 % | 5.7 % |
| Weighted-average receive rate | 2.6 % | 3.3 % | — % | — % | — % | 2.5 % | 2.7 % |

[1] Includes deferred loan costs, discounts, fair value hedges, foreign-held debt and secured debt.

As of January 31, 2023, our variable rate borrowings, including the effect of our commercial paper and interest rate swaps, represented 21% of our total short-term and long-term debt.  Based on January 31, 2023 debt levels, a 100 basis point change in prevailing market rates would cause our annual interest costs to change by approximately $0.1 billion.

*Foreign Currency Risk*

We are exposed to fluctuations in currency exchange rates as a result of our investments and operations in countries other than the U.S., as well as our foreign-currency-denominated long-term debt.  For fiscal 2023, movements in currency exchange rates and the related impact on the translation of the balance sheets resulted in the $1.1 billion net loss in the currency translation and other category of accumulated other comprehensive loss.

We hedge a portion of our foreign currency risk by entering into currency swaps.  The aggregate fair value of these swaps was in a liability position of $1.4 billion and $1.0 billion as of January 31, 2023 and January 31, 2022, respectively.  The change in the fair value of these swaps was due to fluctuations in currency exchange rates, primarily due to the strengthening of the U.S. dollar relative to certain currencies in fiscal 2023.  The hypothetical result of a uniform 10% weakening in the value of the U.S. dollar relative to other currencies underlying these swaps would have resulted in a change in the value of the swaps of $0.7 billion.  A hypothetical 10% change in interest rates underlying these swaps from the market rates in effect as of January 31, 2023 would have resulted in a change in the value of the swaps of $0.1 billion.

In certain countries, we also enter into immaterial foreign currency forward contracts to hedge the purchase and payment of purchase commitments denominated in non-functional currencies.

*Investment Risk*

We are exposed to investment risk primarily related to changes in the fair value of equity securities, as well as certain immaterial equity method investments where we have elected the fair value option measured on a recurring basis.  These changes in fair value are recorded within other gains and losses and resulted in a loss of $1.7 billion in fiscal 2023 primarily due to net decreases in the underlying stock prices of those investments.  As of January 31, 2023, the fair value of our equity investments, including certain equity method investments, measured on a recurring basis was $10.7 billion.  As of January 31, 2023, a hypothetical 10% change in the stock price of such investments would have changed the fair value of such investments by approximately $1.1 billion.

<u>**ITEM 8.**</u>       <u>**FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**</u>

**Consolidated Financial Statements of Walmart Inc.**
**For the Fiscal Year Ended January 31, 2023**

**Table of Contents**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm (PCAOB ID: 42) | 51 |
| Report of Independent Registered Public Accounting Firm on Internal Control over Financial Reporting | 53 |
| Consolidated Statements of Income | 54 |
| Consolidated Statements of Comprehensive Income | 55 |
| Consolidated Balance Sheets | 56 |
| Consolidated Statements of Shareholders' Equity | 57 |
| Consolidated Statements of Cash Flows | 58 |
| Notes to Consolidated Financial Statements | 59 |

### Report of Independent Registered Public Accounting Firm

To the Shareholders and the Board of Directors of Walmart Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Walmart Inc. (the Company) as of January 31, 2023 and 2022, the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended January 31, 2023, and the related notes (collectively referred to as the "Consolidated Financial Statements").  In our opinion, the Consolidated Financial Statements present fairly, in all material respects, the financial position of the Company at January 31, 2023 and 2022, and the results of its operations and its cash flows for each of the three years in the period ended January 31, 2023, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of January 31, 2023, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 17, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the Consolidated Financial Statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the account or disclosure to which it relates.

*Contingencies*

Description of the Matter
As described in Note 10 to the Consolidated Financial Statements, at January 31, 2023, the Company is involved in a number of legal proceedings and regulatory matters.  The Company records a liability for those legal proceedings and regulatory matters when management determines it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated.  The Company also discloses when it is reasonably possible that a material loss may be incurred.  In assessing the probability of occurrence and whether an estimate of loss can be reasonably estimated for a particular legal proceeding, management exercises judgment on matters relevant to each proceeding, such as whether sufficient participation in settlement proceedings will occur, or whether it can predict the number of claims that may be filed.  For example, management exercised judgment in accruing a liability for approximately $3.3 billion for the Settlement Framework and other previously agreed state and tribal settlements regarding opioid-related lawsuits. Auditing management's accounting for, and disclosure of, loss contingencies was complex and highly judgmental as it involved our assessment of the significant judgments made by management when assessing the probability of occurrence for contingencies or when determining whether an estimate of the loss or range of loss could be made.

| | |
|---|---|
| How We Addressed the Matter in Our Audit | We obtained an understanding, evaluated the design and tested the operating effectiveness of controls over the identification and evaluation of contingencies. For example, we tested controls over the Company's assessment of the likelihood of loss and the Company's determinations regarding the measurement of loss. |

To test the Company's assessment of the probability of occurrence or determination of an estimate of loss, or range of loss, among other procedures, we read the minutes of the meetings of the board of directors and committees of the board of directors, reviewed documents provided to the Company by certain outside legal counsel, read letters received directly by us from internal and outside legal counsel, and evaluated the current status of contingencies based on discussions with internal and outside legal counsel. As part of this assessment, we evaluated management's assumptions and calculations by, among other things, comparing those assumptions to key terms in the Settlement Framework and to payments made during the year. We also assessed the adequacy of the related disclosures.

/s/  Ernst & Young LLP

We have served as the Company's auditor since 1969.

Rogers, Arkansas
March 17, 2023

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Walmart Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Walmart Inc.'s internal control over financial reporting as of January 31, 2023, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria).  In our opinion, Walmart Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of January 31, 2023, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Walmart Inc. as of January 31, 2023 and 2022, the related consolidated statements of income, comprehensive income, shareholders' equity and cash flows for each of the three years in the period ended January 31, 2023, and the related notes and our report dated March 17, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.


/s/ Ernst & Young LLP

Rogers, Arkansas
March 17, 2023

**Walmart Inc.**

**Consolidated Statements of Income**

| | | Fiscal Years Ended January 31, | | | | |
|---|---|---|---|---|---|---|
| *(Amounts in millions, except per share data)* | | **2023** | | **2022** | | **2021** |
| **Revenues:** | | | | | | |
| Net sales | $ | 605,881 | $ | 567,762 | $ | 555,233 |
| Membership and other income | | 5,408 | | 4,992 | | 3,918 |
| Total revenues | | 611,289 | | 572,754 | | 559,151 |
| **Costs and expenses:** | | | | | | |
| Cost of sales | | 463,721 | | 429,000 | | 420,315 |
| Operating, selling, general and administrative expenses | | 127,140 | | 117,812 | | 116,288 |
| **Operating income** | | 20,428 | | 25,942 | | 22,548 |
| **Interest:** | | | | | | |
| Debt | | 1,787 | | 1,674 | | 1,976 |
| Finance lease | | 341 | | 320 | | 339 |
| Interest income | | (254) | | (158) | | (121) |
| Interest, net | | 1,874 | | 1,836 | | 2,194 |
| Loss on extinguishment of debt | | — | | 2,410 | | — |
| Other (gains) and losses | | 1,538 | | 3,000 | | (210) |
| **Income before income taxes** | | 17,016 | | 18,696 | | 20,564 |
| Provision for income taxes | | 5,724 | | 4,756 | | 6,858 |
| **Consolidated net income** | | 11,292 | | 13,940 | | 13,706 |
| Consolidated net (income) loss attributable to noncontrolling interest | | 388 | | (267) | | (196) |
| **Consolidated net income attributable to Walmart** | $ | 11,680 | $ | 13,673 | $ | 13,510 |
| | | | | | | |
| **Net income per common share:** | | | | | | |
| Basic net income per common share attributable to Walmart | $ | 4.29 | $ | 4.90 | $ | 4.77 |
| Diluted net income per common share attributable to Walmart | | 4.27 | | 4.87 | | 4.75 |
| | | | | | | |
| **Weighted-average common shares outstanding:** | | | | | | |
| Basic | | 2,724 | | 2,792 | | 2,831 |
| Diluted | | 2,734 | | 2,805 | | 2,847 |
| | | | | | | |
| **Dividends declared per common share** | $ | 2.24 | $ | 2.20 | $ | 2.16 |

*See accompanying notes.*

**Walmart Inc.**

**Consolidated Statements of Comprehensive Income**

| | | Fiscal Years Ended January 31, | | | | |
|---|---|---|---|---|---|---|
| *(Amounts in millions)* | | **2023** | | **2022** | | **2021** |
| Consolidated net income | $ | 11,292 | $ | 13,940 | $ | 13,706 |
| Consolidated net (income) loss attributable to noncontrolling interest | | 388 | | (267) | | (196) |
| **Consolidated net income attributable to Walmart** | | 11,680 | | 13,673 | | 13,510 |
| | | | | | | |
| Other comprehensive income (loss), net of income taxes | | | | | | |
| Currency translation and other | | (1,858) | | 2,442 | | 842 |
| Net investment hedges | | — | | (1,202) | | (221) |
| Cash flow hedges | | (203) | | (444) | | 235 |
| Minimum pension liability | | 5 | | 1,974 | | (30) |
| Other comprehensive income (loss), net of income taxes | | (2,056) | | 2,770 | | 826 |
| Other comprehensive loss attributable to noncontrolling interest | | 404 | | 230 | | 213 |
| **Other comprehensive income (loss) attributable to Walmart** | | (1,652) | | 3,000 | | 1,039 |
| | | | | | | |
| Comprehensive income, net of income taxes | | 9,236 | | 16,710 | | 14,532 |
| Comprehensive (income) loss attributable to noncontrolling interest | | 792 | | (37) | | 17 |
| **Comprehensive income attributable to Walmart** | $ | 10,028 | $ | 16,673 | $ | 14,549 |

*See accompanying notes.*

**Walmart Inc.**

**Consolidated Balance Sheets**

| | | As of January 31, | | |
|---|---|---|---|---|
| *(Amounts in millions)* | | **2023** | | **2022** |
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 8,625 | $ | 14,760 |
| Receivables, net | | 7,933 | | 8,280 |
| Inventories | | 56,576 | | 56,511 |
| Prepaid expenses and other | | 2,521 | | 1,519 |
| Total current assets | | 75,655 | | 81,070 |
| | | | | |
| Property and equipment, net | | 100,760 | | 94,515 |
| Operating lease right-of-use assets | | 13,555 | | 13,758 |
| Finance lease right-of-use assets, net | | 4,919 | | 4,351 |
| Goodwill | | 28,174 | | 29,014 |
| Other long-term assets | | 20,134 | | 22,152 |
| **Total assets** | $ | 243,197 | $ | 244,860 |
| | | | | |
| **LIABILITIES, REDEEMABLE NONCONTROLLING INTEREST, AND EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Short-term borrowings | $ | 372 | $ | 410 |
| Accounts payable | | 53,742 | | 55,261 |
| Accrued liabilities | | 31,126 | | 26,060 |
| Accrued income taxes | | 727 | | 851 |
| Long-term debt due within one year | | 4,191 | | 2,803 |
| Operating lease obligations due within one year | | 1,473 | | 1,483 |
| Finance lease obligations due within one year | | 567 | | 511 |
| Total current liabilities | | 92,198 | | 87,379 |
| | | | | |
| Long-term debt | | 34,649 | | 34,864 |
| Long-term operating lease obligations | | 12,828 | | 13,009 |
| Long-term finance lease obligations | | 4,843 | | 4,243 |
| Deferred income taxes and other | | 14,688 | | 13,474 |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| Redeemable noncontrolling interest | | 237 | | — |
| | | | | |
| **Equity:** | | | | |
| Common stock | | 269 | | 276 |
| Capital in excess of par value | | 4,969 | | 4,839 |
| Retained earnings | | 83,135 | | 86,904 |
| Accumulated other comprehensive loss | | (11,680) | | (8,766) |
| Total Walmart shareholders' equity | | 76,693 | | 83,253 |
| Noncontrolling interest | | 7,061 | | 8,638 |
| Total equity | | 83,754 | | 91,891 |
| **Total liabilities, redeemable noncontrolling interest, and equity** | $ | 243,197 | $ | 244,860 |

*See accompanying notes.*

**Walmart Inc.**

**Consolidated Statements of Shareholders' Equity**

| (Amounts in millions) | Common Stock | | Capital in Excess of Par Value | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | Total Walmart Shareholders' Equity | Noncontrolling Interest | Total Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | | |
| **Balances as of February 1, 2020** | 2,832 | $ 284 | $ 3,247 | $ 83,943 | $ (12,805) | $ 74,669 | $ 6,883 | $ 81,552 |
| Consolidated net income | — | — | — | 13,510 | — | 13,510 | 196 | 13,706 |
| Other comprehensive income (loss), net of income taxes | — | — | — | — | 1,039 | 1,039 | (213) | 826 |
| Cash dividends declared ($2.16 per share) | — | — | — | (6,116) | — | (6,116) | — | (6,116) |
| Purchase of Company stock | (20) | (2) | (97) | (2,559) | — | (2,658) | — | (2,658) |
| Cash dividend declared to noncontrolling interest | — | — | — | — | — | — | (365) | (365) |
| Sale of subsidiary stock | — | — | 29 | — | — | 29 | 111 | 140 |
| Other | 9 | — | 467 | (15) | — | 452 | (6) | 446 |
| **Balances as of January 31, 2021** | 2,821 | 282 | 3,646 | 88,763 | (11,766) | 80,925 | 6,606 | 87,531 |
| Consolidated net income | — | — | — | 13,673 | — | 13,673 | 267 | 13,940 |
| Other comprehensive income (loss), net of income taxes | — | — | — | — | 3,000 | 3,000 | (230) | 2,770 |
| Cash dividends declared ($2.20 per share) | — | — | — | (6,152) | — | (6,152) | — | (6,152) |
| Purchase of Company stock | (70) | (7) | (426) | (9,375) | — | (9,808) | — | (9,808) |
| Cash dividend declared to noncontrolling interest | — | — | — | — | — | — | (416) | (416) |
| Sale of subsidiary stock | — | — | 952 | — | — | 952 | 2,287 | 3,239 |
| Other | 10 | 1 | 667 | (5) | — | 663 | 124 | 787 |
| **Balances as of January 31, 2022** | 2,761 | 276 | 4,839 | 86,904 | (8,766) | 83,253 | 8,638 | 91,891 |
| Consolidated net income | — | — | — | 11,680 | — | 11,680 | (388) | 11,292 |
| Other comprehensive loss, net of income taxes | — | — | — | — | (1,652) | (1,652) | (404) | (2,056) |
| Cash dividends declared ($2.24 per share) | — | — | — | (6,114) | — | (6,114) | — | (6,114) |
| Purchase of Company stock | (74) | (7) | (533) | (9,326) | — | (9,866) | — | (9,866) |
| Cash dividend declared to noncontrolling interest | — | — | — | — | — | — | (449) | (449) |
| Purchase of noncontrolling interest | — | — | (18) | — | (1,262) | (1,280) | (493) | (1,773) |
| Sale of subsidiary stock | — | — | 48 | — | — | 48 | 18 | 66 |
| Other | 6 | — | 633 | (9) | — | 624 | 139 | 763 |
| **Balances as of January 31, 2023** | 2,693 | 269 | 4,969 | 83,135 | (11,680) | 76,693 | 7,061 | 83,754 |

*See accompanying notes.*

**Walmart Inc.**

**Consolidated Statements of Cash Flows**

| (Amounts in millions) | Fiscal Years Ended January 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| **Cash flows from operating activities:** | | | |
| Consolidated net income | $ 11,292 | $ 13,940 | $ 13,706 |
| Adjustments to reconcile consolidated net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 10,945 | 10,658 | 11,152 |
| Net unrealized and realized (gains) and losses | 1,683 | 2,440 | (8,589) |
| Losses on disposal of business operations | — | 433 | 8,401 |
| Deferred income taxes | 449 | (755) | 1,911 |
| Loss on extinguishment of debt | — | 2,410 | — |
| Other operating activities | 1,919 | 1,652 | 1,521 |
| Changes in certain assets and liabilities, net of effects of acquisitions and dispositions: | | | |
| Receivables, net | 240 | (1,796) | (1,086) |
| Inventories | (528) | (11,764) | (2,395) |
| Accounts payable | (1,425) | 5,520 | 6,966 |
| Accrued liabilities | 4,393 | 1,404 | 4,623 |
| Accrued income taxes | (127) | 39 | (136) |
| Net cash provided by operating activities | 28,841 | 24,181 | 36,074 |
| | | | |
| **Cash flows from investing activities:** | | | |
| Payments for property and equipment | (16,857) | (13,106) | (10,264) |
| Proceeds from the disposal of property and equipment | 170 | 394 | 215 |
| Proceeds from disposal of certain operations, net of divested cash | — | 7,935 | 56 |
| Payments for business acquisitions, net of cash acquired | (740) | (359) | (180) |
| Other investing activities | (295) | (879) | 102 |
| Net cash used in investing activities | (17,722) | (6,015) | (10,071) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Net change in short-term borrowings | (34) | 193 | (324) |
| Proceeds from issuance of long-term debt | 5,041 | 6,945 | — |
| Repayments of long-term debt | (2,689) | (13,010) | (5,382) |
| Premiums paid to extinguish debt | — | (2,317) | — |
| Dividends paid | (6,114) | (6,152) | (6,116) |
| Purchase of Company stock | (9,920) | (9,787) | (2,625) |
| Dividends paid to noncontrolling interest | (444) | (424) | (434) |
| Purchase of noncontrolling interest | (827) | — | — |
| Sale of subsidiary stock | 66 | 3,239 | 140 |
| Other financing activities | (2,118) | (1,515) | (1,376) |
| Net cash used in financing activities | (17,039) | (22,828) | (16,117) |
| | | | |
| Effect of exchange rates on cash, cash equivalents and restricted cash | (73) | (140) | 235 |
| | | | |
| Net increase (decrease) in cash, cash equivalents and restricted cash | (5,993) | (4,802) | 10,121 |
| Change in cash and cash equivalents reclassified from (to) assets held for sale | — | 1,848 | (1,848) |
| Cash, cash equivalents and restricted cash at beginning of year | 14,834 | 17,788 | 9,515 |
| Cash, cash equivalents and restricted cash at end of year | $ 8,841 | $ 14,834 | $ 17,788 |
| | | | |
| **Supplemental disclosure of cash flow information:** | | | |
| Income taxes paid | $ 3,310 | $ 5,918 | $ 5,271 |
| Interest paid | 2,051 | 2,237 | 2,216 |

*See accompanying notes.*

**Walmart Inc.**

**Notes to Consolidated Financial Statements**

### Note 1. Summary of Significant Accounting Policies

*General*

Walmart Inc. ("Walmart" or the "Company") people-led, technology-powered omni-channel retailer dedicated to help people around the world save money and live better – anytime and anywhere – by providing the opportunity to shop in both retail stores and through eCommerce.  Through innovation, the Company is striving to continuously improve a customer-centric experience that seamlessly integrates eCommerce and retail stores in an omni-channel offering that saves time for its customers.

The Company's operations comprise three reportable segments: Walmart U.S., Walmart International and Sam's Club.

*Principles of Consolidation*

The Consolidated Financial Statements include the accounts of Walmart and its subsidiaries as of and for the fiscal years ended January 31, 2023 ("fiscal 2023"), January 31, 2022 ("fiscal 2022") and January 31, 2021 ("fiscal 2021").  Intercompany accounts and transactions have been eliminated in consolidation.  The Company consolidates variable interest entities where it has been determined that the Company is the primary beneficiary of those entities' operations.  Investments in common stock or in-substance common stock for which the Company exercises significant influence but does not have control are accounted for under the equity method.  These variable interest entities and equity method investments are immaterial to the Company's Consolidated Financial Statements.

The Company's Consolidated Financial Statements are based on a fiscal year ending on January 31 for the United States ("U.S.") and Canadian operations.  The Company consolidates all other operations generally using a one-month lag and based on a calendar year.  There were no significant intervening events during the month of January 2023 related to the operations consolidated using a lag that materially affected the Consolidated Financial Statements.

*Use of Estimates*

The Consolidated Financial Statements have been prepared in conformity with U.S. generally accepted accounting principles.  Those principles require management to make estimates and assumptions that affect the reported amounts of assets and liabilities.  Management's estimates and assumptions also affect the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results may differ from those estimates.

*Cash and Cash Equivalents*

The Company considers investments with a maturity when purchased of three months or less to be cash equivalents.  All credit card, debit card and electronic transfer transactions that process in less than seven days are classified as cash and cash equivalents.  The amounts due from banks for these transactions classified as cash and cash equivalents totaled $2.0 billion and $1.7 billion as of January 31, 2023 and 2022, respectively.

The Company's cash balances are held in various locations around the world.  Of the Company's $8.6 billion and $14.8 billion in cash and cash equivalents as of January 31, 2023 and January 31, 2022, approximately 62% and 50% were held outside of the U.S., respectively.  Cash and cash equivalents held outside of the U.S. are generally utilized to support liquidity needs in the Company's non-U.S. operations.

The Company uses intercompany financing arrangements in an effort to ensure cash can be made available in the country in which it is needed with the minimum cost possible.

As of January 31, 2023 and 2022, cash and cash equivalents of approximately $2.9 billion and $4.3 billion, respectively, may not be freely transferable to the U.S. due to local laws, other restrictions or are subject to the approval of the noncontrolling interest shareholders.

*Receivables*

Receivables are stated at their carrying values, net of a reserve for doubtful accounts, and are primarily due from the following: customers, which includes pharmacy insurance companies as well as advertisers, and banks for customer credit, debit cards and electronic transfer transactions that take in excess of seven days to process; suppliers for marketing or incentive programs; governments for income taxes; and real estate transactions.  As of January 31, 2023 and January 31, 2022, net receivables from transactions with customers were $3.7 billion and $3.4 billion, respectively.

*Inventories*

The Company utilizes various inventory methods to account for and value its inventories depending upon the nature of the store formats and businesses in each of its segments, resulting in inventories that are recorded at the lower of cost or market or net realizable value, as appropriate.

- Walmart U.S. Segment - Inventories are primarily accounted for under the retail inventory method of accounting ("RIM") to determine inventory cost, using the last-in, first-out ("LIFO") valuation method. RIM generally results in inventory being valued at the lower of cost or market as permanent markdowns are immediately recorded as a reduction of the retail value of inventory.

- Walmart International Segment – Depending on the store format in each market, inventories are generally accounted for using either the RIM or weighted-average cost method, using the first-in, first-out valuation method.

- Sam's Club Segment - The majority of this segment's inventory is accounted for and valued using the weighted-average cost LIFO method.

For those segments that utilize the LIFO method, the Company records an adjustment each quarter, if necessary, for the projected annual effect of inflation or deflation. These estimates are adjusted to actual results determined at year end for inflation or deflation and inventory levels.

*Property and Equipment*

Property and equipment are initially recorded at cost. Gains or losses on disposition are recognized as earned or incurred. Costs of major improvements are capitalized, while costs of normal repairs and maintenance are expensed as incurred. The following table summarizes the Company's property and equipment balances and includes the estimated useful lives that are generally used to depreciate the assets on a straight-line basis:

| (Dollars in millions) | Estimated Useful Lives (in Years) | As of January 31, | |
| --- | --- | --- | --- |
| | | **2023** | **2022** |
| Land | N/A | $ 19,317 | $ 19,204 |
| Buildings and improvements | 3 - 40 | 104,554 | 100,376 |
| Fixtures and equipment | 2 - 30 | 65,235 | 60,282 |
| Transportation equipment | 3 - 15 | 2,462 | 2,263 |
| Construction in progress | N/A | 10,802 | 7,199 |
| **Property and equipment** | | 202,370 | 189,324 |
| Accumulated depreciation | | (101,610) | (94,809) |
| **Property and equipment, net** | | $ 100,760 | $ 94,515 |

Leasehold improvements are depreciated or amortized over the shorter of the estimated useful life of the asset or the remaining expected lease term. Total depreciation and amortization expense for property and equipment, property under finance leases and intangible assets for fiscal 2023, 2022 and 2021 was $10.9 billion, $10.7 billion and $11.2 billion, respectively.

*Leases*

For any new or modified lease, the Company, at the inception of the contract, determines whether a contract is or contains a lease. The Company records right-of-use ("ROU") assets and lease obligations for its finance and operating leases, which are initially recognized based on the discounted future lease payments over the term of the lease. If the rate implicit in the Company's leases is not readily determinable, the Company's applicable incremental borrowing rate is used in calculating the present value of the sum of the lease payments.

Lease term is defined as the non-cancelable period of the lease plus any options to extend or terminate the lease when it is reasonably certain that the Company will exercise the option. The Company has elected not to recognize ROU asset and lease obligations for its short-term leases, which are defined as leases with an initial term of 12 months or less.

For a majority of all classes of underlying assets, the Company has elected to not separate lease from non-lease components. For leases in which the lease and non-lease components have been combined, the variable lease expense includes expenses such as common area maintenance, utilities, and repairs and maintenance.

*Impairment of Long-Lived Assets*

Management reviews long-lived assets for indicators of impairment whenever events or changes in circumstances indicate that the carrying amount may not be recoverable. The evaluation is performed at the lowest level of identifiable cash flows, which is at the individual store or club level. Undiscounted cash flows expected to be generated by the related assets are estimated over the assets' useful lives based on updated projections. If the evaluation indicates that the carrying amount of the assets may not be recoverable, any potential impairment is measured based upon the fair value of the related asset or asset group as determined by an appropriate market appraisal or other valuation technique.

*Goodwill and Other Acquired Intangible Assets*

Goodwill represents the excess of the purchase price over the fair value of net assets acquired in business combinations and is allocated to the appropriate reporting unit when acquired. Other acquired intangible assets are stated at the fair value acquired as determined by a valuation technique commensurate with the intended use of the related asset. Goodwill and indefinite-lived intangible assets are not amortized; rather, they are evaluated for impairment annually and whenever events or changes in circumstances indicate that the value of the asset may be impaired. Definite-lived intangible assets are considered long-lived assets and are amortized on a straight-line basis over the periods that expected economic benefits will be provided.

Goodwill is typically assigned to the reporting unit which consolidates the acquisition. Components within the same reportable segment are aggregated and deemed a single reporting unit if the components have similar economic characteristics. As of January 31, 2023, the Company's reporting units consisted of Walmart U.S., Walmart International and Sam's Club. Goodwill and other indefinite-lived acquired intangible assets are evaluated for impairment using either a qualitative or quantitative approach for each of the Company's reporting units. Generally, a qualitative assessment is first performed to determine whether a quantitative goodwill impairment test is necessary. If management determines, after performing an assessment based on the qualitative factors, that the fair value of the reporting unit is more likely than not less than the carrying amount, or that a fair value of the reporting unit substantially in excess of the carrying amount cannot be assured, then a quantitative goodwill impairment test would be required. The quantitative test for goodwill impairment is performed by determining the fair value of the related reporting units. Fair value is measured based on the discounted cash flow method and relative market-based approaches. Management has performed its evaluation and determined the fair value of each reporting unit is significantly greater than the carrying amount and, accordingly, the Company has not recorded any impairment charges related to goodwill.

The following table reflects goodwill activity, by reportable segment, for fiscal 2023 and 2022:

| *(Amounts in millions)* | Walmart U.S. | | Walmart International | | Sam's Club | | Total | |
|---|---|---|---|---|---|---|---|---|
| **Balances as of February 1, 2021** | $ | 2,696 | $ | 25,966 | $ | 321 | $ | 28,983 |
| Changes in currency translation and other | | — | | (415) | | — | | (415) |
| Acquisitions | | 245 | | 201 | | — | | 446 |
| **Balances as of January 31, 2022** | | 2,941 | | 25,752 | | 321 | | 29,014 |
| Changes in currency translation and other | | — | | (1,475) | | — | | (1,475) |
| Acquisitions | | 433 | | 202 | | — | | 635 |
| **Balances as of January 31, 2023** | $ | 3,374 | $ | 24,479 | $ | 321 | $ | 28,174 |

Intangible assets are recorded in other long-term assets in the Company's Consolidated Balance Sheets. As of January 31, 2023 and 2022, the Company had $4.3 billion and $4.8 billion, respectively, in indefinite-lived intangible assets which primarily consists of acquired trade names. There were no significant impairment charges related to intangible assets for fiscal 2023, 2022 or 2021.

*Fair Value Measurement*

The Company records and discloses certain financial and non-financial assets and liabilities at fair value. The fair value of an asset is the price at which the asset could be sold in an orderly transaction between unrelated, knowledgeable and willing parties able to engage in the transaction. The fair value of a liability is the amount that would be paid to transfer the liability to a new obligor in a transaction between such parties, not the amount that would be paid to settle the liability with the creditor. Refer to Note 8 for more information.

*Investments*

Investments in equity securities are recorded in other long-term assets in the Consolidated Balance Sheets. Changes in fair value of equity securities, as well as certain immaterial equity method investments where the Company has elected the fair value option measured on a recurring basis, are recognized within other gains and losses in the Consolidated Statements of Income. These fair value changes, along with certain other immaterial investment activity, resulted in net losses of $1.7 billion and $2.4 billion for fiscal 2023 and fiscal 2022, respectively and net gains of $8.6 billion in fiscal 2021, primarily due to net changes in the underlying stock prices of those investments. Refer to Note 8 for details. Equity investments without readily

determinable fair values are carried at cost and adjusted for any observable price changes or impairments within other gains and losses in the Consolidated Statements of Income.

Investments in debt securities classified as trading are reported at fair value and adjustments in fair value are recorded within other gains and losses in the Consolidated Statements of Income.  As of January 31, 2023 and January 31, 2022, the Company had $0.5 billion and $1.0 billion, respectively, in debt securities classified as trading.

### Indemnification Liabilities

The Company has provided certain indemnifications in connection with its divestitures and has recorded indemnification liabilities equal to the estimated fair value of the obligations upon inception.  As of January 31, 2023 and January 31, 2022, the Company had $0.6 billion and $0.7 billion, respectively, of certain legal indemnification liabilities recorded within deferred income taxes and other in the Consolidated Balance Sheets.  The maximum of potential future payments under these indemnities was $3.1 billion, based on exchange rates as of January 31, 2023.

### Self Insurance Reserves

The Company self-insures a number of risks, including, but not limited to, workers' compensation, general liability, auto liability, product liability and certain employee-related healthcare benefits.  Standard actuarial procedures and data analysis are used to estimate the liabilities associated with these risks on an undiscounted basis.  The recorded liabilities reflect the ultimate cost for claims incurred but not paid and any estimable administrative run-out expenses related to the processing of these outstanding claim payments.  On a regular basis, the liabilities are evaluated for appropriateness with claims reserve valuations.  To limit exposure to some risks, the Company maintains insurance coverage with varying limits and retentions, including stop-loss insurance coverage for workers' compensation, general liability and auto liability.

### Derivatives

The Company uses derivatives for hedging purposes to manage its exposure to changes in interest and currency exchange rates, as well as to maintain an appropriate mix of fixed- and variable-rate debt.  Use of derivatives in hedging programs subjects the Company to certain risks, such as market and credit risks.  The Company may be exposed to credit-related losses in the event of nonperformance by its counterparties to derivatives.  Credit risk is monitored through established approval procedures, including setting concentration limits by counterparty, reviewing credit ratings and requiring collateral from the counterparty.  The Company enters into derivatives with counterparties rated generally "A-" or better by nationally recognized credit rating agencies. The Company is subject to master netting arrangements which provides set-off and close-out netting of exposures with counterparties, but the Company does not offset derivative assets and liabilities in its Consolidated Balance Sheets.  The Company's collateral arrangements require the counterparty in a net liability position in excess of pre-determined thresholds, after considering the effects of netting arrangements, to pledge cash collateral. Cash collateral received from counterparties and cash collateral provided to counterparties under these arrangements was not significant as of January 31, 2023 and 2022.

In order to qualify for hedge accounting, at the inception of the hedging relationship, the Company formally documents its risk management objective and strategy for undertaking the hedging transaction, as well as its designation of the hedge.  If a derivative is recorded using hedge accounting, depending on the nature of the hedge, derivative gains and losses are recorded through the same financial statement line item in earnings or are recognized in accumulated other comprehensive loss until the hedged item is recognized in earnings.  Derivatives that do not meet the criteria for hedge accounting, or contracts for which the Company has not elected hedge accounting, are recorded at fair value with unrealized gains or losses reported in earnings.  Derivatives with an unrealized gain are recorded in the Company's Consolidated Balance Sheets as either current or non-current assets, based on maturity date, and derivatives with an unrealized loss are recorded as either current or non-current liabilities, based on maturity date.  Refer to Note 8 for the presentation of the Company's derivative assets and liabilities.

### Fair Value Hedges

The Company is a party to receive fixed-rate, pay variable-rate interest rate swaps that the Company uses to hedge the fair value of fixed-rate debt.  All interest rate swaps designated as fair value hedges of the related long-term debt meet the shortcut method requirements under U.S. GAAP.  Accordingly, changes in the fair values of these interest rate swaps are considered to exactly offset changes in the fair value of the underlying long-term debt.  These derivatives will mature on dates ranging from April 2023 to September 2031.

### Cash Flow Hedges

The Company is a party to receive fixed-rate, pay fixed-rate cross currency interest rate swaps used to hedge the currency exposure associated with the forecasted payments of principal and interest of certain non-U.S. denominated debt.  The Company records changes in the fair value of these swaps in accumulated other comprehensive loss which is subsequently reclassified into earnings in the period that the hedged forecasted transaction affects earnings.  These derivatives will mature on dates ranging from July 2024 to January 2039.

*Net Investment Hedges*

Prior to the divestiture of the Company's operations in the United Kingdom and Japan as discussed in Note 12, the Company was a party to receive fixed-rate, pay fixed-rate cross currency interest rate swaps used to hedge the currency exposure associated with net investments of these foreign operations.  Changes in fair value attributable to the hedged risk were recorded in accumulated other comprehensive loss.  The Company also previously designated certain foreign currency denominated long-term debt as a hedge of currency exposure associated with the net investment of these divested operations and recorded foreign currency gain or loss associated with designated long-term debt in accumulated other comprehensive loss.  Upon closing of the sale of the Company's operations in the U.K. and Japan during the first quarter of fiscal 2022, these amounts were released from accumulated other comprehensive loss as discussed in Note 4.

### Income Taxes

Income taxes are accounted for under the balance sheet method.  Deferred tax assets and liabilities are recognized for the estimated future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases ("temporary differences").  Deferred tax assets and liabilities are measured using enacted tax rates in effect for the year in which those temporary differences are expected to be recovered or settled.  The effect on deferred tax assets and liabilities of a change in tax rate is recognized in income in the period that includes the enactment date.

Deferred tax assets are evaluated for future realization and reduced by a valuation allowance to the extent that a portion is not more likely than not to be realized.  Many factors are considered when assessing whether it is more likely than not that the deferred tax assets will be realized, including recent cumulative earnings, expectations of future taxable income, carryforward periods, and other relevant quantitative and qualitative factors.  The recoverability of the deferred tax assets is evaluated by assessing the adequacy of future expected taxable income from all sources, including reversal of taxable temporary differences, forecasted operating earnings and available tax planning strategies.  These sources of income rely on estimates.

In determining the provision for income taxes, an annual effective income tax rate is used based on annual income, permanent differences between book and tax income, and statutory income tax rates.  Discrete events such as audit settlements or changes in tax laws are recognized in the period in which they occur.

The Company records a liability for unrecognized tax benefits resulting from uncertain tax positions taken or expected to be taken in a tax return.  The Company records interest and penalties related to unrecognized tax benefits in interest expense and operating, selling, general and administrative expenses, respectively, in the Company's Consolidated Statements of Income.  Refer to Note 9 for additional income tax disclosures.

### Redeemable Noncontrolling Interest

Noncontrolling interests that are redeemable outside the Company's control at fixed or determinable prices and dates are presented as temporary equity on the Consolidated Balance Sheets. Redeemable noncontrolling interests are recorded at the greater of the redemption fair value or the carrying value of the noncontrolling interest and adjusted each reporting period for income, loss and any distributions made. Remeasurements to the redemption value of the redeemable noncontrolling interest are recognized in capital in excess of par.  As of January 31, 2023, the Company has a redeemable noncontrolling interest related to an acquisition in the Walmart U.S. segment as the minority interest owner holds a put option which may require the Company to purchase its interest beginning in December 2027 with annual options thereafter.

### Revenue Recognition

*Net Sales*

The Company recognizes sales revenue, net of sales taxes and estimated sales returns, at the time it sells merchandise or services to the customer.  eCommerce sales include shipping revenue and are recorded upon delivery to the customer.  Estimated sales returns are calculated based on expected returns.

*Membership Fee Revenue*

The Company recognizes membership fee revenue over the term of the membership, which is typically 12 months.  Membership fee revenue was $2.6 billion for fiscal 2023, $2.2 billion for fiscal 2022 and $1.7 billion for fiscal 2021.  Membership fee revenue is included in membership and other income in the Company's Consolidated Statements of Income.  Deferred membership fee revenue is included in accrued liabilities in the Company's Consolidated Balance Sheets.

*Gift Cards*

Customer purchases of gift cards are not recognized as sales until the card is redeemed and the customer purchases merchandise using the gift card.  Gift cards in the U.S. and some countries do not carry an expiration date; therefore, customers and members can redeem their gift cards for merchandise and services indefinitely.  Gift cards in some countries where the Company does business have expiration dates.  While gift cards are generally redeemed within 12 months, a certain number of gift cards, both with and without expiration dates, will not be fully redeemed.  Management estimates unredeemed balances and recognizes revenue for these amounts in membership and other income in the Company's Consolidated Statements of Income over the expected redemption period.

*Financial, Advertising and Other Services*

The Company recognizes revenue from service transactions at the time the service is performed.  Generally, revenue from services is classified as a component of net sales in the Company's Consolidated Statements of Income.

### Cost of Sales

Cost of sales includes actual product cost, the cost of transportation to the Company's distribution facilities, stores and clubs from suppliers, the cost of transportation from the Company's distribution facilities to the stores, clubs and customers and the cost of warehousing for the Sam's Club segment and import distribution centers.  Cost of sales is reduced by supplier payments that are not a reimbursement of specific, incremental and identifiable costs.

### Payments from Suppliers

The Company receives consideration from suppliers for various programs, primarily volume incentives, warehouse allowances and reimbursements for specific programs such as markdowns, margin protection, certain advertising arrangements and supplier-specific fixtures.  Payments from suppliers are accounted for as a reduction of cost of sales, except in certain limited situations when the payment is a reimbursement of specific, incremental and identifiable costs, and are recognized in the Company's Consolidated Statements of Income when the related inventory is sold.

### Operating, Selling, General and Administrative Expenses

Operating, selling, general and administrative expenses include all operating costs of the Company, except cost of sales, as described above.  As a result, the majority of the cost of warehousing and occupancy for the Walmart U.S. and Walmart International segments' distribution facilities is included in operating, selling, general and administrative expenses.  Because the Company only includes a portion of the cost of its Walmart U.S. and Walmart International segments' distribution facilities in cost of sales, its gross profit and gross profit as a percentage of net sales may not be comparable to those of other retailers that may include all costs related to their distribution facilities in cost of sales and in the calculation of gross profit.

### Advertising Costs

Advertising costs are expensed as incurred, consist primarily of digital, television and print advertisements and are recorded in operating, selling, general and administrative expenses in the Company's Consolidated Statements of Income. Advertising costs were $4.1 billion, $3.9 billion and $3.2 billion for fiscal 2023, 2022 and 2021, respectively.

### Currency Translation

The assets and liabilities of all international subsidiaries are translated from the respective local currency to the U.S. dollar using exchange rates at the balance sheet date.  Related translation adjustments are recorded as a component of accumulated other comprehensive loss.  The Company's Consolidated Statements of Income of all international subsidiaries are translated from the respective local currencies to the U.S. dollar using average exchange rates for the period covered by the income statements.

**Recent Accounting Pronouncements**

In September 2022, the FASB issued ASU 2022-04, Liabilities - Supplier Finance Programs (Subtopic 405-50): Disclosure of Supplier Finance Program Obligations, which enhances the transparency about the use of supplier finance programs for investors and other allocators of capital. The amendments are effective for fiscal years beginning after December 15, 2022, including interim periods within those fiscal years, except for the disclosure of rollforward information, which is effective for fiscal years beginning after December 15, 2023. Early adoption is permitted. The amendments should be applied retrospectively to each period in which a balance sheet is presented, except for disclosure of rollforward information, which should be applied prospectively. Management is currently evaluating this ASU to determine its impact on the Company's disclosures.

**Note 2.  Net Income Per Common Share**

Basic net income per common share attributable to Walmart is based on the weighted-average common shares outstanding during the relevant period.  Diluted net income per common share attributable to Walmart is based on the weighted-average common shares outstanding during the relevant period adjusted for the dilutive effect of share-based awards.  The Company did not have significant share-based awards outstanding that were antidilutive and not included in the calculation of diluted net income per common share attributable to Walmart for fiscal 2023, 2022 and 2021.

The following table provides a reconciliation of the numerators and denominators used to determine basic and diluted net income per common share attributable to Walmart:

| | Fiscal Years Ended January 31, | | |
|---|---|---|---|
| *(Amounts in millions, except per share data)* | **2023** | **2022** | **2021** |
| **Numerator** | | | |
| Consolidated net income | $ 11,292 | $ 13,940 | $ 13,706 |
| Consolidated net (income) loss attributable to noncontrolling interest | 388 | (267) | (196) |
| Consolidated net income attributable to Walmart | $ 11,680 | $ 13,673 | $ 13,510 |
| | | | |
| **Denominator** | | | |
| Weighted-average common shares outstanding, basic | 2,724 | 2,792 | 2,831 |
| Dilutive impact of stock options and other share-based awards | 10 | 13 | 16 |
| Weighted-average common shares outstanding, diluted | 2,734 | 2,805 | 2,847 |
| | | | |
| **Net income per common share attributable to Walmart** | | | |
| Basic | $ 4.29 | $ 4.90 | $ 4.77 |
| Diluted | 4.27 | 4.87 | 4.75 |

**Note 3.  Shareholders' Equity**

The total authorized shares of $0.10 par value common stock is 11.0 billion, of which 2.7 billion and 2.8 billion were issued and outstanding as of January 31, 2023 and 2022, respectively.

*Purchases and Sales of Subsidiary Stock*

During fiscal 2023, the Company completed a $0.4 billion buyout of the noncontrolling interest shareholders of the Company's Massmart subsidiary. This transaction increased the Company's ownership in Massmart from approximately 53% to 100%. Additionally, the Company completed a $0.4 billion acquisition of Alert Innovation, which was previously consolidated as a variable interest entity, and resulted in the Company becoming a 100% owner.

Also during fiscal 2023, the Company increased its ownership in PhonePe, a digital transaction platform in India, from approximately 76% to approximately 89% as part of the separation from the Company's majority-owned Flipkart subsidiary.  In consideration for the transaction, the Company recorded a liability to noncontrolling interest holders of $0.9 billion within accrued liabilities on the Company's Consolidated Balance Sheet.

During fiscal 2022, the Company received $3.2 billion primarily related to a new equity funding for the Company's majority-owned Flipkart subsidiary, which reduced the Company's ownership from approximately 83% as of January 31, 2021 to approximately 75%.

*Share-Based Compensation*

The Company has awarded share-based compensation to associates and nonemployee directors of the Company.  The compensation expense recognized for all stock incentive plans, including expense associated with plans of the Company's consolidated subsidiaries granted in the subsidiaries' respective stock, was $1.6 billion, $1.2 billion and $1.2 billion for fiscal 2023, 2022 and 2021, respectively.  Share-based compensation expense is generally included in operating, selling, general and administrative expenses in the Company's Consolidated Statements of Income.  The total income tax benefit recognized for share-based compensation was $0.4 billion, $0.3 billion and $0.3 billion for fiscal 2023, 2022 and 2021, respectively.  The following table summarizes the Company's share-based compensation expense by award type for all plans:

| | Fiscal Years Ended January 31, | | |
|---|---|---|---|
| *(Amounts in millions)* | **2023** | **2022** | **2021** |
| Restricted stock units | $ 927 | $ 659 | $ 742 |
| Restricted stock and performance-based restricted stock units | 444 | 321 | 277 |
| Other | 207 | 183 | 150 |
| **Share-based compensation expense** | $ 1,578 | $ 1,163 | $ 1,169 |

The Walmart Inc. Stock Incentive Plan of 2015 (the "Plan"), as subsequently amended and restated, was established to grant stock options, restricted (non-vested) stock, restricted stock units, performance share units and other equity compensation

awards for which 260 million shares of Walmart common stock issued or to be issued under the Plan have been registered under the Securities Act of 1933.  The Company believes that such awards serve to align the interests of its associates with those of its shareholders.

The Plan's award types are summarized as follows:

- *Restricted Stock Units.*  Restricted stock units provide rights to Company stock after a specified service period.  Beginning in fiscal 2023, restricted stock units generally vest at a rate of 8% each quarter over a three year period from the date of grant.  For grants made from fiscal 2020 through fiscal 2022, restricted stock units generally vest at a rate of 25% each year over a four year period from the date of grant.  Prior to fiscal 2020, 50% of restricted stock units generally vested three years from the grant date and the remaining 50% were vested five years from the grant date.  The fair value of each restricted stock unit is determined on the date of grant using the stock price discounted for the expected dividend yield through the vesting period and is recognized ratably over the vesting period.  The expected dividend yield is based on the anticipated dividends over the vesting period.  The weighted-average discount for the dividend yield used to determine the fair value of restricted stock units granted in fiscal 2023, 2022 and 2021 was 2.3%, 3.8% and 4.4%, respectively.

- *Restricted Stock and Performance-based Restricted Stock Units.*  Restricted stock awards are for shares that vest based on the passage of time and include restrictions related to employment.  Performance-based restricted stock units vest based on the passage of time and achievement of performance criteria and generally range from 0% to 150% of the original award amount.  Vesting periods for restricted stock are generally between one month and three years.  Vesting periods for performance-based restricted stock units are generally between one and three years.  Restricted stock and performance-based restricted stock units may be settled or deferred in stock and are accounted for as equity in the Company's Consolidated Balance Sheets.  The fair value of restricted stock awards is determined on the date of grant and is expensed ratably over the vesting period.  The fair value of performance-based restricted stock units is determined on the date of grant using the Company's stock price discounted for the expected dividend yield through the vesting period and is recognized over the vesting period.  The weighted-average discount for the dividend yield used to determine the fair value of performance-based restricted stock units in fiscal 2023, 2022 and 2021 was 3.3%, 4.2% and 4.5%, respectively.

In addition to the Plan, Flipkart and PhonePe have share-based compensation plans for associates under which options to acquire their own common shares may be issued.  These plans may be subject to performance or other conditions, including vesting upon an initial public offering. Share-based compensation expense associated with certain of these plans is included in the Other line in the table above.

The following table shows the activity for restricted stock units and restricted stock and performance-based restricted stock units during fiscal 2023:

| | Restricted Stock Units | | Restricted Stock and Performance-based Restricted Stock Units | |
|---|---|---|---|---|
| *(Shares in thousands)* | Shares | Weighted-Average Grant-Date Fair Value Per Share | Shares | Weighted-Average Grant-Date Fair Value Per Share |
| Outstanding as of February 1, 2022 | 17,283 | $ 111.42 | 6,140 | $ 125.25 |
| Granted | 9,357 | 143.97 | 4,572 | 142.74 |
| Adjustment for performance achievement[1] | — | — | 638 | 132.00 |
| Vested/exercised | (8,338) | 111.69 | (3,242) | 120.18 |
| Forfeited | (2,082) | 127.36 | (948) | 128.68 |
| **Outstanding as of January 31, 2023** | 16,220 | $ 128.01 | 7,160 | $ 138.86 |

[1] Represents the adjustment to previously granted performance share units for performance achievement.

The following table includes additional information related to restricted stock units and restricted stock and performance-based restricted stock units:

| | Fiscal Years Ended January 31, | | |
|---|---|---|---|
| *(Amounts in millions, except years)* | **2023** | **2022** | **2021** |
| Fair value of restricted stock units vested | $ 931 | $ 703 | $ 597 |
| Fair value of restricted stock and performance-based restricted stock units vested | 390 | 264 | 275 |
| Unrecognized compensation cost for restricted stock units | 1,323 | 1,102 | 1,062 |
| Unrecognized compensation cost for restricted stock and performance-based restricted stock units | 548 | 417 | 344 |
| Weighted average remaining period to expense for restricted stock units (years) | 1.0 | 1.2 | 1.1 |
| Weighted average remaining period to expense for restricted stock and performance-based restricted stock units (years) | 1.4 | 1.5 | 1.4 |

*Share Repurchase Program*

From time to time, the Company repurchases shares of its common stock under share repurchase programs authorized by the Company's Board of Directors. All repurchases made during the fiscal year prior to November 21, 2022 were made under the plan in effect at the beginning of fiscal 2022. In November 2022, the Company approved a new $20.0 billion share repurchase program which has no expiration date or other restrictions limiting the period over which the Company can make repurchases, and beginning November 21, 2022, replaced the previous share repurchase program. As of January 31, 2023 authorization for $19.3 billion of share repurchases remained under the share repurchase program. Any repurchased shares are constructively retired and returned to an unissued status.

The Company regularly reviews share repurchase activity and considers several factors in determining when to execute share repurchases, including, among other things, current cash needs, capacity for leverage, cost of borrowings, results of operations and the market price of the Company's common stock. The following table provides, on a settlement date basis, the number of shares repurchased, average price paid per share and total amount paid for share repurchases for fiscal 2023, 2022 and 2021:

| | | Fiscal Years Ended January 31, | | | | |
|---|---|---|---|---|---|---|
| *(Amounts in millions, except per share data)* | | **2023** | | **2022** | | **2021** |
| Total number of shares repurchased | | 73.9 | | 69.7 | | 19.4 |
| Average price paid per share | $ | 134.17 | $ | 140.45 | $ | 135.20 |
| Total cash paid for share repurchases | $ | 9,920 | $ | 9,787 | $ | 2,625 |

## Note 4.  Accumulated Other Comprehensive Loss

The following table provides the changes in the composition of total accumulated other comprehensive loss for fiscal 2023, 2022 and 2021:

| *(Amounts in millions and net of immaterial income taxes)* | | **Currency Translation and Other** | | **Net Investment Hedges** | | **Cash Flow Hedges** | | **Minimum Pension Liability** | | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|
| **Balances as of February 1, 2020** | $ | (11,827) | $ | 1,517 | $ | (539) | $ | (1,956) | $ | (12,805) |
| Other comprehensive income (loss) before reclassifications, net | | 214 | | (221) | | 186 | | (172) | | 7 |
| Reclassifications to income, net[1] | | 841 | | — | | 49 | | 142 | | 1,032 |
| **Balances as of January 31, 2021** | | (10,772) | | 1,296 | | (304) | | (1,986) | | (11,766) |
| Other comprehensive loss before reclassifications, net | | (586) | | (7) | | (540) | | — | | (1,133) |
| Reclassifications related to business dispositions, net[2] | | 3,258 | | (1,195) | | 30 | | 1,966 | | 4,059 |
| Reclassifications to income, net | | — | | — | | 66 | | 8 | | 74 |
| **Balances as of January 31, 2022** | | (8,100) | | 94 | | (748) | | (12) | | (8,766) |
| Other comprehensive income (loss) before reclassifications, net | | (1,145) | | — | | (571) | | 5 | | (1,711) |
| Return of currency translation to parent[3] | | (1,262) | | — | | — | | — | | (1,262) |
| Reclassifications to income, net | | (309) | | — | | 368 | | — | | 59 |
| **Balances as of January 31, 2023** | $ | (10,816) | $ | 94 | $ | (951) | $ | (7) | $ | (11,680) |

[1] Includes a cumulative foreign currency translation loss of $0.8 billion, for which there was no related income taxes, upon sale of the majority stake in Walmart Argentina. Refer to Note 12.

[2] Upon closing of the sale of the Company's operations in the U.K. and Japan during the first quarter of fiscal 2022, these amounts were released from accumulated other comprehensive loss, the majority of which was considered in the impairment evaluation when the individual disposal groups met the held for sale classification in fiscal 2021.

[3] Upon closing of the noncontrolling interest shareholder buyout of the Company's Massmart subsidiary during the fourth quarter of fiscal 2023, the cumulative amount of currency translation was reallocated from the Company's noncontrolling interest back to the Company. Refer to Note 3.

Amounts reclassified from accumulated other comprehensive loss for foreign currency on matured bonds (reflected in currency translation and other) and derivatives are recorded in interest, net, in the Company's Consolidated Statements of Income. The amounts for the minimum pension liability, as well as the cumulative translation resulting from the disposition of a business, are recorded in other gains and losses in the Company's Consolidated Statements of Income. Amounts related to the Company's derivatives expected to be reclassified from accumulated other comprehensive loss to net income during the next 12 months are not significant.

**Note 5.  Accrued Liabilities**

The Company's accrued liabilities consist of the following as of January 31, 2023 and 2022:

| | January 31, | |
|---|---|---|
| *(Amounts in millions)* | **2023** | **2022** |
| Accrued wages and benefits[1] | 8,287 | 7,908 |
| Self-insurance[2] | 4,724 | 4,652 |
| Accrued non-income taxes[3] | 3,425 | 3,247 |
| Opioid litigation settlement[4] | 2,949 | — |
| Deferred gift card revenue | 2,488 | 2,559 |
| Other[5] | 9,253 | 7,694 |
| **Total accrued liabilities** | $     31,126 | $     26,060 |

[1]   Accrued wages and benefits include accrued wages, salaries, vacation, bonuses and other incentive plans.
[2]   Self-insurance consists of insurance-related liabilities, such as workers' compensation, general liability, auto liability, product liability and certain employee-related healthcare benefits.
[3]   Accrued non-income taxes include accrued payroll, property, value-added, sales and miscellaneous other taxes.
[4]   Represents the remaining balance for the opioids litigation settlement. See Note 10.
[5]   Other accrued liabilities includes items such as deferred membership revenue, the purchase of PhonePe stock (see Note 3), interest, supply chain, advertising, and maintenance & utilities.

**Note 6.  Short-term Borrowings and Long-term Debt**

Short-term borrowings consist of commercial paper and lines of credit.  Short-term borrowings as of January 31, 2023 and 2022 were $0.4 billion, with weighted-average interest rates of 6.6% and 2.9%, respectively.

The Company has various committed lines of credit in the U.S. to support its commercial paper program and are summarized in the following table:

| | January 31, 2023 | | | January 31, 2022 | | |
|---|---|---|---|---|---|---|
| *(Amounts in millions)* | **Available** | **Drawn** | **Undrawn** | **Available** | **Drawn** | **Undrawn** |
| Five-year credit facility[1] | $     5,000 | $     — | $     5,000 | $     5,000 | $     — | $     5,000 |
| 364-day revolving credit facility[1] | 10,000 | — | 10,000 | 10,000 | — | 10,000 |
| **Total** | $     15,000 | $     — | $     15,000 | $     15,000 | $     — | $     15,000 |

[1]   In April 2022, the Company renewed and extended its existing 364-day revolving credit facility as well as its five year credit facility.

The committed lines of credit in the table above mature in April 2023 and April 2027, carry interest rates of SOFR plus 60 basis points, and incur commitment fees ranging between 1.5 and 4.0 basis points.  In conjunction with the committed lines of credit listed in the table above, the Company has agreed to observe certain covenants, the most restrictive of which relates to the maximum amount of secured debt.  Additionally, the Company has syndicated and fronted letters of credit available which totaled $2.1 billion and $1.8 billion as of January 31, 2023 and 2022, respectively, of which $1.8 billion and $1.7 billion was drawn as of January 31, 2023 and 2022, respectively.

The Company's long-term debt, which includes the fair value instruments further discussed in Note 8, consists of the following as of January 31, 2023 and 2022:

| | | January 31, 2023 | | January 31, 2022 | |
|---|---|---|---|---|---|
| *(Amounts in millions)* | **Maturity Dates By Fiscal Year** | **Amount** | **Average Rate[1]** | **Amount** | **Average Rate[1]** |
| **Unsecured debt** | | | | | |
| Fixed | 2024 - 2053 | $     33,707 | 3.6% | $     29,957 | 3.5% |
| **Total U.S. dollar denominated** | | 33,707 | | 29,957 | |
| Fixed | 2027 - 2030 | 1,790 | 4.0% | 2,787 | 3.3% |
| **Total Euro denominated** | | 1,790 | | 2,787 | |
| Fixed | 2031 - 2039 | 3,318 | 5.4% | 3,601 | 5.4% |
| **Total Sterling denominated** | | 3,318 | | 3,601 | |
| Fixed | 2025 - 2028 | 767 | 0.4% | 1,475 | 0.3% |
| **Total Yen denominated** | | 767 | | 1,475 | |
| **Total unsecured debt** | | 39,582 | | 37,820 | |
| **Total other[2]** | | (742) | | (153) | |
| **Total debt** | | 38,840 | | 37,667 | |
| Less amounts due within one year | | (4,191) | | (2,803) | |
| **Long-term debt** | | $     34,649 | | $     34,864 | |

[1]   The average rate represents the weighted-average stated rate for each corresponding debt category, based on year-end balances and year-end interest rates.
[2]   Includes deferred loan costs, discounts, fair value hedges, foreign-held debt and secured debt.

Annual maturities of long-term debt during the next five years and thereafter are as follows:

*(Amounts in millions)*

| Fiscal Year | | Annual Maturities |
|---|---|---:|
| 2024 | $ | 4,191 |
| 2025 | | 3,516 |
| 2026 | | 2,604 |
| 2027 | | 2,737 |
| 2028 | | 1,817 |
| Thereafter | | 23,975 |
| **Total** | $ | 38,840 |

*Debt Issuances*

Information on significant long-term debt issued during fiscal 2023, for general corporate purposes, is as follows:

*(Amounts in millions)*

| Issue Date | Principal Amount | Maturity Date | Fixed vs. Floating | Interest Rate | Net Proceeds | |
|---|---|---|---|---|---|---:|
| September 9, 2022 | $1,750 | September 9, 2025 | Fixed | 3.900% | $ | 1,744 |
| September 9, 2022 | $1,000 | September 9, 2027 | Fixed | 3.950% | $ | 994 |
| September 9, 2022 | $1,250 | September 9, 2032 | Fixed | 4.150% | $ | 1,239 |
| September 9, 2022 | $1,000 | September 9, 2052 | Fixed | 4.500% | $ | 992 |
| **Total** | | | | | $ | 4,969 |

These issuances are senior, unsecured notes which rank equally with all other senior, unsecured debt obligations of the Company, and are not convertible or exchangeable. These issuances do not contain any financial covenants which restrict the Company's ability to pay dividends or repurchase Company stock.  Additionally, the Company received immaterial proceeds from debt issuances by certain international markets.

*Maturities and Extinguishments*

The following table provides details of debt repayments during fiscal 2023:

*(Amounts in millions)*

| Maturity Date | Principal Amount | Fixed vs. Floating | Interest Rate | Repayment | |
|---|---|---|---|---|---:|
| April 8, 2022 | €850 | Fixed | 1.900% | $ | 927 |
| July 15, 2022 | ¥70,000 | Fixed | 0.183% | | 512 |
| December 15, 2022 | $1,250 | Fixed | 2.350% | | 1,250 |
| **Total repayment of matured debt** | | | | | 2,689 |

The following table provides details of debt repayments during fiscal 2022:

*(Amounts in millions)*

| Maturity Date | Principal Amount | Fixed vs. Floating | Interest Rate | Repayment |
|---|---|---|---|---|
| April 15, 2021 | $510 | Fixed | 4.250% | $ 510 |
| June 23, 2021 | $750 | Floating | Floating | 750 |
| June 23, 2021 | $1,750 | Fixed | 3.125% | 1,750 |
| **Total repayment of matured debt** | | | | 3,010 |
| | | | | |
| June 26, 2023 | $2,750 | Fixed | 3.400% | 470 |
| October 15, 2023 | $152 | Fixed | 6.750% | 2 |
| July 8, 2024 | $1,500 | Fixed | 2.850% | 510 |
| December 15, 2024 | $1,000 | Fixed | 2.650% | 370 |
| June 26, 2025 | $1,500 | Fixed | 3.550% | 625 |
| July 8, 2026 | $1,250 | Fixed | 3.050% | 451 |
| April 5, 2027 | $483 | Fixed | 5.875% | 110 |
| June 26, 2028 | $2,750 | Fixed | 3.700% | 1,271 |
| July 8, 2029 | $1,250 | Fixed | 3.250% | 517 |
| September 24, 2029 | $500 | Fixed | 2.375% | 181 |
| February 15, 2030 | $588 | Fixed | 7.550% | 119 |
| September 1, 2035 | $1,968 | Fixed | 5.250% | 635 |
| August 15, 2037 | $1,300 | Fixed | 6.500% | 262 |
| April 15, 2038 | $919 | Fixed | 6.200% | 116 |
| June 28, 2038 | $1,500 | Fixed | 3.950% | 925 |
| April 1, 2040 | $751 | Fixed | 5.625% | 142 |
| July 8, 2040 | $378 | Fixed | 4.875% | 101 |
| October 25, 2040 | $519 | Fixed | 5.000% | 125 |
| April 15, 2041 | $918 | Fixed | 5.625% | 305 |
| April 11, 2043 | $709 | Fixed | 4.000% | 296 |
| October 2, 2043 | $269 | Fixed | 4.750% | 38 |
| April 22, 2044 | $502 | Fixed | 4.300% | 172 |
| December 15, 2047 | $1,000 | Fixed | 3.625% | 566 |
| June 29, 2048 | $3,000 | Fixed | 4.050% | 1,317 |
| September 24, 2049 | $1,000 | Fixed | 2.950% | 371 |
| **Total repayment of extinguished debt**[1] | | | | 10,000 |
| **Total** | | | | 13,010 |

[1] Represents portion of the outstanding principal amount which was repaid during fiscal 2022.  Individual repayment amounts may not sum due to rounding.

The Company recorded a $2.4 billion loss on extinguishment of debt during fiscal 2022, which included payment of $2.3 billion in early extinguishment premiums.

## Note 7.  Leases

The Company leases certain retail locations, distribution and fulfillment centers, warehouses, office spaces, land and equipment throughout the U.S. and internationally. The Company's lease costs recognized in the Consolidated Statement of Income consist of the following:

| | Fiscal years ended January 31, | | |
|---|---|---|---|
| *(Amounts in millions)* | **2023** | **2022** | **2021** |
| Operating lease cost | $ 2,306 | $ 2,274 | $ 2,626 |
| Finance lease cost: | | | |
|   Amortization of right-of-use assets | 596 | 565 | 583 |
|   Interest on lease obligations | 256 | 232 | 298 |
| Variable lease cost | 899 | 823 | 777 |

Other lease information is as follows:

| | | Fiscal years ended January 31, | | |
| --- | --- | --- | --- | --- |
| *(Amounts in millions)* | | **2023** | **2022** | **2021** |
| Cash paid for amounts included in measurement of lease obligations: | | | | |
| Operating cash flows from operating leases | $ | 2,280 | 2,234 | 2,629 |
| Operating cash flows from finance leases | | 248 | 225 | 286 |
| Financing cash flows from finance leases | | 563 | 538 | 546 |
| Assets obtained in exchange for operating lease obligations | | 1,714 | 1,816 | 2,131 |
| Assets obtained in exchange for finance lease obligations | | 1,226 | 1,044 | 1,547 |

| | As of January 31, | |
| --- | --- | --- |
| | **2023** | **2022** |
| Weighted-average remaining lease term - operating leases | 12.0 years | 12.2 years |
| Weighted-average remaining lease term - finance leases | 13.3 years | 13.4 years |
| Weighted-average discount rate - operating leases | 6.0% | 5.9% |
| Weighted-average discount rate - finance leases | 6.5% | 6.5% |

The aggregate annual lease obligations at January 31, 2023, are as follows:

*(Amounts in millions)*

| Fiscal Year | | Operating Leases | | Finance Leases |
| --- | --- | --- | --- | --- |
| 2024 | $ | 2,166 | $ | 834 |
| 2025 | | 2,077 | | 774 |
| 2026 | | 1,917 | | 712 |
| 2027 | | 1,735 | | 638 |
| 2028 | | 1,556 | | 545 |
| Thereafter | | 11,018 | | 5,438 |
| **Total undiscounted lease obligations** | | 20,469 | | 8,941 |
| Less imputed interest | | (6,168) | | (3,531) |
| **Net lease obligations** | $ | 14,301 | $ | 5,410 |

## Note 8.  Fair Value Measurements

Assets and liabilities recorded at fair value are measured using the fair value hierarchy, which prioritizes the inputs used in measuring fair value.  The levels of the fair value hierarchy are:

- Level 1: observable inputs such as quoted prices in active markets;
- Level 2: inputs other than quoted prices in active markets that are either directly or indirectly observable; and
- Level 3: unobservable inputs for which little or no market data exists, therefore requiring the Company to develop its own assumptions.

As described in Note 1, the Company measures the fair value of certain equity investments, including certain equity method investments, on a recurring basis in the accompanying Consolidated Balance Sheets.  The fair values of the Company's equity investments measured on a recurring basis are as follows:

| *(Amounts in millions)* | | Fair Value as of January 31, 2023 | | Fair Value as of January 31, 2022 |
| --- | --- | --- | --- | --- |
| Equity investments measured using Level 1 inputs | $ | 5,099 | $ | 6,069 |
| Equity investments measured using Level 2 inputs | | 5,570 | | 5,819 |
| **Total** | $ | 10,669 | $ | 11,888 |

*Derivatives*

The Company also has derivatives recorded at fair value.  Derivative fair values are the estimated amounts the Company would receive or pay upon termination of the related derivative agreements as of the reporting dates.  The fair values have been measured using the income approach and Level 2 inputs, which include the relevant interest rate and foreign currency forward curves.  As of January 31, 2023 and January 31, 2022, the notional amounts and fair values of these derivatives were as follows:

| (Amounts in millions) | January 31, 2023 | | January 31, 2022 | |
| | Notional Amount | Fair Value | Notional Amount | Fair Value |
|---|---|---|---|---|
| Receive fixed-rate, pay variable-rate interest rate swaps designated as fair value hedges | $   8,021 | $   (689) [1] | $   8,021 | $   (47) [1] |
| Receive fixed-rate, pay fixed-rate cross-currency swaps designated as cash flow hedges | 5,900 | (1,423) [1] | 7,855 | (1,048) [1] |
| **Total** | $  13,921 | $  (2,112) | $  15,876 | $  (1,095) |

[1]   Primarily classified in deferred income taxes and other in the Company's Consolidated Balance Sheets.

*Nonrecurring Fair Value Measurements*

In addition to assets and liabilities that are recorded at fair value on a recurring basis, the Company's assets and liabilities are also subject to nonrecurring fair value measurements.  Generally, assets are recorded at fair value on a nonrecurring basis as a result of impairment charges.

Upon completing the sales of the Company's operations in the U.K. in February 2021 and Japan in March 2021, the Company recorded incremental non-recurring impairment charges of $0.4 billion in the first quarter of fiscal 2022 within other gains and losses in the Consolidated Statements of Income.  Refer to Note 12. The Company did not have any material assets or liabilities resulting in nonrecurring fair value measurements as of January 31, 2023.

For the fiscal year ended January 31, 2021, the Company's operations in Argentina, Japan and the U.K. met the held for sale criteria in fiscal 2021, as further discussed in Note 12.  As a result, the individual disposal groups were measured at fair value, less costs to sell, which is considered a Level 3 fair value measurement based on each transaction's expected consideration. The carrying value of the Argentina, Japan and U.K. disposal groups exceeded their fair value, less costs to sell, and as a result, the Company recognized non-recurring impairment charges.  The aggregate pre-tax loss of $8.3 billion associated with the divestiture of these operations in the Walmart International segment was recorded in other gains and losses in the Consolidated Statements of Income for the year ended January 31, 2021, and included these impairment charges as well as a $2.3 billion charge related to the Asda pension plan.  These impairment charges included the anticipated release of non-cash cumulative foreign currency translation losses associated with the disposal groups. Other impairment charges for assets measured at fair value on a nonrecurring basis during fiscal 2021 were immaterial.

*Other Fair Value Disclosures*

The Company records cash and cash equivalents, restricted cash and short-term borrowings at cost.  The carrying values of these instruments approximate their fair value due to their short-term maturities.

The Company's long-term debt is also recorded at cost.  The fair value is estimated using Level 2 inputs based on the Company's current incremental borrowing rate for similar types of borrowing arrangements.  The carrying value and fair value of the Company's long-term debt as of January 31, 2023 and 2022, are as follows:

| (Amounts in millions) | January 31, 2023 | | January 31, 2022 | |
| | Carrying Value | Fair Value | Carrying Value | Fair Value |
|---|---|---|---|---|
| Long-term debt, including amounts due within one year | $   38,840 | $   38,169 | $   37,667 | $   42,381 |

## Note 9.  Taxes

The components of income before income taxes are as follows:

| (Amounts in millions) | Fiscal Years Ended January 31, | | |
| | 2023 | 2022 | 2021 |
|---|---|---|---|
| U.S. | $   15,089 | $   15,536 | $   18,068 |
| Non-U.S. | 1,927 | 3,160 | 2,496 |
| **Total income before income taxes** | $   17,016 | $   18,696 | $   20,564 |

A summary of the provision for income taxes is as follows:

| (Amounts in millions) | Fiscal Years Ended January 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| **Current:** | | | |
| U.S. federal | $ 2,030 | $ 3,313 | $ 2,991 |
| U.S. state and local | 610 | 649 | 742 |
| International | 2,654 | 1,553 | 1,127 |
| **Total current tax provision** | 5,294 | 5,515 | 4,860 |
| **Deferred:** | | | |
| U.S. federal | 608 | (671) | 2,316 |
| U.S. state and local | 119 | 41 | 23 |
| International | (297) | (129) | (341) |
| **Total deferred tax expense (benefit)** | 430 | (759) | 1,998 |
| **Total provision for income taxes** | $ 5,724 | $ 4,756 | $ 6,858 |

*Effective Income Tax Rate Reconciliation*

A reconciliation of the significant differences between the U.S. statutory tax rate and the effective income tax rate on pre-tax income from continuing operations is as follows:

| | Fiscal Years Ended January 31, | | |
|---|---|---|---|
| | **2023** | **2022** | **2021** |
| U.S. statutory tax rate | 21.0 % | 21.0 % | 21.0 % |
| U.S. state income taxes, net of federal income tax benefit | 3.1 % | 2.8 % | 2.9 % |
| Income taxed outside the U.S. | 1.1 % | (1.5)% | (0.1)% |
| Separation, disposal and wind-down of certain business operations | 6.3 % | 0.5 % | 7.1 % |
| Valuation allowance | 1.7 % | 4.4 % | 2.3 % |
| Net impact of repatriated international earnings | (0.4)% | (0.3)% | (0.4)% |
| Federal tax credits | (1.3)% | (1.1)% | (0.9)% |
| Change in unrecognized tax benefits | 0.3 % | 0.2 % | 0.8 % |
| Other, net | 1.8 % | (0.6)% | 0.6 % |
| **Effective income tax rate** | 33.6 % | 25.4 % | 33.3 % |

The following sections regarding deferred taxes, unmitted earnings, net operating losses, tax credit carryforwards, valuation allowances and uncertain tax positions exclude amounts related to operations classified as held for sale.

*Deferred Taxes*

The significant components of the Company's deferred tax account balances are as follows:

| (Amounts in millions) | January 31, | |
|---|---|---|
| | **2023** | **2022** |
| **Deferred tax assets:** | | |
| Loss and tax credit carryforwards | $ 7,690 | $ 9,456 |
| Accrued liabilities | 3,312 | 2,752 |
| Share-based compensation | 237 | 231 |
| Lease obligations | 4,653 | 4,320 |
| Other | 839 | 893 |
| **Total deferred tax assets** | 16,731 | 17,652 |
| Valuation allowances | (7,815) | (9,542) |
| **Deferred tax assets, net of valuation allowances** | 8,916 | 8,110 |
| **Deferred tax liabilities:** | | |
| Property and equipment | 4,352 | 4,414 |
| Acquired intangibles | 932 | 1,065 |
| Inventory | 3,032 | 1,588 |
| Lease right of use assets | 4,727 | 4,355 |
| Mark-to-market investments | 1,390 | 1,825 |
| Other | 249 | 307 |
| **Total deferred tax liabilities** | 14,682 | 13,554 |
| **Net deferred tax liabilities** | $ 5,766 | $ 5,444 |

The deferred taxes noted above are classified as follows in the Company's Consolidated Balance Sheets:

| | | January 31, | | |
|---|---|---|---|---|
| *(Amounts in millions)* | | 2023 | | 2022 |
| **Balance Sheet classification** | | | | |
| **Assets:** | | | | |
| Other long-term assets | $ | 1,503 | $ | 1,473 |
| **Liabilities:** | | | | |
| Deferred income taxes and other | | 7,269 | | 6,917 |
| **Net deferred tax liabilities** | $ | 5,766 | $ | 5,444 |

*Unremitted Earnings*

Prior to the Tax Cuts and Jobs Act of 2017 (the "Tax Act"), the Company asserted that all unremitted earnings of its foreign subsidiaries were considered indefinitely reinvested. As a result of the Tax Act, the Company reported and paid U.S. tax on the majority of its previously unremitted foreign earnings, and repatriations of foreign earnings will generally be free of U.S. federal tax, but may incur other taxes such as withholding or state taxes.  As of January 31, 2023, the Company has not recorded approximately $3 billion of deferred tax liabilities associated with remaining unremitted foreign earnings considered indefinitely reinvested, for which U.S. and foreign income and withholding taxes would be due upon repatriation.

*Net Operating Losses, Tax Credit Carryforwards and Valuation Allowances*

As of January 31, 2023, the Company's net operating loss and capital loss carryforwards totaled approximately $32.3 billion. Of these carryforwards, approximately $19.6 billion will expire, if not utilized, in various years through 2043.  The remaining carryforwards have no expiration.

The realizability of these future tax deductions and credits is evaluated by assessing the adequacy of future expected taxable income from all sources, including taxable income in prior carryback years, reversal of taxable temporary differences, forecasted operating earnings and available tax planning strategies.  To the extent the Company does not consider it more likely than not that a deferred tax asset will be recovered, a valuation allowance is generally established.  To the extent that a valuation allowance was established and it is subsequently determined that it is more likely than not that the deferred tax assets will be recovered, the change in the valuation allowance is recognized in the Consolidated Statements of Income.

The Company had valuation allowances of approximately $7.8 billion and $9.5 billion as of January 31, 2023 and 2022, respectively, on deferred tax assets associated primarily with the net operating loss carryforwards. Activity in the valuation allowance during fiscal 2023 related to valuation allowance builds in multiple markets, as well as releases due to the expiration of unrealized deferred tax assets.

*Uncertain Tax Positions*

The benefits of uncertain tax positions are recorded in the Company's Consolidated Financial Statements only after determining a more-likely-than-not probability that the uncertain tax positions will withstand challenge, if any, from taxing authorities.

As of January 31, 2023 and 2022, the amount of gross unrecognized tax benefits related to continuing operations was $3.3 billion and $3.2 billion, respectively.  The amount of unrecognized tax benefits that would affect the Company's effective income tax rate was $1.5 billion and $1.8 billion as of January 31, 2023 and 2022, respectively.

A reconciliation of gross unrecognized tax benefits from continuing operations is as follows:

| | | Fiscal Years Ended January 31, | | | | |
|---|---|---|---|---|---|---|
| *(Amounts in millions)* | | 2023 | | 2022 | | 2021 |
| **Gross unrecognized tax benefits, beginning of year** | $ | 3,245 | $ | 3,135 | $ | 1,817 |
| Increases related to prior year tax positions | | 79 | | 170 | | 92 |
| Decreases related to prior year tax positions | | (248) | | (97) | | (264) |
| Increases related to current year tax positions | | 357 | | 75 | | 1,582 |
| Settlements during the period | | (89) | | (5) | | (64) |
| Lapse in statutes of limitations | | (37) | | (33) | | (28) |
| **Gross unrecognized tax benefits, end of year** | $ | 3,307 | $ | 3,245 | $ | 3,135 |

The Company classifies interest and penalties related to uncertain tax benefits as interest expense and as operating, selling, general and administrative expenses, respectively. Interest expense and penalties related to these positions were immaterial for fiscal 2023, 2022 and 2021.  During the next twelve months, it is reasonably possible that tax audit resolutions could reduce unrecognized tax benefits by an immaterial amount, either because the tax positions are sustained on audit or because the Company agrees to their disallowance.  The Company does not expect any change to have a material impact to its Consolidated Financial Statements.

The Company remains subject to income tax examinations for its U.S. federal income taxes generally for fiscal 2018 through 2022.  The Company also remains subject to income tax examinations for international income taxes for fiscal 2013 through 2022, and for U.S. state and local income taxes generally for the fiscal years ended 2015 through 2022. With few exceptions, the Company is no longer subject to U.S. federal, state, local, or foreign examinations by tax authorities for years before fiscal 2013.

*Other Taxes*

The Company is subject to tax examinations for value added, sales-based, payroll and other non-income taxes.  A number of these examinations are ongoing in various jurisdictions.  In certain cases, the Company has received assessments and judgments from the respective taxing authorities in connection with these examinations.  Unless otherwise indicated, the possible losses or range of possible losses associated with these matters are individually immaterial, but a group of related matters, if decided adversely to the Company, could result in a liability material to the Company's Consolidated Financial Statements.

### Note 10.  Contingencies

### *Legal Proceedings*

The Company is involved in a number of legal proceedings and certain regulatory matters. The Company records a liability for those legal proceedings and regulatory matters when it determines it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. The Company also discloses when it is reasonably possible that a material loss may be incurred. From time to time, the Company may enter into discussions regarding settlement of these matters, and may enter into settlement agreements, if it believes settlement is in the best interest of the Company and its shareholders.

Unless stated otherwise, the matters discussed below, if decided adversely to or settled by the Company, individually or in the aggregate, may result in a liability material to the Company's financial position, results of operations or cash flows.

*Settlement Framework Regarding Multidistrict and State or Local Opioid Related Litigation*

During fiscal 2023, the Company accrued a liability for approximately $3.3 billion for the Settlement Framework (described below) and other previously agreed upon state and tribal settlements. Because loss contingencies are inherently unpredictable and unfavorable developments or resolutions can occur, the assessment is highly subjective and requires judgments about future events. Moreover, the Settlement Framework will only take effect once a sufficient number of political subdivisions join, and there is no assurance regarding such participation. The amount of ultimate loss may thus differ materially from this accrual. The Settlement Framework includes no admission of wrongdoing or liability by the Company, and the Company continues to believe it has substantial factual and legal defenses to opioids-related litigation.

In December 2017, the United States Judicial Panel on Multidistrict Litigation consolidated numerous lawsuits filed against a wide array of defendants by various plaintiffs, including counties, cities, healthcare providers, Native American tribes, individuals, and third-party payers, asserting claims generally concerning the impacts of widespread opioid abuse. The consolidated multidistrict litigation is entitled In re National Prescription Opiate Litigation (MDL No. 2804) (the "MDL") and is pending in the U.S. District Court for the Northern District of Ohio. The Company is named as a defendant in some of the cases included in the MDL.

Similar cases that name the Company also have been filed in state courts by state, local, and tribal governments, healthcare providers, and other plaintiffs. Plaintiffs in these state court cases and in the MDL are seeking compensatory and punitive damages, as well as injunctive relief including abatement. The Company has also been responding to subpoenas, information requests, and investigations from governmental entities related to nationwide controlled substance dispensing and distribution practices involving opioids.

On November 15, 2022, the Company announced it had agreed to financial amounts and payment terms to resolve substantially all opioids-related lawsuits filed against the Company by states, political subdivisions, and Native American tribes whether as part of the MDL (excluding, however, a single, two-county trial described further below) or pending state court, as well as all potential claims that could be made against the Company by states, political subdivisions, and Native American tribes for up to approximately $3.1 billion (the "Settlement Amount"). The Settlement Amount includes amounts for remediation of alleged harms as well as attorneys' fees and costs and also includes some, but not all, amounts from previously agreed recent settlements by the Company. One settlement framework with corresponding conditions and participation thresholds applies for the states and political subdivisions, and another settlement framework with corresponding conditions and participation thresholds applies for the Native American tribes. Both settlement frameworks are referred to collectively as the "Settlement Framework."

The Settlement Framework, among other applicable conditions, provides that payments to states and political subdivisions are contingent upon the number of states and political subdivisions, including those states and political subdivisions who have not yet sued the Company, that agree to participate in the Settlement Framework or otherwise have their claims foreclosed within a prescribed deadline. On December 20, 2022, the Company announced that it had settlement agreements with all 50 states, including four states that previously settled with the Company, as well as the District of Columbia, Puerto Rico, and three other

U.S. territories (the "Settling States"), thus satisfying the initial threshold of required participation by Settling States. The settlement with the Settling States is now contingent upon, among other applicable terms and conditions, a sufficient number of political subdivisions also agreeing to participate in the Settlement Framework.

If all conditions for the Settlement Framework, including, but not limited to, the minimum participation thresholds applicable for political subdivisions are satisfied within the prescribed deadlines, then the Company would expect to pay up to the full portion of the Settlement Amount attributable to the Settling States, beginning as early as the second quarter of fiscal 2024 and being completed during fiscal 2024. However, the Company cannot predict if, when, or to what extent the Settlement Framework will be finalized with any of the Settling States.

In the fourth quarter of fiscal 2023, the Company paid $0.4 billion for separate settlements with Cherokee Nation, New Mexico, and Florida. Following these payments, the remaining $2.9 billion liability for the Settlement Framework and other settlements is recorded in accrued liabilities within the Company's Consolidated Balance Sheet as of January 31, 2023.

The Settlement Framework also provides for payments to Native American tribes (excluding Cherokee Nation), contingent upon the number of tribes, including those tribes that have not yet sued the Company, that agreed to participate in the Settlement Framework or otherwise have their claims foreclosed within a prescribed deadline (the "Settling Tribes"). Pursuant to the terms of the Settlement Framework, on March 3, 2023, the Company paid approximately $0.1 billion to the Settling Tribes in satisfaction of their claims against the Company.

*Other Opioid Related Litigation*

The Company will continue to vigorously defend against any opioid-related litigation not covered or otherwise extinguished by the Settlement Framework, including, but not limited to, each of the matters described below; any other actions filed by healthcare providers, individuals, and third-party payers, as well as any action filed by a state, political subdivision, or Native American tribe that does not agree to the Settlement Framework. Accordingly, the Company has not accrued a liability for these opioid-related litigation matters nor can the Company reasonably estimate any loss or range of loss that may arise from these matters. The Company can provide no assurance as to the scope and outcome of any of these matters and no assurance that its business, financial position, results of operations or cash flows will not be materially adversely affected.

*Two-county Trial and MDL Bellwethers.* The liability phase of a single, two-county trial in one of the MDL cases resulted in a jury verdict on November 23, 2021, finding in favor of the plaintiffs as to the liability of all defendants, including the Company. The abatement phase of the single, two-county trial resulted in a judgment on August 17, 2022, that ordered all three defendants, including the Company, to pay an aggregate amount of approximately $0.7 billion over fifteen years, on a joint and several liability basis, and granted the plaintiffs injunctive relief. On September 7, 2022, the Company filed an appeal with the Sixth Circuit Court of Appeals. The monetary aspect of the judgment is stayed pending appeal, and the injunctive aspect of the judgment went into effect on February 20, 2023.

The MDL has designated five additional single-county cases as bellwethers to proceed through discovery; however, these five counties ultimately may elect to participate in the Settlement Framework and receive a portion of the Settlement Amount rather than go to trial.

*DOJ Opioid Civil Litigation.* On December 22, 2020, the U.S. Department of Justice (the "DOJ") filed a civil complaint in the U.S. District Court for the District of Delaware alleging that the Company unlawfully dispensed controlled substances from its pharmacies and unlawfully distributed controlled substances to those pharmacies. The complaint alleges that this conduct resulted in violations of the Controlled Substances Act. The DOJ is seeking civil penalties and injunctive relief. The Company initially moved to dismiss the DOJ complaint on February 22, 2021. After that motion was fully briefed, the DOJ filed an amended complaint on October 7, 2022. On November 7, 2022, the Company filed a partial motion to dismiss the amended complaint. That motion remains pending.

*Opioid Related Securities Class Actions and Derivative Litigation.* In addition, the Company is the subject of two securities class actions alleging violations of the federal securities laws regarding the Company's disclosures with respect to opioids, filed in the U.S. District Court for the District of Delaware on January 20, 2021 and March 5, 2021 purportedly on behalf of a class of investors who acquired Walmart stock from March 30, 2016 through December 22, 2020. Those cases have been consolidated. On October 8, 2021, the defendants filed a motion to dismiss the consolidated securities action. After the parties had fully briefed the motion to dismiss, on September 9, 2022, the Court entered an order permitting the plaintiffs to file an amended complaint, which was filed on October 14, 2022 and which revised the applicable putative class of investors to those who acquired Walmart stock from March 31, 2017, through December 22, 2020. On November 16, 2022, the defendants filed a motion to dismiss the amended complaint. That motion remains pending.

Derivative actions were also filed by two of the Company's shareholders in the U.S. District Court for the District of Delaware on February 9, 2021 and April 16, 2021 alleging breach of fiduciary duties against certain of its current and former directors with respect to oversight of the Company's distribution and dispensing of opioids and also alleging violations of the federal securities laws and other breaches of duty by current directors and two current officers in connection with the Company's opioids disclosures. Those cases have been stayed pending developments in other opioids litigation matters. On September 27, 2021, three shareholders filed a derivative action in the Delaware Court of Chancery alleging that certain members of the

current Board and certain former officers breached their fiduciary duties in failing to adequately oversee the Company's prescription opioids business. The defendants moved to dismiss and/or to stay proceedings on December 21, 2021, and the plaintiffs responded by filing an amended complaint on February 22, 2022. On April 20, 2022, the defendants moved to dismiss and/or to stay proceedings with respect to the amended complaint. On September 26, 2022, the court held a hearing on that motion, and a ruling remains pending.

*Other Legal Proceedings*

*Asda Equal Value Claims.*  Asda, formerly a subsidiary of the Company, was and still is a defendant in certain equal value claims that began in 2008 and are proceeding before an Employment Tribunal in Manchester in the United Kingdom on behalf of current and former Asda store employees, as well as additional claims in the High Court of the United Kingdom (the "Asda Equal Value Claims"). Further claims may be asserted in the future. Subsequent to the divestiture of Asda in February 2021, the Company continues to oversee the conduct of the defense of these claims. While potential liability for these claims remains with Asda, the Company has agreed to provide indemnification with respect to certain of these claims up to a contractually determined amount. The Company cannot predict the number of such claims that may be filed, and cannot reasonably estimate any loss or range of loss that may arise related to these proceedings. Accordingly, the Company can provide no assurance as to the scope and outcome of these matters.

*Money Transfer Agent Services Matters.*  The Company has responded to grand jury subpoenas issued by the United States Attorney's Office for the Middle District of Pennsylvania on behalf of the U.S. Department of Justice (the "DOJ") seeking documents regarding the Company's consumer fraud prevention program and anti-money laundering compliance related to the Company's money transfer services, where Walmart is an agent. The most recent subpoena was issued in August 2020. The Company continues to cooperate with and provide information in response to requests from the DOJ. The Company has also responded to civil investigative demands from the United States Federal Trade Commission (the "FTC") in connection with the FTC's investigation related to money transfers and the Company's anti-fraud program in its capacity as an agent. On June 28, 2022, the FTC filed a complaint against the Company in the U.S. District Court for the Northern District of Illinois alleging that Walmart violated the Federal Trade Commission Act and the Telemarketing Sales Rule regarding its money transfer agent services and is requesting non-monetary relief and civil penalties. On August 29, 2022, the Company filed a motion to dismiss the complaint, on October 5, 2022, the FTC responded to the motion, and on October 28, 2022, the Company filed its reply. The court has entered an order staying discovery pending a decision on the Company's motion to dismiss. The Company intends to vigorously defend these matters. However, the Company can provide no assurance as to the scope and outcome of these matters and cannot reasonably estimate any loss or range of loss that may arise. Accordingly, the Company can provide no assurance that its business, financial position, results of operations or cash flows will not be materially adversely affected.

## Note 11.  Retirement-Related Benefits

The Company offers a 401(k) plan for associates in the U.S. under which eligible associates can begin contributing to the plan immediately upon hire.  The Company also offers a 401(k) type plan for associates in Puerto Rico under which associates can begin to contribute generally after one year of employment.  Under these plans, after one year of employment, the Company matches 100% of participant contributions up to 6% of annual eligible earnings.  The matching contributions immediately vest at 100% for each associate.  Participants can contribute up to 50% of their pre-tax earnings, but not more than the statutory limits.

Associates in international countries who are not U.S. citizens are covered by various defined contribution post-employment benefit arrangements.  These plans are administered based upon the legislative and tax requirements in the countries in which they are established.

The following table summarizes the contribution expense related to the Company's defined contribution plans for fiscal 2023, 2022 and 2021:

| | | Fiscal Years Ended January 31, | | | | |
|---|---|---|---|---|---|---|
| *(Amounts in millions)* | | 2023 | | 2022 | | 2021 |
| **Defined contribution plans:** | | | | | | |
| U.S. | $ | 1,491 | $ | 1,441 | $ | 1,290 |
| International | | 74 | | 39 | | 200 |
| **Total contribution expense for defined contribution plans** | $ | 1,565 | $ | 1,480 | $ | 1,490 |

Additionally, the Company's previously owned subsidiary in the United Kingdom sponsored a defined benefit pension plan.  In fiscal 2020, Asda, Walmart and the Trustee of the Asda Group Pension Scheme (the "Plan") entered into an agreement pursuant to which Asda made a cash contribution of $1.0 billion to the Plan (the "Asda Pension Contribution") which enabled the Plan to purchase a bulk annuity insurance contract for the benefit of Plan participants, and released the Plan and Asda from any future obligations.  In connection with the sale of Asda, all accumulated pension components of $2.3 billion were included in the disposal group and the estimated pre-tax loss recognized during the fourth quarter of fiscal 2021 as discussed in <u>Note 8</u> and <u>Note 12</u>.

**Note 12.  Disposals, Acquisitions and Related Items**

The following dispositions impact the Company's Walmart International segment. Other immaterial transactions have also occurred.

*Asda*

In February 2021, the Company completed the divestiture of Asda, the Company's retail operations in the U.K., for net consideration of $9.6 billion.  Upon closing of the transaction, the Company recorded an incremental pre-tax loss of $0.2 billion in other gains and losses in its Consolidated Statement of Income in the first quarter of fiscal 2022, primarily related to changes in the net assets of the disposal group, currency exchange rate fluctuations and customary purchase price adjustments upon closing.  During the first quarter of fiscal 2022, the Company deconsolidated the financial statements of Asda and recognized its retained investment in Asda as a debt security within other long-term assets and also recognized certain legal and tax indemnity liabilities within deferred income taxes and other on the Consolidated Balance Sheet.

Asda was classified as held for sale in the Consolidated Balance Sheet as of January 31, 2021, and as a result, the Company recognized an estimated pre-tax loss of $5.5 billion in other gains and losses in its Consolidated Statement of Income in the fourth quarter of fiscal 2021.  Upon classifying the Asda disposal group as held for sale, $2.3 billion of accumulated pension components associated with the expected derecognition of the Asda pension plan were included as part of the loss.  In calculating the loss, the fair value of the disposal group was reduced by approximately $0.8 billion related to the estimated fair value of certain indemnities and other transaction related costs.

*Seiyu*

In March 2021, the Company completed the divestiture of Seiyu, the Company's retail operations in Japan, for net consideration of $1.2 billion.  Upon closing of the transaction, the Company recorded an incremental pre-tax loss of $0.2 billion in other gains and losses in its Consolidated Statement of Income in the first quarter of fiscal 2022, primarily related to changes in the net assets of the disposal group, currency exchange rate fluctuations and customary purchase price adjustments upon closing.  During the first quarter of fiscal 2022, the Company deconsolidated the financial statements of Seiyu and recognized its retained 15 percent ownership interest in Seiyu as an equity investment within other long-term assets on the Consolidated Balance Sheet.

Seiyu was classified as held for sale in the Consolidated Balance Sheet as of January 31, 2021, and as a result, the Company recognized an estimated pre-tax loss of $1.9 billion in other gains and losses in its Consolidated Statement of Income in the fourth quarter of fiscal 2021.

*Walmart Argentina*

In November 2020, the Company completed the sale of Walmart Argentina. As a result, the Company recorded a pre-tax loss of $1.0 billion in the third quarter of fiscal 2021 in other gains and losses in its Consolidated Statement of Income primarily due to the impact of cumulative translation losses on the carrying value of the disposal group.

**Note 13.  Segments and Disaggregated Revenue**

*Segments*

The Company is engaged in the operation of retail and wholesale stores and clubs, as well as eCommerce websites, located throughout the U.S., Africa, Canada, Central America, Chile, China, India and Mexico.  The Company previously operated in Argentina prior to the sale of Walmart Argentina in the fourth quarter of fiscal 2021 and operated in the United Kingdom and Japan prior to the sale of those operations in the first quarter of fiscal 2022.  Refer to Note 12 for discussion of recent divestitures.  The Company's operations are conducted in three reportable segments: Walmart U.S., Walmart International and Sam's Club.  The Company defines its segments as those operations whose results the chief operating decision maker ("CODM") regularly reviews to analyze performance and allocate resources.  The Company sells similar individual products and services in each of its segments.  It is impracticable to segregate and identify revenues for each of these individual products and services.

The Walmart U.S. segment includes the Company's mass merchant concept in the U.S., as well as eCommerce, which includes omni-channel initiatives and certain other business offerings such as advertising services through Walmart Connect.  The Walmart International segment consists of the Company's operations outside of the U.S., as well as eCommerce and omni-channel initiatives.  The Sam's Club segment includes the warehouse membership clubs in the U.S., as well as eCommerce and omni-channel initiatives.  Corporate and support consists of corporate overhead and other items not allocated to any of the Company's segments.

The Company measures the results of its segments using, among other measures, each segment's net sales and operating income, which includes certain corporate overhead allocations.  From time to time, the Company revises the measurement of each segment's operating income, including any corporate overhead allocations, as determined by the information regularly

reviewed by its CODM.  Information for the Company's segments, as well as for Corporate and support, including the reconciliation to income before income taxes, is provided in the following table:

| (Amounts in millions) | | Walmart U.S. | | Walmart International | | Sam's Club | | Corporate and support | | Consolidated |
|---|---|---|---|---|---|---|---|---|---|---|
| **Fiscal Year Ended January 31, 2023** | | | | | | | | | | |
| Net sales | $ | 420,553 | $ | 100,983 | $ | 84,345 | $ | — | $ | 605,881 |
| Operating income (loss) | | 20,620 | | 2,965 | | 1,964 | | (5,121) | | 20,428 |
| Interest, net | | | | | | | | | | (1,874) |
| Other gains and (losses) | | | | | | | | | | (1,538) |
| Income before income taxes | | | | | | | | | $ | 17,016 |
| Total assets | $ | 130,659 | $ | 86,766 | $ | 15,490 | $ | 10,282 | $ | 243,197 |
| Depreciation and amortization | | 7,054 | | 1,964 | | 609 | | 1,318 | | 10,945 |
| Capital expenditures | | 11,425 | | 2,625 | | 727 | | 2,080 | | 16,857 |
| | | | | | | | | | | |
| **Fiscal Year Ended January 31, 2022** | | | | | | | | | | |
| Net sales | $ | 393,247 | $ | 100,959 | $ | 73,556 | $ | — | $ | 567,762 |
| Operating income (loss) | | 21,587 | | 3,758 | | 2,259 | | (1,662) | | 25,942 |
| Interest, net | | | | | | | | | | (1,836) |
| Loss on extinguishment of debt | | | | | | | | | | (2,410) |
| Other gains and (losses) | | | | | | | | | | (3,000) |
| Income before income taxes | | | | | | | | | $ | 18,696 |
| Total assets | $ | 125,044 | $ | 91,403 | $ | 14,678 | $ | 13,735 | $ | 244,860 |
| Depreciation and amortization | $ | 6,773 | $ | 1,963 | $ | 601 | $ | 1,321 | $ | 10,658 |
| Capital expenditures | $ | 8,475 | $ | 2,497 | $ | 622 | $ | 1,512 | | 13,106 |
| | | | | | | | | | | |
| **Fiscal Year Ended January 31, 2021** | | | | | | | | | | |
| Net sales | $ | 369,963 | $ | 121,360 | $ | 63,910 | $ | — | $ | 555,233 |
| Operating income (loss) | | 19,116 | | 3,660 | | 1,906 | | (2,134) | | 22,548 |
| Interest, net | | | | | | | | | | (2,194) |
| Other gains and (losses) | | | | | | | | | | 210 |
| Income before income taxes | | | | | | | | | $ | 20,564 |
| Total assets | $ | 113,490 | $ | 109,445 | $ | 13,415 | $ | 16,146 | $ | 252,496 |
| Depreciation and amortization | | 6,561 | | 2,633 | | 599 | | 1,359 | | 11,152 |
| Capital expenditures | | 6,131 | | 2,436 | | 488 | | 1,209 | | 10,264 |

Total revenues, consisting of net sales and membership and other income, and long-lived assets, consisting primarily of property and equipment, net and lease right-of-use assets, aggregated by the Company's U.S. and non-U.S. operations for fiscal 2023, 2022 and 2021, are as follows:

| | | Fiscal Years Ended January 31, | | | | |
|---|---|---|---|---|---|---|
| (Amounts in millions) | | **2023** | | **2022** | | **2021** |
| **Revenues** | | | | | | |
| U.S. operations | $ | 508,685 | $ | 470,295 | $ | 436,649 |
| Non-U.S. operations | | 102,604 | | 102,459 | | 122,502 |
| **Total revenues** | $ | 611,289 | $ | 572,754 | $ | 559,151 |
| | | | | | | |
| **Long-lived assets** | | | | | | |
| U.S. operations | $ | 95,567 | $ | 89,795 | $ | 87,068 |
| Non-U.S. operations | | 23,667 | | 22,829 | | 22,780 |
| **Total long-lived assets** | $ | 119,234 | $ | 112,624 | $ | 109,848 |

No individual country outside of the U.S. had total revenues or long-lived assets that were material to the consolidated totals. Long-lived assets related to operations classified as held for sale are excluded from the table above.  Additionally, the Company did not generate material revenues from any single customer.

*Disaggregated Revenues*

In the following tables, segment net sales are disaggregated by either merchandise category or market. In addition, net sales related to eCommerce are provided for each segment, which include omni-channel sales where a customer initiates an order digitally and the order is fulfilled through a store or club.

| (Amounts in millions) | Fiscal Years Ended January 31, | | |
| --- | --- | --- | --- |
| **Walmart U.S. net sales by merchandise category** | **2023** | **2022** | **2021** |
| Grocery | $ 247,299 | $ 218,944 | $ 208,413 |
| General merchandise | 118,597 | 125,876 | 119,406 |
| Health and wellness | 46,591 | 42,839 | 38,522 |
| Other categories | 8,066 | 5,588 | 3,622 |
| **Total** | $ 420,553 | $ 393,247 | $ 369,963 |

Of Walmart U.S.'s total net sales, approximately $53.4 billion, $47.8 billion and $43.0 billion related to eCommerce for fiscal 2023, 2022 and 2021, respectively.

| (Amounts in millions) | Fiscal Years Ended January 31, | | |
| --- | --- | --- | --- |
| **Walmart International net sales by market** | **2023** | **2022** | **2021** |
| Mexico and Central America | $ 40,496 | $ 35,964 | $ 32,642 |
| Canada | 22,300 | 21,773 | 19,991 |
| China | 14,711 | 13,852 | 11,430 |
| United Kingdom | — | 3,811 | 29,234 |
| Other | 23,476 | 25,559 | 28,063 |
| **Total** | $ 100,983 | $ 100,959 | $ 121,360 |

Of Walmart International's total net sales, approximately $20.3 billion, $18.5 billion and $16.6 billion related to eCommerce for fiscal 2023, 2022 and 2021, respectively.

| (Amounts in millions) | Fiscal Years Ended January 31, | | |
| --- | --- | --- | --- |
| **Sam's Club net sales by merchandise category** | **2023** | **2022** | **2021** |
| Grocery and consumables | $ 53,027 | $ 46,822 | $ 42,148 |
| Fuel, tobacco and other categories | 14,636 | 10,751 | 7,590 |
| Home and apparel | 9,579 | 9,037 | 7,340 |
| Health and wellness | 4,248 | 3,956 | 3,792 |
| Technology, office and entertainment | 2,855 | 2,990 | 3,040 |
| **Total** | $ 84,345 | $ 73,556 | $ 63,910 |

Of Sam's Club's total net sales, approximately $8.4 billion, $6.9 billion and $5.3 billion related to eCommerce for fiscal 2023, 2022 and 2021, respectively.

## Note 14. Subsequent Event

*Dividends Declared*

The Company approved, effective February 21, 2023, the fiscal 2024 annual dividend of $2.28 per share, an increase over the fiscal 2023 dividend of $2.24 per share. For fiscal 2024, the annual dividend will be paid in four quarterly installments of $0.57 per share, according to the following record and payable dates:

| Record Date | Payable Date |
| --- | --- |
| March 17, 2023 | April 3, 2023 |
| May 5, 2023 | May 30, 2023 |
| August 11, 2023 | September 5, 2023 |
| December 8, 2023 | January 2, 2024 |

**ITEM 9.**     **CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE**

None.

**ITEM 9A.**     **CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to provide reasonable assurance that information, which is required to be timely disclosed, is accumulated and communicated to management in a timely fashion. In designing and evaluating such controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. Our management is necessarily required to use judgment in evaluating controls and procedures. Also, we have investments in unconsolidated entities. Since we do not control or manage those entities, our controls and procedures with respect to those entities are substantially more limited than those we maintain with respect to our consolidated subsidiaries.

In the ordinary course of business, we review our internal control over financial reporting and make changes to our systems and processes to improve such controls and increase efficiency, while ensuring that we maintain an effective internal control environment. Changes may include such activities as implementing new, more efficient systems, updating existing systems, automating manual processes, standardizing controls globally, migrating certain processes to our shared services organizations and increasing monitoring controls. These changes have not materially affected, and are not reasonably likely to materially affect, the Company's internal control over financial reporting. However, they allow us to continue to enhance our internal control over financial reporting and ensure that our internal control environment remains effective.

An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report was performed under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance that information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure and are effective to provide reasonable assurance that such information is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

**Report on Internal Control Over Financial Reporting**

Management has responsibility for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with accounting principles generally accepted in the United States. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Management has assessed the effectiveness of the Company's internal control over financial reporting as of January 31, 2023. In making its assessment, management has utilized the criteria set forth by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission in Internal Control-Integrated Framework (2013). Management concluded that based on its assessment, Walmart's internal control over financial reporting was effective as of January 31, 2023. The Company's internal control over financial reporting as of January 31, 2023, has been audited by Ernst & Young LLP as stated in their report which appears herein.

**Changes in Internal Control Over Financial Reporting**

There has been no change in the Company's internal control over financial reporting as of January 31, 2023, that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

In the first quarter of fiscal 2024, we will begin upgrading our financial system, including our general ledger and other applications, in stages. This financial system will continue to be a significant component of our internal control over financial reporting as it is implemented.

**ITEM 9B.**     **OTHER INFORMATION**

None.

**ITEM 9C.**     **DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS**

Not applicable.

**PART III**

**ITEM 10.     DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

Please see the information concerning our executive officers contained in "Item 1. Business" herein under the caption "Information About Our Executive Officers," which is included in accordance with the Instruction to Item 401 of the SEC's Regulation S-K.

Information required by this Item 10 with respect to the Company's directors and certain family relationships is incorporated by reference to such information under the caption "Proposal No. 1 – Election of Directors" included in our Proxy Statement relating to our 2023 Annual Meeting of Shareholders (our "Proxy Statement").

No material changes have been made to the procedures by which shareholders of the Company may recommend nominees to our Board of Directors since those procedures were disclosed in our proxy statement relating to our 2022 Annual Shareholders' Meeting as previously filed with the SEC.

The information regarding our Audit Committee, including our audit committee financial experts, our Reporting Protocols for Senior Financial Officers and our Code of Conduct applicable to all of our associates, including our Chief Executive Officer, Chief Financial Officer and our Controller, who is our principal accounting officer, required by this Item 10 is incorporated herein by reference to the information under the captions "Corporate Governance" and "Proposal No. 4: Ratification of Independent Accountants" included in our Proxy Statement. "Item 1. Business" above contains information relating to the availability of a copy of our Reporting Protocols for Senior Financial Officers and our Code of Conduct and the posting of amendments to and any waivers of the Reporting Protocols for Senior Financial Officers and our Code of Conduct on our website.

**ITEM 11.     EXECUTIVE COMPENSATION**

The information required by this Item 11 is incorporated herein by reference to the information under the captions "Corporate Governance – Director Compensation" and "Executive Compensation" included in our Proxy Statement.

**ITEM 12.     SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

The information required by this Item 12 is incorporated herein by reference to the information that appears under the caption "Stock Ownership" included in our Proxy Statement.

**ITEM 13.     CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

The information required by this Item 13 is incorporated herein by reference to the information under the caption "Corporate Governance – Board Processes and Practices" included in our Proxy Statement.

**ITEM 14.     PRINCIPAL ACCOUNTING FEES AND SERVICES**

The information required by this Item 14 is incorporated herein by reference to the information under the caption "Proposal No. 4 – Ratification of Independent Accountants" included in our Proxy Statement.

**PART IV**

**ITEM 15.     EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

(a)        Documents filed as part of this report are as follows:

1.          Financial Statements: See the Financial Statements in "Item 8. Financial Statements and Supplementary Data."

2.          Financial Statement Schedules:

            Certain schedules have been omitted because the required information is not present or is not present in amounts sufficient to require submission of the schedule, or because the information required is included in the Consolidated Financial Statements, including the notes thereto.

3.          Exhibits:

            See exhibits listed under part (b) below.

(b)        The required exhibits are filed as part of this Form 10-K or are incorporated by reference herein.[1]

3.1         Restated Certificate of Incorporation of the Company dated February 1, 2018 is incorporated herein by reference to Exhibit 3.1 to the Report on Form 8-K filed by the Company on February 1, 2018

3.2         Amended and Restated Bylaws of the Company dated November 10, 2022 are incorporated herein by reference to Exhibit 3.1 to the Report on Form 8-K filed by the Company on November 16, 2022

4.1         Indenture dated as of April 1, 1991, between the Company and J.P. Morgan Trust Company, National Association, as successor trustee to Bank One Trust Company, NA, as successor trustee to The First National Bank of Chicago, Trustee, is incorporated herein by reference to Exhibit 4(a) to Registration Statement on Form S-3 (File Number 33-51344) [P]

4.2         First Supplemental Indenture dated as of September 9, 1992, to the Indenture dated as of April 1, 1991, between the Company and J.P. Morgan Trust Company, National Association, as successor trustee to Bank One Trust Company, NA, as successor trustee to The First National Bank of Chicago, Trustee, is incorporated herein by reference to Exhibit 4(b) to Registration Statement on Form S-3 (File Number 33-51344) [P]

4.3         Indenture dated as of December 11, 2002, between the Company and J.P. Morgan Trust Company, National Association, as successor trustee to Bank One Trust Company, NA, is incorporated by reference to Exhibit 4.5 to Registration Statement on Form S-3 (File Number 333-101847)

4.4         Indenture dated as of July 19, 2005, between the Company and J.P. Morgan Trust Company, National Association is incorporated by reference to Exhibit 4.5 to Registration Statement on Form S-3 (File Number 333-126512)

4.5         First Supplemental Indenture, dated December 1, 2006, between the Company and The Bank of New York Trust Company, N.A., as successor-in-interest to J.P. Morgan Trust Company, National Association, as Trustee, under the Indenture, dated as of July 19, 2005, between the Company and J.P. Morgan Trust Company, National Association, as Trustee, is incorporated herein by reference to Exhibit 4.6 to Post-Effective Amendment No. 1 to Registration Statement on Form S-3 (File Number 333-130569)

4.6         Second Supplemental Indenture, dated December 19, 2014, between the Company and The Bank of New York Trust Company, N.A., as successor-in-interest to J.P. Morgan Trust Company, National Association, as Trustee, under the Indenture, dated as of July 19, 2005, between the Company and J.P. Morgan Trust Company, National Association, as Trustee, is incorporated herein by reference to Exhibit 4.3 to Registration Statement on Form S-3 (File Number 333-201074)

4.7         Third Supplemental Indenture, dated June 26, 2018, between the Company and The Bank of New York Trust Company, N.A., as successor-in-interest to J.P. Morgan Trust Company, National Association, as Trustee, under the Indenture, dated as of July 19, 2005, between the Company and J.P. Morgan Trust Company, National Association, as Trustee, is incorporated herein by reference to Exhibit 4(S) to Current Report on Form 8-K filed on June 26, 2018

4.8*        Description of Registrant's Securities

| 10.1* | Walmart Inc. Deferred Compensation Matching Plan, as amended and restated effective February 1, 2023 [C] |
|---|---|
| 10.2 | Walmart Inc. Management Incentive Plan, as amended effective February 1, 2018 is incorporated by reference to Exhibit 10(b) to the Annual Report on Form 10-K of the Company for the fiscal year ended January 31, 2018, filed on March 30, 2018 [C] |
| 10.3 | Walmart Inc. 2016 Associate Stock Purchase Plan, as amended effective February 1, 2018 is incorporated by reference to Exhibit 10(c) to the Annual Report on Form 10-K of the Company for the fiscal year ended January 31, 2018, filed on March 30, 2018 [C] |
| 10.4 | Walmart Inc. Stock Incentive Plan of 2015, as amended effective February 1, 2018 is incorporated by reference to Exhibit 10(d) to the Annual Report on Form 10-K of the Company for the fiscal year ended January 31, 2018, filed on March 30, 2018 [C] |
| 10.5* | Walmart Inc. Supplemental Executive Retirement Plan, as amended and restated effective February 1, 2023 [C] |
| 10.6 | Walmart Inc. Director Compensation Deferral Plan, as amended effective February 1, 2018 is incorporated by reference to Exhibit 10(f) to the Annual Report on Form 10-K of the Company for the fiscal year ended January 31, 2018, filed on March 30, 2018 [C] |
| 10.7 | Form of Post-Termination Agreement and Covenant Not to Compete with attached Schedule of Executive Officers who have executed a Post-Termination Agreement and Covenant Not to Compete is incorporated by reference to Exhibit 10(p) to the Annual Report on Form 10-K of the Company for the fiscal year ended January 31, 2011, filed on March 30, 2011 [C] |
| 10.7(a)* | Amended Schedule of Executive Officers who have executed a Post-Termination Agreement and Covenant Not to Compete in the form filed as Exhibit 10(p) to the Annual Report on Form 10-K of the Company for the fiscal year ended January 31, 2011 [C] |
| 10.8 | Form of Walmart Inc. Stock Incentive Plan of 2015 Restricted Stock Notification of Award and Terms and Conditions of Award is incorporated by reference to Exhibit 10.8 to the Annual Report on Form 10-K of the Company for the fiscal year ended January 31, 2022, filed March 18, 2022 [C] |
| 10.9 | Form of Walmart Inc. Stock Incentive Plan of 2015 Global Share-Settled Performance-Based Restricted Stock Unit Notification and Terms and Conditions is incorporated by reference to Exhibit 10.9 to the Annual Report on Form 10-K of the Company for the fiscal year ended January 31, 2022, filed on March 18, 2022 [C] |
| 10.10* | Walmart Inc. Officer Deferred Compensation Plan, as amended and restated effective February 1, 2023 [C] |
| 10.11 | Form of Share Settled Restricted Stock Unit Notification and Terms and Conditions Awarded to Suresh Kumar on July 9, 2019 is incorporated by reference to Exhibit 10.2 to the Quarterly Report on Form 10-Q of the Company for the fiscal quarter ended July 31, 2019 filed on September 6, 2019 [C] |
| 10.12 | Post Termination Agreement and Covenant Not to Compete between the Company and Suresh Kumar dated June 6, 2019 is incorporated herein by reference to Exhibit 10.16 to the Annual Report on Form 10-K for the fiscal year ended January 31, 2020 filed on March 20, 2020 [C] |
| 10.13 | Separation Agreement between the Company and Marc Lore dated January 26, 2021 is incorporated herein by reference to Exhibit 10.18 to the Annual Report on Form 10-K for the fiscal year ended January 31, 2021 filed on March 19, 2021 [C] |
| 10.14 | Retirement Agreement between the Company and M. Brett Biggs dated November 29, 2021 is incorporated herein by reference to Exhibit 10.1 to the Current Report on Form 8-K filed on November 29, 2021 [C] |
| 10.15 | Share Issuance and Acquisition Agreement by and Between Flipkart Private Limited and Walmart Inc. dated as of May 9, 2018 is incorporated herein by reference to Exhibit 10.1 to the Quarterly Report on Form 10-Q of the Company for the fiscal quarter ended July 31, 2018 filed on September 6, 2018 (portions of this exhibit have been omitted and filed separately with the SEC pursuant to a request for confidential treatment.) |
| 10.16 | Counterpart Form of Share Purchase Agreement by and Among Wal-Mart International Holdings, Inc., the shareholders of Flipkart Private Limited identified on Schedule I thereto, Fortis Advisors LLC and Walmart Inc. dated as of May 9, 2018 is incorporated herein by reference to Exhibit 10.2 to the Quarterly Report on Form 10-Q of the Company for the fiscal quarter ended July 31, 2018 filed on September 6, 2018 (portions of this exhibit have been omitted and filed separately with the SEC pursuant to a request for confidential treatment.) |

| 21* | List of the Company's Significant Subsidiaries |
| 23* | Consent of Independent Registered Public Accounting Firm |
| 31.1* | Chief Executive Officer Section 302 Certification |
| 31.2* | Chief Financial Officer Section 302 Certification |
| 32.1** | Chief Executive Officer Section 906 Certification |
| 32.2** | Chief Financial Officer Section 906 Certification |
| 99.1* | Certain Federal and State Court Opioids Litigation Case Citations and Currently Scheduled Trial Dates |
| 101.INS* | Inline XBRL Instance Document |
| 101.SCH* | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL* | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |

| * | Filed herewith as an Exhibit. |
| ** | Furnished herewith as an Exhibit. |
| (C) | This Exhibit is a management contract or compensatory plan or arrangement |
| (P) | This Exhibit was originally filed in paper format.  Accordingly, a hyperlink has not been provided. |
| (1) | Certain instruments defining the rights of holders of long-term debt securities of the Registrant are omitted pursuant to Item601(b)(4)(iii) of Regulation S-K. The Company hereby undertakes to furnish to the SEC, upon request, copies of any such instruments. |

(c)      Financial Statement Schedules: None.

## ITEM 16.      FORM 10-K SUMMARY

None.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Walmart Inc.

Date:  March 17, 2023      By      /s/ C. Douglas McMillon
                                    C. Douglas McMillon
                                    President and Chief Executive Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated:

Date:  March 17, 2023      By      /s/ C. Douglas McMillon
                                    C. Douglas McMillon
                                    President and Chief Executive Officer and Director
                                    (Principal Executive Officer)

Date:  March 17, 2023      By      /s/ Gregory B. Penner
                                    Gregory B. Penner
                                    Chairman of the Board and Director

Date:  March 17, 2023      By      /s/ John David Rainey
                                    John David Rainey
                                    Executive Vice President and Chief Financial Officer
                                    (Principal Financial Officer)

Date:  March 17, 2023      By      /s/ David M. Chojnowski
                                    David M. Chojnowski
                                    Senior Vice President and Controller
                                    (Principal Accounting Officer)

Signature Page to Walmart Inc.
Form 10-K for the Fiscal Year Ended January 31, 2023

Date:  March 17, 2023            By    /s/ Cesar Conde
                                       _____
                                       Cesar Conde
                                       Director

Date:  March 17, 2023            By    /s/ Timothy P. Flynn
                                       _____
                                       Timothy P. Flynn
                                       Director

Date:  March 17, 2023            By    /s/ Sarah Friar
                                       _____
                                       Sarah Friar
                                       Director

Date:  March 17, 2023            By    /s/ Carla A. Harris
                                       _____
                                       Carla A. Harris
                                       Director

Date:  March 17, 2023            By    /s/ Thomas W. Horton
                                       _____
                                       Thomas W. Horton
                                       Director

Date:  March 17, 2023            By    /s/ Marissa A. Mayer
                                       _____
                                       Marissa A. Mayer
                                       Director

Date:  March 17, 2023            By    /s/ Randall L. Stephenson
                                       _____
                                       Randall L. Stephenson
                                       Director

Date:  March 17, 2023            By    /s/ S. Robson Walton
                                       _____
                                       S. Robson Walton
                                       Director

Date:  March 17, 2023            By    /s/ Steuart L. Walton
                                       _____
                                       Steuart L. Walton
                                       Director

Signature Page to Walmart Inc.
Form 10-K for the Fiscal Year Ended January 31, 2023

**Exhibit 21**

**Significant Subsidiaries of Walmart Inc.**

The following list details certain of the subsidiaries of Walmart Inc.  Subsidiaries not included in the list are omitted because, in the aggregate, they are not significant as permitted by Item 601(b)(21) of Regulation S-K.

| Subsidiary | Organized or Incorporated | Percent of Equity Securities Owned | Name Under Which Doing Business Other Than Subsidiary's |
|---|---|---|---|
| Wal-Mart Stores East, LP | Delaware, U.S. | 100% | Walmart |
| Wal-Mart Stores Texas, LLC | Delaware, U.S. | 100% | Walmart |
| Wal-Mart Property Company | Delaware, U.S. | 100% | NA |
| Wal-Mart Real Estate Business Trust | Delaware, U.S. | 100% | NA |
| Sam's West, Inc. | Arkansas, U.S. | 100% | Sam's Club |
| Sam's East, Inc. | Arkansas, U.S. | 100% | Sam's Club |
| Sam's Property Company | Delaware, U.S. | 100% | NA |
| Sam's Real Estate Business Trust | Delaware, U.S. | 100% | NA |
| Wal-Mart de Mexico, S.A.B. de C.V. | Mexico | 71% | Walmex |
| Wal-Mart Canada Corp. | Canada | 100% | Walmart |
| Flipkart Private Limited | Singapore | 75% | Flipkart |
| Walmart Chile S.A.[1] | Chile | 100% | Walmart Chile |
| Massmart Holdings Ltd. | South Africa | 100% | Massmart |
| Qomolangma Holdings Ltd. | Cayman Islands | 100% | NA |

[1]     The Company owns substantially all of Walmart Chile.

Exhibit 23

## Consent of Independent Registered Public Accounting Firm

We consent to the incorporation by reference in the following Registration Statements:

| (1) | Shareholder Investment Plan of Wal-Mart Stores, Inc. | Form S-3 File No. 333-02089 |
| (2) | Wal-Mart Stores, Inc. Director Compensation Plan | Form S-8 File No. 333-24259 |
| (3) | Wal-Mart Stores, Inc. 401(k) Retirement Savings Plan | Form S-8 File No. 333-29847 |
| (4) | Wal-Mart Puerto Rico, Inc., 401(k) Retirement Savings Plan | Form S-8 File No. 333-44659 |
| (5) | Wal-Mart Stores, Inc. Associate Stock Purchase Plan of 1996 | Form S-8 File No. 333-62965 |
| (6) | Wal-Mart Stores, Inc. Stock Incentive Plan of 2015, which amended and restated the 2010 plan | Form S-8 File No. 333-60329 |
| (7) | Wal-Mart Profit Sharing and 401(k) Plan | Form S-8 File No. 333-109421 |
| (8) | Wal-Mart Stores, Inc. Associate Stock Purchase Plan of 1996 | Form S-8 File No. 333-109417 |
| (9) | Wal-Mart Puerto Rico Profit Sharing and 401(k) Plan | Form S-8 File No. 333-109414 |
| (10) | Wal-Mart Stores, Inc. Stock Incentive Plan of 2015, which amended and restated the 2010 plan | Form S-8 File No. 333-128204 |
| (11) | Walmart Deferred Compensation Matching Plan | Form S-8 File No. 333-178717 |
| (12) | Wal-Mart Stores, Inc. Common Stock | Form S-3 ASR File No. 333-178385 |
| (13) | Walmart 401(k) Plan | Form S-8 File No. 333-187577 |
| (14) | Wal-Mart Stores, Inc. Associate Stock Purchase Plan | Form S-8 File No. 333-214060 |
| (15) | Debt Securities of Walmart Inc. | Form S-3 ASR File No. 333-251124 |
| (16) | Walmart Inc. 2016 Associate Stock Purchase Plan | Form S-8 File No. 333-228631 |
| (17) | Walmart Inc. Stock Incentive Plan of 2015 | Form S-8 File No. 333-228635 |
| (18) | Walmart 401(k) Plan | Form S-8 File No. 333-233682 |

of our reports dated March 17, 2023, with respect to the Consolidated Financial Statements of Walmart Inc. and the effectiveness of internal control over financial reporting of Walmart Inc. included in this Annual Report (Form 10-K) of Walmart Inc. for the year ended January 31, 2023.

/s/ Ernst & Young LLP

Rogers, Arkansas
March 17, 2023

**Exhibit 31.1**

I, C. Douglas McMillon, certify that:

1. I have reviewed this Annual Report on Form 10-K of Walmart Inc. (the "registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluations; and

   d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of registrant's Board of Directors:

   a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  March 17, 2023

/s/ C. Douglas McMillon
C. Douglas McMillon
President and Chief Executive Officer

**Exhibit 31.2**

I, John David Rainey, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Walmart Inc. (the "registrant");

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b)  designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c)  evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report, based on such evaluations; and

    d)  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the Audit Committee of registrant's Board of Directors:

    a)  all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b)  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:  March 17, 2023                                    /s/ John David Rainey
                                                        _____
                                                        John David Rainey
                                                        Executive Vice President and Chief Financial Officer

**Exhibit 32.1**

## CERTIFICATION PURSUANT TO
## 18 U.S.C. SECTION 1350 (AS ADOPTED
## PURSUANT TO SECTION 906 OF THE
## SARBANES-OXLEY ACT OF 2002)

In connection with the Annual Report of Walmart Inc. (the "Company") on Form 10-K for the period ending January 31, 2023 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, C. Douglas McMillon, President and Chief Executive Officer of the Company, certify to my knowledge and in my capacity as an officer of the Company, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company as of the dates and for the periods expressed in the Report.

IN WITNESS WHEREOF, the undersigned has executed this Certificate, effective as of March 17, 2023.

/s/ C. Douglas McMillon
C. Douglas McMillon
President and Chief Executive Officer

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]



# Corporate and Stock Information

**Listing**
New York Stock Exchange
Stock Symbol: WMT

**Corporate Information**
Stock Registrar and Transfer Agent:
Computershare Trust Company, N.A.
P.O. Box 43006
Providence RI 02940-3006
1-800-438-6278
TDD for hearing-impaired inside the U.S. 1-800-952-9245
Internet: http://www.computershare.com

**Annual Meeting**
Our 2023 Annual Shareholders' Meeting will be held on Wednesday, May 31, 2023 at 10:30am CDT in a virtual meeting format only, with no physical in-person meeting. Our Annual Shareholders' Meeting will be available for viewing at www.virtualshareholdermeeting.com/WMT2023.

**Communication with Shareholders**
Walmart Inc. periodically communicates with our shareholders and other members of the investment community about our operations. For further information regarding our policy on shareholder and investor communications refer to our website, www.stock.walmart.com.

The following reports are available without charge upon request by writing the company c/o Investor Relations or by emailing IR@walmart.com. These reports are also available via the corporate website.

• Annual Report on Form 10-K
• Quarterly Reports on Form 10-Q
• Earnings Releases
• Current Reports on Form 8-K
• Annual Shareholders' Meeting Proxy Statement
• Environmental, Social and Governance Report
• Culture, Diversity, Equity & Inclusion Report

**Independent Registered Public Accounting Firm**
Ernst & Young LLP
5417 Pinnacle Point Dr., Suite 501
Rogers, AR 72758

**Market Price of Common Stock**
The high market price and low market price per share for the Company's common stock for each fiscal quarter in fiscal 2023 and 2022 were as follows:

|  | 2023 | | 2022 | |
|---|---|---|---|---|
|  | High | Low | High | Low |
| 1st Quarter | $160.77 | $132.01 | $147.50 | $126.28 |
| 2nd Quarter | 154.99 | 117.27 | 144.58 | 134.40 |
| 3rd Quarter | 143.07 | 125.12 | 152.57 | 134.71 |
| 4th Quarter | 154.64 | 138.17 | 152.00 | 133.95 |

The high market price and low market price per share for the Company's common stock for the first fiscal quarter of fiscal 2024, were as follows:

|  | 2024 | |
|---|---|---|
|  | High | Low |
| 1st Quarter[(1)] | $148.34 | $136.09 |

[(1)] Through March 15, 2023

**Dividends Payable Per Share**
For fiscal 2024, dividends will be paid based on the following schedule:

| April 3, 2023 | $0.57 |
|---|---|
| May 30, 2023 | 0.57 |
| September 5, 2023 | 0.57 |
| January 2, 2024 | 0.57 |

**Dividends Payable Per Share**
For fiscal 2023, dividends were paid based on the following schedule:

| April 4, 2022 | $0.56 |
|---|---|
| May 31, 2022 | 0.56 |
| September 6, 2022 | 0.56 |
| January 3, 2023 | 0.56 |

**Dividends Payable Per Share**
For fiscal 2022, dividends were paid based on the following schedule:

| April 5, 2021 | $0.55 |
|---|---|
| June 1, 2021 | 0.55 |
| September 7, 2021 | 0.55 |
| January 3, 2022 | 0.55 |

**Stock Performance Chart**
This graph compares the cumulative total shareholder return on Walmart's common stock during the five fiscal years ending through fiscal 2023 to the cumulative total returns on the S&P 500 Retailing Index and the S&P 500 Index. The comparison assumes $100 was invested on February 1, 2018, in shares of our common stock and in each of the indices shown and assumes that all of the dividends were reinvested.

Comparison of 5-Year Cumulative Total Return*
*Among Walmart Inc., the S&P 500 Index and S&P 500 Retailing Index (Fiscal Years Ended January 31)*



*Assumes $100 Invested on February 1, 2018*
*Assumes Dividends Reinvested*
*Fiscal Year Ended January 31, 2023*

| | Fiscal Years Ended January 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Walmart Inc. | $100.00 | $92.03 | $112.17 | $139.96 | $141.50 | $147.89 |
| S&P 500 Index | 100.00 | 97.69 | 118.87 | 139.37 | 171.83 | 157.71 |
| S&P 500 Retailing Index | 100.00 | 108.42 | 127.45 | 180.19 | 195.77 | 160.10 |

**Holders of Record of Common Stock**
As of March 15, 2023, there were 205,465 holders of record of Walmart's common stock.

# ESG Accomplishments FY23

 >750 million metric tons $CO_2e$ emissions reduced or avoided reported by suppliers cumulatively since 2017 through Project Gigaton™

 ~75% of U.S. product net sales dollars represented by suppliers reporting to Project Gigaton™ for the most recent year

 Raised average U.S. hourly wage to more than $17.00

 Achieved the highest level of women and people of color in senior leadership roles in the U.S. since 2020

 >180,000 U.S. associates were promoted to jobs of greater responsibility and higher pay

 Donated more than 665 million pounds of food to help fight hunger in the U.S.

## ESG Themes and Priority Issues



### Opportunity
- Good jobs and advancement for associates
- Equity and inclusion at Walmart and beyond
- Growth for suppliers, sellers and local economies



### Community
- Serving communities
- Access to safer, healthier food, products & services
- Disaster preparedness and relief



### Sustainability
- Climate & renewable energy leadership
- Zero waste in operation, products and packaging
- Regeneration of natural resources: forests, land & oceans
- Sustainable product supply chains
- Dignity of people in supply chains



### Ethics & integrity
- Highest ethical & compliance standards
- Strong corporate governance
- Engagement in public policy
- Digital citizenship
- Respect for human rights



# EXHIBIT



# V

## Certified Business Records for Walmart Claims Services, Inc.

Control Number : K324093

# STATE OF GEORGIA

## Secretary of State

### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

### CERTIFIED COPY

I, **Brad Raffensperger**, the Secretary of State of the State of Georgia, do hereby certify under the seal of my office that the attached documents are true and correct copies of documents filed with the Corporations Division of the Office of the Secretary of State of Georgia under the name of

### Walmart Claims Services, Inc.
#### a Foreign Profit Corporation

This certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence of the existence or nonexistence of the facts stated herein.

Docket Number    : 26240377
Date Inc/Auth/Filed : 10/26/1993
Jurisdiction       : Arkansas
Print Date         : 12/21/2023
Form Number        : 215



*Brad Raffensperger*

Brad Raffensperger
Secretary of State

**Secretary of State**
**Business Services and Regulation**

**Suite 315, West Tower**
2 Martin Luther King Jr. Dr.
Atlanta, Georgia 30334-1530

CONTROL NUMBER: 9324093
EFFECTIVE DATE: 10/26/1993
JURISDICTION   : ARKANSAS
REFERENCE      : 0069
PRINT DATE     : 10/26/1993
FORM NUMBER    : 316

CT CORPORATION SYSTEM
PATTIE HARDY
1201 PEACHTREE STREET, NE
ATLANTA, GEORGIA 30361

## CERTIFICATE OF AUTHORITY TO TRANSACT BUSINESS

I, **MAX CLELAND**, Secretary of State and the Corporation Commissioner of the State of Georgia, do hereby certify under the seal of my office that

### CLAIMS MANAGEMENT, INC.

has been duly incorporated under the laws of the jurisdiction set forth above and has filed an application meeting the requirements of Georgia law to transact business as a foreign corporation in this state.

**WHEREFORE,** by the authority vested in me as Corporation Commissioner, the above named corporation is hereby granted, on the effective date stated above, a certificate of authority to transact business in the State of Georgia as provided by Title 14 of the Official Code of Georgia Annotated.

**WITNESS** my hand and official seal in the City of Atlanta and the State of Georgia on the date set forth above.

MAX CLELAND
SECRETARY OF STATE

VERLEY J. SPIVEY
DEPUTY SECRETARY OF STATE

SECURITIES
656-2894

CEMETERIES
656-3079

CORPORATIONS
656-2817

CORPORATIONS HOT-LINE
404-656-2222
Outside Metro-Atlanta

BUSINESS SERVICES AND REGULATION
Suite 315, West Tower
2 Martin Luther King Jr., Drive
Atlanta, Georgia 30334-1530
(404) 656-2817

**MAX CLELAND**
Secretary of State
State of Georgia

**J. F. GULLION**
Director

## APPLICATION FOR CERTIFICATE OF AUTHORITY

**DO NOT WRITE IN SHADED AREA - SOS USE ONLY**

DOCKET # 93290443  PENDING CONTROL # P050370  CONTROL # 9324093

Docket Code 316  Name Reservation # 932950432  Corporation Type FP

Date Filed 10/26/93  Amount Received $ 270.00  Check/Receipt # _____

Jurisdiction (State/Country) Code AR

Examiner 69  Date Completed 10/26/93

**NOTICE TO APPLICANT: PRINT PLAINLY OR TYPE THE REMAINDER OF THIS FORM.**
**INSTRUCTIONS ARE ON THE BACK OF THIS FORM.**

1. CLAIMS MANAGEMENT, INC. (ARKANSAS)
   **Corporate Name**
   not earlier than the date of qualification   Check One: [X] Profit   [ ] Non-Profit
   **Date Business Commenced (or Proposed) in Georgia**

2. Kristin M. O'Connor, c/o C T Corporation System          (314) 231-8380
   **Applicant/Attorney**                                    **Telephone Number**
   906 Olive Street
   **Address**
   St. Louis, Missouri 63101
   **City**                          **State**                        **Zip Code**

3. Arkansas                    May 27, 1993                    Perpetual
   **Jurisdiction (Home State/Country)   Date of Incorporation   Period of Duration**
   702 SW 8th Street
   **Principal Office Mailing Address of Corporation**

4. Bentonville, AR 72716
   **City**                          **State**                        **Zip Code**

5. C T Corporation System
   **Name of Registered Agent in Georgia**
   c/s C T Corporation System, 1201 Peachtree Street, N.E.
   **Registered Office Street Address in Georgia**
   Atlanta                        Fulton              GA          30361
   **City**                       **County**          **State**   **Zip Code**

6. See attached list of officers
   **Officer/CEO**                          Address/City,State,Zip
   **Officer/CFO**                          Address/City,State,Zip
   **Officer/SEC**                          Address/City,State,Zip
   See attached list of directors           Address/City,State,Zip
   **Director**                             Address/City,State,Zip
   **Director**                             Address/City,State,Zip
   **Director**

7. **NOTICE:** Mail or deliver an original and one copy of this form and the Secretary of State filing
   fee (profit - $170; nonprofit - $70) to the Secretary of State at the above address. A certificate of
   existence, certified by the home state or country within 90 days of filing in Georgia, must be
   filed with this application. Photocopied and/or faxed documents will not be accepted.
   Authorized Signature: Stuart Bailey                         Date: 10-20-93
                         Stuart Bailey

8623SF (12-91)   (GA. - 1674 - 9/1/92)

Appendix to Georgia
Application for Certificate of Authority

## Officers of
## CLAIMS MANAGEMENT, INC.

1.   Stuart Bailey, President
     5428 W. Magnolia
     Rogers, Arkansas   72756

2.   Mardis DeVore, Vice President
     1810 Clark
     Bentonville, Arkansas   72712

3.   Dan Filla, Secretary
     1324 Quail Run Circle
     Bentonville, Arkansas   72712

Appendix to Georgia
Application for Certificate of Authority

## Directors of
## CLAIMS MANAGEMENT, INC.

1. Paul R. Carter, Director
   Route 4
   Bentonville, Arkansas  72712

2. William E. Newberg, Director
   127 Wolf Road
   Rogers, Arkansas  72756

3. Robert K. Rhoads, Director
   631 Willow
   Fayetteville, Arkansas  72701

4. Ronald A. Williams, Director
   902 Lakeview Dr.
   Rogers, Arkansas  72756



**State of Arkansas**
## SECRETARY OF STATE
State Capitol
Little Rock, Arkansas 72201-1094

W. J. "Bill" McCuen
**SECRETARY OF STATE**

### CERTIFICATE OF GOOD STANDING

### OF A

### DOMESTIC CORPORATION

I, Bill McCuen, Secretary of State of the State of Arkansas, and as such, keeper of the records of domestic and foreign corporations, do hereby certify that the records of this office show:

**CLAIMS MANAGEMENT, INC.**

a corporation chartered under the laws of the State of _____**ARKANSAS**_____,
filed Articles of Incorporation _____**MAY 27, 1993**_____.

I further certify that as far as the records show, this corporation is at this time chartered and in good standing, having met all the requirements governing a domestic corporation in this State.

In Testimony Whereof, I have hereunto set my hand and official seal, on this, the _____**11TH**_____ day of _____**OCTOBER**_____, 19 _____**93**_____.

_Bill McCuen_
W. J. "Bill" McCuen, Secretary of State

by: _Nichole P. Davis_                Corporations Division
**NICHOLE P. DAVIS**

C-2/Rev 10-1-88

*Date:*   October 26, 1993

SECRETARY OF STATE
CORPORATIONS DEPARTMENT
#2 MARTIN LUTHER KING, JR., DR., S.E.
SUITE 315, WEST TOWER
ATLANTA, GEORGIA  30334

' Corporation System
J1 Peachtree Street, NE
aHTa, GA 30361
: 222 6438
-J04 888 6498

*RE:*   CLAIMS MANAGEMENT, INC.  (ARkansas Dom.)

*Job # DK*   10036701

*Dear Sir/Madam:*

*Pursuant to the instructions of Counsel below, we enclose fo.
filing the documents identified below:*

| | |
|---|---|
| _____ *INCORPORATION* | _____ *MERGER* |
| XX  *QUALIFICATION* | _____ A. *Domestic* |
| _____ *CHANGE OF AGENT/OFFICE* | _____ B. *Foreign* |
| _____ A. *Domestic* | _____ *DISSOLUTION* |
| _____ B. *Foreign* | _____ A. *Statement of Intent* |
| _____ *AMENDMENT* | _____ B. *Certificate of* |
| _____ A. *Domestic* |         *Dissolution* |
| _____ B. *Foreign* | _____ *WITHDRAWAL* |
| | _____ *OTHER* |

_____
_____
_____

*Kindly return evidence to* __XX__ *the undersigned* _____ *Counsel
by* _____ *Regular Mail* _____ *Fed-x. If there are any problems,
please call at this toll-free number:* **800-241-8922.**

*Very truly yours,*          *COUNSEL:*


_____
PATTIE HARDY


*Check (s):*      TU 17199 ($170.00)
                 TU 17200 ($100.00)

*SPECIAL INSTRUCTIONS:*

/ph

BR201(12-2000) 2001 CORPORATION ANNUAL REGISTRATION

| | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | DEPT 8013 | BENTONVILLE | AR | 72712 |

PRINCIPAL OFFICERS AND REGISTERED AGENT(AGT)

| | | | | |
|---|---|---|---|---|
| CEO: STEVE CARTER | 702 SW 8TH STREET | BENTONVILLE | AR | 72716 |
| CFO: STUART BAILEY | 702 SW 8TH STREET | BENTONVILLE | AR | 72716 |
| SEC: DAVE LEHENBAUER | 702 SW 8TH STREET | BENTONVILLE | AR | 72716 |
| AGT: CORPORATION SERVICE COMPANY | 4845 JIMMY CARTER BOULEVARD | NORCROSS | GA | 30093 |

IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW

| | | | | |
|---|---|---|---|---|
| CORPORATION ADDRESS: | 702 SW 8th Street, #0555 | Bentonville | AR | 72716-0555 |
| CEO: | | | | |
| CFO: Elizabeth Espinoza | 702 SW 8th Street | Bentonville | AR | 72716 |
| SEC: | | | | |
| AGT: | PO BOX NOT ACCEPTABLE | | GA | |

I HEREBY CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM, AND THAT THE INFORMATION IS TRUE AND CORRECT.

AUTHORIZED SIGNATURE: [signature] DATE: 3/27/01

TITLE: President PHONE #: (501) 204-2096

COUNTY OF REGISTERED OFFICE: GWINNETT

COUNTY CHANGE OR CORRECTION:

FEE :$15.00 AR 10/26/93 FP N K324093

BR201 (12-00) 2001 CORPORATION ANNUAL REGISTRATION

01K32409300150OCLAIMSMANAGEMENTINC

FORM ID SSF01 02/14/0

| | | | | |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 727166209 |
| CEO: DANIEL J FILLA | 702 SW 8TH STREET | BENTONVILLE | AR | 72716 |
| CFO: PAULA L HUTCHINSON | 702 SW 8TH STREET | BENTONVILLE | AR | 72716 |
| SEC: PAULA L HUTCHINSON | 702 SW 8TH STREET | BENTONVILLE | AR | 72716 |
| AGT: CORPORATION SERVICE COMPANY | 40 TECHNOLOGY PKWY SOUTH, #300 | NORCROSS | GA | 30092 |

**IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:**

| | | | | |
|---|---|---|---|---|
| CORPORATION ADDR: | | | | |
| CEO: | | | | |
| CFO: | | | | |
| SEC: | P O BOX NOT ACCEPTABLE | | | |
| AGT: C T Corporation System | 1201 Peachtree St., N.E. | Atlanta | GA | 30361 |

I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT.

COUNTY OF REGISTERED OFFICE: **GWINNETT**

COUNTY CHANGE OR CORRECTION: Fulton

AUTHORIZED SIGNATURE: [signature] DATE: 3/31/04

TITLE: VICE PRESIDENT

BR201 (01-04) 2004 CORPORATION ANNUAL REGISTRATION

**FEE:** $30.00 AR 10/26/1993 FP K324093

0UK3240930030CLAIMSMANAGEMENTINC

| | | | | |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 727166209 |
| CEO: DANIEL J FILLA | 702 SW 8TH STREET | BENTONVILLE | AR | 72716 |
| CFO: PAULA L HUTCHINSON | 702 SW 8TH STREET | BENTONVILLE | AR | 72716 |
| SEC: PAULA L HUTCHINSON | 702 SW 8TH STREET | BENTONVILLE | AR | 72716 |
| AGT: CORPORATION SERVICE COMPANY | 40 TECHNOLOGY PKWY SOUTH, #300 | NORCROSS | GA | 30092 |

**IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:**

| | | | | |
|---|---|---|---|---|
| CORPORATION ADDR: | | | | |
| CEO: | | | | |
| CFO: | | | | |
| SEC: | | | | |
| AGT: C T Corporation System | 1201 Peachtree St., N.E. (P O BOX NOT ACCEPTABLE) | Atlanta | GA | 30361 |

I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT.

AUTHORIZED SIGNATURE: [signature] DATE: 3/31/04

TITLE: VICE PRESIDENT

COUNTY OF REGISTERED OFFICE: **GWINNETT**

COUNTY CHANGE OR CORRECTION: Fulton

BR201 (01-04) 2004 CORPORATION ANNUAL REGISTRATION

**FEE:** $30.00 AR 10/26/1993 FP K324093

CLAIMSMANAGEMENTINC

FEE: $30.00 AR 10/26/1993 FP K324093

BRX01 (01-04) 2004 CORPORATION ANNUAL REGISTRATION

| CLAIMS MANAGEMENT, INC. | | | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 72716- |
|---|---|---|---|---|---|---|
| CEO: | DAVID M REDFIELD | | 702 SW 8TH ST NO 555 | BENTONVILLE | AR | 72716 |
| CFO: | PAULA L CAROLLO | | 702 SW 8TH ST NO 555 | BENTONVILLE | AR | 72716 |
| SEC: | K MAX KOONCE II | | 702 SW 8TH ST NO 555 | BENTONVILLE | AR | 72716 |
| AGT: | C T CORPORATION SYSTEM | | 1201 PEACHTREE STREET, NE | ATLANTA | GA | 30361 |

IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:

CORPORATION ADDR:

| CEO: | | | |
| CFO: | | | |
| SEC: | | | |
| AGT: | Corporation Process Company | 180 Cherokee St., NE | P.O. BOX NOT ACCEPTABLE | Marietta | GA | 30060 |

| COUNTY OF REGISTERED OFFICE: | FULTON | COUNTY OR CHANGE OR CORRECTION: | Cobb |

I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT

AUTHORIZED SIGNATURE:    DATE: 4/13/04

TITLE: Sean L. Emerick, Vice President



**STATE OF GEORGIA**
**2007 Corporation Annual Registration**

Control No: K324093
Date Filed: 02/12/2007 08:13 AM
Karen C Handel
Secretary of State

**Karen C Handel**
Secretary of State

**OFFICE OF SECRETARY OF STATE**
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Entity Control No.** K324093                    **Information on record as of:** 2/12/2007

CLAIMS MANAGEMENT, INC.
702 SW 8TH ST # 555
BENTONVILLE AR, 72716-6209

Amount due from this entity is indicated below.  Annual fee is $30.  If amount is more than $30, total reflects amount(s) due from previous year(s). **Renew by April 1, 2007**

Renew at www.georgiacorporations.org or by submitting bottom portion with check payable to "Secretary of State".

Officer, address and agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer and Secretary of the corporation. Please PRINT LEGIBLY.

**Note:** Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Box may be used for principal office and officers.

Any person authorized by the entity to do so may sign and file registration (including online filing).

Please return ONLY the original form below and fee. Other filings and correspondence should be sent to our Atlanta address: Corporations Division, 315 West Tower, #2 Martin Luther King Jr. Drive, Atlanta, GA 30334.

Visit www.georgiacorporations.org to file online or for more information on annual registration. Or, call 404-656-2817.

**Current information printed below. Review and update as needed. Detach original coupon and return with payment.**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 72716 |
| CEO:  K. MAX KOONCE II | 702 SW 8TH ST NO 555 | BENTONVILLE | GA | 72716 |
| CFO:  PAULA L CAROLLO | 702 SW 8TH ST NO 555 | BENTONVILLE | GA | 72716 |
| SEC:  KIMBERLY A. HOLLIDAY | 702 SE 8TH ST NO 555 | BENTONVILLE | GA | 72716 |
| AGT:  CORPORATION PROCESS COMPANY | 180 CHEROKEE STR NE | MARIETTA | GA | 30060 |

| IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW: | | | | |
|---|---|---|---|---|
| Corporation Addr:   702 SW 8TH ST, MS #0555 | | BENTONVILLE | AR | 72716 |
| CEO:  MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| CFO:  MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| SEC:  KIMBERLY A HOLLIDAY | 702 SE 8TH ST | BENTONVILLE | AR | 72716 |
| AGT: | P.O. BOX NOT ACCEPTABLE | | GA | |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | COUNTY OF REGISTERED OFFICE: | COUNTY CHANGE OR CORRECTION: |
|---|---|---|
| AUTHORIZED SIGNATURE:  CLAIRE BABINEAUX-FONTENOT       DATE:  2/12/2007 | COBB | |
| TITLE:      Filer | | |

BR203 2007 Corporation Annual Registration

| Amount Due: | **$30.00** |
|---|---|

073 K324093%5 0030004 CLAIMSMANAGEMENTINC06



**Karen C Handel**
Secretary of State

# STATE OF GEORGIA
## 2008 Corporation Annual Registration

Control No: K324093
Date Filed: 03/07/2008 08:51 AM
Karen C Handel
Secretary of State

### OFFICE OF SECRETARY OF STATE
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Entity Control No.** K324093                    **Information on record as of:** 3/7/2008

CLAIMS MANAGEMENT, INC.
702 SW 8TH ST
MS #0555
BENTONVILLE AR, 72716-0555

Amount due from this entity is indicated below.  Annual fee is $30.  If amount is more than $30, total reflects amount(s) due from previous year(s). **Renew by April 1, 2008**

Renew at www.georgiacorporations.org or by submitting bottom portion with check payable to "Secretary of State".

Officer, address and agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer and Secretary of the corporation. Please PRINT LEGIBLY.

**Note:** Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Box may be used for principal office and officers.

Any person authorized by the entity to do so may sign and file registration (including online filing).

Please return ONLY the original form below and fee. Other filings and correspondence should be sent to our Atlanta address: Corporations Division, 315 West Tower, #2 Martin Luther King Jr. Drive, Atlanta, GA 30334.

Visit www.georgiacorporations.org to file online or for more information on annual registration. Or, call 404-656-2817.

**Current information printed below. Review and update as needed. Detach original coupon and return with payment.**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8TH ST  MS #0555 | BENTONVILLE | AR | 72716 |
| CEO:  MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| CFO:  MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| SEC:  KIMBERLY A HOLLIDAY | 702 SE 8TH ST | BENTONVILLE | AR | 72716 |
| AGT:  CORPORATION PROCESS COMPANY | 180 CHEROKEE STR NE | MARIETTA | GA | 30060 |

**IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:**

| Corporation Addr: | | | | |
|---|---|---|---|---|
| CEO: | | | | |
| CFO: | | | | |
| SEC: | | | | |
| AGT: | P.O. BOX NOT ACCEPTABLE | | GA | |

I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT.
AUTHORIZED SIGNATURE: MAX KOONCE          DATE:  3/7/2008 8
TITLE:     Filer

COUNTY OF REGISTERED OFFICE:  COBB

COUNTY CHANGE OR CORRECTION:

BR203 2008 Corporation Annual Registration

Amount Due:  **$30.00**

082 K324093%5 0030004 CLAIMSMANAGEMENTINCO6



Control No: K324093
Date Filed: 03/25/2009 12:16 PM
Karen C Handel
Secretary of State

**STATE OF GEORGIA**
**2009 Corporation Annual Registration**

**Karen C Handel**
Secretary of State

**OFFICE OF SECRETARY OF STATE**
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Chauncey Newsome**
Director

**Entity Control No.** K324093                    **Information on record as of:** 3/25/2009

CLAIMS MANAGEMENT, INC.
702 SW 8TH ST
MS #0555
BENTONVILLE AR, 72716-0555

Amount due from this entity is indicated below.  Annual fee is $30.  If amount is more than $30, total reflects amount(s) due from previous year(s). **Renew by April 1, 2009**

Renew at www.georgiacorporations.org or by submitting bottom portion with check payable to "Secretary of State".

Officer, address and agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer and Secretary of the corporation. Please PRINT LEGIBLY.

**Note:** Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Box may be used for principal office and officers.

Any person authorized by the entity to do so may sign and file registration (including online filing).

Please return ONLY the original form below and fee. Other filings and correspondence should be sent to our Atlanta address: Corporations Division, 315 West Tower, #2 Martin Luther King Jr. Drive, Atlanta, GA 30334.

Visit www.georgiacorporations.org to file online or for more information on annual registration. Or, call 404-656-2817.

**Current information printed below. Review and update as needed. Detach original coupon and return with payment.**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8TH ST MS #0555 | BENTONVILLE | AR | 72716 |
| CEO: MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| CFO: MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| SEC: KIMBERLY A HOLLIDAY | 702 SE 8TH ST | BENTONVILLE | AR | 72716 |
| AGT: CORPORATION PROCESS COMPANY | 328 Alexander Street | Marietta | GA | 30060 |

**IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:**

| Corporation Addr: | | | | |
|---|---|---|---|---|
| CEO: | | | | |
| CFO: | | | | |
| SEC: | | | | |
| AGT: | P.O. BOX NOT ACCEPTABLE | | GA | |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | COUNTY OF REGISTERED OFFICE: | COUNTY CHANGE OR CORRECTION: |
|---|---|---|
| AUTHORIZED SIGNATURE: Maxwell Koonce          DATE: 3/25/2009 | COBB | |
| TITLE:     Filer | | |

BR203 2009 Corporation Annual Registration

Amount Due: **$30.00**

091 K324093%5 0030004 CLAIMSMANAGEMENTINC06

Control No: K324093
Date Filed: 02/18/2010 02:10 PM
Brian P. Kemp
Secretary of State

## STATE OF GEORGIA
## 2010 Corporation Annual Registration

### OFFICE OF SECRETARY OF STATE
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Brian P. Kemp**
**Secretary of State**

**Chauncey Newsome**
**Director**

### Information on record as of: 2/18/2010

**Entity Control No. K324093**          **Amount Due: $30.00**          **Amount Due AFTER April 1, 2010: $55.00**

CLAIMS MANAGEMENT, INC.
702 SW 8TH ST
MS #0555
BENTONVILLE AR, 72716-0555

Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.   Amount due for this entity is indicated above and below on the remittance form.  Annual fee is $30.  If amount is more than $30, the total reflects amount(s) due from previous year(s) and any applicable late fee(s).   **Renew by April 1, 2010**.  Your Annual Registration must be postmarked by April 1, 2010.  If your registration and payment are not postmarked by  April 1, 2010, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at www.georgiacorporations.org.  The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only. Annual Registrations not processed online require payment with a check, certified bank check or money order.   **We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of State".   **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing.  Absolutely, no counter or starter checks will be accepted.  Failure to adhere to these guidelines will delay or possibly reject your filing.**  Checks that are dishonored by your bank are subject to a $30.00 NSF charge.  Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below.  Please verify "county of registered office."  If correct and complete, detach bottom portion, sign, and return with payment.  Or, enter changes as needed and submit.  Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.

**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office.  P.O. Boxes may be used for principal office and officers' addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing).  Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s).  For more information on Annual Registrations or to file online, visit www.georgiacorporations.org.   Or, call 404-656-2817.  **PLEASE PRINT LEGIBLY.**
Current information printed below. Review and update as needed. Detach original coupon and return with payment.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8TH ST MS #0555 | BENTONVILLE | AR | 72716 |
| CEO:   MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| CFO:   MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| SEC   KIMBERLY A HOLLIDAY | 702 SE 8TH ST | BENTONVILLE | AR | 72716 |
| AGT   CORPORATION PROCESS COMPANY | 2180 Satellite Blvd #400 | Duluth | GA | 30097 |

**IF ABOVE INFORMATION HAS CHANGES, TYPE OR PRINT CORRECTIONS BELOW:**

| | | | | |
|---|---|---|---|---|
| CORPORATION ADDRESS: | | | | |
| CEO: | | | | |
| CFO: | | | | |
| SEC: | | | | |
| AGT: | | | GA | |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | *P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS* | COUNTY OF REGISTERED OFFICE: Gwinnett | COUNTY CHANGE OR CORRECTION: |
|---|---|---|---|

| AUTHORIZED SIGNATURE: MAX KOONCE | | DATE:   2/18/2010 | **Total Due:** |
|---|---|---|---|
| TITLE:   Filer | EMAIL: | | **$30.00** |

BR201 2010 Corporation Annual Registration

108 K324093%5 0030004 CLAIMSMANAGEMENTINC06 201004019 055004



Control No: K324093
Date Filed: 03/01/2011 02:58 PM
Brian P. Kemp
Secretary of State

**STATE OF GEORGIA**

**2011 Corporation Annual Registration**

OFFICE OF SECRETARY OF STATE
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Brian P. Kemp**
**Secretary of State**

**Chauncey Newsome**
**Director**

**Information on record as of:  3/1/2011**

Entity Control No. K324093          Amount Due: $50.00          Amount Due *AFTER* April 1, 2011: $75.00

CLAIMS MANAGEMENT, INC.
702 SW 8th Street, Dept. 8687, M.S. #0555
Bentonville, AR 72716

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.**   Amount due for this entity is indicated above and below on the remittance form.  Annual fee is $50.  If amount is more than $50, the total reflects amount(s) due from previous year(s) and any applicable late fee(s).  **Renew by April 1, 2011.**  Your Annual Registration must be postmarked by April 1, 2011.  If your registration and payment are not postmarked by  April 1, 2011, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at www.georgiacorporations.org.  The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only.  Annual Registrations not processed online require payment with a check, certified bank check or money order.   **We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of State".   **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing.  Absolutely, no counter or starter checks will be accepted.  Failure to adhere to these guidelines will delay or possibly reject your filing.**  Checks that are dishonored by your bank are subject to a $30.00 NSF charge.  Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below.  Please verify "county of registered office."  If correct and complete, detach bottom portion, sign, and return with payment.  Or, enter changes as needed and submit.  Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.

**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office.  P.O. Boxes may be used for principal office and officers' addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing).  Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law.  [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s).  For more information on Annual Registrations or to file online, visit www.georgiacorporations.org.    Or, call 404-656-2817.  **PLEASE PRINT LEGIBLY.**
Current information printed below. Review and update as needed. Detach original coupon and return with payment.

| CORPORATION NAME | | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | | 702 SW 8TH ST MS #0555 | BENTONVILLE | AR | 72716 |
| CEO: | MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| CFO: | MAX KOONCE | 702 SW 8TH ST | BENTONVILLE | AR | 72716 |
| SEC | KIMBERLY A HOLLIDAY | 702 SE 8TH ST | BENTONVILLE | AR | 72716 |
| AGT | CORPORATION PROCESS COMPANY | 2180 Satellite Blvd | Duluth | GA | 30097 |
| **IF ABOVE INFORMATION HAS CHANGES, TYPE OR PRINT CORRECTIONS BELOW:** | | | | | |
| CORPORATION ADDRESS: | | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| CEO: | K. Maxwell Koonce | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| CFO: | Kim A. Holiday | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| SEC: | Kim A. Holiday | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| AGT: | | | | GA | |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | *P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS* | COUNTY OF REGISTERED OFFICE:   Gwinnett | COUNTY CHANGE OR CORRECTION: |
|---|---|---|---|
| AUTHORIZED SIGNATURE: Michelle Donato | | DATE:    3/1/2011 2 | **Total Due:** |
| TITLE:   Filer | EMAIL:   state.compliance@wal-mart.com | | **$50.00** |

BR201 2011 Corporation Annual Registration

117 K324093X5 0050009 CLAIMSMANAGEMENTINC06 201104018 0050009

Control No: K324093
Date Filed: 02/27/2012 02:58 PM
Brian P. Kemp
Secretary of State

# STATE OF GEORGIA
## 2012 Corporation Annual Registration

### OFFICE OF SECRETARY OF STATE
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Brian P. Kemp**
**Secretary of State**

### Information on record as of:  2/27/2012

**Entity Control No. K324093**          **Amount Due: $50.00**          **Amount Due *AFTER* April 1, 2012: $75.00**

CLAIMS MANAGEMENT, INC.
702 SW 8th Street
Bentonville, AR 72716

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.**  Amount due for this entity is indicated above and below on the remittance form.  Annual fee is $50.  If amount is more than $50, the total reflects amount(s) due from previous year(s) and any applicable late fee(s).  **Renew by April 1, 2012.**  Your Annual Registration must be postmarked by April 1, 2012.  If your registration and payment are not postmarked by April 1, 2012, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at www.georgiacorporations.org.  The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only.  Annual Registrations not processed online require payment with a check, certified bank check or money order.  **We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of State".  **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing.  Absolutely, no counter or starter checks will be accepted.  Failure to adhere to these guidelines will delay or possibly reject your filing.**  Checks that are dishonored by your bank are subject to a $30.00 NSF charge.  Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below.  Please verify "county of registered office."  If correct and complete, detach bottom portion, sign, and return with payment.  Or, enter changes as needed and submit.  Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.

**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office.  P.O. Boxes may be used for principal office and officers' addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing).  Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s).  For more information on Annual Registrations or to file online, visit www.georgiacorporations.org.   Or, call 404-656-2817.  **PLEASE PRINT LEGIBLY.**
Current information printed below. Review and update as needed. Detach original coupon and return with payment.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8th Street Dept. 8887, M.S. #0555 | Bentonville | AR | 72716 |
| CEO:   K. Maxwell Koonce | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| CFO:   Kim A. Holiday | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| SEC    Kim A. Holiday | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| AGT    CORPORATION PROCESS COMPANY | 2180 Satellite Blvd | Duluth | GA | 30097 |

### IF ABOVE INFORMATION HAS CHANGES, TYPE OR PRINT CORRECTIONS BELOW:

| | | | | |
|---|---|---|---|---|
| CORPORATION ADDRESS: | 702 SW 8th Street | Bentonville | AR | 72716 |
| CEO:   K. "MAX" Koonce | 702 SW 8th Street | Bentonville | AR | 72716 |
| CFO:   Kim Holiday | 702 SW 8th Street | Bentonville | AR | 72716 |
| SEC:   Kim Holiday | 702 SW 8th Street | Bentonville | AR | 72716 |
| AGT: | | | GA | |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | *P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS* | COUNTY OF REGISTERED OFFICE: <br><br> Gwinnett | COUNTY CHANGE OR CORRECTION: |
|---|---|---|---|
| AUTHORIZED SIGNATURE: Kelly Lettmann | | DATE:   2/27/2012 | **Total Due:** |
| TITLE:   Filer | EMAIL:   michelle.donato@wolterskluwer.com | | **$50.00** |

BR201 2012 Corporation Annual Registration

126 K324093¾5 0050009 CLAIMSMANAGEMENTINC06 201204017 0050009



**Brian P. Kemp**
**Secretary of State**

**STATE OF GEORGIA**
**2013 Corporation Annual Registration**

OFFICE OF THE SECRETARY OF STATE
Annual Registration Filing
P.O. Box 23038
Columbus, Georgia 31902-3038

**Information on record as of: 3:26:35 PM**

**Entity Control No. K324093**                    **Amount Due: $50.00**                    **Amount Due AFTER April 1, 2013: $50.00**

CLAIMS MANAGEMENT, INC.
702 SW 8th Street
Bentonville, Arkansas 72716

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.** Amount due for this entity is indicated above and below on the remittance form. Annual fee is $50. If amount is more than$50 , the total reflects amount(s) due from previous year(s) and any applicable late fee(s). **Renew by April 1,2013** Your Annual Registration must be postmarked by April 1,2013. If your registration and payment are not postmarked by April 1,2013, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at Http://www.sos.ga.gov/corporations/ The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only. Annual Registrations not processed online require payment with a check, certified bank check or money orde**r. We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of S t a t e " . **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing. Absolutely, no counter or starter checks will be accepted. Failure to adhere to these guidelines will delay or possibly reject your filing.** Checks that are dishonored by your bank are subject to a $30.00 NSF charge. Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.
**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Boxes may be used for principal office and officers'addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing). Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s). For more information on Annual Registrations or to file online, visit Http://www.sos.ga.gov/corporations/ Or, call 404-656-2817.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| : Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| : Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| : K. "MAX" Koonce | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

**THE ABOVE INFORMATION HAS BEEN UPDATED TO:**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CEO: K. "Max" Koonce | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CFO: Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| SEC: Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

| AGT: CORPORATION PROCESS COMPANY | 2180 Satellite Blvd., Suite 400 | Duluth | Georgia | 30097 |
|---|---|---|---|---|
| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS | COUNTY OF REGISTERED OFFICE: | Gwinnett County | |
| AUTHORIZED SIGNATURE:   Kelly Lettmann | | Date:4/1/2013 3:26:20 PM | | Total Due: |
| Title:Attorney-in-Fact | Email: kelly.lettmann@wolterskluwer.com | | **$50.00** | |

BR201 2013 Corporation Annual Registration

135 K324093¾5 0050009 CLAIMSMANAGEMENTINC06 201304016 0075000



**Brian P. Kemp
Secretary of State**

**STATE OF GEORGIA
2014 Corporation Annual Registration**

| Secretary of State |
|---|
| Control No.: K324093 |
| Date Filed:3/12/2014 11:33:40 AM |

OFFICE OF THE SECRETARY OF STATE
Annual Registration Filing
P.O. Box 23038
Columbus, Georgia 31902-3038

**Information on record as of: 11:33:42 AM**

**Entity Control No. K324093**        **Amount Due: $50.00**        **Amount Due AFTER June 1, 2014: $75.00**

CLAIMS MANAGEMENT, INC.
702 SW 8th Street
Bentonville, Arkansas 72716

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.** Amount due for this entity is indicated above and below on the remittance form. Annual fee is $50. If amount is more than$50 , the total reflects amount(s) due from previous year(s) and any applicable late fee(s). **Renew by April 1,2013** Your Annual Registration must be postmarked by June 1,2014. If your registration and payment are not postmarked by June 1,2014, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at Http://www.sos.ga.gov/corporations/ The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only. Annual Registrations not processed online require payment with a check, certified bank check or money orde**r. We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of S t a t e " . **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing. Absolutely, no counter or starter checks will be accepted. Failure to adhere to these guidelines will delay or possibly reject your filing.** Checks that are dishonored by your bank are subject to a $30.00 NSF charge. Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.
**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Boxes may be used for principal office and officers'addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing). Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s). For more information on Annual Registrations or to file online, visit Http://www.sos.ga.gov/corporations/ Or, call 404-656-2817.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8th Street | Bentonville | AR | 72716 |
| CEO: K. "Max" Koonce | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CFO: Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| SEC: Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

**THE ABOVE INFORMATION HAS BEEN UPDATED TO:**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CEO: K. "Max" Koonce | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CFO: Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| SEC: Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

| AGT: CORPORATION PROCESS COMPANY | 2180 Satellite Blvd., Suite 400 | Duluth | Georgia | 30097 |
|---|---|---|---|---|
| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS | COUNTY OF REGISTERED OFFICE: | Gwinnett County | |
| AUTHORIZED SIGNATURE:   Kelly Lettmann | | Date:3/12/2014 11:33:40 AM | Total Due: | |
| Title:Attorney-in-Fact | Email: kelly.lettmann@wolterskluwer.com | | **$50.00** | |

BR201 2013 Corporation Annual Registration

144 K324093X5 0050009 CLAIMSMANAGEMENTINC06 201406013 0075000



**Brian P. Kemp**
**Secretary of State**

| Secretary of State |
| Control No.: K324093 |
| Date Filed:3/19/2015 12:29:08 PM |

**STATE OF GEORGIA**
**2015 Corporation Annual Registration**

OFFICE OF THE SECRETARY OF STATE
Annual Registration Filing
P.O. Box 23038
Columbus, Georgia 31902-3038

**Information on record as of: 12:29:13 PM**

**Entity Control No.: K324093**         **Amount Due: $50.00**         Amount Due AFTER April 1, 2015: $75.00

CLAIMS MANAGEMENT, INC.
922 W Walnut St
Rogers, Arkansas 72756

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.** Amount due for this entity is indicated above and below on the remittance form. Annual fee is $50. If amount is more than$50 , the total reflects amount(s) due from previous year(s) and any applicable late fee(s). **Renew by April 1,2015** Your Annual Registration must be postmarked by April 1,2015. If your registration and payment are not postmarked by April 1,2015, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at Http://www.sos.ga.gov/corporations/ The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only. Annual Registrations not processed online require payment with a check, certified bank check or money orde**r. We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of S t a t e " . **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing. Absolutely, no counter or starter checks will be accepted. Failure to adhere to these guidelines will delay or possibly reject your filing.** Checks that are dishonored by your bank are subject to a $30.00 NSF charge. Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.
**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Boxes may be used for principal office and officers'addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing). Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s). For more information on Annual Registrations or to file online, visit Http://www.sos.ga.gov/corporations/ Or, call 404-656-2817.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 702 SW 8th Street | Bentonville | AR | 72716 |
| CEO: K. "Max" Koonce | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CFO: Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| SEC: Kim Holiday | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

**THE ABOVE INFORMATION HAS BEEN UPDATED TO:**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| CLAIMS MANAGEMENT, INC. | 922 W Walnut St | Rogers | Arkansas | 72756 |
| CEO: K. "Max" Koonce | 922 W Walnut St | Rogers | Arkansas | 72756 |
| CFO: Kim Holiday | 922 W Walnut St | Rogers | Arkansas | 72756 |
| SEC: Kim Holiday | 922 W Walnut St | Rogers | Arkansas | 72756 |

| AGT: CORPORATION PROCESS COMPANY | 2180 Satellite Blvd., Suite 400 | Duluth | Georgia | 30097 |
|---|---|---|---|---|
| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS | COUNTY OF REGISTERED OFFICE: | Gwinnett County | |

153 K324093%5 0050009 CLAIMSMANAGEMENTINC06 201504014 0075000

153 K324093%5 0050009 CLAIMSMANAGEMENTINCO6 201504014 0075000

| AUTHORIZED SIGNATURE:   Kelly Lettmann | | Date:3/19/2015 12:29:08 PM | Total Due: |
|---|---|---|---|
| Title:Attorney-in-Fact | Email: kelly.lettmann@wolterskluwer.com | | **$50.00** |

BR201 2015 Corporation Annual Registration

153 K324093%5 0050009 CLAIMSMANAGEMENTINC06 201504014 0075000

153 K324093%5 0050009 CLAIMSMANAGEMENTINC06 201504014 0075000

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**ANNUAL REGISTRATION**

*Electronically Filed*
Secretary of State
Filing Date: 3/9/2016 4:15:35 PM

## BUSINESS INFORMATION

| | |
|---|---|
| **CONTROL NUMBER** | K324093 |
| **BUSINESS NAME** | CLAIMS MANAGEMENT, INC. |
| **BUSINESS TYPE** | Foreign Profit Corporation |
| **EFFECTIVE DATE** | 03/09/2016 |

## PRINCIPAL OFFICE ADDRESS

| | |
|---|---|
| **ADDRESS** | 922 W Walnut St, Rogers, AR, 72756, USA |

## REGISTERED AGENT'S NAME AND ADDRESS

| **NAME** | **ADDRESS** |
|---|---|
| CORPORATION PROCESS COMPANY | 2180 Satellite Blvd., Suite 400, Gwinnett, Duluth, GA, 30097, USA |

## OFFICERS INFORMATION

| **NAME** | **TITLE** | **ADDRESS** |
|---|---|---|
| K. "Max" Koonce | CEO | 922 W Walnut St, Rogers, AR, 72756, USA |
| Kim Holliday | CFO | 922 W Walnut St, Rogers, AR, 72756, USA |
| Kim Holliday | SECRETARY | 922 W Walnut St, Rogers, AR, 72756, USA |

## AUTHORIZER INFORMATION

| | |
|---|---|
| **AUTHORIZER SIGNATURE** | Kelly Lettmann |
| **AUTHORIZER TITLE** | Attorney In Fact |



Brian P. Kemp
Secretary of State

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/01/2017 10:25:09

## BUSINESS INFORMATION

| | |
|---|---|
| **BUSINESS NAME** | : CLAIMS MANAGEMENT, INC. |
| **CONTROL NUMBER** | : K324093 |
| **BUSINESS TYPE** | : Foreign Profit Corporation |
| **JURISDICTION** | : Arkansas |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | |
|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : 922 W Walnut St, Rogers, AR, 72756, USA |
| **REGISTERED AGENT NAME** | : CORPORATION PROCESS COMPANY |
| **REGISTERED OFFICE ADDRESS** | : 2180 Satellite Blvd., Suite 400, Gwinnett, Duluth, GA, 30097, USA |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| K. "Max" Koonce | CEO | 922 W Walnut St, Rogers, AR, 72756, USA |
| Kim Holliday | CFO | 922 W Walnut St, Rogers, AR, 72756, USA |
| Kim Holliday | Secretary | 922 W Walnut St, Rogers, AR, 72756, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | |
|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| **REGISTERED AGENT NAME** | : CORPORATION PROCESS COMPANY |
| **REGISTERED OFFICE ADDRESS** | : 2180 Satellite Blvd., Suite 400, Gwinnett, Duluth, GA, 30097, USA |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| David Stills | CEO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | Secretary | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | CFO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |

## AUTHORIZER INFORMATION

| | |
|---|---|
| **AUTHORIZER SIGNATURE** | : Kelly Lettmann |
| **AUTHORIZER TITLE** | : Attorney In Fact |



**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
2 Martin Luther King Jr. Dr. SE
Suite 313 West Tower
Atlanta, Georgia 30334
(404) 656-2817

Brian P. Kemp
Secretary of State

## STATEMENT OF CHANGE OF ADDRESS
## OF REGISTERED OFFICE

Note: This form is to be used only for changing the address of a registered office, and is not to be used for changing the registered agent on file with the Secretary of State for an entity. **The filing fee is $5.00 per entity, with a minimum fee of $20.00.**

The undersigned registered agent submits this statement for the purpose of changing the address of the registered office for the entity listed below or the entities listed on an attachment to this statement:

1.  **Name of Registered Agent:** Corporation Process Company

2.  **Entity Information:**          ✓ Multiple entities are involved with this change of address. A typed list of the entity names in alphabetical order, control numbers, and entity types are attached.

    Entity Name: _____

    Entity Control Number: _____

    Entity Type (check one only):

    ☐ Domestic Corporation (Profit, Nonprofit, or Professional)          ☐ Foreign Corporation (Profit, Nonprofit, or Professional)
    ☐ Domestic Limited Liability Company          ☐ Foreign Limited Liability Company
    ☐ Domestic Limited Partnership/Limited Liability Limited Partnership          ☐ Foreign LP/LLLP
    ☐ Foreign Limited Liability Partnership

3.  **Current street address and county of registered office:**

    Address: 2180 Satellite Blvd, Suite 400
    _____

    City: Duluth          County: Gwinnett          State: GA  Zip Code: 30097

4.  **New street address and county of registered office:** email address: FFInboxATL@wolterskluwer.com

    Address: C T Corporation System
    289 S Culver St

    City: Lawrenceville          County: Gwinnett          State: GA  Zip Code: 30046-4805

5.  The address of the entity's registered office and the business address of the registered agent, as changed, will be identical.

6.  **Statement of notification:** The undersigned certifies that written notice of the registered agent's change of address or a copy of this statement has been delivered or mailed to the above-named entity in accordance with the applicable provisions of the Official Code of Georgia Annotated.

7.  I hereby certify, under penalty of law, that the above information is true and correct.

    _Marie Hauer_                                    4/26/17
    Signature of Registered Agent                    Date

    Marie Hauer                                      Asst. Secy.
    Print Name                                       Title (if signing for an entity)

Form RA-2
(9/2016)



**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
2 Martin Luther King Jr. Dr. SE
Suite 313 West Tower
Atlanta, Georgia 30334
(404) 656-2817

Brian P. Kemp
Secretary of State

## MASS REGISTERED AGENT NAME CHANGE

1.  **Name of Registered Agent on file with the Secretary of State:**

    Corporation Process Company

2.  **Entity Information:** Multiple entities are involved with this change. A typed list of the entity names, with corresponding control numbers and entity types, is attached.

3.  **New Name of Registered Agent:**

    C T Corporation System

4.  I hereby certify, under penalty of law, that the above information is true and correct.

    _Marie Hauer_ _____     7/13/17 _____
    Signature of Registered Agent                Date

    Marie Hauer on behalf of C T Corporation System     Assistant Secretary _____
    Print Name                                           Title (if signing for an entity)

**Form RA-3**
(6/2017)

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/16/2018 10:49:53

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | CLAIMS MANAGEMENT, INC. |
| **CONTROL NUMBER** | : | K324093 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Arkansas |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| **REGISTERED AGENT NAME** | : | C T Corporation System |
| **REGISTERED OFFICE ADDRESS** | : | 289 S Culver St, Gwinnett, Lawrenceville, GA, 30046-4805, USA |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| David Stills | CEO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | Secretary | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | CFO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| **REGISTERED AGENT NAME** | : | C T Corporation System |
| **REGISTERED OFFICE ADDRESS** | : | 289 S Culver St, Gwinnett, Lawrenceville, GA, 30046-4805, USA |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| David Stills | CEO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | Secretary | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | CFO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |

## AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Kelly Lettmann |
| **AUTHORIZER TITLE** | : | Attorney In Fact |

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Amended Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 9/28/2018 1:57:35 PM

| BUSINESS INFORMATION | |
|---|---|
| **BUSINESS NAME** | : CLAIMS MANAGEMENT, INC. |
| **CONTROL NUMBER** | : K324093 |
| **BUSINESS TYPE** | : Foreign Profit Corporation |
| **FILING TYPE** | : Amended Annual Registration |

**CURRENT INFORMATION ON FILE FOR PRINCIPAL ADDRESS, REGISTERED AGENT, AND OFFICERS**

| | |
|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| **REGISTERED AGENT NAME** | : C T Corporation System |
| **REGISTERED OFFICE ADDRESS** | : 289 S Culver St, Lawrenceville, GA, 30046-4805, USA |
| **REGISTERED OFFICE COUNTY** | : Gwinnett |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| David Stills | CEO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | Secretary | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | CFO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |

**CHANGES TO THE ABOVE CURRENT INFORMATION ARE INDICATED BELOW**

| | |
|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| **REGISTERED AGENT NAME** | : THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| David Stills | CEO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | Secretary | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | CFO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |

**After the above change(s) are made, the address of the entity's registered office and the business address of the**

**registered agent will be identical.**

| AUTHORIZER INFORMATION |
|---|

| **AUTHORIZER SIGNATURE** | : Kelly Lettmann |
| **AUTHORIZER TITLE** | : Attorney In Fact |

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/13/2019 15:37:37

## BUSINESS INFORMATION

**BUSINESS NAME**     : CLAIMS MANAGEMENT, INC.
**CONTROL NUMBER**     : K324093
**BUSINESS TYPE**     : Foreign Profit Corporation
**JURISDICTION**     : Arkansas

## BUSINESS INFORMATION CURRENTLY ON FILE

**PRINCIPAL OFFICE ADDRESS**     : 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA
**REGISTERED AGENT NAME**     : THE CORPORATION COMPANY (FL)
**REGISTERED OFFICE ADDRESS**     : 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA
**REGISTERED OFFICE COUNTY**     : Forsyth

| OFFICER | TITLE | ADDRESS |
| --- | --- | --- |
| David Stills | CEO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | Secretary | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Kimberly A. Holliday | CFO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

**PRINCIPAL OFFICE ADDRESS**     : 708 SW 8th Street, Bentonville, AR, 72716, USA
**REGISTERED AGENT NAME**     : THE CORPORATION COMPANY (FL)
**REGISTERED OFFICE ADDRESS**     : 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA
**REGISTERED OFFICE COUNTY**     : Forsyth

| OFFICER | TITLE | ADDRESS |
| --- | --- | --- |
| Matthew Allen | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| David Stills | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## AUTHORIZER INFORMATION

**AUTHORIZER SIGNATURE**     : Kelly Lettmann
**AUTHORIZER TITLE**     : Attorney In Fact

Control Number : K324093

# STATE OF GEORGIA
## Secretary of State
**Corporations Division**
**313 West Tower**
**2 Martin Luther King, Jr. Dr.**
**Atlanta, Georgia 30334-1530**

## AMENDED CERTIFICATE OF AUTHORITY
### NAME CHANGE

I, **Brad Raffensperger**, the Secretary of State and the Corporation Commissioner of the State of Georgia, hereby certify under the seal of my office that

### CLAIMS MANAGEMENT, INC.
**a Foreign Profit Corporation**

formed under the laws of the State of **Arkansas** and authorized to transact business in Georgia on **10/26/1993**, has amended its application to transact business in this state by the filing of an amendment changing its name to

### Walmart Claims Services, Inc.
**a Foreign Profit Corporation**

and by the paying of fees as provided by Title 14 of the Official Code of Georgia Annotated. Attached hereto is a true and correct copy of said application.

WITNESS my hand and official seal in the City of Atlanta
and the State of Georgia on **02/13/2020**.



Brad Raffensperger
Secretary of State

DocuSign Envelope ID: ADCB5B8F-9EAA-43E6-8043-31B49B8C7405



Secretary of State

**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
2 Martin Luther King Jr. Dr. SE
Suite 313 West Tower
Atlanta, GA 30334
(404) 656-2817
sos.georgia.gov/corporations

## APPLICATION FOR AMENDED CERTIFICATE
## OF AUTHORITY OF A FOREIGN ENTITY

An amended certificate of authority is obtained by filing an application for amended certificate of authority if a foreign entity changes its name or its jurisdiction of organization. If any other information required in the original application has changed, please use this form, attaching additional pages if necessary, to inform the Secretary of State of said changes. Complete (where applicable) and return this form with a check or money order payable to "Secretary of State" in the amount of $30.00 ($20.00 filing fee plus $10 paper filing service charge).

1. **Entity Name:** Claims Management, Inc.

2. **Entity Control Number:** K324093

3. **Entity Type** (check one only):

   ☒ Corporation (choose one type)   ⦿ Profit   ○ Nonprofit   ○ Professional
   (Corporation must provide certificate of existence from home state with new name, if applicable.)
   ☐ Limited Liability Company
   ☐ Limited Partnership/Limited Liability Limited Partnership
   ☐ Limited Liability Partnership

4. **State/Country of Home Jurisdiction:** Arkansas

5. **Date of Authorization in Georgia:** 10/26/1993

6. **New Entity Type** (if applicable):

   ☐ Corporation (choose one type)   ○ Profit   ○ Nonprofit   ○ Professional
   (Corporation must provide certificate of existence from home state with new name, if applicable.)
   ☐ Limited Liability Company
   ☐ Limited Partnership/Limited Liability Limited Partnership
   ☐ Limited Liability Partnership

7. **New Name of Entity** (if applicable): Walmart Claims Services, Inc.

8. **New Home Jurisdiction** (if applicable): _____

9. **Effective Date:** (Choose one)  ☒ Upon filing   ☐ Delayed effective date and/or time: _____
   (A delayed effective date must be within 90 days of the filing date.)

10. David Stills                                                    01/27/2020
    **Signature**                                                  **Date**

    **Print Name\*:** David Stills

    **Email Address:** _____

    **Signer's Capacity** (check one only):

    Corporation:   ☒ Officer   ☐ Chairperson of Board of Directors   ☐ Court-Appointed Fiduciary   ☐ Attorney-in-fact
    LLC:   ☐ Member   ☐ Manager   ☐ Court-Appointed Fiduciary   ☐ Attorney-in-fact
    LP/LLLP:   ☐ General Partner   ☐ Attorney-in-fact
    LLP:   ☐ Authorized Person

\* Enter individual's legal name, i.e. first and last name without use of initials or nicknames. Middle names or initials may be included.

**FORM CD 518**
(Rev. 10/2019)

0.8047 - 1024/2019 Wolters Kluwer Online



## Arkansas Secretary of State
# John Thurston

State Capitol Building ♦ Little Rock, Arkansas 72201-1094 ♦ 501-682-3409

## Certificate of Good Standing

I, John Thurston, Secretary of State of the State of Arkansas, and as such, keeper of the records of domestic and foreign corporations, do hereby certify that the records of this office show

### WALMART CLAIMS SERVICES, INC.

authorized to transact business in the State of Arkansas as a For Profit Corporation, filed Articles of Incorporation in this office May 27, 1993.

Our records reflect that said entity, having complied with all statutory requirements in the State of Arkansas, is qualified to transact business in this State.



**In Testimony Whereof,** I have hereunto set my hand and affixed my official Seal. Done at my office in the City of Little Rock, this 3rd day of February 2020.

John Thurston
John Thurston
Secretary of State

Online Certificate Authorization Code: e646191e5175784
To verify the Authorization Code, visit sos.arkansas.gov

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/06/2020 10:57:36

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | Walmart Claims Services, Inc. |
| **CONTROL NUMBER** | : | K324093 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Arkansas |
| **ANNUAL REGISTRATION PERIOD** | : | 2020 |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| **OFFICER** | **TITLE** | **ADDRESS** |
|---|---|---|
| David Stills | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Matthew Allen | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| **OFFICER** | **TITLE** | **ADDRESS** |
|---|---|---|
| David Stills | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Kimberly Holiday | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Matthew Allen | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Kelly Lettmann |
| **AUTHORIZER TITLE** | : | Attorney In Fact |

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/27/2021 04:04:45

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | Walmart Claims Services, Inc. |
| **CONTROL NUMBER** | : | K324093 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Arkansas |
| **ANNUAL REGISTRATION PERIOD** | : | 2021 |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| David Stills | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Kimberly Holiday | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Matthew Allen | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| Adams Michele | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Edwards Geoffrey | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Matthew Allen | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

## AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Kelly Lettmann |
| **AUTHORIZER TITLE** | : | Attorney In Fact |

**STATEMENT OF CHANGE OF ADDRESS
OF REGISTERED OFFICE**

*Electronically Filed*
Secretary of State
Filing Date: 04/05/2021 09:05:17 AM

## REGISTERED AGENT INFORMATION

**NAME OF REGISTERED AGENT**    THE CORPORATION COMPANY (FL)

## ENTITY INFORMATION

Multiple entities are involved with this change of address.

## NEW STREET ADDRESS AND COUNTY OF REGISTERED OFFICE

**REGISTERED OFFICE ADDRESS**    106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794, USA

**REGISTERED OFFICE COUNTY**    Forsyth

## STATEMENTS

- The address of the entity's registered office and the business address of the registered agent, as changed, will be identical.
- **Statement of notification:** The undersigned certifies that written notice of the registered agent's change of address or a copy of this statement has been delivered or mailed to the above-named entity in accordance with the applicable provisions of the Official Code of Georgia Annotated.

## AUTHORIZER INFORMATION

**AUTHORIZER SIGNATURE**    The Corporation Company (FL)

**AUTHORIZER TITLE**    Registered Agent

# STATE OF GEORGIA

## Secretary of State

### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/23/2022 09:40:49

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | Walmart Claims Services, Inc. |
| **CONTROL NUMBER** | : | K324093 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Arkansas |
| **ANNUAL REGISTRATION PERIOD** | : | 2022 |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| **OFFICER** | **TITLE** | **ADDRESS** |
|---|---|---|
| Adams Michele | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Edwards Geoffrey | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Matthew Allen | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| **OFFICER** | **TITLE** | **ADDRESS** |
|---|---|---|
| Adams Michele | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Lindsay Rabicoff | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Lindsay Rabicoff | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

## AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Kelly Lettmann |
| **AUTHORIZER TITLE** | : | Attorney In Fact |

Control Number : K324093

# STATE OF GEORGIA

## Secretary of State

**Corporations Division**
**313 West Tower**
**2 Martin Luther King, Jr. Dr.**
**Atlanta, Georgia 30334-1530**

### CERTIFICATE OF WITHDRAWAL

I, **Brad Raffensperger**, the Secretary of State and the Corporation Commissioner of the State of Georgia, hereby certify under the seal of my office that

**Walmart Claims Services, Inc.**
**a Foreign Profit Corporation**

formed under the laws of **Arkansas** and authorized to transact business in Georgia on **10/26/1993**, has been duly withdrawn on **09/12/2022** under the laws of the State of Georgia by the filing of documents in the office of the Secretary of State and by the paying of fees as required by Title 14 of the Official Code of Georgia Annotated and the Rules and Regulations promulgated there under. Attached hereto is a true and correct copy of said application.

WITNESS my hand and official seal in the City of Atlanta and the State of Georgia on **09/12/2022**.



*Brad Raffensperger*

Brad Raffensperger
Secretary of State

**Application for Withdrawal of Certificate of Authority**

*Electronically Filed*
Secretary of State
Filing Date: 9/12/2022 8:05:33 AM

| Article 1 | |
|---|---|
| Business Name | : Walmart Claims Services, Inc. |
| Control Number | : K324093 |
| Date of Registration | : 10/26/1993 |
| Business Type | : Foreign Profit Corporation |
| Jurisdiction | : Arkansas |

| Article 2 |
|---|
| Any process served on the entity after withdrawal from Georgia may be mailed to the following address. |

| Address | : 1702 NEPTUNE RD, 1702 NEPTUNE RD, ASHLAND CITY, TN, 37015, USA |
|---|---|

**Article 3**

ı The entity no longer transacts business in Georgia and surrenders its certificate of authority.
ı The entity revokes the authority of its registered agent to accept service of process on its behalf and appoints the Secretary of State of Georgia as its agent for service in any proceedings based on a cause of action that arose during the time it was authorized to transact business in Georgia.
ı The withdrawing entity commits that it will notify the Secretary of State of any changes in the service of process mailing address provided above.

**Article 4**

This Application for Withdrawal of Certificate of Authority shall be effective on           : 09/12/2022

**Authorizer Information**

**Authorizer Signature :** MARIA            **Authorizer Title :** Officer

# EXHIBIT

# W

Certified Business Records for Walmart Inc.

Control Number : J151025

# STATE OF GEORGIA

## Secretary of State

**Corporations Division**
**313 West Tower**
**2 Martin Luther King, Jr. Dr.**
**Atlanta, Georgia 30334-1530**

### CERTIFIED COPY

I, **Brad Raffensperger**, the Secretary of State of the State of Georgia, do hereby certify under the seal of my office that the attached documents are true and correct copies of documents filed with the Corporations Division of the Office of the Secretary of State of Georgia under the name of

**Walmart INC.**
**a Foreign Profit Corporation**

This certificate is issued pursuant to Title 14 of the Official Code of Georgia Annotated and is prima-facie evidence of the existence or nonexistence of the facts stated herein.

Docket Number    : 26240271
Date Inc/Auth/Filed: 07/20/1981
Jurisdiction      : Delaware
Print Date        : 12/21/2023
Form Number       : 215



*Brad Raffensperger*

**Brad Raffensperger**
**Secretary of State**

WAL-MART STORES, INC.                          DEPT. 8013

| | | STATE | ZIP |
|---|---|---|---|
| | BENTONVILLE | AR | 72716 |

CEO: GLASS, DAVID D.
CFO: JOHN MENZER
SEC: RHOADS, ROBERT K.
AGT: CSC OF GWINNETT COUNTY, INC.

| | | STATE | ZIP |
|---|---|---|---|
| 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR | 72716 |
| 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR | 72716 |
| 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR | 72716 |
| 3781 VENTURE DR. | DULUTH | GA | 30136 |

IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW

CORPORATION ADDRESS:

CEO:

CFO:

SEC:

AGT:
                    PO BOX NOT ACCEPTABLE

I HEREBY CERTIFY THAT ALL INFORMATION ON THIS FORM.

SIGNATURE: *(signature)*          DATE: 3/16/99

TITLE: VP OC Tax       PHONE #: 501- 277- 2765

*FEIN: 710415188
COUNTY OF REGISTERED OFFICE: GWINNETT

FEIN CORRECTION:

COUNTY CHANGE OR CORRECTION:      | GA |

FEE $:  $15.00   DE  07/20/81   FP   N  J151025

BR201 (12-98) 1999 CORPORATION ANNUAL REGISTRATION

FORM ID  SS7001  12/24/98

99J151025001500WALMARTSTORESINC

DEPT. 8013                          BENTONVILLE        AR    72716

PRINCIPAL OFFICERS AND REGISTERED AGENT (AGT)

| | | | | |
|---|---|---|---|---|
| CEO: | GLASS, DAVID D. | 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR  72716 |
| CFO: | JOHN MENZER | 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR  72716 |
| SEC: | RHOADS, ROBERT K. | 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR  72716 |
| AGT: | CSC OF GWINNETT COUNTY, INC. | 4845 JIMMY CARTER BOULEVARD | NORCROSS | GA  30093 |

**IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:**

| CORPORATION ADDR: | | | |
|---|---|---|---|
| CEO: H. Lee Scott, Jr. | 702 SW 8th Street | Bentonville | AR 72716 |
| CFO: Thomas M. Schoewe | 702 SW 8th Street | Bentonville | AR 72716 |
| SEC: | | | |
| AGT: | P. O. BOX NOT ACCEPTABLE | | GA |

I HEREBY CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT.

*FEIN: 710415188

FEIN CORRECTION:

COUNTY OF REGISTERED OFFICE: GWINNETT

COUNTY CHANGE OR CORRECTION:

AUTHORIZED SIGNATURE: _____   DATE: 3/17/2000

TITLE: VP of TAX   PHONE #: (501) 277-1545

FEE: $15.00   DE   7/20/81   FP   J151025

00J151025001500WALMARTSTORESINC

BR201(12-2000) 2001 CORPORATION ANNUAL REGISTRATION | ADDRESS | CITY | STATE | ZIP

**WAL-MART STORES, INC.**     DEPT. 8013     BENTONVILLE     AR    72716

PRINCIPAL OFFICERS AND REGISTERED AGENT(AGT)

| | | | | |
|---|---|---|---|---|
| CEO: | H LEE SCOTT JR | 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR 72716 |
| CFO: | THOMAS M SCHOEWE | 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR 72716 |
| SEC: | RHOADS, ROBERT K. | 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR 72716 |
| AGT: | CSC OF GWINNETT COUNTY, INC. | 4845 JIMMY CARTER BOULEVARD | NORCROSS | GA 30093 |

**IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW**

CORPORATION ADDRESS: *702 SW 8th Street, #0555*     *Bentonville*   *AR*   *72716-0555*

CEO:

CFO:

SEC:

AGT:     PO BOX NOT ACCEPTABLE     *GA*

I HEREBY CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM, AND THAT THE INFORMATION IS TRUE AND CORRECT.

SIGNATURE     DATE: *3-21-01*

TITLE: *V.P. of Taxes*    PHONE #: *(501)204-2096*

COUNTY OF REGISTERED OFFICE: GWINNETT     COUNTY CHANGE OR CORRECTION:

FEE :$15.00   DE   07/20/81    FP   N   J151025

BR201 (12-00) 2001 CORPORATION ANNUAL REGISTRATION

01J151025001500WALMARTSTORESINC

FORM ID 55F01 02/14/01

Entity Name:  WAL-MART STORES, INC.
Entity Control #  J151025FP

Amount Due:        $15.00

☒  If Name and Address Changes,
    Place an X in the Box to the Left
    and Make Changes on Reverse

| PRIN: | WAL-MART STORES, INC. | 702 SW 8TH STREET 06 | BENTONVILLE | AR | 72716 |
|---|---|---|---|---|---|
| CEO: | H LEE SCOTT JR | 702 SOUTHWEST EIGHTH | BENTONVILLE | AR | 72716 |
| CFO: | THOMAS M SCHOEWE | 702 SOUTHWEST EIGHTH | BENTONVILLE | AR | 72716 |
| SEC: | RHOADS, ROBERT K. | 702 SOUTHWEST EIGHTH | BENTONVILLE | AR | 72716 |
| AGT: | | | | | |
| County of Registered Office: | | GWINNETT | | | |

028   J1510257   0015003   WALMARTSTORESINCD0004   072081

Pass II Audit:

J151025   WALMARTSTORESINCD00D

| PLEASE PRINT OFFICER/AGENT NAME AND/OR ADDRESS CHANGES BELOW | | | | | |
|---|---|---|---|---|---|
| P.O. BOX OR MAIL DROP NOT ACCEPTABLE FOR AGT ADDRESS (MAY BE USED FOR OTHERS) | | | | | |
| | NAME | ADDRESS | CITY | STATE | ZIP CODE |
| MAILING ADDR: | Wal-Mart Stores, Inc. | 702 SW 8th Street, #0555 | Bentonville | AR | 72716 |
| CEO: | | | | | |
| CFO: | | | | | |
| SEC: | | | | | |
| AGT: | | | | | |
| County of Registered Agent/Office: | | | | | |

I HEREBY CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM
AND THAT THE INFORMATION IS TRUE AND CORRECT.

AUTHORIZED SIGNATURE: _____     PHONE: 479-277-3765

TITLE: Vice President of Taxes              DATE: 3/25/02

0011

Pass II Audit:        0      0              0   0        N        0

| DPT/1 (14202)  ANY CORPORATION ANNUAL REGISTRATION | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 72716 |

**PRINCIPAL OFFICERS AND REGISTERED AGENT (AGT)**

| | | | | | |
|---|---|---|---|---|---|
| CEO: | H LEE SCOTT JR | 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR | 72718 |
| CFO: | THOMAS M SCHOEWE | 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR | 72718 |
| SEC: | RHOADS, ROBERT K. | 702 SOUTHWEST EIGHTH STREET | BENTONVILLE | AR | 72718 |
| AGT: | CSC OF GWINNETT COUNTY, INC. | 4845 JIMMY CARTER BOULEVARD | NORCROSS | GA | 30093 |

## IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:

| CORPORATION ADDR: | | | | |
|---|---|---|---|---|
| CEO: | | | | |
| CFO: | | | | |
| SEC: | Thomas D. Hyde | 1702 SW 8th Street | Bentonville | AR | 72716 |
| AGT: | F. O. BOX NOT ACCEPTABLE FOR AGT. | | GA | |

I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE
INFORMATION IS TRUE AND CORRECT.

| AUTHORIZED SIGNATURE: | _(signature)_ | DATE: 3/2/05 | COUNTY OF REGISTERED OFFICE: GWINNETT | COUNTY CHANGE OR CORRECTION: |
|---|---|---|---|---|
| TITLE: Vice President of Tax | | | FEE: $15.00    DE    7/20/81    FP    J151025 | |

D3J151025001500WALMARTSTORESINC

| | | | | |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 727166209 |
| CEO: H LEE SCOTT JR | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| CFO: THOMAS M SCHOEWE | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| SEC: THOMAS D HYDE | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| AGT: CSC OF GWINNETT COUNTY, INC. | 40 TECHNOLOGY PKWY SOUTH, #300 | NORCROSS | GA | 30092 |

**IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:**

| | | | | |
|---|---|---|---|---|
| CORPORATION ADDR: | | | | |
| CEO: | | | | |
| CFO: | | | | |
| SEC: | | | | |
| AGT: C T Corporation System | P.O BOX NOT ACCEPTABLE<br>1201 Peachtree, N.E | Atlanta | GA | 30361 |

I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT.

AUTHORIZED SIGNATURE: [signature] DATE: 3/30/04

TITLE: Asst. Secy

COUNTY OF REGISTERED OFFICE: **GWINNETT**

COUNTY CHANGE OR CORRECTION: Fulton

BR201 (01-04) 2004 ~~CORPORATION~~ ANNUAL REGISTRATION

**FEE: $30.00 DE 07/20/1981 FP J151025**

04 11510250 WALMARTSTORESINC

| WAL-MART STORES, INC. | | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 727166209 |
|---|---|---|---|---|---|
| CEO: | H LEE SCOTT JR | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| CFO: | THOMAS M SCHOEWE | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| SEC: | THOMAS D HYDE | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| AGT: | CSC OF GWINNETT COUNTY, INC. | 40 TECHNOLOGY PKWY SOUTH, #300 | NORCROSS | GA | 30092 |

### IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:

| CORPORATION ADDR: | | | | |
|---|---|---|---|---|
| CEO: | | | | |
| CFO: | | | | |
| SEC: | | | | |
| AGT: C T Corporation System | P.O BOX NOT ACCEPTABLE 1201 Peachtree, N.E | Atlanta | GA | 30361 |

I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND
THAT THE INFORMATION IS TRUE AND CORRECT.

AUTHORIZED SIGNATURE: _[signature]_     DATE: 3/30/04

TITLE: Asst. Secy

COUNTY OF
REGISTERED OFFICE:
GWINNETT

COUNTY
CHANGE OR CORRECTION:
Fulton

BR201 (01-04) 2004 CORPORATION ANNUAL REGISTRATION

FEE:  $30.00 DE 07/20/1981 FP J151025

04J151025000WALMARTSTORESINC

CORPORATION NAME                                    ADDRESS

| | | | | | |
|---|---|---|---|---|---|
| WAL-MART STORES, INC. | | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 727166209 |
| CEO: | H LEE SCOTT JR | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| CFO: | THOMAS M SCHOEWE | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| SEC: | THOMAS D HYDE | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| AGT: | C T CORPORATION SYSTEM | 1201 PEACHTREE STREET, NE | ATLANTA | GA | 30361 |

### IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:

CORPORATION ADDR:

CEO:

CFO:

SEC:

AGT: *Corporation Process Company*   180 *Cherokee St., N.E.*   *Marietta*   GA   *30060*

P.O BOX NOT ACCEPTABLE

I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND
THAT THE INFORMATION IS TRUE AND CORRECT.

COUNTY OF
REGISTERED OFFICE:
FULTON

COUNTY
CHANGE OR CORRECTION:

*Cobb*

AUTHORIZED SIGNATURE: *[signature]*   DATE: *4/13/04*

TITLE: *Vice-President*

BR201 (01-04) 2004 CORPORATION ANNUAL REGISTRATION

FEE:   $30.00 DE 07/20/1981 FP J151025

04J151025000WALMARTSTORESINC

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 72716 |
| CEO: H. LEE SCOTT JR | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| CFO: THOMAS M SCHOEWE | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| SEC: THOMAS D HYDE | 702 SW 8TH ST 0555 | BENTONVILLE | AR | 72716 |
| AGT: CORPORATION PROCESS COMPANY | 180 CHEROKEE STREET, N.E. | MARIETTA | CA | 30060 |

### IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:

| CORPORATION ADDR: | | | | |
|---|---|---|---|---|
| CEO: | | | | |
| CFO: | | | | |
| SEC: | | | | |
| AGT: CT Corporation System | 1201 Peachtree St, NE | Atlanta | GA | 30361 |

I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT.

AUTHORIZED SIGNATURE: *Carroll Ital* 

DATE: 3/7/05

TITLE: VP of Domestic Income Tax

COUNTY OF REGISTERED OFFICE: COBB

COUNTY CHANGE OR CORRECTION:

AMOUNT DUE: $34.00 DUE 07/28/05 FP J1510257

8A201 2005 CORPORATION ANNUAL REGISTRATION

DSS J1510257 0030004 WALMARTSTORESINC00004



**CATHY COX**
Secretary of State

# STATE OF GEORGIA
## 2005 ANNUAL REGISTRATION
CORPORATIONS DIVISION
Office of Secretary of State
(404) 656-2817

WARREN H. RARY
Director

**ENTITY-CONTROL-NUMBER:  J151025**

**TOTAL CHARGED: $30.00**

**ENTITY INFORMATION**

| | |
|---|---|
| ENTITY-NAME: | **WAL-MART STORES, INC.** |
| PRINCIPAL-ADDRESS: | **702 SW 8TH ST # 555** |
| PRINCIPAL-CITY: | **BENTONVILLE** |
| PRINCIPAL-STATE: | **AR** |
| PRINCIPAL-ZIP: | **727166209** |
| REGAGENT-NAME: | **CORPORATION PROCESS COMPANY** |
| REGAGENT-ADDRESS: | **180 CHEROKEE STREET N.E.** |
| REGAGENT-CITY: | **MARIETTA** |
| REGAGENT-STATE: | **GA** |
| REGAGENT-ZIP: | **30060** |
| REGAGENT-COUNTY: | **COBB** |

**CEO INFO**

| | |
|---|---|
| NAME: | **H LEE SCOTT JR** |
| ADDRESS: | **702 SW 8TH ST 0555** |
| CITY: | **BENTONVILLE** |
| STATE: | **AR** |
| ZIP CODE: | **72716** |

**CFO INFO**

| | |
|---|---|
| NAME: | **THOMAS M SCHOEWE** |
| ADDRESS: | **702 SW 8TH ST 0555** |
| CITY: | **BENTONVILLE** |
| STATE: | **AR** |
| ZIP CODE: | **72716** |

**SEC INFO**

| | |
|---|---|
| NAME: | **THOMAS D HYDE** |
| ADDRESS: | **702 SW 8TH ST 0555** |
| CITY: | **BENTONVILLE** |
| STATE: | **AR** |
| ZIP CODE: | **72716** |

**SUBMITTED BY:**          **Samuel A. Guess on 04/12/2005**



**CATHY COX**
Secretary of State

**STATE OF GEORGIA**
**2006 ANNUAL REGISTRATION**
CORPORATIONS DIVISION
Office of Secretary of State
(404) 656-2817

WARREN H. RARY
Director

**ENTITY-CONTROL-NUMBER:  J151025**

**TOTAL CHARGED: $30.00**

**ENTITY INFORMATION**

| | |
|---|---|
| ENTITY-NAME: | **WAL-MART STORES, INC.** |
| PRINCIPAL-ADDRESS: | **702 SW 8TH ST # 555** |
| PRINCIPAL-CITY: | **BENTONVILLE** |
| PRINCIPAL-STATE: | **AR** |
| PRINCIPAL-ZIP: | **72712** |
| REGAGENT-NAME: | **CORPORATION PROCESS COMPANY** |
| REGAGENT-ADDRESS: | **180 CHEROKEE STREET N.E.** |
| REGAGENT-CITY: | **MARIETTA** |
| REGAGENT-STATE: | **GA** |
| REGAGENT-ZIP: | **30060** |
| REGAGENT-COUNTY: | **COBB** |

**CEO INFO**

| | |
|---|---|
| NAME: | **H LEE SCOTT JR** |
| ADDRESS: | **702 SW 8TH ST 0555** |
| CITY: | **BENTONVILLE** |
| STATE: | **AR** |
| ZIP CODE: | **72716** |

**CFO INFO**

| | |
|---|---|
| NAME: | **THOMAS M SCHOEWE** |
| ADDRESS: | **702 SW 8TH ST 0555** |
| CITY: | **BENTONVILLE** |
| STATE: | **AR** |
| ZIP CODE: | **72716** |

**SEC INFO**

| | |
|---|---|
| NAME: | **THOMAS D HYDE** |
| ADDRESS: | **702 SW 8TH ST 0555** |
| CITY: | **BENTONVILLE** |
| STATE: | **AR** |
| ZIP CODE: | **72716** |

**SUBMITTED BY:**       **on 03/31/2006**



**Karen C Handel**
Secretary of State

Control No: J151025
Date Filed: 02/08/2007 05:49 PM
Karen C Handel
Secretary of State

# STATE OF GEORGIA
## 2007 Corporation Annual Registration

### OFFICE OF SECRETARY OF STATE
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Entity Control No.** J151025                    **Information on record as of:** 2/8/2007

WAL-MART STORES, INC.
702 SW 8TH ST # 555
BENTONVILLE AR, 72712

Amount due from this entity is indicated below.  Annual fee is $30.  If amount is more than $30, total reflects amount(s) due from previous year(s). **Renew by April 1, 2007**

Renew at www.georgiacorporations.org or by submitting bottom portion with check payable to "Secretary of State".

Officer, address and agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer and Secretary of the corporation. Please PRINT LEGIBLY.

**Note:** Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Box may be used for principal office and officers.

Any person authorized by the entity to do so may sign and file registration (including online filing).

Please return ONLY the original form below and fee. Other filings and correspondence should be sent to our Atlanta address: Corporations Division, 315 West Tower, #2 Martin Luther King Jr. Drive, Atlanta, GA 30334.

Visit www.georgiacorporations.org to file online or for more information on annual registration. Or, call 404-656-2817.

**Current information printed below. Review and update as needed. Detach original coupon and return with payment.**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8TH ST # 555 | BENTONVILLE | AR | 72712 |
| CEO:   H LEE SCOTT JR | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| CFO:   THOMAS M SCHOEWE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| SEC:   THOMAS D HYDE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| AGT:   CORPORATION PROCESS COMPANY | 180 Cherokee Street N.E. | MARIETTA | GA | 30060 |

| IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW: | | | | |
|---|---|---|---|---|
| Corporation Addr:   702 SW 8TH ST, MS #0555 | | BENTONVILLE | AR | 72712 |
| CEO: | | | | |
| CFO: | | | | |
| SEC: | | | | |
| AGT: | P.O. BOX NOT ACCEPTABLE | | GA | |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | COUNTY OF REGISTERED OFFICE: | COUNTY CHANGE OR CORRECTION: |
|---|---|---|
| AUTHORIZED SIGNATURE: CLAIRE BABINEAUX-FONTENOT   DATE:  2/8/2007 5 | COBB | |
| TITLE:   Filer | | |

BR203 2007 Corporation Annual Registration

| Amount Due: | **$30.00** |
|---|---|

073 J151025%7 0030004 WALMARTSTORESINC00004



**STATE OF GEORGIA**

**2008 Corporation Annual Registration**

Control No: J151025
Date Filed: 03/07/2008 08:27 AM
Karen C Handel
Secretary of State

**Karen C Handel**
Secretary of State

**OFFICE OF SECRETARY OF STATE**
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Entity Control No.** J151025                    **Information on record as of:** 3/7/2008

WAL-MART STORES, INC.
702 SW 8TH ST
MS #0555
BENTONVILLE AR, 72712-0555

Amount due from this entity is indicated below.  Annual fee is $30.  If amount is more than $30, total reflects amount(s) due from previous year(s). **Renew by April 1, 2008**

Renew at www.georgiacorporations.org or by submitting bottom portion with check payable to "Secretary of State".

Officer, address and agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer and Secretary of the corporation. Please PRINT LEGIBLY.

**Note:** Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Box may be used for principal office and officers.

Any person authorized by the entity to do so may sign and file registration (including online filing).

Please return ONLY the original form below and fee. Other filings and correspondence should be sent to our Atlanta address: Corporations Division, 315 West Tower, #2 Martin Luther King Jr. Drive, Atlanta, GA 30334.

Visit www.georgiacorporations.org to file online or for more information on annual registration. Or, call 404-656-2817.

**Current information printed below. Review and update as needed. Detach original coupon and return with payment.**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8TH ST MS #0555 | BENTONVILLE | AR | 72712 |
| CEO:   H LEE SCOTT JR | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| CFO:   THOMAS M SCHOEWE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| SEC:   THOMAS D HYDE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| AGT:   CORPORATION PROCESS COMPANY | 180 Cherokee Street N.E. | MARIETTA | GA | 30060 |

**IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:**

| | | | |
|---|---|---|---|
| Corporation Addr: | | | |
| CEO: | | | |
| CFO: | | | |
| SEC: | | | |
| AGT: | P.O. BOX NOT ACCEPTABLE | | GA |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | COUNTY OF REGISTERED OFFICE: | COUNTY CHANGE OR CORRECTION: |
|---|---|---|
| AUTHORIZED SIGNATURE:  H LEE SCOTT JR              DATE:   3/7/2008 8 | COBB | |
| TITLE:    Filer | | |

BR203 2008 Corporation Annual Registration

Amount Due:  **$30.00**

082 J151025%7 0030004 WALMARTSTORESINC00004



**STATE OF GEORGIA**

**2009 Corporation Annual Registration**

Control No: J151025
Date Filed: 03/27/2009 04:55 PM
Karen C Handel
Secretary of State

**OFFICE OF SECRETARY OF STATE**
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

Karen C Handel
Secretary of State

Chauncey Newsome
Director

Entity Control No. J151025                     Information on record as of: 3/27/2009

WAL-MART STORES, INC.
702 SW 8TH ST
MS #0555
BENTONVILLE AR, 72712-0555

Amount due from this entity is indicated below.  Annual fee is $30.  If amount is more than $30, total reflects amount(s) due from previous year(s). **Renew by April 1, 2009**

Renew at www.georgiacorporations.org or by submitting bottom portion with check payable to "Secretary of State".

Officer, address and agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer and Secretary of the corporation. Please PRINT LEGIBLY.

**Note:** Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Box may be used for principal office and officers.

Any person authorized by the entity to do so may sign and file registration (including online filing).

Please return ONLY the original form below and fee. Other filings and correspondence should be sent to our Atlanta address: Corporations Division, 315 West Tower, #2 Martin Luther King Jr. Drive, Atlanta, GA 30334.

Visit www.georgiacorporations.org to file online or for more information on annual registration. Or, call 404-656-2817.

---

**Current information printed below. Review and update as needed. Detach original coupon and return with payment.**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8TH ST MS #0555 | BENTONVILLE | AR | 72712 |
| CEO:   H LEE SCOTT JR | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| CFO:   THOMAS M SCHOEWE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| SEC:   THOMAS D HYDE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| AGT:   CORPORATION PROCESS COMPANY | 328 Alexander Street | Marietta | GA | 30060 |

**IF ABOVE INFORMATION HAS CHANGED, TYPE OR PRINT CORRECTIONS BELOW:**

| Corporation Addr: | | | | |
|---|---|---|---|---|
| CEO:   MICHAEL T DUKE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| CFO: | | | | |
| SEC: | | | | |
| AGT: | P.O. BOX NOT ACCEPTABLE | | GA | |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | COUNTY OF REGISTERED OFFICE: | COUNTY CHANGE OR CORRECTION: |
|---|---|---|
| AUTHORIZED SIGNATURE: MICHAEL T DUKE          DATE:  3/27/2009 | COBB | |
| TITLE:     Filer | | |

BR203 2009 Corporation Annual Registration

Amount Due:  **$30.00**

091  J151025%7  0030004  WALMARTSTORESINC00004

Control No: J151025
Date Filed: 02/18/2010 01:55 PM
Brian P. Kemp
Secretary of State

**STATE OF GEORGIA**
**2010 Corporation Annual Registration**

OFFICE OF SECRETARY OF STATE
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Brian P. Kemp**
**Secretary of State**

**Chauncey Newsome**
**Director**

**Information on record as of: 2/18/2010**

Entity Control No. J151025          Amount Due: $30.00          Amount Due *AFTER* April 1, 2010: $55.00

WAL-MART STORES, INC.
702 SW 8TH ST
MS #0555
BENTONVILLE AR, 72712-0555

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.**   Amount due for this entity is indicated above and below on the remittance form.  Annual fee is $30.  If amount is more than $30, the total reflects amount(s) due from previous year(s) and any applicable late fee(s).   **Renew by April 1, 2010**.  Your Annual Registration must be postmarked by April 1, 2010.  If your registration and payment are not postmarked by April 1, 2010, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at www.georgiacorporations.org.  The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only.  Annual Registrations not processed online require payment with a check, certified bank check or money order.   **We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of State".   **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing.  Absolutely, no counter or starter checks will be accepted.  Failure to adhere to these guidelines will delay or possibly reject your filing.**  Checks that are dishonored by your bank are subject to a $30.00 NSF charge.  Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below.  Please verify "county of registered office."  If correct and complete, detach bottom portion, sign, and return with payment.  Or, enter changes as needed and submit.  Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.

**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office.  P.O. Boxes may be used for principal office and officers' addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing).  Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s).  For more information on Annual Registrations or to file online, visit www.georgiacorporations.org.   Or, call 404-656-2817.  **PLEASE PRINT LEGIBLY.**
Current information printed below. Review and update as needed. Detach original coupon and return with payment.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8TH ST MS #0555 | BENTONVILLE | AR | 72712 |
| CEO: MICHAEL T DUKE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| CFO: THOMAS M SCHOEWE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| SEC: THOMAS D HYDE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| AGT: CORPORATION PROCESS COMPANY | 2180 Satellite Blvd | Duluth | GA | 30097 |

**IF ABOVE INFORMATION HAS CHANGES, TYPE OR PRINT CORRECTIONS BELOW:**

| | | | | |
|---|---|---|---|---|
| CORPORATION ADDRESS: | | | | |
| CEO: | | | | |
| CFO: | | | | |
| SEC: | | | | |
| AGT: | | | GA | |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | *P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS* | COUNTY OF REGISTERED OFFICE: Gwinnett | COUNTY CHANGE OR CORRECTION: |
|---|---|---|---|

| AUTHORIZED SIGNATURE: MICHAEL T DUKE | DATE: 2/18/2010 | **Total Due:** |
|---|---|---|
| TITLE: Filer | EMAIL: | **$30.00** |

BR201 2010 Corporation Annual Registration

108 J151025%7 0030004 WALMARTSTORESINCD0004 201004019 055004

Control No: J151025
Date Filed: 03/01/2011 03:30 PM
Brian P. Kemp
Secretary of State

**STATE OF GEORGIA**

**2011 Corporation Annual Registration**

**OFFICE OF SECRETARY OF STATE**
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Brian P. Kemp**
**Secretary of State**

**Chauncey Newsome**
**Director**

**Information on record as of:  3/1/2011**

Entity Control No. J151025          Amount Due: $50.00          Amount Due *AFTER* April 1, 2011: $75.00

WAL-MART STORES, INC.
702 SW 8th Street, Dept. 8687, M.S. #0555
Bentonville, AR 72716

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.**   Amount due for this entity is indicated above and below on the remittance form.  Annual fee is $50.  If amount is more than $50, the total reflects amount(s) due from previous year(s) and any applicable late fee(s).   **Renew by April 1, 2011.**  Your Annual Registration must be postmarked by April 1, 2011.  If your registration and payment are not postmarked by April 1, 2011, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at www.georgiacorporations.org.  The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only.  Annual Registrations not processed online require payment with a check, certified bank check or money order.   **We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of State".   **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing.  Absolutely, no counter or starter checks will be accepted.  Failure to adhere to these guidelines will delay or possibly reject your filing.**  Checks that are dishonored by your bank are subject to a $30.00 NSF charge.  Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below.  Please verify "county of registered office."  If correct and complete, detach bottom portion, sign, and return with payment.  Or, enter changes as needed and submit.  Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.

**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office.  P.O. Boxes may be used for principal office and officers' addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing).  Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s).  For more information on Annual Registrations or to file online, visit www.georgiacorporations.org.   Or, call 404-656-2817.   **PLEASE PRINT LEGIBLY.**
Current information printed below. Review and update as needed. Detach original coupon and return with payment.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8TH ST MS #0555 | BENTONVILLE | AR | 72712 |
| CEO:   MICHAEL T DUKE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| CFO:   THOMAS M SCHOEWE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| SEC   THOMAS D HYDE | 702 SW 8TH ST 0555 | BENTONVILLE | GA | 72716 |
| AGT   CORPORATION PROCESS COMPANY | 2180 Satellite Blvd | Duluth | GA | 30097 |

**IF ABOVE INFORMATION HAS CHANGES, TYPE OR PRINT CORRECTIONS BELOW:**

| | | | | |
|---|---|---|---|---|
| CORPORATION ADDRESS: | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| CEO:   Michael T. Duke | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| CFO:   Thomas Schoewe | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| SEC:   Thomas D. Hyde | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| AGT: | | | GA | |
| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | *P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS* | COUNTY OF REGISTERED OFFICE:   Gwinnett | COUNTY CHANGE OR CORRECTION: | |

| AUTHORIZED SIGNATURE: Michelle Donato | DATE:   3/1/2011 3 | **Total Due:** |
|---|---|---|
| TITLE:   Filer | EMAIL:   state.compliance@wal-mart.com | **$50.00** |

BR201 2011 Corporation Annual Registration

117 J151025⫶7 0050009 WALMARTSTORESINCO0004 201104018 0050009

8151025 WAL/MART STORES, INC.
Page 2 of 2

81509000000309

## FIFTH
### CERTIFICATE OF AMENDMENT TO
### CERTIFICATE OF INCORPORATION OF
### WAL-MART STORES, INC.

WAL-MART STORES, INC., a corporation organized and existing under the laws of the State of Delaware, hereby certifies as follows:

1.   The name of the corporation is

WAL-MART STORES, INC.

The date of filing of its original Certificate of Incorporation with the Secretary of State of Delaware was October 31, 1969; the date of filing of the first amendment to its Certificate of Incorporation with the Secretary of State of Delaware was January 9, 1970; the date of filing of the second amendment to its Certificate of Incorporation was May 14, 1971; the date of filing of the third amendment to its Certificate of Incorporation was March 27, 1972; and the date of the filing of the fourth amendment to its Certificate of Incorporation was August 18, 1975.

2.   The first sentence of Article FOURTH of the Certificate of Incorporation of Wal-Mart Stores, Inc. is amended hereby to read as follows:

"FOURTH:   The total number of shares of all classes of stock which the Corporation shall have authority to issue is Forty-nine Million (49,000,000) shares, of which Forty-five Million (45,000,000) shares shall be

8150900000310

classified as Common Stock, of the par value of 10¢ per share (herein called "Common Stock"), and of which Four Million (4,000,000) shares shall be classified as Preferred Stock of the par value of 10¢ per share (herein called "Preferred Stock")."

Article FOURTH and the rest of the Certificate of Incorporation of Wal-Mart Stores, Inc., as amended, shall otherwise remain unchanged.

3.   This Amendment to the Certificate of Incorporation was set forth in a resolution duly adopted by the Board of Directors on August 21, 1980, which resolution declared the adoption of the Amendment to be advisable and which ordered that the Amendment be presented for approval by the stockholders of the corporation at a special meeting to be held November 14, 1980.  The said meeting of the stockholders was held pursuant to proper call and notice in accordance with section 222 of the General Corporation Law of the State of Delaware.  Of the 16,144,705 shares of the Common Stock which were issued, outstanding and entitled to vote at the meeting, a total of 12,492,440 shares were voted in favor of approval of the Amendment.  Thus, the corporation hereby certifies that this Amendment has been duly adopted in accordance with the provisions of section 242 of the General Corporation Law of the State of Delaware.

- 2 -

8150900000311

IN WITNESS WHEREOF, said WAL-MART STORES, INC. has
caused its corporate seal to be hereto affixed and this
Certificate to be signed by its Senior Vice President and
attested by its Assistant Secretary as of the 14th day of
November, 1980.

ATTEST:

WAL-MART STORES, INC.

By: _____
    S. Robson Walton
    Senior Vice President

Bette Hendrix
Assistant Secretary

(CORPORATE SEAL)

STATE OF ARKANSAS  )
                   ) ss.
COUNTY OF BENTON   )

        BEFORE ME, a Notary Public, in and for said State,
on this 14th day of November, 1980, personally appeared S. Rob-
son Walton, to me known to be the identical person who subscribed
the name of the maker thereof to the foregoing instrument as its
Senior Vice President and acknowledged to me that the facts stated
therein are true and that he executed the same as his free and
voluntary act and deed, and as the free and voluntary act and
deed of such corporation for the uses and purposes therein set
forth.

                              _____
                                 Notary Public

My Commission Expires:

May 3, 1984
_____

- 3 -

8150900000512

## STATE OF DELAWARE

## OFFICE OF SECRETARY OF STATE

I, GLENN C. KENTON, Secretary of State of the State of Delaware, do hereby certify that the above and foregoing pages numbered from 1 to 9, both numbers inclusive, is a true and correct copy of Certificate of Incorporation of the "WAL-MART, INC.", as received and filed in this office the thirty-first day of October, A.D. 1969, at 10 o'clock A.M.

And I do hereby further certify that the above and foregoing pages numbered from 1 to 6, both numbers inclusive, is a true and correct copy of Certificate of Amendment Before Payment of Capital of the "WAL-MART, INC.", as received and filed in this office the ninth day of January, A.D. 1970, at 10 o'clock A.M.

And I do hereby further certify that the above and foregoing pages numbered from 1 to 2, both numbers inclusive, is a true and correct copy of Certificate of Amendment of the "WAL-MART STORES, INC.", as received and filed in this office the fourteenth day of May, A.D. 1971, at 10 o'clock A.M.

And I do hereby further certify that the above and foregoing pages numbered from 1 to 2, both numbers inclusive, is a true and correct copy of Certificate of Amendment of the "WAL-MART STORES, INC.", as received and filed in this office the twenty-seventh day of March, A.D. 1972, at 10 o'clock A.M.

And I do hereby further certify that the above and foregoing pages numbered from 1 to 3, both numbers inclusive, is a true and correct copy of Certificate of Amendment of the "WAL-MART STORES, INC.", as received and filed in this office the eighteenth day of August, A.D. 1975, at 10 o'clock A.M.

And I do hereby further certify that the above and foregoing pages numbered from 1 to 3, both numbers inclusive, is a true and correct copy of Certificate of Amendment of the "WAL-MART STORES, INC.", as received and filed in this office the eighteenth day of November, A.D. 1980, at 10 o'clock A.M.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Dover this thirteenth day of July in the year of our Lord one thousand nine hundred and eighty-one.



Glenn C. Kenton, Secretary of State

Control No: J151025
Date Filed: 03/28/2012 04:50 PM
Brian P. Kemp
Secretary of State

# STATE OF GEORGIA
## 2012 Corporation Annual Registration

### OFFICE OF SECRETARY OF STATE
Annual Registration Filings
P.O. Box 23038
Columbus, Georgia 31902-3038

**Brian P. Kemp**
**Secretary of State**

### Information on record as of: 3/28/2012

**Entity Control No. J151025**       **Amount Due: $50.00**       **Amount Due *AFTER* April 1, 2012: $75.00**

WAL-MART STORES, INC.
702 SW 8th Street
Bentonville, AR 72716

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.**   Amount due for this entity is indicated above and below on the remittance form.  Annual fee is $50.  If amount is more than $50, the total reflects amount(s) due from previous year(s) and any applicable late fee(s).   **Renew by April 1, 2012**.  Your Annual Registration must be postmarked by April 1, 2012.  If your registration and payment are not postmarked by  April 1, 2012, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at www.georgiacorporations.org.  The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only.  Annual Registrations not processed online require payment with a check, certified bank check or money order.   **We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of State".   **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing.  Absolutely, no counter or starter checks will be accepted.  Failure to adhere to these guidelines will delay or possibly reject your filing.**  Checks that are dishonored by your bank are subject to a $30.00 NSF charge.  Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below.  Please verify "county of registered office."  If correct and complete, detach bottom portion, sign, and return with payment.  Or, enter changes as needed and submit.  Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.

**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office.  P.O. Boxes may be used for principal office and officers' addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing).  Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s).  For more information on Annual Registrations or to file online, visit www.georgiacorporations.org.   Or, call 404-656-2817.  **PLEASE PRINT LEGIBLY.**
Current information printed below. Review and update as needed. Detach original coupon and return with payment.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8th Street, Dept. 8887 M.S. #0555 | Bentonville | AR | 72716 |
| CEO:   Michael T. Duke | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| CFO:   Thomas Schoewe | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| SEC   Thomas D. Hyde | 702 SW 8th Street, Dept. 8687, M.S. #0555 | Bentonville | AR | 72716 |
| AGT   CORPORATION PROCESS COMPANY | 2180 Satellite Blvd | Duluth | GA | 30097 |

**IF ABOVE INFORMATION HAS CHANGES, TYPE OR PRINT CORRECTIONS BELOW:**

| | | | | |
|---|---|---|---|---|
| CORPORATION ADDRESS: | 702 SW 8th Street | Bentonville | AR | 72716 |
| CEO:   Michael T. Duke | 702 SW 8th Street | Bentonville | AR | 72716 |
| CFO:   Jeff Davis | 702 SW 8th Street | Bentonville | AR | 72716 |
| SEC:   Adele Lucas | 702 SW 8th Street | Bentonville | AR | 72716 |
| AGT: | | | GA | |

| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | *P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS* | COUNTY OF REGISTERED OFFICE:   Gwinnett | COUNTY CHANGE OR CORRECTION: |
|---|---|---|---|

| AUTHORIZED SIGNATURE: Kelly Lettmann | DATE:   3/28/2012 | **Total Due:** |
|---|---|---|
| TITLE:   Filer | EMAIL:   michelle.donato@wolterskluwer.com | **$50.00** |

BR201 2012 Corporation Annual Registration

126 J151025%7 0050009 WALMARTSTORESINCO0004 201204017 0050009



**Brian P. Kemp**
**Secretary of State**

**STATE OF GEORGIA**
**2013 Corporation Annual Registration**

OFFICE OF THE SECRETARY OF STATE
Annual Registration Filing
P.O. Box 23038
Columbus, Georgia 31902-3038

**Information on record as of: 1:49:28 PM**

**Entity Control No. J151025**          **Amount Due: $50.00**          **Amount Due AFTER April 1, 2013: $50.00**

WAL-MART STORES, INC.
702 SW 8th Street
Bentonville, Arkansas 72716

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.** Amount due for this entity is indicated above and below on the remittance form. Annual fee is $50. If amount is more than$50 , the total reflects amount(s) due from previous year(s) and any applicable late fee(s). **Renew by April 1,2013** Your Annual Registration must be postmarked by April 1,2013. If your registration and payment are not postmarked by April 1,2013, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at Http://www.sos.ga.gov/corporations/ The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only. Annual Registrations not processed online require payment with a check, certified bank check or money ord**er. We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of S t a t e " . **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing. Absolutely, no counter or starter checks will be accepted. Failure to adhere to these guidelines will delay or possibly reject your filing.** Checks that are dishonored by your bank are subject to a $30.00 NSF charge. Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.
**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Boxes may be used for principal office and officers'addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing). Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s). For more information on Annual Registrations or to file online, visit Http://www.sos.ga.gov/corporations/ Or, call 404-656-2817.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| : Michael T. Duke | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| : Jeff Davis | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| : Adele Lucas | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

**THE ABOVE INFORMATION HAS BEEN UPDATED TO:**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CEO: Michael Duke | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CFO: Jeff Davis | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| SEC: Jeffrey Gearhart | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

| AGT: CORPORATION PROCESS COMPANY | 2180 Satellite Blvd, Suite 400 | Duluth | Georgia | 30097 |
|---|---|---|---|---|
| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS | COUNTY OF REGISTERED OFFICE: Gwinnett County | | |
| AUTHORIZED SIGNATURE:   Kelly Lettmann | | Date:4/1/2013 1:49:24 PM | Total Due: | |
| Title:Attorney-in-Fact | Email: kelly.lettmann@wolterskluwer.com | | **$50.00** | |

BR201 2013 Corporation Annual Registration

135 J151025٤7 0050009 WALMARTSTORESINC00004 201304016 0075000



**Brian P. Kemp**
**Secretary of State**

**STATE OF GEORGIA**
**2014 Corporation Annual Registration**

| Secretary of State |
|---|
| Control No.: J151025 |
| Date Filed:3/12/2014 12:45:18 PM |

OFFICE OF THE SECRETARY OF STATE
Annual Registration Filing
P.O. Box 23038
Columbus, Georgia 31902-3038

**Information on record as of: 12:45:20 PM**

**Entity Control No. J151025**                    **Amount Due: $50.00**                    **Amount Due AFTER June 1, 2014: $75.00**

WAL-MART STORES, INC.
702 SW 8th Street
Bentonville, Arkansas 72716

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.** Amount due for this entity is indicated above and below on the remittance form. Annual fee is $50. If amount is more than$50 , the total reflects amount(s) due from previous year(s) and any applicable late fee(s). **Renew by April 1,2013** Your Annual Registration must be postmarked by June 1,2014. If your registration and payment are not postmarked by June 1,2014, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at Http://www.sos.ga.gov/corporations/ The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only. Annual Registrations not processed online require payment with a check, certified bank check or money orde**r. We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of S t a t e " . **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing. Absolutely, no counter or starter checks will be accepted. Failure to adhere to these guidelines will delay or possibly reject your filing.** Checks that are dishonored by your bank are subject to a $30.00 NSF charge. Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.
**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Boxes may be used for principal office and officers'addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing). Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s). For more information on Annual Registrations or to file online, visit Http://www.sos.ga.gov/corporations/ Or, call 404-656-2817.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8th Street | Bentonville | AR | 72716 |
| CEO: Michael Duke | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CFO: Jeff Davis | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| SEC: Jeffrey Gearhart | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

**THE ABOVE INFORMATION HAS BEEN UPDATED TO:**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CEO: Michael Duke | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CFO: Jeffrey  A.  Davis | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| SEC: Jeffrey Gearhart | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

| AGT: CORPORATION PROCESS COMPANY | 2180 Satellite Blvd., Suite 400 | Duluth | Georgia | 30097 |
|---|---|---|---|---|
| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS | COUNTY OF REGISTERED OFFICE: | Gwinnett County | |
| AUTHORIZED SIGNATURE:   Kelly Lettmann | | Date:3/12/2014 12:45:18 PM | Total Due: | |
| Title:Attorney-in-Fact | Email: kelly.lettmann@wolterskluwer.com | **$50.00** | | |

BR201 2013 Corporation Annual Registration

144 J15102527 0050009 WALMARTSTORESINC00004 201406013 0075000



**Brian P. Kemp**
**Secretary of State**

**STATE OF GEORGIA**
**2015 Corporation Annual Registration**

OFFICE OF THE SECRETARY OF STATE
Annual Registration Filing
P.O. Box 23038
Columbus, Georgia 31902-3038

Secretary of State
Control No.: J151025
Date Filed:3/19/2015 4:08:34 PM

**Information on record as of: 4:08:37 PM**

**Entity Control No.: J151025**          **Amount Due: $50.00**          **Amount Due AFTER April 1, 2015: $75.00**

WAL-MART STORES, INC.
702 SW 8th Street
Bentonville, Arkansas 72716

**Each business entity registered or filed with the Office of Secretary of State is required to file an annual registration.** Amount due for this entity is indicated above and below on the remittance form. Annual fee is $50. If amount is more than$50 , the total reflects amount(s) due from previous year(s) and any applicable late fee(s). **Renew by April 1,2015** Your Annual Registration must be postmarked by April 1,2015. If your registration and payment are not postmarked by April 1,2015, you will be assessed a $25.00 late filing penalty fee.

For faster processing, we invite you to file your Annual Registration online with a credit card at Http://www.sos.ga.gov/corporations/ The Corporations Division accepts Visa, MC, Discover, American Express and ATM/Debit Cards with the Visa or MC logo for online filings only. Annual Registrations not processed online require payment with a check, certified bank check or money orde**r. We cannot accept cash for payment.**

You may mail your registration in by submitting the bottom portion of this remittance with a check or money order payable to "Secretary of S t a t e " . **All checks must be pre-printed with a complete address in order to be accepted by our offices for your filing. Absolutely, no counter or starter checks will be accepted. Failure to adhere to these guidelines will delay or possibly reject your filing.** Checks that are dishonored by your bank are subject to a $30.00 NSF charge. Failure to honor your payment could result in a civil suit filed against you and/or your entity may be Administratively Dissolved by the Secretary of State. [See O.C.G.A. § 13-6-15 and Title 14, respectively.]

Officer, address and Agent information currently of record is listed below. Please verify "county of registered office." If correct and complete, detach bottom portion, sign, and return with payment. Or, enter changes as needed and submit. Complete each line, even if the same individual serves as Chief Executive Officer, Chief Financial Officer, and Secretary of the corporation.
**Note: Registered Agent address must be a street address in Georgia where the agent may be served personally. A mail drop or P.O. Box does not comply with Georgia law for registered office. P.O. Boxes may be used for principal office and officers'addresses.**

Any person authorized by the entity to do so may sign and file registration (including online filing). Additionally, a person who signs a document submits an electronic filing he or she knows is false in any material respect with the intent that the document be delivered to the Secretary of State for filing shall be guilty of a misdemeanor and, upon conviction thereof, shall be punished to the highest degree permissible by law. [O.C.G.A. § 14-2-129.]

Please return ONLY the original form below and applicable fee(s). For more information on Annual Registrations or to file online, visit Http://www.sos.ga.gov/corporations/ Or, call 404-656-2817.

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8th Street | Bentonville | AR | 72716 |
| CEO: Michael Duke | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CFO: Jeffrey  A.  Davis | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| SEC: Jeffrey Gearhart | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

**THE ABOVE INFORMATION HAS BEEN UPDATED TO:**

| CORPORATION NAME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|
| WAL-MART STORES, INC. | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CEO: Doug  McMillon | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| CFO: Jeffrey  A.  Davis | 702 SW 8th Street | Bentonville | Arkansas | 72716 |
| SEC: Jeffrey Gearhart | 702 SW 8th Street | Bentonville | Arkansas | 72716 |

| AGT: CORPORATION PROCESS COMPANY | 2180 Satellite Blvd., Suite 400 | Duluth | Georgia | 30097 |
|---|---|---|---|---|
| I CERTIFY THAT I AM AUTHORIZED TO SIGN THIS FORM AND THAT THE INFORMATION IS TRUE AND CORRECT. | P.O. BOX NOT ACCEPTABLE FOR REGISTERED AGENT'S ADDRESS | COUNTY OF REGISTERED OFFICE: | Gwinnett County | |

153 J151025%7 0050009 WALMARTSTORESINCO0004 201504014 0075000

153 J151025%7 0050009 WALMARTSTORESINC00004 201504014 0075000

| AUTHORIZED SIGNATURE:   Kelly Lettmann | | Date:3/19/2015 4:08:54 PM | Total Due: |
|---|---|---|---|
| Title:Attorney-in-Fact | Email: kelly.lettmann@wolterskluwer.com | | **$50.00** |

BR201 2015 Corporation Annual Registration

153 J151025%7 0050009 WALMARTSTORESINCO0004 201504014 0075000

153 J15102527 0050009 WALMARTSTORESINCO0004 201504014 0075000

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**ANNUAL REGISTRATION**

*Electronically Filed*
Secretary of State
Filing Date: 3/9/2016 6:05:41 PM

| BUSINESS INFORMATION | |
|---|---|
| CONTROL NUMBER | J151025 |
| BUSINESS NAME | WAL-MART STORES, INC. |
| BUSINESS TYPE | Foreign Profit Corporation |
| EFFECTIVE DATE | 03/09/2016 |

| PRINCIPAL OFFICE ADDRESS | |
|---|---|
| ADDRESS | 702 SW 8th Street, Bentonville, AR, 72716, USA |

| REGISTERED AGENT'S NAME AND ADDRESS | |
|---|---|
| **NAME** | **ADDRESS** |
| CORPORATION PROCESS COMPANY | 2180 Satellite Blvd., Suite 400, Gwinnett, Duluth, GA, 30097, USA |

| OFFICERS INFORMATION | | |
|---|---|---|
| **NAME** | **TITLE** | **ADDRESS** |
| Doug McMillon | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Jeffrey Gearhart | SECRETARY | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Jeffrey A. Davis | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

| AUTHORIZER INFORMATION | |
|---|---|
| AUTHORIZER SIGNATURE | Kelly Lettmann |
| AUTHORIZER TITLE | Attorney In Fact |



Brian P. Kemp
Secretary of State

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 02/15/2017 18:25:11

## BUSINESS INFORMATION

| | |
|---|---|
| **BUSINESS NAME** | : WAL-MART STORES, INC. |
| **CONTROL NUMBER** | : J151025 |
| **BUSINESS TYPE** | : Foreign Profit Corporation |
| **JURISDICTION** | : Delaware |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | |
|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : 702 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : CORPORATION PROCESS COMPANY |
| **REGISTERED OFFICE ADDRESS** | : 2180 Satellite Blvd., Suite 400, Gwinnett, Duluth, GA, 30097, USA |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| Doug McMillon | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Jeffrey Gearhart | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Jeffrey Davis, A. | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | |
|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| **REGISTERED AGENT NAME** | : CORPORATION PROCESS COMPANY |
| **REGISTERED OFFICE ADDRESS** | : 2180 Satellite Blvd., Suite 400, Gwinnett, Duluth, GA, 30097, USA |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| Michael Duke | CEO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Jeffrey Gearhart | Secretary | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Jeffrey Davis, A. | CFO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |

## AUTHORIZER INFORMATION

| | |
|---|---|
| **AUTHORIZER SIGNATURE** | : Kelly Lettmann |
| **AUTHORIZER TITLE** | : Attorney In Fact |



**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
2 Martin Luther King Jr. Dr. SE
Suite 313 West Tower
Atlanta, Georgia 30334
(404) 656-2817

Brian P. Kemp
Secretary of State

## STATEMENT OF CHANGE OF ADDRESS
## OF REGISTERED OFFICE

Note: This form is to be used only for changing the address of a registered office, and is not to be used for changing the registered agent on file with the Secretary of State for an entity. **The filing fee is $5.00 per entity, with a minimum fee of $20.00.**

The undersigned registered agent submits this statement for the purpose of changing the address of the registered office for the entity listed below or the entities listed on an attachment to this statement:

1. **Name of Registered Agent:** Corporation Process Company

2. **Entity Information:**  ✓ Multiple entities are involved with this change of address. A typed list of the entity names in alphabetical order, control numbers, and entity types are attached.

   Entity Name: _____

   Entity Control Number: _____

   Entity Type (check one only):

   ☐ Domestic Corporation (Profit, Nonprofit, or Professional)        ☐ Foreign Corporation (Profit, Nonprofit, or Professional)

   ☐ Domestic Limited Liability Company                                ☐ Foreign Limited Liability Company

   ☐ Domestic Limited Partnership/Limited Liability Limited Partnership  ☐ Foreign LP/LLLP

   ☐ Foreign Limited Liability Partnership

3. **Current street address and county of registered office:**

   Address: 2180 Satellite Blvd, Suite 400
   _____

   City: Duluth                    County: Gwinnett                    State: GA   Zip Code: 30097

4. **New street address and county of registered office:** email address: FFInboxATL@wolterskluwer.com

   Address: C T Corporation System

   289 S Culver St

   City: Lawrenceville              County: Gwinnett                    State: GA   Zip Code: 30046-4805

5. The address of the entity's registered office and the business address of the registered agent, as changed, will be identical.

6. **Statement of notification:** The undersigned certifies that written notice of the registered agent's change of address or a copy of this statement has been delivered or mailed to the above-named entity in accordance with the applicable provisions of the Official Code of Georgia Annotated.

7. I hereby certify, under penalty of law, that the above information is true and correct.

   _Marie Hauer_                                            4/26/17
   Signature of Registered Agent                            Date

   Marie Hauer                                              Asst. Secy.
   Print Name                                               Title (if signing for an entity)

**Form RA-2**
(9/2016)



**OFFICE OF SECRETARY OF STATE**
**CORPORATIONS DIVISION**
2 Martin Luther King Jr. Dr. SE
Suite 313 West Tower
Atlanta, Georgia 30334
(404) 656-2817

Brian P. Kemp
Secretary of State

## MASS REGISTERED AGENT NAME CHANGE

1.  **Name of Registered Agent on file with the Secretary of State:**

    Corporation Process Company

2.  **Entity Information:** Multiple entities are involved with this change. A typed list of the entity names, with corresponding control numbers and entity types, is attached.

3.  **New Name of Registered Agent:**

    C T Corporation System

4.  I hereby certify, under penalty of law, that the above information is true and correct.

    *Marie Hauer*

    Signature of Registered Agent

    7/13/17
    Date

    Marie Hauer on behalf of C T Corporation System
    Print Name

    Assistant Secretary
    Title (if signing for an entity)

Form RA-3
(6/2017)

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 02/01/2018 12:36:39

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | WAL-MART STORES, INC. |
| **CONTROL NUMBER** | : | J151025 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Delaware |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| **REGISTERED AGENT NAME** | : | C T Corporation System |
| **REGISTERED OFFICE ADDRESS** | : | 289 S Culver St, Gwinnett, Lawrenceville, GA, 30046-4805, USA |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| Jeffrey Gearhart | Secretary | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Jeffrey A. Davis | CFO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| Michael Duke | CEO | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA |
| **REGISTERED AGENT NAME** | : | C T Corporation System |
| **REGISTERED OFFICE ADDRESS** | : | 289 S Culver St, Gwinnett, Lawrenceville, GA, 30046-4805, USA |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| Gordon Y. Allison | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| C. Douglas McMillon | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |

## AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Gordon Y. Allison |
| **AUTHORIZER TITLE** | : | Officer |

Control Number : J151025

# STATE OF GEORGIA

## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

## AMENDED CERTIFICATE OF AUTHORITY
### NAME CHANGE

I, **Brian P. Kemp**, the Secretary of State and the Corporation Commissioner of the State of Georgia, hereby certify under the seal of my office that

### WAL-MART STORES, INC.
**a Foreign Profit Corporation**

formed under the laws of the State of **Delaware** and authorized to transact business in Georgia on **07/20/1981**, has amended its application to transact business in this state by the filing of an amendment changing its name to

### Walmart INC.
**a Foreign Profit Corporation**

and by the paying of fees as provided by Title 14 of the Official Code of Georgia Annotated. Attached hereto is a true and correct copy of said application.

WITNESS my hand and official seal in the City of Atlanta and the State of Georgia on **03/01/2018**.



Brian P. Kemp
Secretary of State

**APPLICATION FOR AMENDED CERTIFICATE OF AUTHORITY**

*Electronically Filed*
Secretary of State
Filing Date: 2/1/2018 12:47:08 PM

| Business Information | |
| --- | --- |
| Business Name | : WAL-MART STORES, INC. |
| Control Number | : J151025 |
| Business Type | : Foreign Profit Corporation |
| Home Jurisdiction | : Delaware |
| Name in Home Jurisdiction | : Walmart, Inc. |
| Date of Authorization in Georgia | : 07/20/1981 |

| Amended Business Information | |
| --- | --- |
| New Business Name | : Walmart INC. |
| Effective Date | : 02/01/2018 |

| Authorizer Information | |
| --- | --- |

**Authorizer Signature :**  Gordon Y. Allison          **Authorizer Title :**  Officer



# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "WALMART INC." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIRST DAY OF FEBRUARY, A.D. 2018.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

732109  8300

SR# 20180644624

Authentication: 202073056

Date: 02-01-18

You may verify this certificate online at corp.delaware.gov/authver.shtml

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Amended Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 3/2/2018 11:01:46 AM

## BUSINESS INFORMATION

**BUSINESS NAME**      : Walmart INC.
**CONTROL NUMBER**     : J151025
**BUSINESS TYPE**      : Foreign Profit Corporation
**FILING TYPE**        : Amended Annual Registration

## CURRENT INFORMATION ON FILE FOR PRINCIPAL ADDRESS, REGISTERED AGENT, AND OFFICERS

**PRINCIPAL OFFICE ADDRESS**    : 124 West Capitol Avenue, Suite 1900, Little Rock, AR, 72201, USA
**REGISTERED AGENT NAME**       : C T Corporation System
**AGENT ADDRESS**               : 289 S Culver St, Gwinnett, Lawrenceville, GA, 30046-4805, USA

| OFFICER | TITLE | ADDRESS |
|---------|-------|---------|
| C. Douglas McMillon | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

## CHANGES TO THE ABOVE CURRENT INFORMATION ARE INDICATED BELOW

**PRINCIPAL OFFICE ADDRESS**    : 702 SW 8th Street, Bentonville, AR, 72716, USA
**REGISTERED AGENT NAME**       : C T Corporation System
**AGENT ADDRESS**               : 289 S Culver St, Gwinnett, Lawrenceville, GA, 30046-4805, USA

| OFFICER | TITLE | ADDRESS |
|---------|-------|---------|
| C. Douglas McMillon | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

**After the above change(s) are made, the address of the entity's registered office and the business address of the registered agent will be identical.**

**AUTHORIZER INFORMATION**

**AUTHORIZER SIGNATURE**      :  Gordon Y. Allison

**AUTHORIZER TITLE**      :  Officer

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Amended Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 9/28/2018 2:42:44 PM

### BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | Walmart INC. |
| **CONTROL NUMBER** | : | J151025 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **FILING TYPE** | : | Amended Annual Registration |

### CURRENT INFORMATION ON FILE FOR PRINCIPAL ADDRESS, REGISTERED AGENT, AND OFFICERS

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | C T Corporation System |
| **REGISTERED OFFICE ADDRESS** | : | 289 S Culver St, Lawrenceville, GA, 30046-4805, USA |
| **REGISTERED OFFICE COUNTY** | : | Gwinnett |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

### CHANGES TO THE ABOVE CURRENT INFORMATION ARE INDICATED BELOW

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

**After the above change(s) are made, the address of the entity's registered office and the business address of the**

**registered agent will be identical.**

## AUTHORIZER INFORMATION

**AUTHORIZER SIGNATURE**       : Kelly Lettman

**AUTHORIZER TITLE**       : Attorney In Fact

# STATE OF GEORGIA

## Secretary of State

### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/13/2019 16:43:03

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | Walmart INC. |
| **CONTROL NUMBER** | : | J151025 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Delaware |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 702 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 702 SW 8th Street, Bentonville, AR, 72716, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| Matthew Allen | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| C. Douglas McMillon | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Kelly Lettmann |
| **AUTHORIZER TITLE** | : | Attorney In Fact |

# STATE OF GEORGIA

## Secretary of State

### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/29/2020 11:50:13

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | Walmart INC. |
| **CONTROL NUMBER** | : | J151025 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Delaware |
| **ANNUAL REGISTRATION PERIOD** | : | 2020 |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Matthew Allen | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Kelly Lettmann |
| **AUTHORIZER TITLE** | : | Attorney In Fact |

# STATE OF GEORGIA

## Secretary of State

### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 02/27/2021 09:40:49

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | Walmart INC. |
| **CONTROL NUMBER** | : | J151025 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Delaware |
| **ANNUAL REGISTRATION PERIOD** | : | 2021 |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Gordon Y. Allison | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 112 NORTH MAIN STREET, CUMMING, GA, 30040, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Rachel Brand | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Michael Brett Biggs | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Kelly Lettmann |
| **AUTHORIZER TITLE** | : | Attorney In Fact |

**STATEMENT OF CHANGE OF ADDRESS
OF REGISTERED OFFICE**

*Electronically Filed*
Secretary of State
Filing Date: 04/05/2021 09:05:17 AM

## REGISTERED AGENT INFORMATION

**NAME OF REGISTERED AGENT**     THE CORPORATION COMPANY (FL)

## ENTITY INFORMATION

Multiple entities are involved with this change of address.

## NEW STREET ADDRESS AND COUNTY OF REGISTERED OFFICE

**REGISTERED OFFICE ADDRESS**     106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794, USA

**REGISTERED OFFICE COUNTY**     Forsyth

## STATEMENTS

- The address of the entity's registered office and the business address of the registered agent, as changed, will be identical.
- **Statement of notification:** The undersigned certifies that written notice of the registered agent's change of address or a copy of this statement has been delivered or mailed to the above-named entity in accordance with the applicable provisions of the Official Code of Georgia Annotated.

## AUTHORIZER INFORMATION

**AUTHORIZER SIGNATURE**     The Corporation Company (FL)

**AUTHORIZER TITLE**     Registered Agent

# STATE OF GEORGIA

## Secretary of State

### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/23/2022 17:00:30

### BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | Walmart INC. |
| **CONTROL NUMBER** | : | J151025 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Delaware |
| **ANNUAL REGISTRATION PERIOD** | : | 2022 |

### BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Michael Brett Biggs | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Rachel Brand | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |

### UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Jessica Rancher | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |

### AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Kelly Lettmann |
| **AUTHORIZER TITLE** | : | Attorney In Fact |

# STATE OF GEORGIA
## Secretary of State
### Corporations Division
### 313 West Tower
### 2 Martin Luther King, Jr. Dr.
### Atlanta, Georgia 30334-1530

**Annual Registration**

*Electronically Filed*
Secretary of State
Filing Date: 03/26/2023 05:23:13

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **BUSINESS NAME** | : | Walmart INC. |
| **CONTROL NUMBER** | : | J151025 |
| **BUSINESS TYPE** | : | Foreign Profit Corporation |
| **JURISDICTION** | : | Delaware |
| **ANNUAL REGISTRATION PERIOD** | : | 2023 |

## BUSINESS INFORMATION CURRENTLY ON FILE

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| Jessica Rancher | Secretary | 708 SW 8th Street, Bentonville, AR, 72716, USA |
| M. Brett Biggs | CFO | 708 SW 8th Street, Bentonville, AR, 72716, USA |

## UPDATES TO ABOVE BUSINESS INFORMATION

| | | |
|---|---|---|
| **PRINCIPAL OFFICE ADDRESS** | : | 702 SW 8th St., Bentonville, AR, 72716, USA |
| **REGISTERED AGENT NAME** | : | THE CORPORATION COMPANY (FL) |
| **REGISTERED OFFICE ADDRESS** | : | 106 Colony Park Drive Ste. 800-B, Cumming, GA, 30040-2794, USA |
| **REGISTERED OFFICE COUNTY** | : | Forsyth |

| OFFICER | TITLE | ADDRESS |
|---|---|---|
| C. Douglas McMillon | CEO | 702 SW 8th St, Bentonville, AR, 72716, USA |
| Jessica Rancher | Secretary | 702 SW 8th St, Bentonville, AR, 72716, USA |
| John David Rainey | CFO | 702 SW 8th St, Bentonville, AR, 72716, USA |

## AUTHORIZER INFORMATION

| | | |
|---|---|---|
| **AUTHORIZER SIGNATURE** | : | Kelly Lettmann |
| **AUTHORIZER TITLE** | : | Attorney In Fact |

# EXHIBIT



# Notice of Rejected Service of Process



September 01, 2023

**Notice of Rejected Service of Process – Log# 544454861**

RECEIVED
1008494
SEP 5 2023

Agent Served:   C T Corporation
Party Served:   Walmart Claims Services, Inc.
Jurisdiction Served:   Georgia
Title of Action:   Re: NISHIJIMA MARIA // To: Walmart Claims Services, Inc.
Case No.   23CV12001

Dear Sir/Madam:

We have received documents from you in the above-referenced matter, but we are not able to forward the documents to any party due to the reason indicated below.

☑ Not Agent: According to our records and/or the records of the Secretary of State, we are not the registered agent for the party you are attempting to serve.

☐ Documents Do Not Correctly Identify the Intended Recipient: The name of the party that you are trying to serve appears to be incomplete and/or there are other errors in how you have identified the party that you are trying to serve. Our company is the registered agent for service of process for hundreds of thousands of entities, and because of your errors in identifying the party that you are trying to serve, we are unable to determine the identity of the party that you are attempting to serve.

☐ Inactive Entity: The entity that you are attempting to serve is either discontinued on our records and/or inactive with the Secretary of State. Accordingly, we no longer have any active agreement with the entity to operate as its registered agent for service of process, and we no longer have current delivery instructions on file.

To be clear, for the aforementioned reason(s), we have not been able to forward the documents that you are attempting to serve to any party. We are writing this letter to you so that you can take action to address the problems that we have identified. If you do not correct the errors identified herein, the party you are trying to serve will not receive notice of these documents.

Please email SOPInquiries@wolterskluwer.com if you believe that you have received this letter in error or if you need further assistance.

Very truly yours,
C T Corporation System

**(Returned To)**

Hung Q. (Alex) Nguyen
770Goodlaw, H.Q. Alex Nguyen Law Firm, LLC
5495 Jimmy Carter Blvd., Ste. B-17,
Norcross, GA  30093

# EXHIBIT



# Defendant Walmart Inc.'s
# Corporate Disclosure
# Statement

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

MARIA NISHIJIMA,                    )
                                    )        Civil Action No.
    Plaintiff,                  )
                                    )        2:24-cv-040-SCJ
WALMART INC., John Doe, Jane        )
Doe, and ABC Corp.                  )
                                    )
    Defendants.                 )

DEFENDANT WALMART INC.'S
<u>CORPORATE DISCLOSURE STATEMENT</u>

COMES NOW, Defendant Walmart Inc., through its undersigned counsel of record, and, pursuant to Fed. R. Civ. P. 7.1 and to Local Rule 87.1, hereby discloses the following subsidiary corporations of Defendant Walmart Inc.:

- ASDA Group Limited

- Beaver Lake Aviation, Inc.

- Bharti Walmart Private Limited

- Central American Retail Holding Company N.V.

- Walmart Claims Services, Inc. (formerly known as Claims Management, Inc.)

- Corporacion de Companias Agroindustriales

- Corporacion de Supermercados Unidos S.A.

- Distribucion y Servicio D&S S.A.

- La Fruga S.A.

- Massmart Holdings Ltd.

- Sam's East, Inc.

- Sam's Real Estate Business Trust

- Sam's West, Inc.

- Texas Retail Energy, LLC

- The Seiyu, Ltd.

- Wal-Mart Argentina S.R.L.

- Wal-Mart Associates, Inc.

- Wal-Mart Brasil, Ltda.

- Wal-Mart Canada Corp.

- Wal-Mart China Co., Ltd.

- Walmart de México, S.A. de C.V.

- Wal-Mart Leasing, Inc.

- Wal-Mart Louisiana, LLC

- Wal-Mart Puerto Rico, Inc.

- Wal-Mart Real Estate Business Trust

- Wal-Mart Stores Arkansas, LLC

- Wal-Mart Stores East, LP

- Wal-Mart Stores Texas, LLC

- Wal-Mart Transportation, LLC

- Wal-Mart.com USA, LLC

- WMS Supermercados do Brasil, S.A. (formerly Sonae Distribuicao Brasil S.A.)

No publicly held company owns 10% or more of this Defendant's stock.


Respectfully submitted this <u>27</u> of March, 2024.

<div style="text-align:right">

WALDON ADELMAN CASTILLA
MCNAMARA & PROUT

<u>/s/ Matthew J. Hurst</u>
Matthew J. Hurst
Georgia Bar No. 480267
Attorney for Walmart Inc.

</div>

900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(770) 953-1710
mhurst@waldonadelman.com

## **5.1 CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that the foregoing Defendant Walmart Inc.'s Corporate Disclosure Statement has been prepared with one of the font and point selections approved by the court in LR 5.1B.


This <u>27</u> of March, 2024.

<div style="margin-left:40%">

WALDON ADELMAN CASTILLA
MCNAMARA & PROUT

<u>/s/ Matthew J. Hurst</u>
Matthew J. Hurst
Georgia Bar No. 480267
Attorney for Walmart Inc.

</div>

900 Circle 75 Parkway
Suite 1040
Atlanta, Georgia 30339
(770) 953-1710
mhurst@waldonadelman.com

# EXHIBIT

# Z

Screenshot of walmartclaimsservices.com and Domain Record Information

Home >   Whois Lookup >   WalmartClaimsServices.com

## Whois Record for WalmartClaimsServices.com

**—** Domain Profile

| | |
|---|---|
| Registrar | MarkMonitor, Inc. MarkMonitor Inc.<br>IANA ID: 292<br>URL: http://www.markmonitor.com<br>Whois Server: whois.markmonitor.com<br>abusecomplaints@markmonitor.com<br>(p) +1.2086851750 |
| Registrar Status | clientDeleteProhibited, clientTransferProhibited, clientUpdateProhibited |
| Dates | 1,535 days old<br>Created on 2019-10-16<br>Expires on 2025-10-16<br>Updated on 2023-09-14 |
| Name Servers | PDNSWM1.ULTRADNS.NET. (has 77,571 domains)<br>PDNSWM1.ULTRADNS.NET. (has 77,571 domains)<br>PDNSWM2.ULTRADNS.NET. (has 77,571 domains)<br>PDNSWM2.ULTRADNS.NET. (has 77,571 domains)<br>PDNSWM3.ULTRADNS.ORG. (has 201 domains)<br>PDNSWM3.ULTRADNS.ORG. (has 201 domains)<br>PDNSWM4.ULTRADNS.ORG. (has 201 domains)<br>PDNSWM4.ULTRADNS.ORG. (has 201 domains)<br>PDNSWM5.ULTRADNS.INFO. (has 33 domains)<br>PDNSWM5.ULTRADNS.INFO. (has 33 domains)<br>PDNSWM6.ULTRADNS.CO.UK. (has 840 domains)<br>PDNSWM6.ULTRADNS.CO.UK. (has 840 domains) |
| IP Address | 23.44.248.228 - 2 other sites hosted on this server |
| IP Location | - Washington - Seattle - Akamai Technologies Inc. |
| ASN | AS16625 AKAMAI-AS, US (registered May 30, 2000) |
| Domain Status | Registered And No Website |
| IP History | 250 changes on 250 unique IP addresses over 3 years |
| Registrar History | 1 registrar |
| Hosting History | 2 changes on 3 unique name servers over 4 years |

Whois Record ( last updated on 2023-12-29 )

```
Domain Name: walmartclaimsservices.com
Registry Domain ID: 2444172577_DOMAIN_COM-VRSN
Registrar WHOIS Server: whois.markmonitor.com
Registrar URL: http://www.markmonitor.com
Updated Date: 2023-09-14T09:52:58+0000
Creation Date: 2019-10-16T16:49:54+0000
Registrar Registration Expiration Date: 2025-10-16T00:00:00+0000
Registrar: MarkMonitor, Inc.
Registrar IANA ID: 292
Registrar Abuse Contact Email: abusecomplaints@markmonitor.com
Registrar Abuse Contact Phone: +1.2086851750
Domain Status: clientUpdateProhibited (https://www.icann.org/epp#clientUpdateProhibited)
Domain Status: clientTransferProhibited (https://www.icann.org/epp#clientTransferProhibited)
Domain Status: clientDeleteProhibited (https://www.icann.org/epp#clientDeleteProhibited)
Registrant Organization: Wal-Mart Stores, Inc.
Registrant State/Province: AR
Registrant Country: US
Registrant Email: Select Request Email Form at
https://domains.markmonitor.com/whois/walmartclaimsservices.com
Admin Organization: Wal-Mart Stores, Inc.
Admin State/Province: AR
Admin Country: US
Admin Email: Select Request Email Form at
https://domains.markmonitor.com/whois/walmartclaimsservices.com
Tech Organization: Wal-Mart Stores, Inc.
Tech State/Province: AR
Tech Country: US
Tech Email: Select Request Email Form at
https://domains.markmonitor.com/whois/walmartclaimsservices.com
Name Server: pdnswm6.ultradns.co.uk.
Name Server: pdnswm1.ultradns.net.
Name Server: pdnswm3.ultradns.org.
Name Server: pdnswm4.ultradns.org.
Name Server: pdnswm2.ultradns.net.
Name Server: pdnswm5.ultradns.info.
DNSSEC: unsigned
URL of the ICANN WHOIS Data Problem Reporting System: http://wdprs.internic.net/

For more information on WHOIS status codes, please visit:
  https://www.icann.org/resources/pages/epp-status-codes
```

```
MarkMonitor Domain Management(TM)
Protecting companies and consumers in a digital world.

Visit MarkMonitor at https://www.markmonitor.com
Contact us at +1.8007459229
In Europe, at +44.02032062220
```



**Tools**

| Hosting History |  |
| --- | --- |
| Monitor Domain Properties | ▼ |
| Reverse IP Address Lookup | ▼ |
| Network Tools | ▼ |
| Visit Website |  |
| ⬇ Preview the Full Domain Report |  |

**Available TLDs**

| General TLDs | Country TLDs |

The following domains are available through our preferred partners. Select domains below for more information. (3rd party site)

☐ Taken domain.
☐ Available domain.
☐ Deleted previously owned domain.

| WalmartClaimsServic... | View Whois |
| WalmartClaimsServic... | View Whois |
| WalmartClaimsServic... | View Whois |
| WalmartClai...rvices.i... | View Whois |
| WalmartClaimsServic... | View Whois |
| WalmartClaimsServic... | View Whois |

🔊  f  🐦  in

Sitemap    Blog    Terms    Privacy    Contact    California Privacy Notice    Do Not Sell My Personal Information    © 2023 DomainTools

# EXHIBIT

# AA

Screenshots of
corporate.walmart.com



Home > Walmart Claims Services Privacy Notice

# Walmart Claims Services Privacy Notice

Updated: Jan. 1, 2023
This Notice is also available in Spanish.

## We Recently Updated Our Privacy Notice

Updates include:

- Addition of Virginia Privacy Rights section
- Updated California Privacy Rights section
- Addition of section about how long we keep your information

Walmart Claims Services, Inc. (d.b.a. "Arkansas Claims Management, Inc." in some locations) is the casualty claims administrator for Walmart Inc., its subsidiaries and affiliates ("Walmart"), family of companies), and Walmart's insurance carriers. We recognize the importance of information privacy. We strive to manage personal information in accordance with our core value of respect for the individual. This Notice describes:

- Why we collect your personal information.
- How your information is used and protected.
- When and with whom we disclose your information.

We do not sell or rent your personal information to third parties for money. If you have any questions about this Privacy Notice, please contact us as described in the

We Recently Updated Our Privacy Notice

Information We Collect

How We Collect Information

How We Use Your Information

How We Disclose Your Information

How Long We Retain Your Information

How We Secure Your Information

State Privacy Rights

Changes to This Privacy Notice

Contact Us

Home  >  Walmart Claims Services Privacy Notice

# Walmart Claims Services Privacy Notice

Updated: Jan. 1, 2023
This Notice is also available in Spanish.

## We Recently Updated Our Privacy Notice

Updates include:

- Addition of Virginia Privacy Rights section
- Updated California Privacy Rights section
- Addition of section about how long we keep your information

Walmart Claims Services, Inc. (d.b.a. "Arkansas Claims Management, Inc." in some locations) is the casualty claims administrator for Walmart Inc., its subsidiaries and affiliates ("Walmart"), family of companies), and Walmart's insurance carriers. We recognize the importance of information privacy. We strive to manage personal information in accordance with our core value of respect for the individual. This Notice describes:

- Why we collect your personal information.
- How your information is used and protected.
- When and with whom we disclose your information.

We do not sell or rent your personal information to third parties for money. If you have any questions about this Privacy Notice, please contact us as described in the section entitled Contact Us below.

## Information We Collect

We collect personal information from you and others to appropriately administer Workers' Compensation and liability claims involving Walmart. We also must adhere to various legal requirements concerning claims administration and reporting - including reporting of Workers' Compensation claim data, Medicare reporting requirements, Child Support Lien Network data matching, claim fraud detection and prevention, and applicable HIPAA requirements.

Personal information is information that identifies you or reasonably can be linked to information that identifies you. Some laws define "personal information" differently, and we use those definitions when they are applicable. Rest assured, though, that no matter where you live, we treat your personal information with respect, and we collect, use, and disclose it only as described in this Notice. The personal information we collect includes contact information like name, address, and phone numbers.

We may collect or receive the following categories of personal information. Not all categories may be collected or received about every individual:

- Personal identifiers, such as name and address
- Device and online identifiers and related information, such as telephone number and email address
- Internet, application, and network activity, such as cookie IDs and browser visits
- Government identifiers, such as national identification numbers and driver's license numbers
- Demographic information, such as age and date of birth
- Financial information, such as credit and debit card numbers and claims information
- Health and health insurance information, such as prescription numbers and health insurance identification numbers
- Characteristics of protected classifications under state or federal law, such as gender and nationality
- Purchase history information, such as products you have bought, rented, and returned
- Audio, visual, and other sensory information, such as audio and video recordings
- Employment information, such as occupation, title, licenses and professional memberships

- Background and criminal information, such as background checks and criminal convictions
- Education information, such as degree and schooling information
- Individual preferences and characteristics, such as inferences related to shopping patterns and behaviors

# How We Collect Information

We collect information from you in a variety of ways. It may be:

- Provided directly by you or a member of your household
- Collected from a device associated with you or your household
- Collected through in-store technology
- Collected from another company within our family of companies
- Collected from an external third-party source

Examples of third-party sources are entities that help prevent or detect fraud and entities that provide documentation concerning your claim including, but not limited to, records from healthcare providers.

# How We Use Your Information

Walmart Claims Services, Inc. uses your information to:

- Fulfill our legal function or obligations, such as administering claims
- Protect the security and integrity of our websites, mobile services and our business, and help prevent fraud
- Conduct business analysis, such as analytics, projections, identifying areas for operational improvement, such as maintaining public safety

Further examples include:

- Medicare Reporting
- Workers' Compensation data reporting to regulatory agencies
- Fraud detection and reporting
- Data matching with the Child Support Lien Network (CSLN)
- Reporting to Walmart and its insurance carriers
- Claim processing

# How We Disclose Your Information

All of the categories of personal information that we collect have been disclosed to other companies for a business purpose. When we disclose, the information will be used in ways that are consistent with this Notice. We may disclose information about you with insurance carriers and service providers who perform services on our behalf. These service providers are not authorized by us to use or disclose the information except as necessary to perform services on our behalf or comply with legal requirements. In addition, we may disclose information about you to disability or benefit plans sponsored by Walmart and the administrators of and service providers for such plans for purposes of administering disability benefits for which you may be entitled.

We also may disclose your information in certain other circumstances. These include situations when we believe in good faith that the law requires it or that the disclosure is necessary to protect the safety, property, or other rights of our associates, or any other person. Examples include:

- Protecting the health or safety of customers and associates;
- Addressing crimes committed on Walmart property;
- Identifying and addressing fraud or financial risk;
- Providing personal information from cameras to law enforcement at their written request;
- Responding to a search warrant or other valid legal inquiry; and
- Responding to an investigative body in the case of a breach of an agreement or violation of law.

| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Those we are legally required to disclose to |
| --- | --- |

**Categories of Personal Information Disclosed for a Business Purpose**

**Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose**

**Categories of Personal Information Disclosed for a Business Purpose**

**Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose**

| Categories of Personal Information Disclosed for a Business Purpose | |
|---|---|
| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Device and Online Identifiers |
| Categories of Personal Information Disclosed for a Business Purpose | |
| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Employment Information |
| Categories of Personal Information Disclosed for a Business Purpose | |
| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Financial Information |
| Categories of Personal Information Disclosed for a Business Purpose | |
| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Government Identifiers |
| Categories of Personal Information Disclosed for a Business Purpose | |
| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Health and Health Insurance Information |
| Categories of Personal Information Disclosed for a Business Purpose | |
| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Personal Identifiers |
| Categories of Personal Information Disclosed for a Business Purpose | |
| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Purchase History Information |
| Categories of Personal Information Disclosed for a Business Purpose | |
| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Service providers that receive data in order to provide services to us (e.g. technology providers, cloud storage providers, etc.) |

**Categories of Personal Information Disclosed for a Business Purpose**

---

**Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose**

**Categories of Personal Information Disclosed for a Business Purpose**

**Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose**

| Categories of Personal Information Disclosed for a Business Purpose |
| --- |

| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Device and Online Identifiers |
| --- | --- |
| **Categories of Personal Information Disclosed for a Business Purpose** | |

| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Employment Information |
| --- | --- |
| **Categories of Personal Information Disclosed for a Business Purpose** | |

| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Financial Information |
| --- | --- |
| **Categories of Personal Information Disclosed for a Business Purpose** | |

| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Government Identifiers |
| --- | --- |
| **Categories of Personal Information Disclosed for a Business Purpose** | |

| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Health and Health Insurance Information |
| --- | --- |
| **Categories of Personal Information Disclosed for a Business Purpose** | |

| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Location Information |
| --- | --- |
| **Categories of Personal Information Disclosed for a Business Purpose** | |

| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Personal Identifiers |
| --- | --- |
| **Categories of Personal Information Disclosed for a Business Purpose** | |

| Types of Third Parties to Which the Personal Information Was Disclosed for a Business Purpose | Purchase History Information |
| --- | --- |

Categories of Personal Information Disclosed for a Business Purpose

**Categories of Personal Information We Disclose to Each Type of Third Party:**
We may disclose your personal information to certain categories of third parties, as described below.

# Aggregate Information

We may disclose aggregate and statistical data that does not identify you personally. We may do this for actuarial analysis, research, and benchmarking purposes.

# Business Transfers

In the unlikely event that Walmart Claims Services, Inc. or substantially all of its assets are acquired by an unrelated third party, your personal information may be transferred to the acquiring party.

# How Long We Retain Your Information

We will keep the personal information we collect about you for as long as necessary to carry out the purposes set forth in this Privacy Notice or any other notice provided at the time of data collection, but no longer than as required or permitted under applicable law or internal Walmart policy. We dispose of the information we collect in accordance with Walmart's retention policies and procedures.

# How We Secure Your Information

We use reasonable information security measures, including physical, administrative, and technical safeguards.

# State Privacy Rights

**Virginia Consumer Data Protection Act:**

Virginia residents, if you are a Walmart customer, you can exercise the following rights by going to the footer of our website or settings section of our app and selecting the "Request My Personal Information" link:

- Request to Access My Personal Information
- Delete My Personal Information
- Correct My Personal Information

Virginia residents can exercise the following rights by going to the footer of our website or the settings section of our app and selecting the "My Privacy Choices" link:

- Opt Out of the Processing of My Personal Information for Purposes of Targeted Advertising

If we decline to take action on one of your rights as a Virginia resident, you can submit an appeal by going to our privacy request page.

**California Consumer Privacy Act:**

California residents, if you are a current or former Walmart associate, see the Walmart Associate Information Privacy Notice for information about your California privacy rights.

California residents, if you are a Walmart customer, see our California Privacy Rights page.

# Changes to This Privacy Notice

Please check our Privacy Notice periodically for changes. We will provide additional notice of significant updates. We will post the date our Notice was last updated at the top of the Privacy Notice.

# Contact Us

Please feel free to contact us with any questions or comments about this Notice or about how your information is handled. You can contact us via the phone number or address below:

**Walmart Claims Services, Inc.**
Attn: Compliance Office
PO Box 14731
Lexington, KY 40512-4731
Tel: (800) 527-0566

Walmart

Privacy & Security | Fraud | Request my Personal Information | Walmart California Consumer Privacy Act Notice |
California Supply Chains Act | FAQs | Contact | Policies | Terms of Use | Recalls | Your Privacy Choices

Walmart U.S.        Sam's Club        Walmart International

WMT   157.95   ⬆ 0.38

© 2023 Walmart Inc. All Rights Reserved.



Home › About › Leadership

# Leadership

## Executive Council



### Doug McMillon

President and CEO, Walmart Inc.



### Dan Bartlett

Executive Vice President, Corporate Affairs, Walmart Inc.



### Rachel Brand

Executive Vice President of Global Governance, Chief Legal Officer and Corporate Secretary, Walmart Inc.



### John Furner

President and CEO, Walmart U.S.



### Suresh Kumar

Executive Vice President, Global Chief Technology Officer and Chief Development Officer, Walmart Inc.



### Kathryn McLay

President and CEO, Walmart International



### Donna Morris



### Chris Nicholas



### John David Rainey

Executive Vice President, Chief People Officer, Walmart Inc.

President and CEO, Sam's Club

Executive Vice President and Chief Financial Officer, Walmart Inc.

# Senior Leadership

## Cheryl Ainoa

Executive Vice President and Chief Technology Officer, Sam's Club

## Andrea Albright

Executive Vice President, Sourcing

## Jon Alferness

Chief Product Officer, Walmart U.S.

## Ciara Anfield

Senior Vice President, Chief Member and Marketing Officer, Sam's Club

## Julie Barber

Executive Vice President, General Merchandising, Walmart U.S.

## Dan Binder

Senior Vice President, Global Treasurer

## Dan Bryant

Executive Vice President, Global Public Policy and Government Affairs, Walmart Inc.

## Kelvin L. Buncum

Executive Vice President, Neighborhood Markets, Walmart U.S.

## David M. Chojnowski

Senior Vice President and Controller

## Cedric Clark

Executive Vice President, Store Operations, Walmart U.S.

## Megan Crozier

Executive Vice President and Chief Merchant, Sam's Club

## Chris Cyrenne

Senior Vice President and International Chief Ethics and Compliance Officer

## Seth Dallaire

Executive Vice President and Chief Revenue Officer, Walmart U.S.

## Jerry R. Geisler III

Senior Vice President and Chief Information Security Officer, Walmart

## Joseph Godsey

Senior Vice President and Chief Supply Chain Officer, Sam's Club

## David Guggina

Executive Vice President, Supply Chain Operations, Walmart U.S.

## Leigh Hopkins

Executive Vice President, International Strategy & Development and Regional CEO – Asia and Walmex

## Denise Incandela

Executive Vice President, Apparel and Private Brands, Walmart U.S.

## Brandi Joplin

Senior Vice President and Chief Financial Officer, Sam's Club

## Silvia Azrai Kawas

Executive Vice President, Consumables, Walmart U.S.

## Kerry Kotouc

Senior Vice President & Chief Counsel, U.S. Retail Operations

## John Laney

Executive Vice President, Food, Walmart U.S.

## Larry Lundeen

Senior Vice President, Global Security & Chief Security Officer

## Denise Malloy

Senior Vice President and Chief Belonging Officer, Walmart Inc.

## Diana Marshall

Executive Vice President and Chief Growth Officer, Sam's Club

## Kathleen McLaughlin

Executive Vice President and Chief Sustainability Officer, Walmart Inc.; President, Walmart Foundation

## Dwayne Milum

Senior Vice President and Chief Audit Executive

## Matt Miner

Executive Vice President and Global Chief Ethics and Compliance Officer

## Nuala O'Connor

## Allyson Park

## Lance de la Rosa

## Steve Schmitt

Senior Vice President and Chief Counsel, Digital Citizenship

Chief Communications Officer, Walmart

Executive Vice President and Chief Operating Officer, Sam's Club

Executive Vice President and Chief Financial Officer, Walmart U.S.

**Brian Setzer**

Executive Vice President, Health & Wellness, Walmart U.S.

**Kieran Shanahan**

Executive Vice President and Chief Operating Office, Walmart U.S.

**Christopher Shryock**

Senior Vice President and Chief People Officer, Sam's Club

**Tim Simmons**

Senior Vice President and Chief Product Officer, Sam's Club

**Omer Tore**

Executive Vice President and Chief Financial Officer, Walmart International

**Hari Vasudev**

Executive Vice President, Global Technology Platform

**Deborah Vaughn**

Senior Vice President & Chief Counsel for Walmart International and Global Sourcing

**Srini Venkatesan**

Executive Vice President, Walmart U.S. Omni Platforms and Tech

**Emma Waddell**

Senior Vice President and U.S. Chief Ethics and Compliance Officer

**Tom Ward**

Executive Vice President and Chief eCommerce Officer, Walmart U.S.

**Latriece Watkins**

Executive Vice President and Chief Merchandising Officer, Walmart U.S.

**Judy Werthauser**

Executive Vice President, Chief People Officer, Walmart U.S.

**William White**

Senior Vice President and Chief Marketing Officer, Walmart U.S.

---

**Walmart**

Privacy & Security | Fraud | Request my Personal Information | Walmart California Consumer Privacy Act Notice |
California Supply Chains Act | FAQs | Contact | Policies | Terms of Use | Recalls | Your Privacy Choices

Walmart U.S.     Sam's Club     Walmart International

WMT  157.95  ↑ 0.38

© 2023 Walmart Inc. All Rights Reserved.

# EXHIBIT

# BB

Job listing for Case Manager- **Claims on Walmart Inc.'s** website

Careers

# Case Manager - Claims

Apply

**LOCATION**

ST PETERSBURG, FL

**CAREER AREA**

Administrative and Support Services

**JOB FUNCTION**

Support Services

**EMPLOYMENT TYPE**

Regular/Permanent

**POSITION TYPE**

Salary

**REQUISITION**

R-1555650

## Position Summary...

## What you'll do...

**Associate must live within 2 hours of primary job location**

Leads claim investigations by conducting ongoing medical and legal reviews; commissioning field investigators, reconstructionists, and cause and origin specialists to determine claim origination; managing media exposure during investigations; synthesizing information from outside counsel; and reviewing, documenting, and indexing information received on each claim in the claim/image management system.
Handles monetary aspects of assigned claims by establishing reserves within approval level; notifying store managers of significant reserve increases; monitoring reserves for all open claims; authorizing payment for approval or facilitating denial of the claim; and reserving file for payments that exceed authority for manager and serious case review.
Minimizes legal exposure by securing services of outside legal counsel; attending and participating in arbitrations; auditing and paying outside counsel invoices; assessing the impact claim may have on case law and precedent prior to making claim payment; and structuring complex settlements.
Manages moderately complex cases involving alleged bodily injury, personal injury, and property damage by interviewing key witnesses; securing evidence; analyzing evidence; reviewing applicable laws; interpreting medical reports; deducing causes and responsibilities; documenting case details; determining whether payment is warranted; and managing multiple claims related to a single event as required.
Manages interpretation of medical reports and case information; reviewing records for preexisting conditions; referencing applicable case law/statutes; and presenting claim reviews and decisions to senior management for approval or guidance.
Manages negotiations with customer, customer's attorney, or third party to resolve claims by sharing investigative results and rationale; listening to claimant perspective and arguments; influencing claimant's perspective; and coming to consensus on appropriate and final resolution.
Coordinates, completes, and oversees job-related activities and assignments by developing and maintaining relationships with key stakeholders; supporting plans and initiatives to meet customer and business needs; identifying and communicating goals and objectives; building accountability for and measuring progress in achieving results; identifying and addressing improvement opportunities; and demonstrating adaptability and promoting continuous learning.
Provides supervision and development opportunities for associates by hiring and training; mentoring; assigning duties; providing recognition; and ensuring diversity awareness.
Ensures compliance with company policies and procedures and supports company mission, values, and standards of ethics and integrity by

Apply

Culture Champion

• Models the Walmart values to foster our culture; holds oneself and others accountable; and supports Walmart's commitment to communities, social justice, corporate social responsibility, and sustainability; maintains and promotes the highest standards of integrity, ethics and compliance.

Servant Leadership

• Acts as an altruistic servant leader and is consistently humble, self-aware, honest, and transparent.

Embrace Change

Curiosity & Courage

• Demonstrates curiosity and a growth mindset; fosters an environment that supports learning, innovation, and intelligent risk-taking; and exhibits resilience in the face of setbacks.

Digital Transformation & Change

• Seeks and implements continuous improvements and encourages the team to leverage new digital tools and ways of working.

Deliver for the Customer

Customer Focus

• Delivers expected business results while putting the customer first and consistently applying an omni-merchant mindset and the EDLP and EDLC business models to all plans.

Strategic Thinking

• Adopts a holistic perspective that considers data, analytics, customer insights, and different parts of the business when making plans and shaping the team's strategy.

Focus on our Associates

Diversity, Equity & Inclusion

• Identifies, attracts, and retains diverse and inclusive team members; builds a high-performing team; embraces diversity in all its forms; and actively supports diversity goal programs.

Collaboration & Influence

• Builds strong and trusting relationships with team members and business partners; works collaboratively and cross-functionally to achieve objectives; and communicates with energy and positivity to motivate, influence, and inspire commitment and action.

Talent Management

• Creates a discipline and focus around developing talent, promotes an environment allowing everyone to bring their best selves to work, empowers associates and partners to act in the best interest of the customer and company, and regularly recognizes others' contributions and accomplishments.

## Minimum Qualifications...

*Outlined below are the required minimum qualifications for this position. If none are listed, there are no minimum qualifications.*

Insurance Adjuster license OR will obtain an Insurance Adjuster license within 30 days of job entry date.

## Preferred Qualifications...

*Outlined below are the optional preferred qualifications for this position. If none are listed, there are no preferred qualifications.*

Bachelor's degree OR 2 years' experience in insurance claims or related area, Settling claims and customer service

## Primary Location...

140 Fountain Parkway, ST Petersburg, FL 33716-1205, United States of America

## About Walmart

At Walmart, we help people save money so they can live better. This mission serves as the foundation for every decision we make, from responsible sourcing to sustainability—and everything in between. As a Walmart associate, you will play an integral role in shaping the future of retail, tech, merchandising, finance and hundreds of other industries—all while affecting the lives of millions of

Apply

*communities we serve live better when we really know them. That means understanding, respecting, and valuing diversity- unique styles, experiences, identities, abilities, ideas and opinions- while being inclusive of all people.*

## All the benefits you need for you and your family

Multiple health plan options, including vision & dental plans for you & dependents

Financial benefits including 401(k), stock purchase plans, life insurance and more

Associate discounts in-store and online

Education assistance for Associate and dependents

Parental Leave

Pay during military service

Paid Time off - to include vacation, sick, parental

Short-term and long-term disability for when you can't work because of injury, illness, or childbirth

*Eligibility requirements apply to some benefits and may depend on your job classification and length of employment. Benefits are subject to change and may be subject to specific plan or program terms. For information about benefits and eligibility, see One.Walmart.com/Benefits.*

## Frequently asked questions

On average, how long does it take to fill out an application?

Can I change my application after submitting?

Apply



How do you protect my personal information?

What are the recommended Internet Browsers for applying for open roles?

See All FAQs

## Recently viewed jobs

Case Manager - Claims

 ADMINISTRATIVE AND SUPPORT SERVICES

ST PETERSBURG, FL

FAQ Sitemap Corporate Terms & Conditions Privacy Policy Notice at Collection

©2023 Walmart, Inc. is an Equal Opportunity Employer- By Choice.
We believe we are best equipped to help our associates, customers, and the communities we serve live better when we really know them. That means understanding, respecting, and valuing diversity- unique styles, experiences, identities, abilities, ideas and opinions- while being inclusive of all people. Walmart Inc. participates in E-Verify. Learn more about applicant rights under Federal Employment Laws.



# EXHIBIT

# CC

Docket Sheet from Lowe, Lynn v. Walmart Claims Services, Inc.

Query    Reports    Utilities    Help    Log Out

RECAP Actions

CLOSED,PROTECTIVE_ORDER

**U.S. District Court**
**Western District of Wisconsin (Madison)**
**CIVIL DOCKET FOR CASE #: 3:21-cv-00214-wmc**

Lowe, Lynn et al v. Walmart Claims Services, Inc. et al
Assigned to: District Judge William M. Conley
Referred to: Magistrate Judge Stephen L. Crocker
Case in other court: Green County Circuit Court, 2021CV38
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 03/31/2021
Date Terminated: 07/29/2022
Jury Demand: Defendant
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 03/31/2021 | 1 | NOTICE OF REMOVAL from Green County Circuit Court, case number 2021CV000038. ( Filing fee $ 402 receipt number 0758-2852047), filed by Walmart Inc. / Monroe Walmart Supercenter, Store No. 802, Walmart Claims Services Inc. (Attachments: # 1 R Exhibit 1 - Summons and Complaint, # 2 Exhibit 2 - Service of Process Transmittal, # 3 Civil Cover Sheet) (Vigil, Vincent) Modified on 3/31/2021. (lak) (Entered: 03/31/2021) |
| 04/01/2021 | | Case randomly assigned to District Judge William M. Conley and Magistrate Judge Stephen L. Crocker. (jls) (Entered: 04/01/2021) |
| 04/01/2021 | | Standard attachments for Judge William M. Conley required to be served on all parties with summons or waiver of service: NORTC, Corporate Disclosure Statement. (jls) (Entered: 04/01/2021) |
| 04/06/2021 | 2 R | ANSWER with Jury Demand by Defendants Walmart Claims Services, Inc., Walmart Inc. / Monroe Walmart Supercenter, Store No. 802. (Vigil, Vincent) (Entered: 04/06/2021) |
| 04/07/2021 | | Set Telephone Pretrial or Status Conference: Telephone Pretrial Conference set for 5/11/2021 at 01:00 PM before Magistrate Judge Stephen L. Crocker. Counsel for Plaintiff responsible for setting up the call to chambers at (608) 264-5153. [Standing Order Governing Preliminary Pretrial Conference attached] (jls) (Entered: 04/07/2021) |
| 05/05/2021 | 3 | Preliminary Pretrial Conference Report by Defendants Walmart Claims Services, Inc., Walmart Inc. / Monroe Walmart Supercenter, Store No. 802. (Vigil, Vincent) Modified on 5/5/2021. (lak) (Entered: 05/05/2021) |
| 05/11/2021 | | Minute Entry for proceedings held before Magistrate Judge Stephen L. Crocker: Telephone Preliminary Pretrial Conference held on 5/11/2021 [:10] (cak) (Entered: 05/11/2021) |
| 05/18/2021 | 4 | Pretrial Conference Order - Preliminary Pretrial Packet in cases assigned to District Judge William M. Conley attached. Amendments to Pleadings due 6/25/2021. Dispositive Motions due 1/21/2022. Settlement Letters due 1/30/2022. Motions in Limine due 5/13/2022. Response to Motion due 5/27/2022. Final Pretrial Conference set for 6/7/2022 at 04:00 PM. Jury Selection and Trial set for 6/20/2022 at 09:00 AM. Signed by Magistrate Judge Stephen L. Crocker on 5/18/2021. (jls) (Entered: 05/18/2021) |
| 09/16/2021 | 5 | Joint Motion for Protective Order by Defendants Walmart Claims Services, Inc., Walmart Inc. / Monroe Walmart Supercenter, Store No. 802. (Vigil, Vincent) (Entered: 09/16/2021) |
| 09/16/2021 | 6 | Text of Proposed Order re: 5 Joint Motion for Protective Order. (Vigil, Vincent) Modified on 9/17/2021. (lak) (Entered: 09/16/2021) |
| 09/21/2021 | 7 | ** TEXT ONLY ORDER ** The parties' stipulated protective order is accepted and entered as the court's order with the understanding that "confidential information" is objectively limited to the categories spelled out in the first paragraph of the order. Signed by Magistrate Judge Stephen L. Crocker on 9/21/2021. (jls) (Entered: 09/21/2021) |
| 04/14/2022 | 8 | Notice of Appearance filed by Mercedes de la Rosa for Defendants Walmart Claims Services, Inc., Walmart Inc. / Monroe Walmart Supercenter, Store No. 802. (de la Rosa, Mercedes) (Entered: 04/14/2022) |
| 04/20/2022 | 9 | AMENDED Scheduling Order: Rule 26 (a)(3) Disclosures due 8/19/2022. Response to Motion due 9/2/2022. Final Pretrial Conference set for 9/14/2022 at 03:00 PM. Jury Selection and Trial set for 9/26/2022 at 09:00 AM. Signed by District Judge William M. Conley on 4/20/2022. (jls) (Entered: 04/20/2022) |
| 04/26/2022 | 10 | Notice of Appearance filed by Lynette K Fons for Defendants Walmart Claims Services, Inc., Walmart Inc. / Monroe Walmart Supercenter, Store No. 802. (Fons, Lynette) (Entered: 04/26/2022) |
| 04/27/2022 | 11 | Joint Motion for Extension of Time *Extend Discovery Deadline and Settlement Letter Deadline* by Defendants Walmart Claims Services, Inc., Walmart Inc. / Monroe Walmart Supercenter, Store No. 802. Motions referred to Magistrate Judge Stephen L. Crocker. (Vigil, Vincent) (Entered: 04/27/2022) |
| 04/27/2022 | 12 | ** TEXT ONLY ORDER ** The parties' joint motion to extend the discovery cutoff and the settlement letter deadline to June 20, 2022 is GRANTED. After the parties submit their settlement letters, the court will contact them to schedule a settlement conference. Signed by Magistrate Judge Stephen L. Crocker on 4/27/2022. (jls) (Entered: 04/27/2022) |
| 07/28/2022 | 13 | STIPULATION of Dismissal (Vigil, Vincent) (Entered: 07/28/2022) |
| 07/29/2022 | | Pursuant to Fed. R. Civ. P. 41(a)(1), this case is closed without further order of the court. (jls) (Entered: 07/29/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/28/2023 15:28:38 | | |
| **PACER Login:** | AdamTheLawyer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cv-00214-wmc |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# EXHIBIT

# DD

Original Complaint from Lowe, Lynn v. Walmart Claims Services, Inc.

# EXHIBIT 1

**FILED**
**02-25-2021**
**Clerk of Circuit Court**
**Green County Wisconsin**
**2021CV000038**
**Honorable James R. Beer**
**Branch 1**

STATE OF WISCONSIN     CIRCUIT COURT     GREEN COUNTY

**LYNN M. LOWE**
12998 N. Zimmerman Rd.
Orangeville, IL 61060,

       Plaintiff,

and

**MOLINA HEALTHCARE, INC.**
200 Oceangate, Ste. 100
Long Beach, CA 90802,

       Subrogated Plaintiff,

vs.                       Case Code: 30107

**WALMART CLAIMS SERVICES, INC.**
P.O. Box 1288
Bentonville, AR 72712-1288,

and

**WALMART, INC./**
**MONROE WALMART SUPERCENTER, STORE NO. 802**
300 Sixth Ave. W
Monroe, WI 53566,

       Defendants.

---

## SUMMONS

---

**THE STATE OF WISCONSIN**

      To the persons named above as Defendants:

      You are hereby notified that the Plaintiff named above has filed a Complaint against you, which is attached, stating the nature and basis of the legal action.

      Within forty-five (45) days of receiving this Summons, you must respond with a written answer, as that term is used in Chapter 802, Wis. Stats., to the Complaint. The Court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to this Court, whose address is:

Clerk of Circuit Court
Green County Justice Center
2841 Sixth St.
Monroe, WI 53566

and to Gregory E. Knoke, the Plaintiff's attorney, whose address is:

Knoke & Kind Law Office
1904 10th St.
P.O. Box 620
Monroe, WI 53566

You may have an attorney help or represent you.

If you do not provide a proper response within forty-five (45) days, the Court may grant a judgment against you for the award of money or other legal action requested in the Complaint, or you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgement may be enforced as provided by law. A judgement awarding money may become a lien against any real estate you own now or in the future and may also be enforced by garnishment of wages or seizure of property.

Dated: February 25, 2021.

**Knoke & Kind Law Office**
Attorney for Plaintiff Lynn M. Lowe

Gregory E. Knoke
State Bar No. 01013426
1904 10th St., P.O. Box 620
Monroe, WI 53566
Phone: (608) 325-7137

FILED
02-25-2021
Clerk of Circuit Court
Green County Wisconsin
2021CV000038
Honorable James R. Beer
Branch 1

STATE OF WISCONSIN     CIRCUIT COURT     GREEN COUNTY

**LYNN M. LOWE**
12998 N. Zimmerman Rd.
Orangeville, IL 61060,

       Plaintiff,

and

**MOLINA HEALTHCARE, INC.**
200 Oceangate, Ste. 100
Long Beach, CA 90802,

       Subrogated Plaintiff,

vs.                              Case Code: 30107

**WALMART CLAIMS SERVICES, INC.**
P.O. Box 1288
Bentonville, AR 72712-1288,

and

**WALMART, INC./**
**MONROE WALMART SUPERCENTER, STORE NO. 802**
300 Sixth Ave. W
Monroe, WI 53566,

       Defendants.

---

## COMPLAINT

---

The above-named Plaintiff, Lynn M. Lowe, by her attorney, Gregory E. Knoke of Knoke & Kind Law Office, hereby states the following Complaint in this matter:

     1.      Lynn M. Lowe (hereinafter "Lynn") is an adult individual residing at 12998 N. Zimmerman Rd., Orangeville, IL 61060.

     2.      Subrogated Plaintiff, Molina Healthcare, Inc. (hereinafter "Molina") is a health insurance agency administering health insurance benefits to members of the general public in the State of Illinois. Molina's principal office address is 200 Oceangate, Ste. 100, Long Beach, CA 90802. Its registered agent for service of process in the State of Wisconsin is Corporation Service Company, 8040 Excelsior Dr., Ste. 400, Madison, WI 53717.

3.      Defendant Walmart, Inc. (hereinafter "Walmart") is a company engaged in the retail sales of multiple lines of consumer products throughout the world.  One of its locations in Wisconsin is known as the Monroe Walmart Supercenter Store No. 802, at 300 Sixth Ave. W, Monroe, WI 53566 (hereinafter "The Store").  Walmart's principal office is located at 702 SW Eighth St., #0555, Bentonville, AR 72716-0555.  Walmart's registered agent for service of process in the State of Wisconsin is CT Corporation System, 301 S. Bedford St., Ste. 1, Madison, WI 53703.

4.      Defendant Walmart Claims Services, Inc. (hereinafter "Claims Services"), on information and belief, is the claims handler for Walmart and for any insurance carrier for Walmart regarding customer incidents.  Claims Services' principal office is located at 702 SW Eighth St., Bentonville, AR 72716.  Claims Services' registered agent for service of process in the State of Wisconsin is CT Corporation System, 301 S. Bedford St., Ste. 1, Madison, WI 53703.

5.      On June 16, 2018, Lynn was entering The Store.  Lynn was in the area of the hand sanitizer/cart area when she slipped and fell on an accumulation of liquid on The Store's floor.  On information and belief, the liquid on said floor had been in place for a substantial period of time, which would have allowed Walmart to detect the problems thereof, as, on information and belief, Walmart has in place certain protocols for inspection of the entrance of the floor area – called "sweeps".

6.      As a result of Lynn's fall caused by the liquid substance on the floor to the entry of The Store, Lynn lost her balance and fell to the floor.

7.      Almost immediately, Lynn began to experience significant pain and discomfort when her right side and head struck the floor.  As the result of Lynn's fall, she sustained new injuries to her head, hip, upper back, knee, and neck, and she significantly aggravated pre-existing health conditions of her lower back, hip, and other parts of her torso well beyond the normal progression of those conditions.

8.      The maintenance of the entry area to The Store and the failure to place signs warning the public of the wet conditions, or, in the alternative, to timely inspect the area of Lynn's fall and correct a dangerous condition constituted a breach of Walmart's duty to the general public to maintain a safe place for customers in the following respects:

a.      Failing to timely inspect the area of Lynn's fall to remove the liquid substance which caused Lynn's fall and injuries; and

b.      Failing to display warning signs of an appropriate height and condition to warn the public of the unsafe condition of The Store's entryway, to ensure The Store's entryway complied with standard practices for safe walking surfaces within the retail industry.

## FIRST CAUSE OF ACTION
### Breach of Duty to Provide a Safe Place

9.      Lynn restates as fully set forth herein the allegations contained in paragraph 1-8.

10.     Walmart is a public building and/or place of employment as the terms are defined in Chapter 101 of Wisconsin Statutes.

11.     Walmart had a duty to keep The Store and property safe for patrons, guests and/or frequenters, one of whom was Lynn, and use such methods and procedures necessary to render the premises safe and do everything reasonably necessary to protect the health, safety and welfare of the patrons, employers, guests and/or frequenters of The Store in question pursuant to Chapter 101 of Wisconsin Statutes.

12.     Walmart, its employees, servants and agents, were negligent and careless and violated Chapter 101 of the Wisconsin Statutes by failing to maintain The Store's entryway in a reasonably safe condition, causing Lynn to sustain injuries and damages.

13.     Walmart acted in a manner which intentionally disregarded Walmart's duties to Lynn and other frequenters of The Store by failing to furnish a safe shopping environment in accordance with applicable codes, ordinances and law, all of which, on information and belief were known to Walmart based on years of experience in the retail business.

14.     As a result of the foregoing negligence, carelessness and violation of the Safe Place Statute by Walmart, Lynn sustained serious injuries and damages.  Lynn was required to seek medical attention and incurred and will continue to incur expenses for medical care past and future.

## SECOND CAUSE OF ACTION
### Negligent hiring, training or supervision

15.     Lynn restates as fully set forth herein the allegations contained in paragraph 1-14.

16.     Walmart owed a duty of care to Lynn.

17.     Walmart's employees or supervisors were negligent in failing to take timely steps to make the entryway area of The Store safe for its customers, and, in the event Walmart was unable to timely inspect the floor for liquid substances, make the entryway safe for pedestrian traffic by properly posting signs warning the public of the dangerous condition of The Store's walking surface.

18.     Walmart's failure to properly hire, train or supervise its employees resulted in the failure to remedy the dangerous condition.

19.     Walmart's failure to properly hire, train or supervise its employees constituted a breach of its duty to Lynn.

20.     Walmart knew or had reason to know that its conduct created an unreasonable risk of harm and a strong possibility, although not of substantial certainty, that harm would result in their failure to properly hire, train and supervise its employees.

21.     Walmart's employees' failure to properly warn the public of and to remedy the unsafe walking surface of the entryway area of The Store caused Lynn's injuries and damages.

22.     Walmart's failure to properly hire, train and supervise its employees was an intentional disregard of Lynn's rights.

23.     As a result of the negligence outlined in this cause of action, Lynn has sustained damages as hereinbefore set forth.

### THIRD CAUSE OF ACTION
### Ordinary Negligence

24.     Lynn restates as fully set forth herein the allegations contained in paragraph 1-23.

25.     Walmart had an obligation of due care to ensure the entryway of The Store did not create an unreasonably dangerous risk to others.

26.     Walmart was negligent and breached its duty of care by failing to timely inspect the condition of the entryway area to The Store, to ensure safe pedestrian travel, which failure caused Lynn's injuries.

27.     On information and belief, Walmart was either aware of or had sufficient time to discover the condition of the entryway area to The Store and took no action to correct the condition of the entryway area to The Store, which would have prevented Lynn's injuries.

28.     Walmart's failure to properly maintain the walking surface of the entryway area of The Store was a direct and proximate cause of Lynn's aforesaid injuries and damages.

29.     Walmart's failure to act to correct the slippery condition of the entryway area of The Store or to properly warn the public of the hazardous condition of the entryway floor was an intentional disregard of the rights and safety of Lynn and other frequenters of the Store by failing to correct a substantial safety problem in the entryway area of The Store.

30.     As a result of the foregoing negligence, carelessness, and violation of the Safe Place Statute by Walmart, Lynn sustained injuries and damages and was required to seek medical attention and incurred medical expenses for her injuries.  Lynn will be required to seek medical care in the future for these injuries.

WHEREFORE, based upon the foregoing Complaint, Lynn seeks the following relief:

a.  That Lynn recover from Walmart and Claims Services her medical expenses to date and in the future and any other damages, including, but not limited to, pain and suffering and loss of enjoyment of life;

b.  That Lynn recover from Walmart and Claims Services any future damages for pain and suffering and loss of enjoyment of life as a result of this incident;

c.  That Lynn recover punitive damages against Walmart and Claims Services for conduct amounting to an intentional disregard of her rights; and

d.  For such other and further relief as the Court deems appropriate, including, but not limited to, allowable attorney's fees and costs.

**PLAINTIFF HEREBY REQUESTS A 12 PERSON JURY TRIAL.**

Dated: February 25, 2021.

**KNOKE & KIND LAW OFFICE**
Attorney for Lynn M. Lowe

Gregory E. Knoke
State Bar No. 01013426
1904 10th St.
Monroe, WI 53566
Phone:  (608) 325-7137

# EXHIBIT

# EE

## Answer from Lowe, Lynn v. Walmart Claims Services, Inc.

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

LYNN M. LOWE,

     Plaintiff,

and

MOLINA HEALTHCARE, INC.,                   Case No.: 21-cv-214

     Subrogated Plaintiff,

vs.

WALMART CLAIMS SERVICES, INC.,
and
WALMART, INC./MONROE WALMART
SUPERCENTER, STORE NO. 802,

     Defendants.

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES

Defendants Walmart Claims Services, Inc. and Walmart, Inc. ("Defendants"), by and through their attorneys, MWH Law Group LLP, for their Answer to Plaintiff Lynn M. Lowe's ("Plaintiff") Complaint ("Complaint"), hereby state as follows:

1.     Defendants admit that, on information and belief, Plaintiff is an adult residing at 12998 N. Zimmerman Rd., Orangeville, Illinois 61060.

2.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2, and therefore deny same, and demand strict proof thereof.

3.     In answering Paragraph 4, Defendants admit Walmart is a foreign corporation with its principal offices and registered agent for service of process as alleged.

4.      In answering Paragraph 4 of Plaintiff's Complaint, Defendants admit Walmart Claims Services, Inc. handles certain claims regarding customer incidents alleged to have occurred at a Walmart store, and is a foreign corporation with its principal offices and registered agent for service of process as alleged.

5.      In answering Paragraph 5 of Plaintiff's Complaint, Defendants admit that on June 16, 2018, Plaintiff was present in the Walmart Supercenter store located at 300 Sixth Avenue W, Monroe, Wisconsin.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 5, and therefore deny same, and demand strict proof thereof. Further answering, Defendants deny that they were negligent in any manner and deny that any alleged negligence by Defendants or their employees agents and/or servants was a proximate cause of any of Plaintiff's injuries.

6.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 6, and therefore deny same, and demand strict proof thereof. Further answering, Defendants deny that they were negligent in any manner and deny that any alleged negligence by Defendants or their employees agents and/or servants was a proximate cause of Plaintiff's fall.

7.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7, and therefore deny same, and demand strict proof thereof. Further answering, Defendants deny that they were negligent in any manner and deny that any alleged negligence by Defendants or their employees agents and/or servants was a proximate cause of Plaintiff's injuries.

8.      Defendants aver that the allegations contained in Paragraph 8 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations

and demand strict proof thereof. To the extent Paragraph 8 contains assertions of fact, these answering Defendants deny all allegations contained in Paragraph 8, including a denial of subparagraphs (a) through (b).

<div align="center">

**FIRST CAUSE OF ACTION**
**Breach of Duty to Provide a Safe Place**

</div>

9.      Defendants restate and set forth their answers to Paragraphs 1 through 8 as if fully set forth herein.

10.      Defendants aver that the allegations contained in Paragraph 10 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof.

11.      Defendants admit only those duties imposed by law and admit the existence of Chapter 101 of Wisconsin Statutes. Defendants deny that they or their employees, agents and/or servants committed acts or omissions that would contravene the provisions of Chapter 101 of Wisconsin Statutes, including in particular the Safe Place Act of Wisconsin. Further answering, Defendants deny applicability of the Safe Place Act of Wisconsin and deny all allegations not specifically admitted.

12.      Defendants aver that the allegations contained in Paragraph 12 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof. To the extent Paragraph 12 contains assertions of fact, these answering Defendants deny all allegations.

13.      Defendants aver that the allegations contained in Paragraph 13 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof. To the extent Paragraph 13 contains assertions of fact, these answering Defendants deny all allegations.

<div align="center">3</div>

14.     Defendants aver that the allegations contained in Paragraph 14 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof. To the extent Paragraph 14 contains assertions of fact, these answering Defendants deny all allegations. Further answering said paragraph, these answering Defendants deny that they or their employees, agents and/or servants committed acts or omissions that would contravene the Safe Place Act of Wisconsin and deny that any alleged negligence on their part or the part of any of their employees, agents and/or servants was the proximate cause of any of the Plaintiff's injuries.

### SECOND CAUSE OF ACTION
### Negligent hiring, training or supervision

15.     Defendants restate and set forth their answers to Paragraphs 1-14 as if though fully set forth herein.

16.     Defendants aver that the allegations contained in Paragraph 16 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof.

17.     Defendants aver that the allegations contained in Paragraph 17 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof. To the extent Paragraph 17 contains assertions of fact, these answering Defendants deny all allegations.

18.     Defendants deny the allegations contained Paragraph 18.

19.     Defendants aver that the allegations contained in Paragraph 19 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof. To the extent Paragraph 19 contains assertions of fact, these answering Defendants deny all allegations.

20.     Defendants aver that the allegations contained in Paragraph 20 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof. To the extent Paragraph 20 contains assertions of fact, these answering Defendants deny all allegations.

21.     Defendants deny the allegations contained Paragraph 21. Further answering said paragraph, these answering Defendants specifically deny that it or its employees, agents and/or servants committed acts or omissions which would be a proximate cause of any of the Plaintiff's injuries.

22.     Defendants deny the allegations contained Paragraph 22.

23.     Defendants deny the allegations contained Paragraph 23. Further answering said paragraph, these answering Defendants specifically deny that it or its employees, agents and/or servants committed acts or omissions which would be a proximate cause of any of the Plaintiff's damages.

### THIRD CAUSE OF ACTION
### Ordinary Negligence

24.     Defendants restate and set forth their answers to Paragraphs 1-23 as if though fully set forth herein.

25.     Defendants aver that the allegations contained in Paragraph 25 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof. To the extent Paragraph 25 contains assertions of fact, these answering Defendants deny all allegations.

26.     Defendants aver that the allegations contained in Paragraph 26 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations

and demand strict proof thereof. To the extent Paragraph 26 contains assertions of fact, these answering Defendants deny all allegations.

27. Defendants deny the allegations contained in Paragraph 27.

28. Defendants deny the allegations contained Paragraph 28. Further answering said paragraph, these answering Defendants specifically deny that they or their employees, agents and/or servants committed acts or omissions which would be a proximate cause of any of the Plaintiff's injuries.

29. Defendants deny the allegations contained in Paragraph 29.

30. Defendants aver that the allegations contained in Paragraph 30 call for a legal conclusion for which no answer is required, and on such basis, Defendants deny the allegations and demand strict proof thereof. To the extent Paragraph 30 contains assertions of fact, these answering Defendants deny all allegations.

**WHEREFORE,** Walmart Claims Services, Inc. and Walmart, Inc. respectfully request that this Court dismiss Plaintiff's claims against Defendants in its entirety, assess the costs of this matter to Plaintiff and for such other and further relief as the Court deems just and equitable in the premises.

## **AFFIRMATIVE DEFENSES**

1. Plaintiff has failed to state a claim upon which relief can be granted.

2. Any allegations contained in Plaintiff's Complaint not specifically admitted are hereby denied.

3. Plaintiff's action is barred because the condition complained of by Plaintiff was not in existence for a sufficient amount of time to place these answering Defendants on notice of the existence of the condition and opportunity to remedy.

4. Plaintiff's action is barred because she has not suffered any injury proximately caused by any act or omission attributable to these answering Defendants.

5. No act or omission on the part of Defendants caused or contributed to the alleged damages complained of in Plaintiff's Complaint.

6. Lynn M. Lowe was at fault and her fault was the sole proximate cause or proximate cause of the incident alleged in Plaintiff's Complaint, and resulting damages, if any, and such fault should bar or reduce the amount of Plaintiff's recovery against the answering Defendants.

7. Plaintiff's action is barred because Plaintiff unreasonably failed to take action to avoid damages, if any.

8. Plaintiff's action is barred because Plaintiff unreasonably assumed the risk by knowing the risk was present, understood the nature of the risk, and nevertheless unreasonably, freely and voluntarily took the risk and therefore, Plaintiff's assumption of the risk was the proximate cause of her damages.

9. Plaintiff's damages are the direct result of Plaintiff's failure to exercise ordinary care in failing to keep a proper lookout which was the cause of Plaintiff's fall.

10. Plaintiff's damages are the direct result of Plaintiff's failure to exercise ordinary care in failing to take action to avoid injuries, as Plaintiff had an alternate, safe route that she chose not to take.

11. Plaintiff's alleged damages, if any, were the result of an unforeseeable series of events over which answering Defendants had no control.

12. Plaintiff's alleged injuries, if any, may have been caused by preexisting conditions or to her to her accident for which these answering Defendants bear no legal responsibility.

13. Plaintiff may have failed to mitigate her damages, if any.

14.     Plaintiff is not entitled to the relief of damages requested.

15.     Plaintiff is not entitled to prejudgment interest, costs, or attorney's fees.

16.     Walmart Claims Services, Inc. is not a properly named Defendant in the litigation.

17.     Walmart reserves the right to assert additional affirmative defenses that become known during discovery and/or trial.

## JURY DEMAND

**NOW COME** Defendants Walmart Claims Services, Inc. and Walmart, Inc., and hereby request a trial by jury on all issues in the above-captioned matter.

Dated at Milwaukee, Wisconsin, this 6th day of April, 2021.

**MWH LAW GROUP, LLP**
Attorneys for Defendants Walmart Claims Services, Inc. and Walmart, Inc.

By: _/s/ Electronically signed by Vincent Vigil_
Vincent Vigil                     SBN 1120981
Eric L. Andrews                 SBN 1068550
735 N. Water Street, Suite 610
Milwaukee, WI 53202
(414) 436-0353 Phone
(414) 436-0354 Facsimile
_vincent.vigil@mwhlawgroup.com_
_eric.andrews@mwhlawgroup.com_

8

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 6, 2021, a copy of this document was served upon all parties in the above cause by the **electronic document management/electronic filing system ("ECF")**, which will send notification of such filing to all attorneys of record, upon the following:

**Attorney for Plaintiff, Lynn Lowe**
Gregory E. Knoke   State Bar No. 01013426
Knoke & Kind Law Office
1904 10th Street
Monroe, WI  5356
Telephone: (608) 325-7137

**Molina Healthcare, Inc.**
11002 W. Park Place
Milwaukee, WI 53224

*/s/ Brooke E. Klingbeil*

# EXHIBIT

# FF

Docket Sheet from Rose v. Walmart Claims Services, Inc.

Query    Reports    Utilities    Help    Log Out

RECAP Actions

JURY,SCHEDO

### U.S. District Court
### SOUTHERN DISTRICT OF ALABAMA (Mobile)
### CIVIL DOCKET FOR CASE #: 1:23-cv-00044-TFM-MU

| | |
|---|---|
| Rose v. Walmart Claims Services, Inc. et al | Date Filed: 02/01/2023 |
| Assigned to: District Judge Terry F. Moorer | Jury Demand: Both |
| Referred to: Magistrate Judge P. Bradley Murray | Nature of Suit: 360 P.I.: Other |
| Cause: 28:1441 Petition for Removal- Account Receivable | Jurisdiction: Diversity |

**Plaintiff**

**Susan Ayla Rose**                                        represented by **Johnathan E. Austin**
                                                            Austin Law, P.C.
                                                            P.O. Box 321173
                                                            Birmingham, AL 35212
                                                            205-538-0169
                                                            Fax: 205-707-1168
                                                            Email: austin@jaustinlawpc.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Richard Allan Rice**
                                                            The Rice Law Firm
                                                            PO Box 453
                                                            Birmingham, AL 35201
                                                            205-618-8733
                                                            Email: rrice@rice-lawfirm.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Walmart Claims Services, Inc.**                          represented by **Chad Marchand**
                                                            DeLashmet & Marchand, P.C.
                                                            P.O. Box 2047
                                                            Mobile, AL 36652
                                                            2514331577
                                                            Fax: 2514331578
                                                            Email: ccm@delmar-law.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Keith B. Franklin**
                                                            DeLashmet & Marchand, PC
                                                            462 Dauphin Street
                                                            Mobile, AL 36602
                                                            251-433-1577
                                                            Fax: 251-433-7994
                                                            Email: kbf@delmar-law.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **W. Pemble DeLashmet**
                                                            DeLashmet & Marchand, P.C.
                                                            P.O. Box 2047
                                                            Mobile, AL 36652
                                                            2514331577
                                                            Fax: 2514331578
                                                            Email: wpd@delmar-law.com
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

**Defendant**

**Walmart, Inc.**                                          represented by **Chad Marchand**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Keith B. Franklin**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **W. Pemble DeLashmet**
                                                            (See above for address)
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| | | |

| 02/01/2023 | 1 | NOTICE OF REMOVAL ( Filing fee $ 402, Receipt number AALSDC-3143794, Online Credit Card Payment), filed by Walmart Claims Services, Inc., Walmart, Inc.. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B) (Marchand, Chad) (Entered: 02/01/2023) |
| 02/01/2023 | 2 [R] | ANSWER to Complaint with Jury Demand by Walmart Claims Services, Inc., Walmart, Inc.. (Marchand, Chad) (Entered: 02/01/2023) |
| 02/01/2023 | 3 | Corporate Disclosure Statement filed by Defendants Walmart Claims Services, Inc., Walmart, Inc.. (Marchand, Chad) (Entered: 02/01/2023) |
| 02/01/2023 | 4 | Document endorsed NOTED by Magistrate Judge P. Bradley Murray: A review of the Corporate Disclosure Statement 3 filed by Defendants Walmart, Inc. and Walmart Claims Services, Inc., reveals no reason to believe that there are potential conflicts of interest that would require disqualification or recusal in this action. (dtd) (Entered: 02/01/2023) |
| 02/02/2023 | 5 | Notice of Assignment to Magistrate Judge P. Bradley Murray for trial. (eec) (Entered: 02/02/2023) |
| 02/02/2023 | 6 | PRELIMINARY SCHEDULING ORDER entered. Rule 26 Meeting Report due by 3/20/2023. Signed by Magistrate Judge P. Bradley Murray on 2/2/2023. (eec) (Entered: 02/02/2023) |
| 02/03/2023 | 7 | This action has been transferred from the docket of Magistrate Judge P. Bradley Murray and is now assigned to the docket of District Judge Terry F. Moorer. To insure that your pleadings are referred to the proper Judge and Magistrate Judge with as little delay as possible, please use the letter suffix TFM-MU after the case number on all future pleadings. (eec) (Entered: 02/03/2023) |
| 02/06/2023 | 8 | Document endorsed NOTED by District Judge Terry F. Moorer: 3 Corporate Disclosure Statement filed by Walmart, Inc., Walmart Claims Services, Inc. A review does not reveal any reason to believe that there are potential conflicts of interest that would require recusal in this action. (tot) (Entered: 02/06/2023) |
| 02/20/2023 | 9 | NOTICE of Appearance by Richard Allan Rice on behalf of Susan Ayla Rose (Rice, Richard) (Entered: 02/20/2023) |
| 03/30/2023 | 10 | TEXT-ONLY ORDER: Paragraph A.1. of the Preliminary Scheduling Order 6 entered on February 2, 2023, ordered the parties to meet and file a report pursuant to Fed. R. Civ. P. 26(f) as soon as practicable but not later than March 20, 2023. The parties have not complied with this requirement of the scheduling order. Accordingly, the parties are ORDERED to meet and file their joint Rule 26(f) Report not later than April 13, 2023. Signed by Magistrate Judge P. Bradley Murray on 03/30/2023. (dtd) (Entered: 03/30/2023) |
| 04/04/2023 | 11 | NOTICE by All Defendants *of Intent to Serve Subpoenas on Non-Parties* (Marchand, Chad) (Entered: 04/04/2023) |
| 04/14/2023 | 12 | REPORT of Rule 26(f) Planning Meeting . (Marchand, Chad) (Entered: 04/14/2023) |
| 04/14/2023 | | REFERRAL of 12 Report of Rule 26(f) Planning Meeting to Judge Murray. (mab) (Entered: 04/14/2023) |
| 04/17/2023 | 13 | TEXT ONLY ORDER: This cause is before the Court on the parties' Rule 26(f) Report, filed April 14, 2023. (Doc. 12). This action shall come on for a Rule 16(b) scheduling conference on May 3, 2023, at 11:00 a.m., in Courtroom 5A, United States Courthouse, Mobile, Alabama, as it is the undersigned's belief that bringing the parties and the Court together at this stage promotes efficiency in the litigation process, helps avoid discovery disputes, provides a clearer path to pretrial resolution, and allows counsel to pose questions to the Court. See Fed. R. Civ. P. 16(b)(1)(B) (providing that a magistrate judge must issue a scheduling order "after consulting with the parties' attorneys... at a scheduling conference."). Out of town counsel may attend the scheduling conference by telephone in lieu of attendance in person by filing a notice with the Court and using the following numbers to call-in for the conference call: CALL IN NO.: 571-353-2301 and Guest ID: 002111803. Signed by Magistrate Judge P. Bradley Murray on 4/17/23. (lto) (Entered: 04/17/2023) |
| 04/17/2023 | | Set/Reset Hearings: Scheduling Conference set for 5/3/2023 at 11:00 AM in US Courthouse, Courtroom 5A, 155 St. Joseph Street, Mobile, AL 36602 before Magistrate Judge P. Bradley Murray - See Doc. 13. (tot) (Entered: 04/17/2023) |
| 04/18/2023 | 14 | Notice of Filing Notice of Deposition of Plaintiff, Notice of Defendant's Interrogatories and Requests for Production of Documents to Plaintiff, Defendant's Initial Disclosures filed by Walmart Claims Services, Inc., Walmart, Inc.. (DeLashmet, W.) (Entered: 04/18/2023) |
| 05/03/2023 | | Minute Entry for proceedings held before Magistrate Judge P. Bradley Murray: Scheduling Conference held on 5/3/2023. (Digital Court Recording; Courtroom 5A) (eec) (Entered: 05/03/2023) |
| 05/04/2023 | 16 | SCHEDULING ORDER: Pretrial Conference set for 11/8/2024at 09:30 AM in US Courthouse, Courtroom 3B, 155 St. Joseph Street, Mobile, AL 36602 before District Judge Terry F. Moorer. Jury Selection set for 12/3/2024 at 08:45 AM. Trial set during the month of December 2024, the specific dates of trial will be set at the Final Pretrial Conference. ETT: 3 Days. Discovery cutoff 8/2/2024. Amended Pleadings due by 9/15/2024. Dispositive Motions due by 9/4/2024. Position Regarding Settlement due by 8/2/2024. Signed by Magistrate Judge P. Bradley Murray on 5/4/23. (Attachment: # 1 Standing Order Governing Final Pretrial Conferences) (tot)

**Pattern Jury Instruction Builder** - To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 05/04/2023) |
| 06/06/2023 | 17 | Notice of Filing Notice of Intent to Serve Subpoenas on Non-Parties filed by Walmart Claims Services, Inc., Walmart, Inc.. (Marchand, Chad) (Entered: 06/06/2023) |
| 06/09/2023 | 18 | Notice of Filing Notice of Intent to Serve Subpoenas on Non-Parties filed by Walmart Claims Services, Inc., Walmart, Inc.. (Marchand, Chad) (Entered: 06/09/2023) |
| 06/30/2023 | 19 | Notice of Filing Notice of Videotaped Deposition filed by Walmart Claims Services, Inc., Walmart, Inc.. (Marchand, Chad) (Entered: 06/30/2023) |
| 07/18/2023 | 20 | Notice of Filing Notice of Intent to Serve Subpoenas on Non-Parties filed by Walmart Claims Services, Inc., Walmart, Inc.. (Marchand, Chad) (Entered: 07/18/2023) |
| 08/07/2023 | 21 | Notice of Filing Interrogatories, Request for Production of Documents filed by Susan Ayla Rose. (Rice, Richard) (Entered: 08/07/2023) |
| 09/18/2023 | 22 | Notice of Filing Non-Party Subpoena filed by Walmart Claims Services, Inc., Walmart, Inc.. (Attachments: # 1 Supplement NPS to Ascension Medical Group, # 2 Supplement NPS to Newman's Medical Group, # 3 Supplement NPS to University of South Alabama) (Marchand, Chad) (Entered: 09/18/2023) |

**PACER Service Center**

**Transaction Receipt**

12/28/2023 15:30:51

| PACER Login: | AdamTheLawyer | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:23-cv-00044-TFM-MU |
| Billable Pages: | 4 | Cost: | 0.40 |

# EXHIBIT

# GG

Original Complaint from Rose v. Walmart Claims Services, Inc.

Case 1:23-cv-00414-TFM-MU Case 2:04-cv-T04-MU-SCDocument 1-32 Filed 02/05/23 Page 351 of 459 ELECTRONICALLY FILED
1/5/2023 10:56 AM
02-CV-2023-900014.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
SHARLA KNOX, CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form ARCiv-93    Rev. 9/18 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>02<br><br>Date of Filing:<br>01/05/2023 | Judge Code: |
|---|---|---|---|

## GENERAL INFORMATION

### IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA
### SUSAN AYLA ROSE v. WALMART CLAIMS SERVICES, INC. ET AL

**First Plaintiff:** ☐ Business ☑ Individual ☐ Government ☐ Other    **First Defendant:** ☑ Business ☐ Individual ☐ Government ☐ Other

**NATURE OF SUIT:** Select primary cause of action, by checking box (check only one) that best characterizes your action:

**TORTS: PERSONAL INJURY**
- ☐ WDEA - Wrongful Death
- ☑ TONG - Negligence: General
- ☐ TOMV - Negligence: Motor Vehicle
- ☐ TOWA - Wantonness
- ☐ TOPL - Product Liability/AEMLD
- ☐ TOMM - Malpractice-Medical
- ☐ TOLM - Malpractice-Legal
- ☐ TOOM - Malpractice-Other
- ☐ TBFM - Fraud/Bad Faith/Misrepresentation
- ☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**
- ☐ TOPE - Personal Property
- ☐ TORE - Real Property

**OTHER CIVIL FILINGS**
- ☐ ABAN - Abandoned Automobile
- ☐ ACCT - Account & Nonmortgage
- ☐ APAA - Administrative Agency Appeal
- ☐ ADPA - Administrative Procedure Act
- ☐ ANPS - Adults in Need of Protective Service

**OTHER CIVIL FILINGS (cont'd)**
- ☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture Appeal/Enforcement of Agency Subpoena/Petition to Preserve
- ☐ CVRT - Civil Rights
- ☐ COND - Condemnation/Eminent Domain/Right-of-Way
- ☐ CTMP - Contempt of Court
- ☐ CONT - Contract/Ejectment/Writ of Seizure
- ☐ TOCN - Conversion
- ☐ EQND - Equity Non-Damages Actions/Declaratory Judgment/Injunction Election Contest/Quiet Title/Sale For Division
- ☐ CVUD - Eviction Appeal/Unlawful Detainer
- ☐ FORJ - Foreign Judgment
- ☐ FORF - Fruits of Crime Forfeiture
- ☐ MSHC - Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
- ☐ PFAB - Protection From Abuse
- ☐ EPFA - Elder Protection From Abuse
- ☐ QTLB - Quiet Title Land Bank
- ☐ FELA - Railroad/Seaman (FELA)
- ☐ RPRO - Real Property
- ☐ WTEG - Will/Trust/Estate/Guardianship/Conservatory
- ☐ COMP - Workers' Compensation
- ☐ CVXX - Miscellaneous Circuit Civil Case

**ORIGIN:** F ☑ INITIAL FILING    A ☐ APPEAL FROM DISTRICT COURT    O ☐ OTHER

R ☐ REMANDED    T ☐ TRANSFERRED FROM OTHER CIRCUIT COURT

**HAS JURY TRIAL BEEN DEMANDED?** ☑ YES ☐ NO    **Note:** Checking "Yes" does not constitute a demand for a jury trial. (See Rules 38 and 39, Ala.R.Civ.P. for procedure)

**RELIEF REQUESTED:** ☑ MONETARY AWARD REQUESTED ☐ NO MONETARY AWARD REQUESTED

**ATTORNEY CODE:**
AUS023

1/5/2023 10:56:02 AM
Date

/s/ Johnathan F. Austin
Signature of Attorney/Party filing this form

**MEDIATION REQUESTED:** ☐ YES ☐ NO ☑ UNDECIDED

Election to Proceed under the Alabama Rules for Expedited Civil Actions: ☐ YES ☐ NO

**DEFENDANT'S EXHIBIT**
**A**

ELECTRONICALLY FILED
1/5/2023 10:56 AM
02-CV-2023-900014.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
SHARLA KNOX, CLERK

## IN THE STATE COURT OF MOBILE COUNTY
## STATE OF ALABAMA

| | |
|---|---|
| SUSAN AYLA ROSE, | |
| **Plaintiff,** | |
| v. | CASE NO.: |
| WALMART CLAIMS SERVICES INC., WALMART, INC., a Corporation; Its Agents, Servants, and Employees; FICTITIOUS No. 1, whether singular or plural, that entity or those entities who or which afforded any insurance coverage to either the person(s) and/or entities involved in the occurrence made the basis of this lawsuit; FICTITIOUS No. 2, whether singular or plural, that entity or those entities who or which had supervisory authority relating to the selection, training and hiring of the persons involved in the occurrence made the basis of this lawsuit. Plaintiff avers that the identities of the fictitious party defendants are otherwise unknown to the Plaintiff at this time or if their names are known to the Plaintiff at this time, their identities as proper party defendants are not known to Plaintiff at this time, but their true names will be substituted by amendment when ascertained, | JURY DEMANDED |
| **Defendants.** | |

---

## COMPLAINT

---

**COMES NOW,** the undersigned counsel on behalf of Plaintiff, Susan A. Rose, and files

this Complaint against the Defendants, Walmart Claims Services, Inc., and Walmart Inc., in this

1

matter, and in support thereof, respectfully shows unto this Honorable Court as follows:

## I. PARTIES

1.  Plaintiff Susan A. Rose (hereinafter referred to as "Plaintiff" or "Ms. Rose) is an adult individual, above the age of 19, and is a resident of the State of Alabama, Mobile County.

2.  Defendant Walmart Claims Services, Inc. (hereinafter referred to as "Walmart Claims") is based in Arkansas, with registered agent of CT Corp. System located at 2 N. Jackson St. Suite 605, Montgomery, AL 36104.

3.  Defendant Walmart, Inc. (hereinafter referred to as "Walmart") is a domestic corporation and is the corporate owner and management umbrella for the local retail store located at 2500 Dawes Road, Mobile, AL 36695 (Store # 4581).

4.  The Defendants, Fictitious Parties 1 and 2 are the persons, firms, partnerships, corporations, government entities or other entities, whether singular or plural, which caused or contributed to any of the injuries made a part of this complaint.

## II. JURISDICTION AND VENUE

5.  Defendants have operated a business, and located in Mobile County, Alabama and are otherwise engaged in substantial and regular business operations in Mobile County, Alabama. Defendants otherwise have sufficient contacts with this State and County.

6.  The Plaintiff, at all times relevant, interacted with the Defendants from a location within Mobile County, Alabama and the events and actions complained of herein occurred in Mobile County, Alabama.

7.  The amount in controversy exceeds $50,000.

## III. FACTS

8. Ms. Rose is a resident of Mobile County, Alabama.

9. Ms. Rose visits Walmart for various items on a regular basis.

10. On or about January 5, 2021, Ms. Rose entered Walmart Store #4581 to purchase groceries and other household items.

11. As Ms. Rose was gathering items, she came upon an aisle containing various packaged bottle waters.

12. Ms. Rose walked up to a pallet containing 32-packs of bottled water available for purchase.

13. As the Plaintiff attempted to retrieve one of the cases off of the pallet to place in her buggy, unbeknownst to her, the 32-pack of water that she was attempting to retrieve was staked in a way that obstructed the view of what was underneath the cardboard, which was an empty space.

14. As the Plaintiff lifted the 32-pack of water towards her, the open space below gave way, and caused Plaintiff to fall forward into the pallet of water and injuring her back.

15. Concurrently with the Plaintiff falling forward into the stack of waters, a wrench which was presumably left by the Defendant, fell and struck the Plaintiff in her right hand, causing severe pain and discomfort.

16. A female Walmart employee stocking product in the cheese section of the area heard and/or saw the incident occur. She asked Ms. Rose if she was okay.

17. After gathering herself after her fall, Plaintiff proceeded to the checkout.  Ms. Rose immediately felt pain in her right hand when the wrench fell.

18. By the time she gathered herself and made her way to the checkout line, Ms. Rose noticed her lower back was significantly starting to hurt.

3

19. Ms. Rose reported her accident to the Asset Protection Manager, Mr. Labarron Cryer. Mr. Cryer took photographs showing the pack of water in her buggy. He visited the site where the incident occurred, and took photographs at this location as well. Cryer wrote an incident report but did not provide Rose with a copy of it at that time.

20. Cryer claimed that he attempted to interview the female Walmart employee who had witnessed the incident, but stated that she was currently at lunch. Cryer claimed he would interview the witness and would then contact Ms. Rose.

21. The incident report provided to Ms. Rose did not mention anything regarding the Walmart employee witness.

22. While taking the incident report, Cryer asked Ms. Rose if she was going to see a doctor as a result of her injuries. Not realizing the soreness that she would soon experience and the extent of her injuries, she stated that she would likely not see a doctor. Cryer instructed her to contact him personally if she changed her mind and decided to seek medical treatment.

23. When Ms. Rose quickly realized that her pain was worsening in her lower and middle back, neck, lower abdomen area, and her hands became numb, she immediately visited a doctor.

24. As a result of her accident at the Walmart location (Store #4581) on or about January 5, 2021, Plaintiff Rose's medical condition worsened, and her quality of life sharply declined in multiple aspects of her life.

25. Not only has her work life and income been affected by the incident, but also her physical weight, blood pressure, and overall health has declined due to not being able to exercise regularly. As a result, Plaintiff has experienced depression and emotional damages.

26. Plaintiff sues under state common law for negligence and negligent supervision and training.

27. Plaintiff Susan Rose has sustained injuries to her person, which has caused her physical and mental health to decline in the two years since the incident as a result of the incidents described herein.

## IV. CAUSES OF ACTION

### COUNT I: NEGLIGENCE

28. Paragraphs 1 - 27 above are incorporated by reference as if fully set forth herein.

29. Defendant Walmart had a duty to protect the safety of customers by ensuring that all retail products are in a stable and safe condition suitable for the consumers to safely shop.

30. Defendant Walmart breached its duty to its customers by failing to ensure that the 32-pack water bottles were stacked correctly and all service items, including the wrench, were properly stored.

31. Defendants' breach of duty caused Plaintiff Susan Rose, an elderly yet otherwise relatively healthy woman, to suffer permanent injuries to her neck, shoulders, back, and right hand.

32. Plaintiff was caused to suffer damages requiring physical, psychological, and emotional treatment. Her enjoyment of life has diminished since the accident. As many of her injuries are permanent, Plaintiff will continue to suffer additional damages in the future.

### COUNT II: NEGLIGENT TRAINING AND SUPERVISION

33. Paragraphs 1 - 32 above are incorporated by reference as if fully set forth herein.

34. Defendants had a duty to train and supervise their employees on how to stack items including 32-pack bottles of water, and how to properly store service tools.

35. Defendant breached their duty by failing to inspect and or otherwise confirm that their

5

employees were in fact packing and stacking retail items properly and in accordance with policies.

36. Defendants' breach of duty caused Plaintiff Susan Rose, an elderly yet otherwise relatively healthy woman, to suffer permanent injuries to her neck, shoulders, back, and right hand.

37. Plaintiff was caused to suffer damages requiring physical, psychological, and emotional treatment. Her enjoyment of life has diminished since the accident. As many of her injuries are permanent, Plaintiff will continue to suffer additional damages in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, **PREMISES CONSIDERED**, Plaintiff demands judgment against Defendant in an amount which the Court deems appropriate, to include compensatory and punitive damages, attorney's fees, and costs of this action. Plaintiffs pray for such other, further and different relief to which she is entitled.

*Respectfully* submitted this 5th day of January, 2023.

/s/ *Johnathan F. Austin (AUS023)*
Johnathan F. Austin
Attorney for Plaintiff

Of Counsel:

Austin Law, P.C.
P.O. Box 321173
Birmingham, AL 35212
Ph: (205) 538-0169
Mobile: (205) 215.2219
Facsimile: (205) 707-1168
Email: austin@jaustinlawpc.com

6

*/s/ Richard A. Rice (RIC086)*
Richard A. Rice
Attorney for Plaintiff

The Rice Firm, LLC
Richard A. Rice
115 Richard Arrington Blvd. Jr. N
Birmingham, AL 35203
Ph: (205) 618-8733 ext 101
Facsimile: (888).391-7193
Email: rrice@rice-lawfirm.com

## DEFENDANTS – SERVICE BY CERTIFIED MAIL REQUESTED
## (CLERK'S OFFICE)

Walmart (Store #4581)
2500 Dawes Road
Mobile, AL 36695

Walmart Inc.
c/o C T CORPORATION SYSTEM
2 NORTH JACKSON ST., SUITE 605
MONTGOMERY, AL 36104

Walmart Claims Services, Inc.
c/o C T CORPORATION SYSTEM
2 NORTH JACKSON ST., SUITE 605
MONTGOMERY, AL 36104

*/s/ Johnathan F. Austin*
Of Counsel

7

Revised 1-1-014; 4-1-99; 11-1-99

02-CV-2023-900014.00
CIRCUIT COURT OF
MOBILE COUNTY, ALABAMA
SHARLA KNOX, CLERK

## IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | |
|---|---|
| _____ | * |
| _____ | * |
| _____ | * |
| Plaintiff(s) | * |
| Vs. | *  CIVIL ACTION NO. _____ |
| _____ | *  DATE COMPLAINT FILED: _____ |
| _____ | * |
| Defendant(s) | |

### ASSIGNMENT TO EXPEDITED CASE MANAGEMENT SYSTEM AND GENERAL PRE-TRIAL ORDER

This case has been placed on the Expedited Case Management System which is designed to dispose of a case within 12 months after filing.

### OBJECTION TO INCLUSION IN SYSTEM

If a party to this cause believes that the cause is extremely complex or will involve unique problems and will be impossible to prepare for trial within the time frame of the system, he may, within 40 days after the date of this order, or if the party has not been served at the date of this order, within 40 days after service, file a motion requesting that the cause not be included in the system and that the parties be allowed additional time to prepare the cause for trial. A motion filed later than the aforesaid 40 days will not be considered by the Court, a discovery schedule will be set by the Court after conference with the parties. If a case is so excluded the General Pre-Trial Order will remain in effect unless specifically altered by the Court.

### DISCOVERY

Unless the Court sets a shorter time, all pre-trial discovery shall be completed within 270 days after filing of the complaint unless party filing Motion to Set and Certificate of Readiness requests additional period of time, not to exceed 60 days, and certifies that all discovery will be concluded within that time. Notwithstanding the foregoing, for good cause shown, the Court may permit, or parties may agree, that additional discovery procedures be undertaken anytime prior to trial, so long as such discovery can be completed so as not to require a continuance of the trial setting.

### MOTION TO SET AND CERTIFICATE OF READINESS

Counsel for the plaintiff shall, and counsel for any other party may, file a Motion to Set and Certificate of Readiness, which hall be filed not later than 270 days after the filing of the complaint. If such motion is not filed by the 280th day, the Court will place the case marked "To Be Dismissed", on a disposition docket as near as possible to the 300th day and send notice of such to all parties. If a Motion to Set and Certificate of Readiness is not received by the Court prior to the disposition date, the case will be dismissed.

The Motion to Set and Certificate of Readiness will be in a form similar to that available in the Clerk's Office and will contain the following information:

    (1)    The date the complaint was filed;

    (2)    That the issues in this cause have been defined and joined;

    (3)    That all discovery has been completed or will be completed 60 days after the filing of the Certificate of Readiness;

    (4)    That a jury demand has or has not been demanded;

    (5)   The expected length of the trial expressed in hours and/or days;

    (6)   A brief description of the plaintiff's claim;

    (7)   The names, addresses and telephone numbers of the parties or their attorneys responsible for their litigation;

    (8)   That the movant certifies that all expert witnesses expected to testify at trial have been disclosed to all parties, together with a summary of their opinions;

    (9)   That the movant acknowledges his/her responsibility to make all documents, exhibits, and physical evidence, or copies thereof, expected to be used in the case in chief available to the other parties, not less than 21 days prior to trial, for inspection and copying;

    (10)  That the movant certifies that he/she has rad the pre-trial order, and that he/she has complied with it to date and will comply with its requirements in the future.

The filing by the plaintiff of a Motion to Set and Certificate of Readiness constitutes the voluntary dismissal of all fictitious parties whose true names have not been substituted.

## CONTROVERTING CERTIFICATE

Within 14 days after a Motion to Set and Certificate of Readiness has been filed, counsel for any other party may file a Controverting Certificate specifying the particular statements contained in the Certificate of Readiness to which objection is made, and the reason therefore. Oral argument may be requested. The Court shall thereupon enter an order placing the case on the Active Calendar either immediately or, where for good cause is shown, at a specified later date.

## ACTIVE CALENDAR

    Fourteen days after a Motion to Set and Certificate of Readiness is filed, if a Controverting Certificate has not been filed, the case shall be placed on the Active Calendar, unless otherwise ordered by the Court

## SETTING FOR TRIAL

    Unless specifically set by the Court, cases on the Active Calendar shall be set for trial generally in the same order as they came on the Active Calendar and as soon as possible. Preference shall be given to cases which by statute, rule or order of the Court are entitled to priority. Counsel shall be given at least sixty days notice of the trial date.

## DELAY

    When a case has been set for trial, no postponement of the trial will be considered by the Court except on a written motion substantially in the form previously approved by the Court. (Obtain from the Court a Request for Delay form)

## NOTIFICATION OF SETTLEMENT

    In order to provide other litigants with prompt trial settings all attorneys shall notify the Court of settlement, regardless of the status or state of the case (discovery stage, active calendar or trial calendar)

## GENERAL PRE-TRIAL ORDER

To expedite pre-trial and trial procedures, it is ORDERED, BY THE Court that the following will apply:

1.   EXHIBITS, DOCUMENTS AND PHYSICAL EVIDENCE

a.   Each party shall identify in writing to all other parties and shall make all documents, exhibits and physical evidence, or copies thereof, expected to be used in this case in chief available to the other parties, not less than 21 days prior to trial, for inspection and copying. The same shall then be authenticated and admitted into evidence without further proof, unless written objections to any such documents or exhibits be made to the Court not less than 14 days prior to trial specifying the grounds of objection to the genuineness and relevancy of the proposed documents, exhibits and physical evidence used solely as impeachment evidence.

b.   Documents, exhibits or physical evidence not timely exhibited to or made available to other parties prior to trial under this Order will not be admitted into evidence at trial unless solely for impeachment purposes or unless the ends of justice so require.

c.   Documents, exhibits or physical evidence so admitted hereunder shall be presented to the court reporter for marking in evidence prior to trial.

## 2.   DOCTOR, HOSPITAL AND MEDICAL RECORDS

a.   If applicable, all doctor, medical and hospital bills shall be sent or made available to all parties not less than 21 days prior to trial and shall be admitted in evidence as reasonable without further proof, unless written objection to any such bill be made to the Court no less than 14 days before trial specifying the grounds for objection.

b.   Any such bill not timely exhibited to other parties will not be admitted at trial unless the ends of justice so require.

c.   The bills so admitted shall be presented to the court reporter for marking in evidence prior to trial.

## 3.   DAMAGES

a.   All parties seeking special damages shall furnish the other parties with a list thereof not less than 21 days prior to trial.  Written objections thereto may be made not less than 14 days before trial specifying the grounds of objections.

b.   Evidence of special damages claimed, but not time exhibited to other parties, will not be admitted into evidence unless the ends of justice so require.

## 4.   AGENCY-TIME AND PLACE-DUTY

a.   Agency and the time and place of the incident involved, if alleged in the complaint, and, if a negligence case, the existence of a duty, are admitted and the parties are deemed correctly named and designated unless specifically denied by answer or unless written objection is made not less than 14 days before trial.  The objections shall include the correct name and entity and/or grounds relied on.

## 5.   EXPERTS

a.   Unless previously obtained by discovery, each party will furnish to all other parties the names, addresses and qualifications of all expert witnesses expected to testify, together with a brief summary of their opinions.  Such disclosure of experts shall be made by the party filing the Motion to Set and Certificate of Readiness not later than the time of filing of such motion.  Disclosure by all parties shall be made not later than 14 days after the filing of the Motion to Set and Certificate of Readiness.

b.   Disclosure of experts in cases not included in the Fasttrack system shall be made by all parties not less than 60 days before trial.

c.   Unless written objection to the qualifications of an expert is made not later than 30 days before trial, stating grounds, the qualification of such experts will be admitted.

d.   Upon calling an expert to testify at trial, the attorney may state to the Court and jury the name, address and summary of the qualifications of the expert.

## 6.   JURY INSTRUCTIONS

a.   If a case is to be tried by a jury, requested written charges shall be submitted to the Court not less than the close of the plaintiff's case, subject to supplementation during the course of the trial on matters which could not be reasonably anticipated.  Each requested charge will be typed on letter sized paper and identified by the party's last name and shall be numbered.

## 7.   JURY SELECTION

a.   Before the commencement of trial, the parties will furnish or advise the Court, outside the presence of the jury, the names of all insurance companies involved and any special voir dire questions for the purpose of qualifying the jury.

## 8.   DUTY TO SUPPLEMENT DISCOVERY

a.   All parties are under duty to supplement responses to discovery as provided by Rule 26(e)(3) ARCP which

should be done not less than 30 days before trial.

9.   **MOTIONS GENERALLY**

    a.    If motion to strike or dismiss a pleading is filed, the Court will not consider such unless a copy of the pleading sought to be struck or dismissed is attached thereto.

11.   **CONFLICTS**

    a.    In the event of scheduling conflict affected counsel shall comply with the Attorney Calendar Conflict Resolution Order of the Alabama Supreme Court.

    It is further ORDERED, by the Court that the Court will consider any portion of the General Pre-Trial Order upon timely application by any party.

Done this _____ day of _____

_____
Presiding Judge, Michael A. Youngpeter


UNITED STATES
POSTAL SERVICE

January 9, 2023

Dear Circuit Clerk:

| UJS Information | |
|---|---|
| Case Number: 02-CV-2023-900014.00<br>Document Type: Complaint<br>Restricted Delivery Requested: No | Intended Recipient:<br>WALMART, INC. (D002)<br>2 NORTH JACKSON STREET<br>SUITE 605<br>MONTGOMERY, AL 36104 |

The following is in response to your request for proof of delivery on your item with the tracking number: **9214 8901 7301 4102 2300 0013 50**.

## Item Details

| | |
|---|---|
| **Status:** | Delivered, Individual Picked Up at Post Office |
| **Status Date / Time:** | January 9, 2023, 8:13 am |
| **Location:** | MONTGOMERY, AL 36104 |
| **Postal Product:** | First-Class Mail® |
| **Extra Services:** | Certified Mail™ |
| | Return Receipt Electronic |

## Recipient Signature

| Signature of Recipient: | X [signature] Printed Name: MARILEE P[illegible] |
|---|---|
| Address of Recipient: | Delivery Address: 2 N Jackson 605 |

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service® for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service®
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

Cancel

100%

**UNITED STATES POSTAL SERVICE**

January 9, 2023

Dear Circuit Clerk:

| UJS Information | |
|---|---|
| Case Number: 02-CV-2023-900014.00<br>Document Type: Complaint<br>Restricted Delivery Requested: No | Intended Recipient:<br> WALMART CLAIMS SERVICES, INC.  (D001)<br>2 NORTH JACKSON STREET<br>SUITE 605<br>MONTGOMERY, AL 36104 |

The following is in response to your request for proof of delivery on your item with the tracking number: **9214 8901 7301 4102 2300 0013 43**.

## Item Details

| | |
|---|---|
| **Status:** | Delivered, Individual Picked Up at Post Office |
| **Status Date / Time:** | January 9, 2023, 8:13 am |
| **Location:** | MONTGOMERY, AL 36104 |
| **Postal Product:** | First-Class Mail |
| **Extra Services:** | Certified Mail™ |
| | Return Receipt Electronic |

## Recipient Signature

Signature of Recipient:

Address of Recipient:

Note: Scanned image may reflect a different destination address due to Intended Recipient's delivery instructions on file.

Thank you for selecting the United States Postal Service for your mailing needs. If you require additional assistance, please contact your local Post Office™ or a Postal representative at 1-800-222-1811.

Sincerely,
United States Postal Service
475 L'Enfant Plaza SW
Washington, D.C. 20260-0004

100%

Cancel

# EXHIBIT

# HH

Answer from Rose v. Walmart Claims Services, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

SUSAN AYLA ROSE,                         *
                                          *
                                          *
    Plaintiff,                            *
                                          *
vs.                                       *          CASE NO.  23-44
                                          *        Removed from Circuit Court of
                                          *             Mobile, Alabama
                                          *            02-CV-2023-900014
                                          *
WALMART CLAIMS SERVICES, INC.             *
WALMART, INC.                             *
FICTITIOUS PARTIES 1 TO 2                 *
                                          *
    Defendants.                           *

<u>WALMART'S ANSWER TO PLAINTIFF'S COMPLAINT</u>

Defendants WALMART, INC and WALMART CLAIMS SERVICES, INC. (collectively "Walmart") answer Plaintiff's Complaint as follows, with each numbered paragraph corresponding to the numbered paragraphs of Plaintiff's Complaint:

I.      PARTIES

1.      As this paragraph is a statement of Plaintiff's residency it does not require a response from Walmart.

2.      Admitted.

3.      Walmart, Inc. admits that it is organized under the laws of Delaware and maintains its principal place of business in Bentonville, Arkansas.  Walmart further admits that it controlled the premises located at 2500 Dawes Road, Mobile, AL 36695, Store #4581.  Walmart denies the remaining allegations of this paragraph and demands strict proof thereof.

4.     As this paragraph is a statement of fictitious defendants and therefore, no response is required from Walmart.

## II.     JURISDICTION AND VENUE

5.     Walmart, Inc. admits that it operated a business located in Mobile County, Alabama and are engaged in regular business operations in Mobile County, Alabama.  Walmart denies the remaining allegations of this paragraph and demands strict proof thereof.

6.     Walmart admits that the actions that are the subject of Plaintiff's Complaint occurred in Mobile County, Alabama.  Walmart denies the remaining allegations of this paragraph and demands strict proof thereof.

7.     Walmart based upon information and belief, namely, Plaintiff Counsel's representations and settlement demands, admits that the amount that Plaintiff claims is in controversy exceeds $50,000, but denies that it is liable to Plaintiff and denies that the damages in this case exceed $50,000.  Walmart denies the remaining allegations of this paragraph and demands strict proof thereof.

8.     Admitted.

9.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

10.     Walmart admits that Plaintiff was present in Walmart Store #4581 on or about January 5, 2021.  Walmart, however, is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

11.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

12.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

13.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

14.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

15.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

16.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

17.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

18.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

19.     Walmart admits that Plaintiff reported an accident, that photographs of the area were taken as well as Plaintiff's cart containing a case of water, and that an incident report was made. Walmart denies the remaining allegations of this paragraph and demands strict proof thereof.

20.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

21.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

22.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

23.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

24.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

25.     Walmart is without sufficient information to admit or deny the allegations of this paragraph and therefore denies the same and demand strict proof thereof.

26.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

27.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

IV.     CAUSES OF ACTION

COUNT I: NEGLIGENCE

28.     Walmart adopts and incorporates the previous paragraphs as if fully set forth herein.

29.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

30.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

31.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

32.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

COUNT II:  NEGLIGENT TRAINING AND SUPERVISION

33.     Walmart adopts and incorporates the previous paragraphs as if fully set forth herein.

34.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

35.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

36.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

37.     Walmart denies the allegations of this paragraph and demands strict proof thereof.

## PRAYER FOR RELIEF

Walmart denies the allegations and demand for damages in the unnumbered paragraph under the heading "Prayer for Relief."

## AFFIRMATIVE DEFENSES

1.      Plaintiff's Complaint fails to state a claim upon which relief may be granted against this defendant.

2.      Defendant Walmart Claims Services, Inc. is in improper party, Plaintiff fails to state any viable claim against this defendant, and therefore, this defendant is due to be dismissed.

3.      Plaintiff's claims are barred by insufficiency of service and/or insufficiency of process.

4.      Walmart denies each and every material allegation of Plaintiff's Complaint not heretofore admitted and demands strict proof thereof.

5.      The Plaintiff was guilty of negligence that contributed to cause the injuries about which he complains, and therefore under Alabama law is not entitled to recover any damages.

6.      The alleged hazard about which Plaintiff complains was open and obvious thereby obviating a duty to warn and precluding Plaintiff from recovering damages under Alabama law.

7.      Walmart did not have notice of the alleged hazard about which Plaintiff complains, and therefore, under Alabama law Walmart owed Plaintiff no duty to eliminate the alleged hazard.

8.     No act or omission of this defendant was the proximate cause of any injury to Plaintiff.

9.     Walmart owed Plaintiff no duty as alleged.

10.    Plaintiff's claims are barred, in whole or in part, because she failed to undertake the precautions that a reasonably prudent person would take to protect against dangers which a reasonably careful person would reasonably appreciate under the same or similar circumstances.

11.    Plaintiff's claims are barred due to her contributory negligence.

12.    Plaintiff assumed the risk associated with her actions and therefore her claims against this Defendant fail.

13.    Plaintiff assumed the risk of conditions present and the dangers inherent therein.

14.    Plaintiff's claims are precluded by the applicable statute of limitations.

15.    Plaintiff's injuries and damages were the result of an intervening and/or superseding cause; therefore, Plaintiff should not recover from Walmart.

16.    Walmart had no knowledge of the alleged defect or condition Plaintiff alleges to have been the cause of his injury; therefore, Plaintiff should not recover from Walmart.

17.    Plaintiff, in whole or in part, failed to mitigate her alleged damages, and therefore is precluded from recovery.

18.    Walmart respectfully demands credit for any and all monies paid to, or on behalf of, Plaintiff from any and all collateral sources.

19.    Walmart is entitled to the applicable Alabama statutory damages caps.

20.     Plaintiff, in whole or in part, failed to mitigate her alleged damages, and therefore is precluded from recovery.

21.     Plaintiff's alleged damages are the result of a condition and/or injury which predates the incident made the basis of his Complaint and having no causal relationship with this defendant.

22.     The imposition of punitive damages in this case would violate the Due Process Clause of Amendments V and XIV to the United States Constitution and Article I, § 6 of the Alabama Constitution because such an award under these facts would violate the defendants' right to procedural and substantive due process.

23.     The imposition of punitive damages in this case would violate the Due Process Clause of Amendments V and XIV to the United States Constitution and Article I, § 6 of the Alabama Constitution because the alleged culpability of the defendant's conduct is not so reprehensible as to warrant further additional sanctions after payment of compensatory damages.

24.     Inasmuch as Plaintiff asserts a claim for punitive damages, as applied in this case would violate the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution to the extent it exceeds the standards and limitations set forth in *State Farm Mut. Auto. Ins. Co. v. Campbell*, 123 S. Ct. 1513 (2003).

25.     Plaintiff's claim for punitive damages violates the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments, jointly and separately, of the Constitution of the United States in each of the following separate and several ways: a. It seeks an award of punitive damages that is vastly disproportionate to any actual harm, and thus exceeds the standards of substantive and procedural due process under the Eighth and Fourteenth Amendments of the U.S. Constitution.

7

i. Seeks a disproportionate award of punitive damages that constitutes an arbitrary and capricious taking of property which is unjustified by any legitimate governmental interest, thereby violating the Fifth and Fourteenth Amendments of the U.S. Constitution.

ii. It seeks an award of punitive damages without sufficient substantive and procedural standards to guide the jury's discretion in determining both the liability and amount of punitive damages to be awarded, thus violating the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution. d. It seeks punitive damages under substantive standards of liability that are vague, ambiguous, subjective, and not reasonably ascertainable, and are thus "void for vagueness" under the Fourteenth Amendment of the U.S. Constitution.

iii. It seeks punitive damages for conduct by the defendant which complied with all applicable statutory, regulatory, and/or administrative rules and regulations, thus failing to furnish fair notice of punishable conduct and violating the Due Process and Equal Protection Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution.

iv. It seeks punitive damages upon a standard of proof less than that required for the imposition of criminal sanctions, thus violating procedural due process under the Fifth Amendment of the U.S. Constitution.

v. It seeks joint and several punitive damages liability from defendants who are guilty of different acts and degrees of culpability, thus violating the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution.

vi.   It would result in multiple awards of punitive damages for the same alleged acts or omission in violation of the Fifth, Seventh, Eighth and Fourteenth Amendments of the U.S. Constitution.

vii.   It seeks punitive damages based, in whole or part, upon evidence of out-of-state conduct that is immaterial and/or lawful in the jurisdiction where it occurred, thus violating the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution.

viii.   It seeks punitive damages based, in whole or part, upon improper character evidence consisting of other alleged misconduct that is dissimilar and/or immaterial to the conduct that harmed the plaintiff, thus violating the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution. k. It seeks punitive damages based, in whole or part, upon the financial status of the defendant, thus violating the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution, and the Equal Protection Clause of the Fourteenth Amendment.

ix.   It seeks punitive damages based, in whole or part, upon hypothetical evidence of other similar claims, thus violating the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution.

x.   The applicable state law does not provide fair notice of the conduct that will subject the defendant to punishment, nor a reasonable limitation on the degree of punishment, nor fair notice of the severity of punishment for the alleged

misconduct, thus violating the Due Process Clause of the Fifth and Fourteenth Amendments of the U.S. Constitution.

xi.    The Plaintiff's claim improperly seeks to justify and award of punitive damages based on a profit-removal theory that is based on the removal of each dollar of profit made by the defendant from other alleged similar acts of misconduct, thus violating the Due Process and Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution.

xii.   The applicable state law fails to provide a clear, objective, and consistent appellate standard for post-verdict review of punitive damages thus violating the Fifth and Fourteenth Amendments of the United States Constitution.

26.    Defendants respectfully demands credit for any and all monies paid to, or on behalf of, Plaintiff from any and all collateral sources.

27.    Any relief for punitive damages sought by Plaintiff is limited by and must comply with Ala. Code § 6-11-20, et. seq.

28.    Defendants reserves the right to add and/or supplement its affirmative defenses as discovery in this matter has not yet begun.

DEFENDANTS DEMANDS TRIAL BY STRUCK JURY

*/s/ Chad C. Marchand*
W. PEMBLE DELASHMET (DELAW0873)
wpd@delmar-law.com
CHAD C. MARCHAND        (MARCC5089)
ccm@delmar-law.com
KEITH B. FRANKLIN        (FRANK8196)
kbf@delmart-law.com
*Attorneys for Defendants*

10

OF COUNSEL:

DELASHMET & MARCHAND, P.C.
Post Office Box 2047
Mobile, AL 36652
Telephone:     (251) 433-1577
Facsimile:     (251) 433-7994

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have served a copy of the foregoing document by electronically filing same with the E-File court system upon undersigned counsel on this the 1ˢᵗ day of February, 2023.

Johnathan E. Austin
Austin Law, PC
Post Office Box 321173
Birmingham, AL 35212

*/s/ Chad C. Marchand* _____
OF COUNSEL

# EXHIBIT



Docket Sheet from Pinero v. Walmart Claims Services

Query    Reports    Utilities    Help    Log Out

RECAP Actions

CLOSED,LFL,MEDIATION,REF_DISCOV

**U.S. District Court**
**Southern District of Florida (Miami)**
**CIVIL DOCKET FOR CASE #: 1:21-cv-23458-KMM**

Pinero v. Walmart Claims Services, Inc.
Assigned to: Judge K. Michael Moore
Referred to: Magistrate Judge Lauren Fleischer Louis
Case in other court: 11th Judicial Circuit, Miami-Dade County, Florida, 21-019069- CA-01
Cause: 28:1446 Notice of Removal-Personal Injury

Date Filed: 09/27/2021
Date Terminated: 09/13/2022
Jury Demand: Defendant
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Dorelia Camps Pinero**
represented by **William Castile Ruggiero**
William C Ruggiero
200 S Andrews Ave
Suite 703
Fort Lauderdale, FL 33301
954-462-2300
Fax: 954-463-2460
Email: ruggiero@wcrlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Walmart Claims Services, Inc.**
represented by **Frantz Destin , Jr.**
Fasi & DiBello, P.A.
150 SE 2nd Ave.
Suite 1010
Miami, FL 33131
305-537-0469
Fax: 305-503-7405
Email: destin@fasidibellolaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Clayton D. Hackney**
Fasi & DiBello, P.A.
150 SE 2nd Avenue
Suite 1010
Miami, FL 33131
305-537-0469
Fax: 305-503-7405
Email: hackney@fasidibellolaw.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/27/2021 | 1 | NOTICE OF REMOVAL (STATE COURT COMPLAINT - Complaint for Damages) Filing fee $ 402.00 receipt number AFLSDC-15046552, filed by Walmart Claims Services, Inc.. (Attachments: # 1 Exhibit A - State Court Complaint, # 2 Exhibit B - Return of Service, # 3 Exhibit C - Florida Secretary of State Filing, # 4 Exhibit D - Pre-suit Demand Letter (redacted), # 5 Exhibit E - Arkansas Secretary of State Filing)(Hackney, Clayton) No Answer/Motion to Dismiss filed. Modified on 9/28/2021 (pcs). (Entered: 09/27/2021) |
| 09/27/2021 | 2 | Clerks Notice of Judge Assignment to Judge K. Michael Moore. Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Lauren F. Louis is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent. Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (pcs) (Entered: 09/28/2021) |
| 09/29/2021 | 3 | PAPERLESS PRETRIAL ORDER. THIS ORDER has been entered upon the filing of a Notice of Removal. Counsel for the removing party is hereby ORDERED to forward a copy of this Order to all other parties. It is further ORDERED that S.D. Fla. L.R. 16.1 shall apply to this case and the parties shall hold a scheduling conference within twenty (20) days of the date of this Order. Within ten (10) days of the scheduling conference, counsel shall file a Joint Scheduling Report. The report shall indicate the proposed month and year for the trial and the estimated number of days required for trial. The scheduling conference may be held via telephone. At the conference, the parties shall comply with the following agenda that the Court adopts from S.D. Fla. L.R. 16.1: (1) Documents (S.D. Fla. L.R. 16.1.B.1 and 2) The parties shall determine the procedure for exchanging a copy of, or a description by category and location of, all documents and other evidence that is reasonably available and that a party expects to offer, or may offer, if the need arises. Fed. R. Civ. P. 26(a)(1)(B). (A) Documents include computations of the nature and extent of any category of damages claimed by the disclosing party unless the computations are privileged or otherwise protected from disclosure. Fed. R. Civ. P. 26(a)(1)(C). (B) Documents include insurance agreements which may be at issue with the satisfaction of the judgment. Fed. R. Civ. P. 26(a)(1)(D). (2) List of Witnesses - The parties shall exchange the name, address, and telephone number of each individual known to have knowledge of the facts supporting the material allegations of the pleading filed by the party. Fed. R. Civ. P. 26(a)(1)(A). The parties have a continuing obligation to disclose this information. (3) Discussions and Deadlines (S.D. Fla. L.R. 16.1.B.2) - The parties shall discuss the nature and basis of their claims and defenses and the possibility of a prompt settlement or resolution of the case. Failure to comply with this Order or to exchange the information listed above may result in sanctions and/or the exclusion of documents or witnesses at the time of trial. S.D. Fla. L.R. 16.1.I. Failure of counsel to file a joint scheduling report may result in remand or dismissal, default, and the imposition of other sanctions including attorney's fees and costs. The filing of a motion to dismiss, or other motion, does not toll the time for filing a joint scheduling report. Counsel for the non-removing party must file a motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction within thirty (30) days after the filing of the Notice of Removal. The parties are hereby on notice that this Court requires all filings to be formatted in 12 point Times New Roman font and double spaced, including any footnotes, with one-inch margins on all sides. Failure to follow these formatting guidelines may result in the filing being stricken, any opposing filing being granted by default, and the imposition of other sanctions, including attorney's fees and costs. Pursuant to Administrative Order 2016-70 of the Southern District of Florida and consistent with the Court of Appeals for the Eleventh Circuit's Local Rules and Internal Operating Procedures, within three days |

| | | |
|---|---|---|
| | | of the conclusion of a trial or other proceeding, parties must file via CM/ECF electronic versions of documentary exhibits admitted into evidence, including photographs of non-documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in Administrative Order 2016-70 unless directed otherwise by the Court. Telephonic appearances are not permitted for any purpose. Upon reaching a settlement in this matter the parties are instructed to notify the Court by telephone and to file a Notice of Settlement within twenty-four (24) hours. Signed by Judge K. Michael Moore on 9/29/2021. (tgr) (Entered: 09/29/2021) |
| 09/29/2021 | 4 | PAPERLESS ORDER REFERRING PRETRIAL DISCOVERY MATTERS TO MAGISTRATE JUDGE LAUREN F. LOUIS. PURSUANT to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida, the above-captioned Cause is referred to United States Magistrate Judge Lauren F. Louis to take all necessary and proper action as required by law with respect to any and all pretrial discovery matters. Any motion affecting deadlines set by the Court's Scheduling Order is excluded from this referral, unless specifically referred by separate Order. It is FURTHER ORDERED that the parties shall comply with Magistrate Judge Lauren F. Louis's discovery procedures. Signed by Judge K. Michael Moore on 9/29/2021. (tgr) (Entered: 09/29/2021) |
| 09/29/2021 | 5 | CERTIFICATE OF SERVICE by Walmart Claims Services, Inc. re 3 Pretrial Order,,,,,,,,,,,,, (Hackney, Clayton) (Entered: 09/29/2021) |
| 10/04/2021 | 6 R | *Defendant's* ANSWER and Affirmative Defenses to Complaint re the Notice of Removal with Jury Demand by Walmart Claims Services, Inc.. (Hackney, Clayton) (Entered: 10/04/2021) |
| 10/19/2021 | 7 R | **STRICKEN PER DE 8.** Plaintiff's REPLY *to Affirmative Defenses* by Dorelia Camps Pinero. (Ruggiero, William) Modified on 10/22/2021 (lbc). (Entered: 10/19/2021) |
| 10/21/2021 | 8 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's Reply to Affirmative Defenses. 7 R . Therein, Plaintiff denies "each and every allegation contained in the Defendant's Affirmative Defenses." Id. Neither the Local Rules of the Southern District of Florida nor the Federal Rules of Civil Procedure authorize the filing of a reply to an answer and affirmative defenses, except where a court orders such a reply. See Fed. R. Civ. P. 7(a)(7). The Court has not so ordered such a reply in this case. Accordingly, Plaintiff's Reply to Affirmative Defenses is an improper pleading. UPON CONSIDERATION of the Reply, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED that Plaintiff's Reply to Affirmative Defenses 7 R is STRICKEN. The Clerk of Court is INSTRUCTED to STRIKE Plaintiff's Reply to Affirmative Defenses 7 R from the docket. Signed by Judge K. Michael Moore on 10/21/2021. (elm) (Entered: 10/21/2021) |
| 10/30/2021 | 9 | PAPERLESS ORDER. THIS CAUSE came before the Court upon a sua sponte examination of the record. On September 29, 2021, the Court entered a Pretrial Order 3 which ordered the Parties to "hold a scheduling conference within twenty (20) days of the date of this Order. Within ten (10) days of the scheduling conference, counsel shall file a Joint Scheduling Report. " 3 . Thus, the deadline for the Parties to submit a joint scheduling report was October 29, 2021. The Order cautioned, "[f]ailure of counsel to file a joint scheduling report may result in remand or dismissal, default, and the imposition of other sanctions including attorney's fees and costs." Id. Now, the October 29, 2021 deadline has passed and no Joint Scheduling Report has been filed in this case. Accordingly, based on the foregoing, it is ORDERED and ADJUDGED that this action is DISMISSED WITHOUT PREJUDICE. The Clerk of Court is instructed to CLOSE this case. All pending motions, if any, are DENIED as MOOT. The Parties may move to reopen this matter upon the Parties filing a joint scheduling report. Signed by Judge K. Michael Moore on 10/30/2021. (elm) (Entered: 10/30/2021) |
| 11/03/2021 | 10 | Plaintiff's MOTION to Reopen Case by Dorelia Camps Pinero. (Attachments: # 1 Joint Scheduling Report of Scheduling Conference and Discovery Plan, # 2 Text of Proposed Order Order on Plaintiff's Motion to Reopen Case)(Ruggiero, William) (Entered: 11/03/2021) |
| 11/04/2021 | 11 | PAPERLESS ORDER. THIS CAUSE came before the Court upon the filing of Plaintiff's Motion to Reopen Case 10 . On October 30, 2021, this Court entered an Order dismissing the instant matter because the Parties failed to file a joint scheduling report. 9 . Now, Plaintiff has requested that the Court reopen this case, and has attached the Parties' Joint Scheduling Report to her Motion. See [10-1]. Accordingly, UPON CONSIDERATION of the Joint Schedule Report and the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is ORDERED and ADJUDGED that the above-captioned case is hereby REOPENED. The Clerk of Court is INSTRUCTED to REOPEN this case. All previously issued orders in this action remain in effect except those inconsistent with this Order. The Parties shall move this Court to reopen any previously filed motions that were mooted when this case was closed. The Parties are INSTRUCTED to separately file their Joint Scheduling Report on or before November 5, 2021. Signed by Judge K. Michael Moore on 11/4/2021. (elm) (Entered: 11/04/2021) |
| 11/04/2021 | 12 | Joint SCHEDULING REPORT - **Rule** by Dorelia Camps Pinero (Ruggiero, William) (Entered: 11/04/2021) |
| 11/05/2021 | 13 | PAPERLESS ORDER REQUIRING RESPONSE. THIS CAUSE came before the Court upon the filing of the Parties' Joint Scheduling Report of Scheduling Conference and Discovery Plan. 12 . Therein, the Parties have checked "Yes" next to "All Parties Consent to Proceed Before Magistrate Judge." 12 at 3. On September 27, 2021, the Parties were advised that Magistrate Judge Lauren F. Louis is available to handle any and all proceedings in this matter, and that, should the Parties agree, they may file the Consent form found on the Court's website. 2 . Accordingly, pursuant to 28 U.S.C. § 636(c) and Magistrate Judge Rule 1(h) of the Local Rules of the Southern District of Florida, the Parties are hereby ORDERED to inform the Court, on or before November 9, 2021, as to whether they consent to jurisdiction by Magistrate Judge Lauren F. Louis to take all necessary and proper action as required by law, including, if necessary, a jury or non-jury trial and entry of final judgment. Signed by Judge K. Michael Moore on 11/5/2021. (elm) (Entered: 11/05/2021) |
| 11/08/2021 | 14 | Joint Notice and Consent to Jurisdiction US Magistrate Judge signed by all parties *for discovery purposes.* Filed by Walmart Claims Services, Inc. (Destin, Frantz) (Entered: 11/08/2021) |
| 11/08/2021 | 15 | NOTICE of Change of Address, Email or Law Firm Name by Frantz Destin, Jr (Destin, Frantz) (Entered: 11/08/2021) |
| 11/09/2021 | 16 | PAPERLESS ORDER SCHEDULING TRIAL IN MIAMI. This case is now set for trial commencing the two week trial period of August 29, 2022, at 9 a.m. in Courtroom 13-1, (thirteenth floor) United States Courthouse, 400 North Miami Avenue, Miami, Florida. All parties are directed to report to the calendar call on August 25, 2022, at 2 p.m., at which time all matters relating to the scheduled trial date may be brought to the attention of the Court. A final pretrial conference as provided for by Rule 16, Fed. R. Civ. P., and Rule 16.1(C), S.D. Fla. L.R., is scheduled for August 16, 2022, at 11 a.m. A bilateral pretrial stipulation and all other pretrial preparations shall be completed NO LATER THAN FIVE DAYS PRIOR TO THE PRETRIAL CONFERENCE. All motions to amend the pleadings or to join additional parties must be filed by the later of forty-five (45) days after the date of entry of this Order, or forty-five (45) days after the first responsive pleading by the last responding defendant. Any and all pretrial motions, including motions for summary judgment, Daubert motions, and motions in limine must be filed no later than eighty (80) days prior to the trial date. Responses to summary judgment motions must be filed no later than fourteen (14) days after service of the motion, and replies in support of the motion must be filed no later than seven (7) days after service of the response, with both deadlines computed as specified in Rule 6, Fed. R. Civ. P. Each party is limited to one Daubert motion. If all evidentiary issues cannot be addressed in a 20-page memorandum, the parties must file for leave to exceed the page limit. Each party is also limited to one motion in limine (other than Daubert motions). If all evidentiary issues cannot be addressed in a 20-page memorandum, the parties must file for leave to exceed the page limit. Rule 26(a)(2) expert disclosures shall be completed one hundred thirty (130) days prior to the date of trial. All discovery, including expert discovery, shall be completed one hundred (100) days prior to the date of trial. The failure to engage in discovery pending settlement negotiations shall not be grounds for continuance of the trial date. All evidence which must be pre-marked, and a typewritten exhibit list setting forth the number and description of each exhibit shall be submitted at the time of trial. Plaintiff's exhibits shall be marked numerically with the letter "P" as a prefix. Defendant's exhibits shall be marked numerically with the letter "D" as a prefix. For a jury trial, counsel shall submit proposed jury instructions to the Court. The Parties shall submit their proposed jury instructions and verdict form jointly, although they do not need to agree on each proposed instruction. Where the parties do not agree on a proposed instruction, that instruction shall be set forth in bold type. Instructions proposed only by a plaintiff should be underlined. Instructions proposed only by a defendant should be italicized. Every instruction must be supported by citation to authority. The parties should use the Eleventh Circuit Pattern Jury Instructions for Civil Cases as a guide, including the directions to counsel contained therein. The parties shall jointly file their proposed jury instructions via CM/ECF, and shall also submit their proposed jury instructions to the Court via e-mail at moore@flsd.uscourts.gov in WordPerfect or Word format. For a non-jury trial, the parties shall prepare and submit to the Court proposed findings of fact and conclusions of law fully supported by the evidence, which counsel expects the trial to develop, and fully supported by citations to law. The proposed jury instructions or the proposed findings of fact and conclusions of law shall be submitted to the Court no later than five (5) business days prior to the scheduled trial date. Pursuant to Administrative Order 2016-70 of the Southern District of Florida and consistent with the Court of Appeals for the Eleventh Circuit's Local Rules and Internal Operating Procedures, within three days of the conclusion of a trial or other proceeding, parties must file via CM/ECF electronic versions of documentary exhibits admitted into evidence, including photographs of non-documentary physical exhibits. The Parties are directed to comply with each of the requirements set forth in Administrative Order 2016-70 unless directed otherwise by the Court.<br><br>THE FILING BY COUNSEL OF A "NOTICE OF UNAVAILABILITY" BY MOTION OR OTHERWISE IS NOT PROVIDED FOR UNDER THE LOCAL RULES AND SHALL NOT BE PRESUMED TO ALTER OR MODIFY THE COURT'S SCHEDULING ORDER. |

| | | Signed by Judge K. Michael Moore on 11/9/2021. (elm) (Entered: 11/09/2021) |
|---|---|---|
| 11/09/2021 | 17 | PAPERLESS ORDER OF REFERRAL TO MEDIATION. Trial having been set in this matter for the two-week trial period beginning August 29, 2022, at 9:00 a.m. pursuant to Rule 16 of the Federal Rule of Civil Procedure and Rule 16.2 of the Local Rules of the United States District Court for the Southern District of Florida, it is hereby ORDERED and ADJUDGED as follows: 1. All parties are required to participate in mediation. The mediation shall be completed no later than eighty (80) days before the scheduled trial date. 2. Plaintiff's counsel, or another attorney agreed upon by all counsel of record and any unrepresented parties, shall be responsible for scheduling the mediation conference. The parties are encouraged to avail themselves of the services of any mediator on the List of Certified Mediators, maintained in the office of the Clerk of this Court, but may select any other mediator. The parties shall agree upon a mediator and file a Notice of Mediator Selection within fifteen (15) days from the date of this Order. If there is no agreement, lead counsel shall file a request for the Clerk of Court to appoint a mediator in writing within fifteen (15) days from the date of this Order, and the Clerk shall designate a mediator from the List of Certified Mediators. Designation shall be made on a blind rotation basis. 3. The parties shall agree upon a place, date, and time for mediation convenient to the mediator, counsel of record, and unrepresented parties and file a Notice of Scheduling Mediation no later than one hundred and ten (110) days prior to the scheduled trial date. If the parties cannot agree to a place, date, and time for the mediation, they may motion the Court for an order dictating the place, date, and time. 4. **The physical presence of counsel and each party or representatives of each party with full authority to enter in a full and complete compromise and settlement is mandatory.** The mediation shall take place in person absent good cause shown by the parties. If insurance is involved, an adjuster with authority up to the policy limits or the most recent demand, whichever is lower, shall attend. 5. All discussions, representations and statements made at the mediation conference shall be confidential and privileged. 6. At least ten (10) days prior to the mediation date, all parties shall present to the mediator a brief written summary of the case identifying issues to be resolved. Copies of those summaries shall be served on all other parties. 7. The Court may impose sanctions against parties and/or counsel who do not comply with the attendance or settlement authority requirements herein, or who otherwise violate the terms of this Order. The mediator shall report non-attendance and may recommend imposition of sanctions by the Court for non-attendance. 8. The mediator shall be compensated in accordance with the standing order of the Court entered pursuant to Rule 16.2.B.6, or on such basis as may be agreed to in writing by the parties and the mediator selected by the parties. The cost of mediation shall be shared equally by the parties unless otherwise ordered by the Court. All payments shall be remitted to the mediator within 30 days of the date of the bill. Notice to the mediator of cancellation or settlement prior to the scheduled mediation conference must be given at least two (2) full business days in advance. Failure to do so will result in imposition of a fee for one hour. 9. If a full or partial settlement is reached in this case, counsel shall promptly notify the Court of the settlement in accordance with Local Rule 16.2.F, by filing a notice of settlement signed by the counsel of record within ten (10) days of the mediation conference. Thereafter, the parties shall forthwith submit an appropriate pleading concluding the case. 10. Within five (5) days following the mediation conference, the mediator shall file a Mediation Report indicating whether all required parties were present. The report shall also indicate whether the case settled (in full or in part), was continued with the consent of the parties, or whether the mediator declared an impasse. 11. If mediation is not conducted, the case may be stricken from the trial calendar, and other sanctions may be imposed.<br><br>Signed by Judge K. Michael Moore on 11/9/2021. (elm) (Entered: 11/09/2021) |
| 11/22/2021 | 18 | NOTICE of Mediator Selection. Selected/Added Markel Arrizabalaga as Mediator. (Ruggiero, William) (Entered: 11/22/2021) |
| 05/16/2022 | 19 | PAPERLESS ORDER TO SHOW CAUSE. THIS CAUSE came before the Court upon a sua sponte examination of the record. On November 9, 2021, the Court referred this matter to mediation. (ECF No. 17). The Court's Paperless Order of Referral to Mediation requires, among other things, that "[t]he parties shall agree upon a place, date, and time for mediation convenient to the mediator, counsel of record, and unrepresented parties and file a Notice of Scheduling Mediation no later than one hundred and ten (110) days prior to the scheduled trial date." Id. The Court's Order warned that "[i]f mediation is not conducted, the case may be stricken from the trial calendar, and other sanctions may be imposed." Id. To date, the Parties have not filed a Notice of Scheduling Mediation. Accordingly, the Parties are hereby ORDERED to SHOW CAUSE why they did not file a Notice of Scheduling Mediation consistent with this Court's Paperless Order of Referral to Mediation. The Parties' joint response is due on or before May 20, 2022. Alternatively, the Parties may file their Notice of Scheduling Mediation on or before May 20, 2022. Signed by Judge K. Michael Moore on 5/16/2022. (elm) (Entered: 05/16/2022) |
| 05/16/2022 | 20 | (STRICKEN PER DE# 22 ) NOTICE of Mediation Hearing. Mediation Hearing set for 6/8/2022 at 2:00 p.m.. (Ruggiero, William) Modified Text on 5/16/2022 (cds). (Entered: 05/16/2022) |
| 05/16/2022 | 21 | Clerks Notice to Filer re 20 Notice of Mediator Selection and/or Hearing. **Login/Signature Block Violation**; CORRECTIVE ACTION REQUIRED - The name of attorney e-filing this document via their CM/ECF login does not match the name of attorney on the signature block of the document. The name used for login must match the typed name on signature block of the document. This filing is a violation of Section 3J(1) of CM/ECF Admin Procedures and Local Rule 5.1(b). Filer must File a Notice of Striking, then refile document pursuant to CM/ECF Admin Procedures and Local Rules.**Mediator Not Added** (cds) (Entered: 05/16/2022) |
| 05/16/2022 | 22 | NOTICE of Striking *Document Number 20* by Dorelia Camps Pinero (Ruggiero, William) (Entered: 05/16/2022) |
| 05/16/2022 | 23 | NOTICE by Dorelia Camps Pinero *Notice of Filing Notice of Mediation* (Attachments: # 1 Notice of Mediation) (Ruggiero, William) (Entered: 05/16/2022) |
| 05/16/2022 | 24 | PLAINTIFF'S NOTICE OF FILING NOTICE OF MEDIATION. Selected/Added Victor Rams as Mediator. Mediation Hearing set for 06/08/2022 at 02:00 p.m. (For Image See DE# 23 ) (cds) (Entered: 05/16/2022) |
| 05/16/2022 | 25 | Clerks Notice to Filer re 23 Notice (Other). **Wrong Event Selected**; ERROR - The Filer selected the wrong event. The document was re-docketed by the Clerk, See DE# 24 . It is not necessary to refile this document. (cds) (Entered: 05/16/2022) |
| 05/16/2022 | 26 | PAPERLESS ORDER TO SHOW CAUSE. THIS CAUSE came before the Court upon the filing of the Notice of Mediation. 23 . Therein, notice is given that mediation in this case is scheduled for June 8, 2022 at 2:00 PM, to be conducted by remote videoconferencing. Id. at 1. On November 9, 2022, the Court referred this matter to mediation. (ECF No. 17). The Court's Paperless Order of Referral to Mediation states that "**[t]he physical presence of counsel and each party or representatives of each party with full authority to enter in a full and complete compromise and settlement is mandatory.** The mediation shall take place in person absent good cause shown by the parties." Id. (emphasis in original). The Parties have not requested leave to conduct the mediation remotely via the Zoom videoconferencing platform. Accordingly, the Parties are hereby ORDERED to SHOW CAUSE why they have scheduled the mediation to occur remotely, in violation of this Court's Order and without seeking leave. The Parties shall file their response on or before May 20, 2022. Alternatively, on or before May 20, 2022, the Parties may re-notice their mediation in compliance with this Court's Paperless Order of Referral to Mediation. Signed by Judge K. Michael Moore on 5/16/2022. (elm) (Entered: 05/16/2022) |
| 05/16/2022 | 27 | NOTICE of Mediation Hearing. *Plaintiff's Notice of Filing Re-Notice of* Mediation Hearing set for 6/8/2022 at 3:00 p.m.. (Attachments: # 1 Exhibit Re-Notice of Mediation)(Ruggiero, William) (Entered: 05/16/2022) |
| 05/20/2022 | 28 | Unopposed MOTION for Extension of Time of Discovery Cutoff Deadline by Walmart Claims Services, Inc.. (Attachments: # 1 Text of Proposed Order Order Granting Unopposed Motion for Extension of Pre-Trial Discovery Deadline)(Destin, Frantz) (Entered: 05/20/2022) |
| 05/23/2022 | 29 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant Walmart Claims Services, Inc.'s Unopposed Motion for Extension of Pre-Trial Discovery Deadline. 28 . Therein, Defendant requests an extension of the deadline to complete discovery, up to and including June 30, 2022. Id. at 1. Trial is currently set for the two-week trial period commencing August 29, 2022, thus the deadline to complete discovery was May 20, 2022, and the deadline to file pretrial motions, including motions for summary judgment and motions in limine is June 10, 2022. (ECF No. 16.) Defendant has not requested a continuance of the any other deadlines. See generally 28 . Plaintiff does not oppose the Motion. Id. at 3.<br><br>"District courts have 'unquestionable' authority to control their own dockets." Smith v. Psychiatric Sol., Inc., 750 F.3d 1253, 1262 (11th Cir. 2014) (internal citation omitted). "This authority includes 'broad discretion in deciding how best to manage the cases before them.'" Id. (internal citation omitted). Once a scheduling order is entered, it "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "To establish good cause, the party seeking the extension must establish that the schedule could not be met despite the party's diligence." Ashmore v. Sec'y, Dep't of Transp., 503 F. App'x 683, 685 (11th Cir. 2013); see also Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998).<br><br>Here, Defendant informs the Court that its medical expert conducted a medical evaluation of Plaintiff, but needs to review additional medical records from Plaintiff's treating physicians before he can render a final opinion. According to Defendant, it is still awaiting responsive documents from Plaintiff's physicians for Defendant's medical expert to review, and it argues that "allowing additional and sufficient time for Defendant's expert to finalize his opinion is essential to Walmart's defense at trial." 28 at 3. The Court observes that the deadline to complete expert disclosures pursuant to Federal Rule of Civil Procedure 26(a)(2), which "must be accompanied by a written report," was April 21, 2022. Fed. R. Civ. P. 26(a)(2)(B); (ECF No. 16). Yet Defendant's medical expert did not conduct the |

medical evaluation of Plaintiff until May 3, 2022. Thus, it is apparent that Defendant implicitly requests an extension of the deadline to complete expert disclosures in addition to an extension of the deadline to complete discovery. However, Defendant's Motion does not address why its expert could not have conducted the medical evaluation prior to the deadline to complete expert disclosures. Accordingly, UPON CONSIDERATION of the Motion 28 , the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendant Walmart Claims Services, Inc.'s Unopposed Motion for Extension of Pre-Trial Discovery Deadline 28 is DENIED.

Signed by Judge K. Michael Moore on 5/23/2022. (elm) (Entered: 05/23/2022)

| 06/07/2022 | 30 | Renewed MOTION for Extension of Time of Discovery Cutoff Deadline by Walmart Claims Services, Inc.. (Attachments: # 1 Exhibit Ex. A- Confirmation of CME, # 2 Exhibit Ex. B- Expert Disclosure, # 3 Exhibit Ex. C-New Records, # 4 Exhibit Ex. D-Proposed Order)(Destin, Frantz) (Entered: 06/07/2022) |
|---|---|---|
| 06/08/2022 | 31 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant Walmart Claims Services, Inc.'s Renewed Unopposed Motion for Extension of Pre-Trial Discovery Deadline. 30 . Therein, Defendant renews its request for an extension of the deadline to complete discovery, up to and including June 30, 2022. Id. at 1. Trial is currently set for the two-week trial period commencing August 29, 2022, thus the deadline to complete discovery was May 20, 2022, and the deadline to file pretrial motions, including motions for summary judgment and motions in limine is June 10, 2022. (ECF No. 16.) Defendant has not requested a continuance of the any other deadlines. See generally 30 . Plaintiff does not oppose the Motion. Id. at 7.

"District courts have 'unquestionable' authority to control their own dockets." Smith v. Psychiatric Sol., Inc., 750 F.3d 1253, 1262 (11th Cir. 2014) (internal citation omitted). "This authority includes 'broad discretion in deciding how best to manage the cases before them.'" Id. (internal citation omitted). Once a scheduling order is entered, it "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "To establish good cause, the party seeking the extension must establish that the schedule could not be met despite the party's diligence." Ashmore v. Sec'y, Dept of Transp., 503 F. App'x 683, 685 (11th Cir. 2013); see also Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998).

On May 23, 2022, the Court denied Defendant's first motion to extend the discovery deadline because its motion "d[id] not address why its expert could not have conducted the medical evaluation prior to the deadline to complete expert disclosures." (ECF No. 29). Now, Defendant renews its motion to address that concern. Defendant informs the Court that Defendant unsuccessfully made efforts to retain a medical expert from December 2021 through February 2022, and was not successful in retaining a medical expert until March 3, 2022, who due to scheduling conflicts, was unable to complete a compulsory medical examination of Plaintiff until May 3, 2022 after the deadline to disclose the expert report. Plaintiff agreed to permit Defendant to identify its expert on the date of the expert disclosure deadline and to accept production of the medical expert's report upon the completion of his examination. Defendant informs the Court that, prior to rendering a final opinion, the medical expert must review Plaintiff's medical records. To that end, Defendant directly subpoenaed medical records from Plaintiff's treating physicians on March 4, 2022, and asserts that those treating physicians produced incomplete medical records, and a new and complete set of medical records from one treating physician was not produced until June 7, 2022. Defendant represents that Plaintiff does not intend to complete additional pretrial discovery, thus it appears that the requested extension is solely to permit Defendant's medical expert to prepare and submit an expert report. Defendant does not seek an extension of any other deadline, including the June 10, 2022 deadline to file motions for summary judgment and motions in limine, or the August 29, 2022 trial. The Court agrees that Defendant has demonstrated diligence and good cause, therefore the Court will extend the discovery deadline to permit Defendant's medical expert to render a final opinion and submit an expert report, no later than June 30, 2022. However, the Court further finds that an extension of the discovery deadline without an extension of the pretrial motions deadline or a continuance of the trial will ultimately require a continuance of the trial.

Accordingly, UPON CONSIDERATION of the Motion 30 , the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendant Walmart Claims Services, Inc.'s Renewed Unopposed Motion for Extension of Pre-Trial Discovery Deadline 30 is GRANTED. It is further ORDERED that this case is now set for trial commencing the two-week trial period of October 10, 2022 in Courtroom 13-1 (thirteenth floor), United States Courthouse, 400 North Miami Avenue, Miami, Florida. All parties are directed to report to the calendar call on October 6, 2022, at 2 p.m., at which time all matters relating to the scheduled trial date may be brought to the attention of the Court. A final pretrial conference as provided for by Rule 16, Fed. R. Civ. P., and Rule 16.1(C), S.D. Fla. L.R., is scheduled for September 27, 2022, at 11 a.m. The calendar call and the final pretrial conference will take place in Courtroom 13-1 (thirteenth floor), United States District Courthouse, 400 North Miami Avenue, Miami, Florida. The Court's Paperless Order Scheduling Trial (ECF No. 16) remains in effect except that the deadlines therein shall be calculated based on the newly scheduled trial date. For example, all pretrial motions, including motions for summary judgment, Daubert motions, and motions in limine must be filed no later than 80 days before the newly scheduled trial date.

Signed by Judge K. Michael Moore on 6/8/2022. (elm) (Entered: 06/08/2022) |
| 06/09/2022 | 32 | NOTICE by Dorelia Camps Pinero Notice of Plaintiff's Proposal for Settlement (Ruggiero, William) (Entered: 06/09/2022) |
| 06/30/2022 | 33 | PAPERLESS ORDER. THIS CAUSE came before the Court upon a sua sponte examination of the record. On November 9, 2021, the Court referred this matter to mediation. (ECF No. 17). This Court's Paperless Order of Referral to Mediation requires that "[w]ithin five (5) days following the mediation conference, the mediator shall file a Mediation Report indicating whether all required parties were present." Id. Further, "[t]he report shall also indicate whether the case settled (in full or in part), was continued with the consent of the parties, or whether the mediator declared an impasse. 11. If mediation is not conducted, the case may be stricken from the trial calendar, and other sanctions may be imposed." Id. The Parties' mediation conference was scheduled for June 8, 2022. See 27 . Thus, the Parties' Mediation Report are due five days later. To date, the Parties have not filed their mediation report. Accordingly, the Parties are ORDERED to show good cause for their failure to file a mediation report consistent with this Court's prior orders. Alternatively, the Parties may file their mediation report on or before July 5, 2022. Signed by Judge K. Michael Moore on 6/30/2022. (elm) (Entered: 06/30/2022) |
| 06/30/2022 | | Set Deadlines. Mediation Deadline 7/5/2022. Show Cause Response due by 7/5/2022. PER DE# 33 (cds) (Entered: 06/30/2022) |
| 06/30/2022 | 34 | FINAL MEDIATION REPORT by Victor H. Rams, Jr.. Disposition: Case did not settle.(Ruggiero, William) (Entered: 06/30/2022) |
| 07/07/2022 | 35 | Witness List Notice of Disclosure of Medical Witnesses by Dorelia Camps Pinero.. (Ruggiero, William) (Entered: 07/07/2022) |
| 07/07/2022 | 36 | Witness List Plaintiff's Rule 26(a)(2)(C) Expert Disclosure by Dorelia Camps Pinero.. (Attachments: # 1 Exhibit)(Ruggiero, William) (Entered: 07/07/2022) |
| 07/22/2022 | 37 | Defendant's MOTION in Limine by Walmart Claims Services, Inc.. (Destin, Frantz) (Entered: 07/22/2022) |
| 07/22/2022 | 38 🄱 | Defendant's MOTION for Summary Judgment by Walmart Claims Services, Inc.. Responses due by 8/5/2022 (Destin, Frantz) (Entered: 07/22/2022) |
| 07/22/2022 | 39 | Statement of: Undisputed Material Facts by Walmart Claims Services, Inc. re 38 🄱 Defendant's MOTION for Summary Judgment (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Destin, Frantz) (Entered: 07/22/2022) |
| 07/25/2022 | 40 | NOTICE by Walmart Claims Services, Inc. re 39 Statement, 38 🄱 Defendant's MOTION for Summary Judgment (Attachments: # 1 Exhibit Exhibit 13 (Undisputed Statement of Facts D.E. 39), # 2 Exhibit Exhibit 15 (Undisputed Statement of Facts D.E. 39), # 3 Exhibit Exhibit 16 (Undisputed Statement of Facts D.E. 39)) (Destin, Frantz) (Entered: 07/25/2022) |
| 07/25/2022 | 41 | Defendant's MOTION for Leave to File Video In Support of Its Motion for Summary Judgment by Walmart Claims Services, Inc.. (Attachments: # 1 Exhibit Proposed Order)(Destin, Frantz) (Entered: 07/25/2022) |
| 07/26/2022 | 42 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Defendant Walmart Claims Services, Inc.'s Motion for Leave to File Video in Support of Its Motion for Summary Judgment. 41 . Therein, Defendant requests permission from the Court to conventionally file a USB thumb drive containing a video recording of the subject area at or around when the alleged incident occurred. Defendant represents that the video recording is referenced in its pending Motion for Summary Judgment and Statement of Undisputed Facts. Defendant did not indicate during conferral whether Plaintiff opposes the Motion. Local Rule 5.3(b)(3) of the Local Rules of the Southern District of Florida sets forth the exemptions from mandatory electronic filing via CM/ECF, which includes video recordings. UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendant Walmart Claims Services, Inc.'s Motion for Leave to File Video in Support of Its Motion for Summary Judgment 41 is GRANTED. Defendant shall physically file a USB thumb drive containing the referenced video with the Clerk of Court on or before August 1, 2022. Defendant shall file a notice on the docket upon conventionally filing the USB thumb drive and certify that a copy of the video was provided to opposing counsel. Signed by Judge K. Michael Moore on 7/26/2022. (elm) (Entered: 07/26/2022) |
| 07/28/2022 | 43 | NOTICE by Walmart Claims Services, Inc. Notice of Serving Proposal for Settlement to Plaintiff Dorelia Camps Pinero (Destin, Frantz) (Entered: 07/28/2022) |

| 07/29/2022 | 44 | NOTICE OF CONVENTIONAL FILING (USB) by Walmart Claims Services, Inc. (cds) (Entered: 07/29/2022) |
| 07/29/2022 | 45 | Clerk's Notice of Filing Deficiency Re: 44 Notice of Conventional Filing filed by Walmart Claims Services, Inc.. Document(s) missing required signature(s) (Fed.R.Civ.P. 11(a)). (cds) (Entered: 07/29/2022) |
| 08/02/2022 | 46 | NOTICE of Compliance by Walmart Claims Services, Inc. re 45 Clerk's Notice of Filing Deficiency re 44 NOTICE OF CONVENTIONAL FILING (USB) (cds) (Entered: 08/02/2022) |
| 08/03/2022 | 47 | Amended MOTION in Limine by Walmart Claims Services, Inc.. (Destin, Frantz) (Entered: 08/03/2022) |
| 08/04/2022 | 48 R | Plaintiff's MOTION for Sanctions *and to Strike Defendant's Liability Defenses, or, Alternatively, for Burden-Shifting Presumption and for Standard Jury Instructions 301.11(a) and 301.11(b)* by Dorelia Camps Pinero. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Ruggiero, William) (Entered: 08/04/2022) |
| 08/04/2022 | 49 | RESPONSE to Motion re 37 Defendant's MOTION in Limine , 47 Amended MOTION in Limine filed by Dorelia Camps Pinero. Replies due by 8/11/2022. (Ruggiero, William) (Entered: 08/04/2022) |
| 08/04/2022 | 50 | Plaintiff's RESPONSE *to Defendant's Statement of Undisputed Material Facts* by Dorelia Camps Pinero. (Attachments: # 1 Exhibit A)(Ruggiero, William) (Entered: 08/04/2022) |
| 08/04/2022 | 51 | RESPONSE to Motion re 38 R Defendant's MOTION for Summary Judgment filed by Dorelia Camps Pinero. Replies due by 8/11/2022. (Attachments: # 1 Exhibit A)(Ruggiero, William) (Entered: 08/04/2022) |
| 08/05/2022 | 52 | PAPERLESS ORDER. THIS CAUSE came before the Court upon Plaintiff's Motion for Sanctions and to Strike Defendant's Liability Defenses, or, Alternatively, for Burden-Shifting Presumption and for Standard Jury Instructions 301.11(a) and 301.11(b). 48 R . Plaintiff's Motion cites only to Florida law, fails to identify the Federal Rule of Civil Procedure pursuant to which the Motion is brought, and does not contain a certificate of conferral as required by Local Rule 7.1(a)(3). The Motion will be denied without prejudice to correct these deficiencies. Accordingly, UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that the Motion for Sanctions 48 R is DENIED WITHOUT PREJUDICE. Plaintiff's renewed Motion shall be due on or before August 10, 2022. Further, the Court finds good cause to order expedited briefing upon the re-filing of Plaintiff's renewed Motion. Accordingly, the Parties are hereby ORDERED to comply with the following expedited briefing schedule: Defendant's response to Plaintiff's renewed motion for sanctions shall be due on or before August 15, 2022, and Plaintiff's reply shall be due on or before August 18, 2022. Signed by Judge K. Michael Moore on 8/5/2022. (tgr) (Entered: 08/05/2022) |
| 08/09/2022 | 53 | Amended MOTION for Sanctions *and to Strike Defendant's Liability Defenses, or, Alternatively, for Burden-Shifting Presumption and for Standard Jury Instructions 301.11(a) and 301.11(b)* by Dorelia Camps Pinero. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Ruggiero, William) (Entered: 08/09/2022) |
| 08/10/2022 | 54 | PAPERLESS ORDER REFERRING MOTIONS. PURSUANT to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida, the above-captioned cause is hereby referred to United States Magistrate Judge Lauren F. Louis to take all necessary and proper action as required by law and/or issue a Report and Recommendation regarding Plaintiff Dorelia Camps Pinero's Amended Motion for Sanctions and to Strike Defendant's Liability Defenses, or, Alternatively, for Burden-Shifting Presumption and for Standard Jury Instructions 301.11(a) and 301.11(b). 53 Signed by Judge K. Michael Moore on 8/10/2022. (fpi) (Entered: 08/10/2022) |
| 08/11/2022 | 55 | Defendant's REPLY to Response to Motion re 38 R Defendant's MOTION for Summary Judgment filed by Walmart Claims Services, Inc.. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Destin, Frantz) (Entered: 08/11/2022) |
| 08/15/2022 | 56 | RESPONSE in Opposition to Motion *and to Strike Defendant's Liability Defenses, or, Alternatively, for Burden-Shifting Presumption and for Standard Jury Instructions 301.11(a) and 301.11(b)* filed by Walmart Claims Services, Inc.. Replies due by 8/22/2022. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit)(Destin, Frantz) (Entered: 08/15/2022) |
| 08/22/2022 | 57 | Plaintiff's RESPONSE to 56 Response in Opposition to Motion, *for Sanctions* by Dorelia Camps Pinero. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Ruggiero, William) (Entered: 08/22/2022) |
| 08/30/2022 | 58 | Defendant's MOTION to Strike 57 Response/Reply (Other) by Walmart Claims Services, Inc.. Responses due by 9/13/2022 (Attachments: # 1 Exhibit, # 2 Exhibit)(Destin, Frantz) (Entered: 08/30/2022) |
| 08/31/2022 | 59 | RESPONSE to Motion re 58 Defendant's MOTION to Strike 57 Response/Reply (Other) *and Motion to Strike Defendant's Motion to Strike Plaintiff's Reply* filed by Dorelia Camps Pinero. Replies due by 9/7/2022. (Attachments: # 1 Exhibit A)(Ruggiero, William) (Entered: 08/31/2022) |
| 09/06/2022 | 60 | Defendant's REPLY to Response to Motion re 58 Defendant's MOTION to Strike 57 Response/Reply (Other) filed by Walmart Claims Services, Inc.. (Destin, Frantz) (Entered: 09/06/2022) |
| 09/09/2022 | 61 | PAPERLESS ORDER Setting Hearing. An Evidentiary Hearing on 53 Plaintiff's Amended Motion for Sanctions is set for September 14, 2022, at 9:00 A.M. in Miami Division before Magistrate Judge Lauren Fleischer Louis, United States Courthouse, Clyde Atkins Bldg., 301 North Miami Avenue, Miami, Florida 33128. All Parties, their witnesses, and counsel of record shall appear in person. Signed by Magistrate Judge Lauren Fleischer Louis on 9/9/2022. (nce) (Entered: 09/09/2022) |
| 09/12/2022 | 62 | NOTICE of Settlement by Dorelia Camps Pinero (Ruggiero, William) (Entered: 09/12/2022) |
| 09/13/2022 | 63 | PAPERLESS NOTICE OF COURT PRACTICE. THIS CAUSE came before the Court upon Plaintiff's Notice of Settlement. 62 . Therein, Plaintiff states that a settlement has been reached between the parties. See id. The Parties are hereby directed to file a stipulation of dismissal of all claims signed by all parties pursuant to Rule 41(a) of the Federal Rules of Civil Procedure within thirty (30) days from the date of this Notice. If such papers are not filed within the time specified, this matter will be dismissed and the Court will be divested of jurisdiction to enforce the settlement agreement. The Clerk of Court is INSTRUCTED to ADMINISTRATIVELY CLOSE this case. All pending motions, if any, are DENIED AS MOOT. Signed by Judge K. Michael Moore on 9/13/2022. (fpi) (Entered: 09/13/2022) |
| 09/13/2022 | 64 | PAPERLESS Order Cancelling Evidentiary Hearing set for September 14, 2022, at 9:00 A.M. per 63 the Court's Order instructing the Clerk of the Court to administratively close this case. Signed by Magistrate Judge Lauren Fleischer Louis on 9/13/2022. (nce) (Entered: 09/13/2022) |
| 10/03/2022 | 65 | STIPULATION re 63 Order Dismissing/Closing Case,,, by Walmart Claims Services, Inc. (Destin, Frantz) (Entered: 10/03/2022) |
| 10/04/2022 | 66 | PAPERLESS ORDER. THIS CAUSE came before the Court upon the Parties' Agreed Joint Stipulation to Dismiss With Prejudice. 65 . UPON CONSIDERATION of the Stipulation, the pertinent portions of the record, and being otherwise fully advised in the premises, it is ORDERED AND ADJUDGED that the above-styled cause is hereby DISMISSED WITH PREJUDICE. The Clerk of Court is instructed to CLOSE this case. All pending motions, if any, are DENIED AS MOOT. Signed by Judge K. Michael Moore on 10/4/2022. (fpi) (Entered: 10/04/2022) |

**PACER Service Center**

**Transaction Receipt**

12/28/2023 15:50:39

| PACER Login: | AdamTheLawyer | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:21-cv-23458-KMM |
| Billable Pages: | 14 | Cost: | 1.40 |

# EXHIBIT

# JJ

Original Complaint Pinero v. Walmart Claims Services

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 2021-019069 CA07

**DORELIA CAMPS PINERO,**

       Plaintiff,

vs.

**WALMART CLAIMS SERVICES, INC.**

       Defendant.

_____/

## COMPLAINT FOR DAMAGES

      COMES NOW the Plaintiff, DORELIA CAMPS PINERO, by and through
undersigned counsel and sues the Defendant, WALMART CLAIMS SERVICES, INC. and
alleges as follows:

      1.    That this is an action for damages in excess of Thirty Thousand
($30,000.00) Dollars.

      2.    That the Plaintiff, DORELIA CAMPS PINERO, at all times material and
relevant hereto was a resident of Miami, Miami-Dade County, Florida and is sui juris.

      3.    That the Defendant, WALMART CLAIMS SERVICES, INC. is and has
been at all times material hereto licensed to do business in the State of Florida.

      4.    That on or about October 07, 2020 the Plaintiff, DORELIA CAMPS
PINERO, was lawfully on the premises of the Defendant, WALMART CLAIMS SERVICES,
INC. located at 8425 NW 13th Terrace, Doral, FL 33126, as a business invitee.

      5.    That on or about October 7, 2020 the Defendant, WALMART CLAIMS
SERVICES, INC. by and through its agents, employees, and/or servants, had exclusive
dominion, possession and control of the premises.

      6.    That on or about October 7, 2020 the Defendant, WALMART CLAIMS

SERVICES, INC. by and through its agents, employees, and/or servants, negligently and carelessly maintained the above mentioned premises, to-wit:  The Plaintiff slipped and fell on a dirty, slippery substance on the Defendant's premises,  causing the Plaintiff, DORELIA CAMPS PINERO, to seriously injure herself.

7. That the Defendant, WALMART CLAIMS SERVICES, INC. either knew or should have known of the existence of the dangerous condition of the common area and should have taken steps to warn the Plaintiff, DORELIA CAMPS PINERO, of the existence of the dangerous condition.

8. That the Defendant, WALMART CLAIMS SERVICES, INC. had a non-delegable duty to maintain the common areas in a reasonably safe and proper condition for the general public.

9. That the Defendant failed to maintain said common areas in a safe and proper condition.

10. That the Defendant, WALMART CLAIMS SERVICES, INC. was negligent in creating or permitting the aforementioned dangerous and hazardous condition to remain upon the premises, rendering said premises dangerous and unsafe for the Plaintiff.

11. That the Defendant, WALMART CLAIMS SERVICES, INC. failed to warn the Plaintiff, DORELIA CAMPS PINERO, of the aforementioned condition and the risk involved in as much as the presence of the Plaintiff, DORELIA CAMPS PINERO, was known or reasonably foreseeable by the Defendant, WALMART CLAIMS SERVICES, INC. and the Plaintiff, DORELIA CAMPS PINERO, neither knew nor should have known of said condition and risk by the use of reasonable care.

12. That as a result of the Defendant's negligence, Plaintiff, DORELIA CAMPS PINERO, was severely injured.

13. That as a direct and proximate result of the negligence of the Defendant, WALMART CLAIMS SERVICES, INC. the Plaintiff, DORELIA CAMPS

PINERO, was injured in and about her body and extremities, suffered pain therefrom, suffered physical handicap, lost wages, loss of ability to earn money in the past and in the future, aggravation of a previously existing condition and suffered the inability to lead a normal life; all of which are permanent and continuing in nature.

14. In addition, as a direct and proximate result of the Defendant, WALMART CLAIMS SERVICES, INC. the Plaintiff, DORELIA CAMPS PINERO, incurred medical expenses in the treatment of injuries and will continue to incur said expenses in the future.

WHEREFORE, Plaintiff demands judgment for damages against the Defendant, WALMART CLAIMS SERVICES, INC. and a trial by jury of all issues triable as a right by a jury.

DATED this 12th Day of August, 2021.

Respectfully submitted,

LAW OFFICES OF WILLIAM C. RUGGIERO
Attorneys for Plaintiff
Museum Plaza, Suite 703
200 South Andrews Avenue
Fort Lauderdale, Florida 33301
Phone: (954) 462-2300
Email: Ruggiero@wcrlaw.com

BY: /s/ William C. Ruggiero
WILLIAM C. RUGGIERO
Florida Bar No. 878499

WCR:mc

# EXHIBIT

# KK

## Answer from Pinero v. Walmart Claims Services

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
## CASE NO. 21-cv-23458-KMM

DORELIA CAMPS PINERO,

            Plaintiff,

vs.

WALMART CLAIMS SERVICES, INC.,

           Defendant. _____/

## DEFENDANT'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT

Defendant, Walmart Claims Services, Inc. ("Wal-Mart"), by and through undersigned counsel, hereby files its answer to Plaintiff's Original Complaint ("Complaint"), and states as follows:

## COMPLAINT

1.    Defendant is without knowledge of this allegation and therefore denies the same.

2.    Defendant is without knowledge of this allegation and therefore denies the same.

3.    Defendant admits this allegation.

4.    Defendant denies this allegation.

5.    Defendant denies this allegation.   On the alleged date of incident, the subject premises was owned and operated by Sam's East, Inc.

6.    Defendant denies this allegation.

7.    Defendant denies this allegation.

8.    Defendant denies this allegation as phrased.

9.    Defendant denies this allegation.

10.     Defendant denies this allegation.

11.     Defendant denies this allegation.

12.     Defendant denies this allegation.

13.     Defendant denies this allegation.

14.     Defendant denies this allegation.

## **GENERAL DENIAL**

All allegations, contentions, claims or prayers for relief not specifically admitted to are hereby denied.

## **AFFIRMATIVE DEFENSES**

### **First Affirmative Defense**

The Complaint, and each and every cause of action alleged therein fails to state facts sufficient to constitute a cause of action for which relief may be granted.

### **Second Affirmative Defense**

Any negligence that caused or contributed to the injuries of Plaintiff was solely the result of negligence on the part of third parties and other individuals or entities who may be discovered through the discovery process, and were not under the care, custody, control or supervision of Defendant, and therefore, Plaintiff cannot recover against Defendant.

### **Third Affirmative Defense**

Plaintiff's claims are barred in whole or in part because of Plaintiff's own negligence.

**Fourth Affirmative Defense**

Pursuant to Florida Statute Section 768.76, or any other applicable provision, in the event of any recovery by Plaintiff in this action, the amount awarded to Plaintiff in this action must be reduced by any amounts paid to Plaintiff from any collateral source or benefits.

**Fifth Affirmative Defense**

Defendant is entitled to all setoffs and limitations of liability pursuant to the doctrine of comparative fault, including but not limited to the provisions of Florida Statute § 768.81.

**Sixth Affirmative Defense**

Plaintiff was negligent, and otherwise at fault, with regard to the events alleged in the Complaint, and such negligence and fault is the proximate cause of any liabilities or damages Plaintiff may incur.  Accordingly, Plaintiff's recovery, if any, should be precluded or reduced in proportion to Plaintiff's own negligence.

**Seventh Affirmative Defense**

Plaintiff failed to take reasonable steps to reduce Plaintiff's claims, damages, losses, if any, and that said failure to mitigate Plaintiff's damages bars or reduces any claims, losses, or damages.

**Eighth Affirmative Defense**

Defendant had no actual or constructive knowledge of the alleged dangerous condition or defect and is otherwise not liable pursuant to Florida Statute § 768.0755.

**Ninth Affirmative Defense**

Plaintiff's recovery for medical damages is limited to only those medical expenses for which Plaintiff has become liable. *Cooperative Leasing, Inc. v. Johnson*, 872 So. 2nd 956 (Fla. 2d DCA 2004).

### Tenth Affirmative Defense

At the time of the incident alleged in the Complaint, Plaintiff was suffering from pre-existing conditions, which caused or contributed to the damages Plaintiff is claiming.

### Eleventh Affirmative Defense

Plaintiff's claims are barred in whole or in part because the condition or defect alleged to have been present at the premises was open and obvious to Plaintiff.

### Twelfth Affirmative Defense

Plaintiff's claims are barred in whole or in part because Plaintiff's knowledge of the condition or defect alleged to be present at the premises was superior to or at least equal to the Defendant's alleged knowledge and thus, the Defendant had no duty to warn the Plaintiff of such alleged condition or defect.

### Thirteenth Affirmative Defense

Plaintiff's claims are barred in whole or in part because Plaintiff's alleged injuries and damages, if any, were the result of a superseding and intervening cause.

### Fourteenth Affirmative Defense

Defendant did not cause or create any dangerous conditions for which it could be held liable for any failure to remedy or warn thereof.

### Fifteenth Affirmative Defense

Plaintiff knowingly and voluntarily assumed the risks alleged in this Complaint, and thus subjected herself to those risks inherent in the activity in which she was engaging at the time, as well as to the conditions of which she now complains, thereby assuming the risk of injury and damages complained of and reducing her recovery proportionately.

### Sixteenth Affirmative Defense

Defendant is entitled to the benefits and protections regarding an itemized verdict as set forth in Florida Statute §768.77.

### Seventeenth Affirmative Defense

Defendant is entitled to a credit or set off for any payments received or receivable by Plaintiff for any damages alleged in the Complaint from any collateral source whatsoever, including but not limited to payments from any health insurance, health plan benefits, Medicare, social security, or any other private or public funding source which either reimbursed Plaintiff for any other damages claimed in this case or reduced the amount of any bills of Plaintiff, as set forth in Florida Statute §768.76.

### Eighteenth Affirmative Defense

Plaintiff could have discovered any alleged danger on the premises by exercising the use of due care but failed to do so, thereby eliminating any liability for her to recover from Defendant in this action as a matter of law.

### RESERVATION OF RIGHTS

Defendant reserves the right to amend these affirmative defenses as discovery proceeds and additional information becomes known.

**WHEREFORE**, Defendant respectfully requests the Court (i) deny the relief requested by Plaintiff, (ii) enter judgment in favor of the Defendant and against Plaintiff, (iii) award Defendant costs incurred in defending this action, and (iv) award Defendant such further relief the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Defendant demands a trial by jury on all issues so triable.

Respectfully submitted,

By: /s/ *Clayton D. Hackney*
Clayton D. Hackney
Florida Bar No. 26163
Frantz Destin, Jr.
Florida Bar No. 109669
hackney@fasidibellolaw.com
destin@fasidibellolaw.com
blakewindhorst@fasidibellolaw.com
lopez@fasidibellolaw.com
pleadings@fasibibellolaw.com
*Counsel for Defendant*
**FASI & DIBELLO, P.A.**
150 SE 2nd Ave, Suite 1010
Miami, Florida 33131
Telephone: (305) 537-0469
Facsimile: (305) 503-7405

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that on this 4th day of October, 2021, we electronically filed the foregoing with the Clerk of Court through the Court's CM/ECF electronic notification system, which will send a Notice of Electronic Filing to all CM/ECF participants in this case. We also certify that the foregoing document is being served by first-class mail to any non-CM/ECF participants.

By: /s/ *Clayton D. Hackney*
Clayton D. Hackney

**SERVICE LIST**

**DORELIA CAMPS PINERO vs. WALMART CLAIMS SERVICES, INC.,**
**Case No.** 21-cv-23458-KMM
**United States District Court, Southern District of Florida**

William C. Ruggiero, Esq.
Law Offices of William C Ruggiero
Museum Plaza, Suite 703
200 S Andrews Ave
Fort Lauderdale, FL 33301
Florida Bar No. 878499
E-Mail: ruggiero@wrclaw.com; wruggiero@wcrlaw.com
Office: 954-462-2300
Fax: 954-463-2460
Attorneys For Plaintiff

Clayton D. Hackney, Esq.
Florida Bar No. 26163
Frantz Destin Jr., Esq.
Florida Bar No. 109669
Fasi & DiBello, P.A.
150 S.E. 2nd Avenue, Suite 1010
Miami, FL 33131
E-Mail: hackney@fasidibellolaw.com; destin@fasidibellolaw.com
blakewindhorst@fasidibellolaw.com; lopez@fasidibellolaw.com
Telephone: (305) 537-0469
Facsimile: (305) 503-7405
Attorneys For Defendant

# EXHIBIT

# LL

## Mediation Report from Pinero v. Walmart Claims Services

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 21-CV-23458-KMM

DORELIA CAMPS PINERO,

      Plaintiff,

vs.

WALMART CLAIMS SERVICES, INC.,

      Defendant.

_____/

## **MEDIATOR'S REPORT**

      COMES NOW Victor H. Rams, Jr., Esq., the undersigned certified Mediator, and reports to this Honorable Court:

The Mediation held on **June 8, 2022 at 2:00 P.M.**

_____      An Agreement was reached.

_____      Mediation Agreement attached, with the parties' consent.

___X___      No Agreement was reached.

_____      The parties wish to continue settlement negotiations and may reconvene for a Continuation of the Mediation. Notice of the date, time and place shall be furnished to the parties and filed with the court. If no Notice of Mediation Agreement or Post-Mediation Agreement is filed on or before ____/____/____, then it shall be considered no agreement was reached in this matter.

_____      A Pre/Post-Mediation Settlement was reached, as per information received on ____/____/____, from _____.

                                    ***/s/ Victor Hugo Rams, Jr***
                                    VICTOR H. RAMS, JR.
                                    Certified Circuit and Federal Court Mediator
                                    Florida Bar No.: 771732
                                    Certification No.: 26364R
                                    5840 W. Flagler St.
                                    Miami, FL 33144
                                    Tel: (786)703-7008
                                    victor@ramsmediationgroup.com

Copies to:
Court
Attorneys of Record

# EXHIBIT

# MM

## Motion for Summary Judgment from Pinero v. Walmart Claims Services

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO. 21-cv-23458-KMM

DORELIA CAMPS PINERO,

                Plaintiff,

vs.

WALMART CLAIMS SERVICES, INC.,

               Defendant.                 /

## DEFENDANT WALMART'S
## MOTION FOR SUMMARY JUDGMENT

Defendant, Walmart Claims Services, Inc., ("Walmart") moves this Court, pursuant to Federal Rule of Civil Procedure 56(a) and Local Rule 56.1 for the entry of final summary judgment against Plaintiff Dorelia Pinero ("Plaintiff"), and in support thereof, states:

### INTRODUCTION

Plaintiff alleges that she slipped and fell on a dirty liquid substance in a Walmart gas station. Florida law requires Plaintiff to show that Walmart had actual or constructive knowledge of the alleged condition in order to establish negligence. Summary judgment must be entered in Walmart's favor because the evidence of record reveals that Plaintiff has not—and cannot—meet her burden of proving Walmart had actual or constructive knowledge of the alleged condition.

Here, the evidence comprehensively evinces that negligence cannot be imputed to Walmart as a matter of law. The record is devoid of any evidence that Walmart had actual knowledge of the alleged substance because the undisputed material facts show that no Walmart employee created or otherwise knew of the condition on the floor before the alleged incident. Plaintiff is also unable to demonstrate that Walmart had constructive notice because the record contains no evidence of: (1) when the substance got on the floor or how long it was present prior to the alleged

incident, (2) *anyone* seeing the substance before the alleged incident (3) where it came from, (4) any signs of aging, (5) how the substance got to be on the floor, or (6) that such a condition occurred regularly in the subject area. Even when viewed in the light most favorable to Plaintiff— the undisputed material facts show that she has not and cannot establish that Walmart had actual or constructive notice of the condition. Indeed, as Walmart will show below—the record evidence supports only one conclusion—that the substance was *not* on the floor for a long period of time.

Plaintiff alleges that she slipped and fell on what she believes to be gasoline. Notably, Plaintiff admits that she saw the substance before the incident, but did not avoid it:

> **Q. Okay. Were you able to start pumping gasoline before the incident happened?**
> A.  Yes. I got out of the car. And I got out
> of the car and went to where the tank is. I -- I
> noticed that the floor was wet. But I didn't pay
> too much importance to that. And I uncovered the
> gas tank and I picked up the pump -- the hose and I
> started pumping gas. And I noticed that my -- the
> soles of my shoes were slippery. But I finished
> pumping gas because I was standing right there.
> and when I turned around to go to the door of my
> car I started skidding. And I was slipping and I
> was trying to hold onto the car.
> …
> And I thought
> that I was slipping on water.

*See* Pinero Dep. 85:21-86:24 attached as Exhibits 12 and 13 to Walmart's Statement of Undisputed Facts.  Plaintiff does not know what the substance was, how long the substance was on the floor before her alleged fall, where it came from, or when it first spilled onto the floor.

> **Q. Okay. And that substance that you saw when**

**you got out of your car, you don't know exactly
where it came from?**
A. No.
**Q. Okay. The substance that you saw on the
floor, you didn't see when it first got on the
floor?**
A. No. It was already there when I arrived.
…
**Q. Okay. And you don't know when that gas
would have spilled?**
A. No. I wasn't there.
…
**Q. You don't know who spilled that gasoline on
the floor?**
A. If the lady who was there didn't know, how
could I know.
**Q. Okay. And you didn't see anyone spill that
gasoline while you were driving up to the gas
station?**
A. There was nobody there.

*See Id*. at 89:02-89:09, 100:01-100:13, and 122:05-122:07, attached as Exhibit 14 to Walmart's

Statement of Undisputed Facts.  Plaintiff also did not know how long the substance had been on

the floor before her alleged fall.

**You don't know how long this substance was
on the floor before you stepped in it, correct?**
A. No, darling; I don't know.

*Id*. at 122:05-122:07.

She did not smell the substance, herself, and only believes it gasoline because her aunt told her she

smelled like gasoline after the fall.  *See Id*. at 97:03-97:21 attached as Exhibit 15.

Similarly, Sam's Club employee Rita Diaz who was working at the gas station inspected that gas station floor between 6:00AM and 7:00AM and did not have any knowledge of the alleged substance being on the floor before the alleged incident. *See* Diaz Dec. (Ex. 5) ¶ ¶ 7-9, 12. And no other employee caused any spill or had any knowledge of such a spill before Plaintiff's alleged incident. *Id*. *See* Diaz Dec. (Ex. 5) ¶ ¶ 13-15. Moreover, liquid spills were not a regular occurrence on the gas station floor. *See* Diaz Dec. (Ex. 5) ¶ 15.

Under these undisputed facts, Florida law requires that final summary judgment be entered in favor of Walmart because Plaintiff cannot establish that Walmart/the store had either actual or constructive notice of the alleged substance on its store floor, and therefore, did not breach its duty of care.

I.     **The Summary Judgment Standard**

As is well known, pursuant to Federal Rule of Civil Procedure 56(a), summary judgment should be entered when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). To discharge their burden, a movant need only direct the district court's attention to the fact there is an absence of evidence to support the nonmoving party's case. *See Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). Once a movant has met its burden, the burden shifts to the non-moving party to come forward with affirmative evidence to support its claim. *Monelus*, 2008 WL 5272171, at *1 (citing *Anderson*, 477 U.S. 252, 257 (1986)).

However, to escape summary judgment, "the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient to permit the jury to reasonably find on its be-half." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Failing to present proof concerning an essential element of the non-moving party's case renders all other facts immaterial and requires the court to grant the motion. *See Celotex Corp.*, 477 U.S. at 322.

The undisputed material facts herein form only one reasonable conclusion—Plaintiff cannot carry her burden of proving Walmart had either actual or constructive notice of the alleged condition and, therefore, Plaintiff's claim of negligence fails under Florida law.

## II.     This Court Should Enter Summary Judgment in Walmart's Favor Because The Alleged Substance Was Open and Obvious and Plaintiff Cannot Establish That Walmart Had Actual or Constructive Knowledge of It.

Plaintiff cannot show that Walmart breached any duty of care owed to her because Plaintiff has failed to provide any evidence establishing that Walmart had actual or constructive notice of the alleged dangerous condition. Under Florida law, a claim of negligence requires the Plaintiff to establish the following four elements: (1) Walmart owed a duty, (2) Walmart breached that duty, (3) that Walmart's breach proximately caused Plaintiff's injury, and (4) Plaintiff was actually harmed by the injury. *See Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007); *Florida Dept. of Corrections v. Abril*, 969 So. 2d 201, 204 (Fla. 2007). Additionally, a plaintiff in a premises liability action must show (5) "the defendant's possession or control of the premises and [(6)] notice of the dangerous condition." *Lisanti v. City of Port Richey*, 787 So. 2d 36, 37 (Fla. 2d DCA 2001).

A business owes its customers two duties, "(1) to take ordinary and reasonable care in keeping its premises reasonably safe for invitees; and (2) to warn [only] of perils that were known

or should have been known to the [business] and of which the invitee could not discover." *Delgado v. Laundromax, Inc.*, 65 So.3d 1087, 1090 (Fla. 3d DCA 2011). However, "where a business invitee [alleges] that she slipped and fell on a 'transitory substance' in a business establishment … proof of the breach element of the claim against the [business owner] is statutorily constrained by section 768.0755 of the Florida Statutes (2013)." *Encarnacion v. Lifemark Hosps. of Florida*, 211 So. 3d 275, 278 (Fla. 3d DCA 2017).

Florida Statutes §768.0755 specifically outlines what Plaintiff must prove to recover under her negligence claim arising from a foreign substance being on the floor:

> (1)  If a person slips and falls on a transitory foreign substance in a business establishment, the injured person must prove that the business establishment had actual or constructive knowledge of the dangerous condition and should have taken action to remedy it. Constructive knowledge may be proven by circumstantial evidence showing that:
>
> > (a)  The dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or
> >
> > (b)  The condition occurred with regularity and was therefore foreseeable.

§768.0755(1), Fla. Stat.

Thus, for Plaintiff to succeed in establishing that Walmart was negligent regarding the alleged transitory foreign substance, she must show that Walmart had actual or constructive knowledge of the alleged dangerous condition. For the reasons detailed below, the undisputed facts and evidence of record establish that Plaintiff cannot carry her burden of proving that Walmart had actual or constructive knowledge of the alleged condition. As a result, Florida law requires this Court grant summary judgment in Walmart's favor.

a.      **Plaintiff Knew That The Substance Was on The Gas Station Floor And Could Have Avoided It.**

Some injury-causing conditions are simply so open and obvious that they can be held as a matter of law not to give rise to liability as dangerous conditions. *See Taylor v. Universal City Property Management*, 779 So. 2d 621, 622 (Fla. 5th DCA 2001) ("The precise nature of the hazard need not be observable."); *see also Arnoul v. Busch Entertainment Corp*., 2008 WL 4525106 (M.D. Fla. 2008) ("If the obviousness of the condition would lead a reasonable person to believe that the danger will be avoided, the condition is not unreasonably dangerous, and the landowner is not liable."). Additionally, there are two types of obvious conditions which will both discharge the duty to warn and will not constitute a breach of a duty to maintain the premises in a reasonably safe condition as a matter of law. *Brookie v. Winn-Dixie Stores, Inc*., 213 So. 3d 1129, 1133 (Fla. 1st DCA 2017). As the Brookie court explained:

> Thus, there are two types of obvious conditions that will not constitute a breach of a duty to maintain premises in a reasonably safe condition, to wit: 1) where the condition is so—open and obvious and not inherently dangerous; or 2) where the condition may be dangerous, but is—so open and obvious that an invitee may be reasonably expected to discover them to protect himself. Thus, while many decisions speak of the duty to warn and the duty to maintain premises in a reasonably safe condition as separate and distinct duties, for analytical purposes the duties are not mutually exclusive, as **the open and obvious nature of a condition may preclude a finding of a breach of either duty, as a matter of law**.

*Id*. (citations omitted) (emphasis added); *see also Ramsey v. Home Depot U.S.A., Inc.,* 124 So. 3d 415 (Fla. 1st DCA 2013) (affirming summary judgment where Plaintiff alleged that she was focused on an accessibility sign and did not see the wheel stop in front of her on which she tripped).

In *Wolf*, a customer sued Sam's Club after he tripped on a tree root while walking across a landscaped area of the parking lot on his way to the store entrance. *Wolf v. Sam's E., Inc*., 132 So. 3d 305 (Fla. 4th DCA 2014). Although he conceded that he was aware of trees in the landscaped areas, plaintiff alleged that he had not "consciously noted" the tree roots in those areas before the

incident. *Id.* Accordingly, he alleged that the store failed to properly maintain its premises and to warn him of the dangerous condition of the tree roots on its premises. *Id.*

Upon its review of these facts, the Fourth District Court of Appeal affirmed the trial court's entry of summary judgment for Sam's Club. *Id.* at 309. In doing so, the court rejected plaintiff's arguments that the tree roots were not easily visible. *Id.* The court reasoned that the tree roots were "so obvious and not inherently dangerous" that they constituted a non-dangerous condition as a matter of law which precluded recovery under a failure- to-maintain theory. *Id.* at 308.

Applying the Open and Obvious Doctrine to the Facts of this Case Requires Entry of Summary Judgment in Favor of Walmart. Simply put, here, Plaintiff admits that she observed that the floor was wet before her alleged fall.[1] She chose to not avoid the wet area on the floor and did not "pay too much importance" to it. Her failure to care for her own safety is her own negligence— no Walmart's. Indeed, in keeping with *Brookie* and *Wolf*, the alleged condition was so open and obvious that she could have reasonably been expected to protect herself from it. Therefore, Walmart's motion for summary judgment should be granted.

### b.     There is No Evidence that Walmart Had Actual Notice of the Substance.

Plaintiff has not and cannot establish that Walmart had actual notice of any dangerous condition as required by Florida law. *See* §768.0755(1). "Actual notice" exists where a business owner's agents or employees create or know of the dangerous condition. *See Barbour v. Brinker Fla., Inc.*, 801 So. 2d 953, 957 (Fla. 5th DCA 2001). Plaintiff has provided no evidence that a Walmart employee created or otherwise knew of the condition being on the floor at any point before the alleged incident occurred. Indeed, Ms. Diaz, who was working at the has station and

---

[1] *See* Pinero Dep. 85:21-86:24 attached as Ex.12 and13.

appears on the store video, attested that no one at Sam's Club had actual notice of the alleged spill.[2] By Plaintiff's own admission, the person that she allegedly spoke to, did not know who spilled the substance.[3] Moreover, the store video shows that there were no caution cones or warning signs in the area of the alleged incident which could imply the possibility of actual notice.[4] Therefore, there is no evidence in the record that remotely suggests Walmart had actual notice of the condition.

### c.    There is No Evidence that Walmart Had Constructive Notice of Any Dangerous Condition.

In the absence of actual notice, it is incumbent on Plaintiff to come forward with evidence of constructive notice. *See* §768.0755 (1)(a)-(b). The evidence of record here, however, reveals that Plaintiff cannot show that Walmart had constructive notice of any dangerous condition as required by Florida law. *See* §768.0755 (1)(a)-(b). First, the record is devoid of any evidence establishing that the alleged condition "occurred with regularity and was therefore foreseeable." §768.0755(1)(b). Indeed, Ms. Diaz's declaration indicates that liquid spills were not a regular occurrence at the gas station.[5] Accordingly, Walmart' Motion for Summary Judgment should be granted. *See Speedway, LLC v. Cevallos*, 331 So. 3d 731, 738 (Fla. 4th DCA 2021) (reversing denial of motion for directed verdict where jury was left to speculate as to the existence of a substance at a gas station and the defendant gas station's purported constructive knowledge of "buildup" on its concrete floor.)

There is also no evidence of when the liquid came to be on the floor. Thus, to establish constructive notice, Plaintiff must present circumstantial evidence that the alleged gasoline

---

[2]    *See* Diaz Dec. (Ex. 5) ¶¶ 7-9, 12-14.
[3]    *See* Pinero Dep. at 100:01-100:13 (Ex. 14).
[4]    *See* Store Surveillance Video between timestamps 7:00:19AM to 09:04:30AM (Ex. 4).
[5]    *See* Diaz Dec. (Ex. 5) ¶ 15.

"existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition." §768.0755 (1)(a); *see Encarnacion*, 211 So. 3d at 278.

Florida courts have found that a defendant is entitled to summary judgment where an employee inspected the area less than twenty minutes prior to the alleged incident. *See Hill v. Ross Dress for Less, Inc.*, 12-23368-CIV, 2013 WL 6190435, at *5 (S.D. Fla. Nov. 26, 2013); For example, in *Hill*, a store employee testified that the store trains its employees to always be on the lookout for dangerous conditions and to pick up any items on the floor upon notice. 2013 WL 6190435, at *1. The employee testified that she did not see anything on the floor when she inspected the area approximately ten minutes prior to the incident, and if she ever comes across something on the floor, she cleans it up. *Id*. Based on this evidence, and the fact there was no evidence of when the substance got on the floor, the source, or how long it was present, the Court flatly rejected the customer's argument that an issue of material fact existed as to when the store employees last inspected the area of incident. *Id*. at *5. Rather, the Court found that there was "no evidence that Defendant knew or should have known of the hazardous condition." *Id*.; *see Hernandez v. Sam's E., Inc.*, 20-CV-61648-RAR, 2021 WL 1647887, at *3 (S.D. Fla. Apr. 26, 2021); *see also Pussinen v. Target Corp.*, 731 Fed. Appx. 936, 938 (11th Cir. 2018) (affirming summary judgment and emphasizing "**it would be pure speculation** for a jury to conclude … that the liquid was on floor for more than fifteen minutes" based solely on employee testimony that he last inspected area 'more than fifteen minutes' before fall.)

Furthermore, Florida law is clear—the mere presence of a transitory substance is insufficient to establish constructive notice—rather, "the record must contain additional facts to create a permissible inference regarding the amount of time the [substance] had been on the floor." *Palavicini v. Walmart Stores E., LP*, 787 Fed. Appx. 1007, 1013 (11th Cir. 2019); *Bucholtz v. City*

*of Jacksonville,* 72 So. 2d 52, 53 (Fla. 1954); *see Delgado*, 65 So.3d at 1090; *see also Lago v. Costco Wholesale Corp.*, 233 So. 3d 1248, 1252 (Fla. 3d DCA 2017); *Oliver v. Winn-Dixie Stores, Inc.*, 291 So. 3d 126, 130 (Fla. 4th DCA 2020). In *Delgado*, a customer fell in a laundromat and alleged that she had slipped on water that was left on the floor. *See Delgado*, 65 So.3d at 1090. The customer testified that she did not know where the water came from, how long it was on the floor prior to her fall, or if anyone at the laundromat knew of the water being there before she walked in. *See Id*. In affirming summary judgment, the Third District Court of Appeal emphasized that—**without additional facts**—the mere presence of water on the floor and that the customer slipped on it was insufficient to hold the laundromat liable for negligence. *See Id*. In fact, the court found that "all the facts regarding the spill suggest that it was not on the floor for a long period of time" prior to the incident. *Id*. Similarly, a customer in *Lago* testified that she did not see the liquid before she fell, did not know what it was, and did not know how long it had been there. *See Id*. at 1251-52. Relying on *Delgado*, the court in *Lago* affirmed summary judgment, reasoning that, "without additional facts suggesting the liquid had been there for a long period of time or this happened regularly, the trial court properly granted summary judgment" in favor of the grocery store. *Id*. at 1252.

Here, much like *Hill*, *Delgado* and *Lago*—the record is completely devoid of any evidence reasonably signifying the liquid was on the floor long enough to impute constructive knowledge to Walmart. Akin to the employees in *Hill* and *Hernandez*, Ms. Diaz walked through the area of the incident throughout the hour between 6:00 AM and 7:00 AM prior to the alleged fall and did not notice any substance on the gas station floor.[6]  The evidence of record shows that Sam's Club regularly trains its employees to always be on the lookout for spills, produce, or any potentially

---

[6]    *See* Diaz Dec. (Ex. 5) ¶ 15.

dangerous conditions and to clean them up immediately upon notice.[7] Further, Plaintiff does not know what the substance was, how long the substance was on the floor before her alleged fall, where it came from, or when it first spilled onto the floor.[8] Plaintiff also did not know how long the substance had been on the floor before her alleged fall.[9] There is simply *no evidence of anyone* seeing the alleged condition prior to the alleged incident, nor is there any evidence of its source, or how long it was present prior to the alleged incident. Moreover, neither In sum, the record is completely devoid of any evidence remotely suggesting how long the condition was on the floor prior to the alleged incident. Rather, as in *Delgado* and *Lago*, "all the facts regarding the [substance] suggest that it was *not* on the floor for a long period of time."

The only possible alternative is for Plaintiff to establish, by *permissible* inference, that the condition itself showed *obvious* signs of aging sufficient to impute constructive knowledge to Walmart. A "reasonable inference is one that a reasonable and fair-minded [person] in the exercise of impartial judgment might draw from the evidence." *Pussinen v. Target Corp.*, 731 Fed. Appx. 936, 937 (11th Cir. 2018). "Yet **a jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility**." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982)(emphasis added); *see Hernandez v. Sam's E., Inc.*, 20-CV-61648-RAR, 2021 WL 1647887, at *5 (S.D. Fla. Apr. 26, 2021) ("[I]f a party to a civil action depends upon the inferences to be drawn from circumstantial evidence as proof of one fact, it cannot construct a further inference upon the initial inference in order to establish a further fact unless it can be found that the original, basic inference was established to the exclusion of all other reasonable inferences.")(quoting *Nielson v. City of Sarasota*, 117 So. 2d 731, 733 (Fla. 1960).

---

[7]  *Id.* at ¶ 16.
[8]  See Pinero Dep. at 89:02-89:09, 100:01-100:13, and 122:05-122:07, attached as Exhibit 14 to Walmart's Statement of Undisputed Facts.
[9]  Id. at 122:05-122:07.

Importantly, "[f]or such testimony to create a jury issue, the testimony **must be accompanied by a 'plus,'** namely some **_additional_ fact or facts** from which a jury can reasonably conclude that the substance was on the floor long enough to have become discolored **_without assuming other facts_**." *Encarnacion*, 211 So. 3d at 278 (emphasis added).

Florida courts have repeatedly held that "the mere presence of footprints or marks, standing alone, may not constitute competent evidence tending to show the length of time that a substance has been on the floor." *Hernandez*, 2021 WL 1647887, at *5; *see also Granela v. Walmart Stores E., L.P.*, 1:19-CV-23726, 2021 WL 768271, at *3 (S.D. Fla. Feb. 26, 2021); *Calvache v. Jackson Memorial Hosp.*, 588 So. 2d 28, 29 (Fla. 3d DCA 1991). Where a slip and fall plaintiff fails to identify additional facts sufficiently signifying the length of time the condition was on the floor, there is no genuine issue of material fact, and the premises owner is entitled to summary judgment. *See Oliver*, 291 So. 3d at 130; *Espinoza v. Target Corp.*, 843 Fed. Appx. 168, 171 (11th Cir. 2021). For example, in *Oliver*, a shopper claimed she slipped and fell on what appeared to be a squished grape and liquid surrounding it in a Winn-Dixie store. *Id.* at 127. The shopper described the condition as a "clear, dirty liquid on the floor [with] some sort of red or purple speck in it." *Id.* (emphasis added). Importantly, however, just as in *Delgado* and *Lago*, the shopper in *Oliver* "did not see the grape or surrounding liquid before falling. Neither did the customer who happened to be shopping in the area when [the shopper] fell," nor did the shopper's daughter who had previously been in the area of the fall. *Id.* at 129. Nor did the employee that was in the area before the fall. *See Id.* Furthermore, there were no obvious signs of aging. *See id.* As a result, the Fourth District Court of Appeal emphasized that this limited evidence "**hardly establishes that**… the grape and surrounding liquid were on the ground for enough time to impute constructive knowledge to Winn-Dixie." *Id.* at 129-130 (emphasis added). Rather, the court concluded that—

without more—the "**facts indicate that the liquid was not on the floor for a long period of time prior to the incident**." *Id.* at 130.

Similarly, in *Encarnacion*, the Third District Court of Appeal categorically rejected plaintiff's argument that her testimony of the substance being "oily, dirty, and dark," in and of itself was sufficient to create an issue for the jury on constructive notice. *Id.* The court reasoned, "the testimony must be accompanied by a 'plus,' namely some additional fact or facts from which a jury can reasonably conclude that the substance was on the floor long enough to have become discolored without assuming other facts, such as the substance, in its original condition, was not "oily," "dirty" and "dark."" *Id*; *see Palavicini v. Walmart Stores E., LP*, 787 Fed. Appx. 1007, 1013 (11th Cir. 2019) (affirming summary judgment despite testimony liquid was "yellow" and "dirty," where plaintiff could not identify when the liquid presented itself, how long it was present, or *what caused it to be dirty*, and no indicia of prior marks).

Here, as in *Hernandez, Oliver* and *Encarnacion*, Plaintiff has not and cannot provide any evidence giving rise to a permissible inference that the alleged substance was on the floor for a long enough period of time to impute liability to Walmart. There is no evidence of any marks or any footprints ever being in the alleged substance. There is no evidence that the substance was not "dirty" in its original form before it spilled onto the ground. Thus, without speculating, Plaintiff can never establish how long the alleged substance was on the ground. *See Granela*, 2021 WL 768271, at *4 (affirming summary judgment where **customer's "arguments [would] require the court to make impermissible inferential leaps and assumptions" and "[a] reasonable jury would … be left to speculate as to the length of time the water was on the floor, whether moments, minutes, or hours**").

Again, as in *Hernandez, Oliver*, and *Encarnacion,* Plaintiff has failed to provide evidence sufficient for a reasonable jury to infer that water/gasoline—devoid of any reasonable obvious signs of aging and with no known source—had been on the floor for a sufficient length of time to charge Walmart with constructive knowledge of its presence.

## **CONCLUSION**

Summary judgment is the proper and necessary means for terminating litigation where there is no genuine issue of material fact. *Buitrago v. Rohr*, 672 So. 2d 646 (Fla. 4th DCA 1996) (affirming entry or summary judgment because case "cried out" for its entry where party had no legal exposure). As discussed above, there is no evidence to support a claim of negligence against Walmart. Accordingly, this Court should enter summary judgment in favor of Walmart.

WHEREFORE, the Defendant Walmart respectfully requests that this Honorable Court issue an order granting Summary Judgment in its favor and against Dorelia Pinero, stating Plaintiff is to go hence without day, and awarding any other relief that the Court deems just and proper.

Respectfully submitted,

By: /s/ *Frantz Destin Jr.*
Frantz Destin Jr.
Florida Bar No. 109669
destin@fasidibellolaw.com
lopez@fasidibellolaw.com
*Counsel for Defendant*
**FASI & DIBELLO, P.A.**
150 SE 2nd Ave, Suite 1010
Miami, FL 33131
Telephone: (305) 537-0469
Facsimile: (305) 503-7405

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 22nd day of July, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: <u>/s/ *Frantz Destin, Jr.*</u>
Frantz Destin Jr.

## <u>SERVICE LIST</u>

**DORELIA CAMPS PINERO vs. WALMART CLAIMS SERVICES, INC.,**
**Case No. 21-cv-23458-KMM**
**United States District Court, Southern District of Florida**

William C. Ruggiero, Esq.
Vanessa Lagios, Esq.
Law Offices of William C Ruggiero
Museum Plaza, Suite 703
200 S Andrews Ave
Fort Lauderdale, FL 33301
Florida Bar No. 878499
E-Mail: ruggiero@wrclaw.com; wruggiero@wcrlaw.com; vlagios@wcrlaw.com
Office: 954-462-2300
Fax: 954-463-2460
Attorneys For Plaintiff

Frantz Destin Jr., Esq.
Florida Bar No. 109669
Fasi & DiBello, P.A.
150 S.E. 2nd Avenue, Suite 1010
Miami, FL 33131
E-Mail: destin@fasidibellolaw.com; lopez@fasidibellolaw.com
Telephone: (305) 537-0469
Facsimile:  (305) 503-7405
Attorneys For Defendant

# EXHIBIT

# NN

Settlement Stipulation from
Pinero v. Walmart Claims
Services

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 21-cv-23458-KMM

DORELIA CAMPS PINERO,

                Plaintiff,

vs.

WALMART CLAIMS SERVICES, INC.,

                Defendant.               /

## AGREED JOINT STIPULATION TO DISMISS WITH PREJUDICE

IT IS HEREBY STIPULATED and agreed, pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii), by and between the parties and their respective counsel, that the above cause has been amicably settled out of Court for a satisfactory sum, and therefore, the Court may enter a Final Order on this Agreed Joint Stipulation to Dismiss, dismissing the action of the Plaintiff with prejudice, and each party to bear its own costs and attorney's fees. The Court shall retain jurisdiction to enforce the terms of the settlement agreement reached by the parties.

Date: October 3, 2022             Date:     October 3, 2022

LAW OFFICE OF WILLIAM C. RUGGIERO
Attorneys for Plaintiff
Museum Plaza, Suite 703
200 South Andrews Avenue
Fort Lauderdale, Florida 33301
Phone: (954) 462-2300
Ruggiero@wcrlaw.com

FASI & DIBELLO, P.A.
Attorneys for Defendant
150 S.E. 2nd Avenue, Suite 1010
Miami FL 33131
Tel: (305) 537-0469
Fax: (305) 503-7405
destin@fasidibellolaw.com
lopez@fasidibellolaw.com
wiza@fasidibellolaw.com

By: _s/ Vanessa Lagios_            By: _s/ Frantz Destin Jr._
      Vanessa Lagios                    Frantz Destin, Jr.
      Florida Bar No. 50953          Florida Bar No. 109669

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 3rd day of October, 2022, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: _s/ Frantz Destin Jr._____

Frantz Destin Jr.

## SERVICE LIST

**DORELIA CAMPS PINERO vs. WALMART CLAIMS SERVICES, INC.,**
**Case No. 21-cv-23458-KMM**
**United States District Court, Southern District of Florida**

William C. Ruggiero, Esq.
Vanessa Lagios, Esq.
Law Offices of William C Ruggiero
Museum Plaza, Suite 703
200 S Andrews Ave
Fort Lauderdale, FL 33301
Florida Bar No. 878499
E-Mail: ruggiero@wrclaw.com; wruggiero@wcrlaw.com; vlagios@wcrlaw.com
Office: 954-462-2300
Fax: 954-463-2460
Attorneys For Plaintiff

Frantz Destin Jr., Esq.
Florida Bar No. 109669
Fasi & DiBello, P.A.
150 S.E. 2nd Avenue, Suite 1010
Miami, FL 33131
E-Mail: destin@fasidibellolaw.com; lopez@fasidibellolaw.com
Telephone: (305) 537-0469
Facsimile:  (305) 503-7405
Attorneys For Defendant

# EXHIBIT

# OO

Docket Sheet from Grant v. Walmart Claims Services, Inc.

RECAP Actions

ATTYOPEN,CLOSED

**United States District Court**
**Eastern District of Wisconsin (Milwaukee)**
**CIVIL DOCKET FOR CASE #: 2:22-cv-00428-LA**

Grant et al v. Walmart Claims Services Inc                    Date Filed: 04/06/2022
Assigned to: Judge Lynn Adelman                              Date Terminated: 05/02/2023
Cause: 28:1332 Diversity-Personal Injury                     Jury Demand: Defendant
                                                             Nature of Suit: 360 P.I.: Other
                                                             Jurisdiction: Diversity

**Plaintiff**
**Leasa K Grant**                          represented by   **Michael A Lococo**
                                                            McCoy Leavitt Laskey LLC
                                                            Riverwood Corporate Center III
                                                            N19 W24200 Riverwood Dr - Ste 125
                                                            Waukesha, WI 53188
                                                            262-522-7015
                                                            Email: MLococo@MLLlaw.com
                                                            *TERMINATED: 09/14/2022*
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Richard B Hess**
                                                            Gruber Law Offices LLC
                                                            100 E Wisconsin Ave - Ste 2800
                                                            Milwaukee, WI 53202
                                                            414-276-6666
                                                            Fax: 414-273-4047
                                                            *LEAD ATTORNEY*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Geoffrey D Wilber**
                                                            Gruber Law Offices LLC
                                                            100 E Wisconsin Ave - Ste 2800
                                                            Milwaukee, WI 53202
                                                            414-276-6666
                                                            Email: gdw@gruber-law.com
                                                            *ATTORNEY TO BE NOTICED*

V.

**Involuntary Plaintiff**
**State of Wisconsin Department of Health Services**    represented by   **Allison M Welch**
*TERMINATED: 06/07/2022*                                                 State of Wisconsin Department of Health Services
                                                                         Office of Legal Counsel
                                                                         1 W Wilson St
                                                                         PO Box 7850
                                                                         Madison, WI 53707-7850
                                                                         608-266-9543
                                                                         Email: allison.welch@dhs.wisconsin.gov
                                                                         *ATTORNEY TO BE NOTICED*

**Involuntary Plaintiff**
**UnitedHealthcare Insurance Company**

V.

**Defendant**
**Walmart Claims Services Inc**            represented by   **Lynette Fons**
                                                            MWH Law Group LLP
                                                            735 N Water St - Ste 610
                                                            Milwaukee, WI 53202
                                                            414-436-0353
                                                            Fax: 414-436-0354
                                                            Email: lynette.fons@mwhlawgroup.com
                                                            *TERMINATED: 05/25/2022*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Peggy E Van Horn**
                                                            Law Offices of Thomas P Stilp
                                                            11800 W Park Pl - Ste 210
                                                            PO Box 245023
                                                            Milwaukee, WI 53224-9523
                                                            414-577-4328
                                                            Fax: 603-334-7164
                                                            Email: peggy.vanhorn@libertymutual.com
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Carlos R Pastrana**
                                                            MWH Law Group LLP
                                                            735 N Water St - Ste 610

Milwaukee, WI 53202
414-436-0353
Fax: 414-436-0354
Email: carlos.pastrana@mwhlawgroup.com
*TERMINATED: 05/25/2022*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/06/2022 | 1 🅁 | NOTICE OF REMOVAL by Walmart Claims Services Inc from Milwaukee County Circuit Court, Case Number: 2022CV00917 with attached state court documents. (Filing Fee PAID $402 receipt number AWIEDC-4082537) (Attachments: # 1 🅁 Exhibit 1 - Complaint, # 2 🅁 Exhibit 2 - Service of Process Transmittal, # 3 🅁 Civil Cover Sheet)(Pastrana, Carlos) |
| 04/06/2022 | 2 🅁 | DISCLOSURE Statement by Walmart Claims Services Inc. (Pastrana, Carlos) |
| 04/06/2022 | | NOTICE Regarding assignment of this matter to Judge Lynn Adelman; Consent/refusal forms for Magistrate Judge Duffin to be filed within 21 days; the consent/refusal form is available here. (jcl) |
| 04/08/2022 | 3 | Magistrate Judge Jurisdiction Form filed by Walmart Claims Services Inc. (NOTICE: Pursuant to Fed.R.Civ.P. 73 this document is not viewable by the judge.) (Pastrana, Carlos) |
| 04/13/2022 | 4 🅁 | *Defendant's* ANSWER to Complaint with Jury Demand by Walmart Claims Services Inc.(Pastrana, Carlos) |
| 04/26/2022 | 5 | NOTICE of Appearance by Lynette Fons on behalf of Walmart Claims Services Inc. Attorney(s) appearing: Lynette K. Fons (Fons, Lynette) |
| 04/29/2022 | 6 | SCHEDULING ORDER: signed by Judge Lynn Adelman on 4/29/22.IT IS ORDERED that a telephonic Fed. R. Civ. P. 16(b) scheduling conference is scheduled for June 7, 2022 at 10:00 a.m. The court will initiate the call. The participation of the attorney who will be handling the case is required and the telephone number should be provided in the Rule 26(f) report. (cc: all counsel)(kmr) |
| 05/10/2022 | 7 | DISCLOSURE Statement by Leasa K Grant. (Lococo, Michael) |
| 05/10/2022 | 8 | Magistrate Judge Jurisdiction Form filed by Leasa K Grant. (NOTICE: Pursuant to Fed.R.Civ.P. 73 this document is not viewable by the judge.) (Lococo, Michael) |
| 05/13/2022 | 9 | ORDER REASSIGNING CASE ON CONSENT signed by Judge Lynn Adelman on 5/13/22. Case reassigned to Magistrate Judge William E Duffin for all further proceedings. (cc: all counsel)(kmr) |
| 05/13/2022 | | NOTICE of Cancellation of Hearing: The telephonic Fed. R. Civ. P. 16(b) scheduling conference scheduled for June 7, 2022 at 10:00 a.m. is removed from the court's calendar. (cc: all counsel) (kmr) |
| 05/16/2022 | | This case was reassigned to Magistrate Judge William E Duffin in error. This case has been returned to Judge Lynn Adelman. (kmr) |
| 05/16/2022 | | NOTICE of Hearing: A telephonic Fed. R. Civ. P. 16(b) scheduling conference is scheduled for June 7, 2022 at 10:00 a.m. The court will initiate the call. The participation of the attorney who will be handling the case is required and the telephone number should be provided in the Rule 26(f) report. Please see 6 . (cc: all counsel)(kmr) |
| 05/18/2022 | 10 | NOTICE of Appearance by Peggy E Van Horn on behalf of Walmart Claims Services Inc. Attorney(s) appearing: Peggy Van Horn (Van Horn, Peggy) |
| 05/24/2022 | 11 | STIPULATION *for Substitution of Counsel* by Walmart Claims Services Inc. (Fons, Lynette) |
| 05/24/2022 | 12 | PROPOSED Proposed Order for Substitution of Counsel filed by Walmart Claims Services Inc. (Fons, Lynette) |
| 05/24/2022 | 13 | MOTION to Substitute Attorney ~~Appoint Counsel~~ by Walmart Claims Services Inc. (Fons, Lynette) Modified on 5/25/2022 (jcl). |
| 05/24/2022 | 14 | REPORT of Rule 26(f) Plan by Walmart Claims Services Inc. (Fons, Lynette) |
| 05/24/2022 | | NOTICE of Electronic Filing Error re 12 Proposed Order for Substitution of Counsel filed by Walmart Claims Services Inc ; Proposed Orders should be e-filed as an attachment to the stipulation or motion and NOT e-filed as a separate document. Please ensure that the proposed order has been emailed to the proposed email box for the assigned judge in Word format. This document does not need to be re-filed; Please refer to the policies and procedures for electronic case filing and the user manual found at www.wied.uscourts.gov (jcl) (Entered: 05/25/2022) |
| 05/25/2022 | 15 | NOTICE of Appearance by Allison M Welch on behalf of State of Wisconsin Department of Health Services. Attorney(s) appearing: Allison M. Welch (Welch, Allison) |
| 05/25/2022 | 16 | MOTION to Dismiss *DHS* by State of Wisconsin Department of Health Services. (Attachments: # 1 Text of Proposed Order)(Welch, Allison) |
| 05/25/2022 | 17 | AFFIDAVIT of Allison M. Welch *In Support of Motion to Dismiss*. (Attachments: # 1 Certificate of Service)(Welch, Allison) |
| 05/25/2022 | | TEXT ONLY ORDER signed by Judge Lynn Adelman on 5/24/22 GRANTING 11 Stipulation for Substitution of Counsel. (cc: all counsel)(kmr) |
| 06/07/2022 | 18 🅁 | Minute Order. Proceedings held before Judge Lynn Adelman: Scheduling Conference held on 6/7/2022. The court approves the proposed schedule and will issue a scheduling order shortly. Plaintiff and Defendant do not object to the motion to dismiss by the Wisconsin Department of Health Services at ECF no. 16 so that motion is GRANTED. The parties will inform the court if they are interested in mediation services. (kmr) |
| 06/07/2022 | 19 | SCHEDULING ORDER: signed by Judge Lynn Adelman on 6/7/22. Rule 26(a) Disclosures to be exchanged by 6/30/2022. Amended Pleadings due by 9/7/2022. Plaintiff's Expert Witness List and Lay Witness List due by 9/30/2022. Defendant's Expert Witness List and Lay Witness List due by 1/31/2023. Motions due by 3/31/2023. (cc: all counsel)(kmr) (Entered: 06/08/2022) |
| 08/08/2022 | 20 | NOTICE of Appearance by Geoffrey D Wilber on behalf of Leasa K Grant. Attorney(s) appearing: Geoffrey D. Wilber (Wilber, Geoffrey) |
| 08/08/2022 | 21 | MOTION to Withdraw as Attorney *Michael A. LoCoco* by Leasa K Grant. (Lococo, Michael) |
| 09/14/2022 | 22 | TEXT ONLY ORDER signed by Judge Lynn Adelman on 9/14/22 GRANTING 21 Motion to Withdraw as Attorney. (cc: all counsel)(kmr) (Entered: 09/15/2022) |
| 09/20/2022 | 23 | Witness List by Leasa K Grant. (Wilber, Geoffrey) |
| 11/08/2022 | 24 | STIPULATION *To Amend The Scheduling Order* by Leasa K Grant. (Attachments: # 1 Text of Proposed Order)(Wilber, Geoffrey) |
| 11/17/2022 | 25 | TEXT ONLY ORDER signed by Judge Lynn Adelman on 11/17/22 GRANTING 24 Stipulation To Amend The Scheduling Order. Plaintiff shall amend her witness list so as to include a claim for permanent injuries by February 13, 2023, and disclose expert witnesses and reports consistent with Rule 26(a)(2) by the same date. Defendant shall disclose expert witnesses and reports consistent with Rule 26(1)(2) on or before May 14, 2023. All other deadlines in the Court's Order Following Scheduling Conference dated June 7, 2022 remain in effect. (cc: all counsel)(kmr) |
| 02/07/2023 | 26 | Witness List by Leasa K Grant. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Wilber, Geoffrey) |
| 05/01/2023 | 27 | LETTER from Attorney Geoffrey D. Wilber *Advising of Settlement*. (Wilber, Geoffrey) |
| 05/02/2023 | 28 | STIPULATION of Dismissal by Walmart Claims Services Inc. (Van Horn, Peggy) |
| 05/02/2023 | 29 | Docket Annotation: The parties have informed the court that they have reached a settlement. Therefore, the case will be closed for administrative purposes only pending receipt of a stipulation of dismissal. (kmr) |
| 05/02/2023 | | Case Terminated (jcl) |

| PACER Service Center |||
|---|---|---|
| **Transaction Receipt** |||
| 12/28/2023 15:05:17 |||
| **PACER Login:** | AdamTheLawyer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-00428-LA |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# EXHIBIT

# PP

Original Complaint Grant v.
Walmart Claims Services, Inc.

03-07-2022
TMS
1/2/9

**FILED**
**02-11-2022**
**Anna Hodges**
**Clerk of Circuit Court**
**2022CV000917**
**Honorable Paul R Van**
**Grunsven-09**
**Branch 09**

STATE OF WISCONSIN          ::          CIRCUIT COURT          ::          MILWAUKEE COUNTY

LEASA K. GRANT,
3205 North 23rd Street
Milwaukee, WI 53206,                                          **SUMMONS**

          Plaintiff,                                          Case No:
                                                             Case Code No: 30107

STATE OF WISCONSIN DEPARTMENT                                 Amount Claimed is
OF HEALTH SERVICES,                                          greater than $10,000.00
A Governmental Agency
c/o Office of Legal Counsel
One West Wilson Street, Room 651
Madison, WI 53703,

UNITEDHEALTHCARE INSURANCE
COMPANY,
A Foreign Corporation
185 Asylum Street
Hartford, CT 06103,
Registered Agent: CT Corporation System,
301 South Bedford Street, Suite 1
Madison, WI 53703,

          Involuntary Plaintiffs,

vs.

QBE INSURANCE CORPORATION,
A Foreign Corporation
600 North 2nd Street, Suite 401
Harrisburg, PA 14101,
Registered Agent: CT Corporation System,
301 South Bedford Street, Suite 1
Madison, WI 53703,

WALMART CLAIMS SERVICES, INC.
A Foreign Corporation
702 SW 8th Street
Bentonville, AR 72716,
Registered Agent: CT Corporation System,
301 South Bedford Street, Suite 1
Madison, WI 53703,

          Defendants.

THE STATE OF WISCONSIN
TO EACH PERSON NAMED ABOVE AS A DEFENDANT
OR INVOLUNTARY PLAINTIFF

YOU ARE HEREBY NOTIFIED that the Plaintiff named above has filed a lawsuit or other legal action against you. The Complaint which is attached states the nature and basis of the legal action.

Within forty-five (45) days after receiving this Summons, you must respond with a written Answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an Answer that does not follow the requirements of the statutes. The Answer must be sent or delivered to the Circuit Court for Milwaukee County whose address is 901 North Ninth Street, Milwaukee, Wisconsin, 53233, and to the Plaintiff's attorneys, Michael A. LoCoco and Richard B. Hess, whose address is 100 East Wisconsin Avenue, Suite 2800, Milwaukee, Wisconsin 53202. You may have an attorney help or represent you.

If you do not provide a proper Answer within forty-five (45) days, the Court may grant Judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A Judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future and may also be enforced by garnishment or seizure of property.

Dated at Milwaukee, Wisconsin this 11th day of February, 2022.

GRUBER LAW OFFICES, LLC
Attorneys for Plaintiff, Leasa K. Grant

By: *electronically signed by Michael LoCoco*
Michael A. LoCoco
SBN: 1098069
Richard B. Hess
SBN: 1024672

**POST OFFICE ADDRESS**:
100 East Wisconsin Avenue, Suite 2800
Milwaukee, Wisconsin 53202
Telephone: 414.276.6666
Facsimile: 414.273.4047

**FILED**
**02-11-2022**
**Anna Hodges**
**Clerk of Circuit Court**

STATE OF WISCONSIN          ::          CIRCUIT COURT          ::          MILWAUKEE COUNTY

Honorable Paul R Van
Grunsven-09
Branch 09

LEASA K. GRANT,
3205 North 23rd Street
Milwaukee, WI 53206,

      Plaintiff,

STATE OF WISCONSIN DEPARTMENT
OF HEALTH SERVICES,
A Governmental Agency
c/o Office of Legal Counsel
One West Wilson Street, Room 651
Madison, WI 53703,

UNITEDHEALTHCARE INSURANCE
COMPANY,
A Foreign Corporation
185 Asylum Street
Hartford, CT 06103,
Registered Agent: CT Corporation System,
301 South Bedford Street, Suite 1
Madison, WI 53703,

      Involuntary Plaintiffs,

vs.

QBE INSURANCE CORPORATION,
A Foreign Corporation
600 North 2nd Street, Suite 401
Harrisburg, PA 14101,
Registered Agent: CT Corporation System,
301 South Bedford Street, Suite 1
Madison, WI 53703,

WALMART CLAIMS SERVICES, INC.
A Foreign Corporation
702 SW 8th Street
Bentonville, AR 72716,
Registered Agent: CT Corporation System,
301 South Bedford Street, Suite 1
Madison, WI 53703,

      Defendants.

**COMPLAINT**

Case No:
Case Code No: 30107

Amount Claimed is
greater than $10,000.00

**NOW COMES** the Plaintiff, LEASA K. GRANT, by her attorneys, GRUBER LAW OFFICES, LLC, by attorneys Michael A. LoCoco and Richard B. Hess, and alleges as follows:

1.    Plaintiff, LEASA K. GRANT, is an adult individual residing at 834 North 35th Street, Apartment 109, in the City and County of Milwaukee, State of Wisconsin, 53208.

2.    Involuntary Plaintiff, STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES, is upon information and belief a Governmental Agency, with its principal office located at Office of Legal Counsel, One West Wilson Street, Room 651, in the City of Madison, County of Dane, State of Wisconsin 53073, and at all times material herein allegedly provided monies for health care services to the Plaintiff, LEASA K. GRANT, as a result of the injuries she sustained in the alleged incident. The Plaintiff, LEASA K. GRANT, alleges doubt as to whether the Involuntary Plaintiff, STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES, is truly subrogated or interested in this action, but that said party is joined for the purposes of complying with the provisions of Wis. Stat. § 803.03. The Plaintiff, LEASA K. GRANT, further states that pursuant to Wis. Stats. § 803.03(2)(b)(1)(b), the Involuntary Plaintiff must do one of the following: a. Participate in the prosecution of the action; b. Agree to have his or her interest represented by the party who caused the joinder; or c. Move for dismissal with or without prejudice. In the event of the Involuntary Plaintiff's failure to answer this Complaint within forty-five (45) days, or otherwise appear or exercise one of the foregoing options, then and in that event, any interest they may claim in this action shall be deemed waived, and any and all claims they may have, of whatever type or kind, shall be dismissed with prejudice. Upon information and belief, the Involuntary Plaintiff, STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES, conducts substantial business in the County of Milwaukee, State of Wisconsin.

3.      Involuntary Plaintiff, UNITEDHEALTHCARE INSURANCE COMPANY, is upon information and belief a foreign corporation, with its principal office located at 185 Asylum Street in the City and County of Hartford, State of Connecticut 06103, and whose registered agent for service of process is CT Corporation System located at 301 South Bedford Street, Suite 1, in the City of Madison, County of Dane, State of Wisconsin 53703. That the Involuntary Plaintiff, UNITEDHEALTHCARE INSURANCE COMPANY, is a health plan and alleges to have made payments on behalf of Plaintiff, LEASA K. GRANT, and therefore is joined as an Involuntary Plaintiff for the purpose of complying with the provisions of Wis. Stat. § 803.03. The Plaintiff, LEASA  K.  GRANT,  alleges  doubt  as  to  whether  the  Involuntary  Plaintiff, UNITEDHEALTHCARE INSURANCE COMPANY, is truly subrogated or interested in this action. The Plaintiff, LEASA K. GRANT, further states that pursuant to Wis. Stats. § 803.03(2)(b)(1)(b), the Involuntary Plaintiff must do one of the following: a. Participate in the prosecution of the action; b. Agree to have his or her interest represented by the party who caused the joinder; or c. Move for dismissal with or without prejudice. In the event of the Involuntary Plaintiff's failure to answer this Complaint within forty-five (45) days, or otherwise appear or exercise one of the foregoing options, then and in that event, any interest they may claim in this action shall be deemed waived, and any and all claims they may have, of whatever type or kind, shall be dismissed with prejudice. Upon information and belief, the Involuntary Plaintiff, UNITEDHEALTHCARE INSURANCE COMPANY, conducts substantial business in the County of Milwaukee, State of Wisconsin.

4.      Defendant, QBE INSURANCE CORPORATION, is upon information and belief a foreign corporation, with its principal offices located at 600 North 2nd Street, Suite 401 in the City of Harrisburg, County of Dauphin, State of Pennsylvania 14101, and whose registered agent

for service of process is CT Corporation System located at 301 South Bedford Street, Suite 1, in the City of Madison, County of Dane, State of Wisconsin 53703. Upon information and belief, the defendant, QBE INSURANCE CORPORATION, was at all times material herein the liability insurance carrier of the Defendant, WALMART CLAIMS SERVICES, INC., pursuant to Wis. Stat. § 803.04(2), and is a proper party by reason of the terms of its policies and the laws of the State of Wisconsin. Upon information and belief, the Defendant, QBE INSURANCE CORPORATION, conducts substantial business in the County of Milwaukee, State of Wisconsin.

5.      Defendant, WALMART CLAIMS SERVICES, INC., is upon information and belief a foreign corporation, with its principal office located at 702 SW 8th Street in the Town of Bentonville, County of Benton, State of Arkansas 72716, and whose registered agent for service of process is CT Corporation System located at 301 South Bedford Street, Suite 1, in the City of Madison, County of Dane, State of Wisconsin 53703. Upon information and belief, the Defendant, WALMART CLAIMS SERVICES, INC., was at all times material herein the owner of the property located at 5301 South 76th Street in the City of Greendale, County of Milwaukee, State of Wisconsin 53129 (herein after referred to as "The Property"); that the Defendant, WALMART CLAIMS SERVICES, INC., was responsible for the inspection, management and maintenance of The Property; that the Defendant, WALMART CLAIMS SERVICES, INC., conducts substantial business in the County of Milwaukee, State of Wisconsin.

## FIRST CAUSE OF ACTION:

## GENERAL NEGLIGENCE OF WALMART CLAIMS SERVICES, INC.

6.      Plaintiff re-alleges and incorporates herein, as though more fully set forth, all of the allegations contained in paragraphs one (1) through five (5) above, with the same force and effect.

7.      On or about the 17th day of August 2019, the Plaintiff, LEASA K. GRANT, was lawfully upon The Property when she slipped and fell in a dangerous and negligently maintained area, causing the Plaintiff, LEASA K. GRANT, to sustain serious injury. Upon information and belief, The Property was owned, inspected, and maintained by the Defendant, WALMART CLAIMS SERVICES, INC.; that as owner of The Property, the Defendant, WALMART CLAIMS SERVICES, INC., owed a duty to inspect, repair and maintain the walkways and premises of said property, and that by failing to timely and properly maintain the area, the Defendant, WALMART CLAIMS SERVICES, INC., breached that duty.

8.      Upon information and belief, the Defendant, WALMART CLAIMS SERVICES, INC., failed to remove standing water from inside the premises, creating an unreasonably dangerous condition.

9.      Upon information and belief, the Defendant, WALMART CLAIMS SERVICES, INC., failed to warn the Plaintiff, LEASA K. GRANT, that a dangerous condition existed on the premises.

10.     Defendant, WALMART CLAIMS SERVICES, INC., was negligent in the manner in which it inspected, maintained, controlled, supervised, and managed The Property in that it was in a hazardous and dangerous condition; and it was otherwise negligent.

11.     The negligence of the Defendant, WALMART CLAIMS SERVICES, INC., was the proximate cause of the incident and the resulting injuries and damages to the Plaintiff, LEASA K. GRANT.

12.     As a direct result of the actions or inactions and negligence of Defendant, WALMART CLAIMS SERVICES, INC., the Plaintiff, LEASA K. GRANT, was seriously injured, suffered great pain of body and mind, was obliged to expend monies for medical care and

attention, and was prevented from engaging in her normal activities, all to her damage in an amount to be determined by the trier of fact.

<div align="center">

**SECOND CAUSE OF ACTION:**

**NEGLIGENCE OF WALMART CLAIMS SERVICES, INC.: SAFE PLACE**

</div>

13.    Re-alleges and incorporates herein, as though more fully set forth, all of the allegations contained in paragraphs one (1) through twelve (12) above with the same force and effect.

14.    On or about the 17th day of August 2019, the Plaintiff, LEASA K. GRANT, was a frequenter, as that term is used in Chapter 101, Wisconsin Statutes, and lawfully upon The Property, owned, inspected, and maintained by Defendant, WALMART CLAIMS SERVICES, INC., when Plaintiff, LEASA K. GRANT, slipped and fell in a dangerous and negligently maintained area, causing the Plaintiff, LEASA K. GRANT, to sustain serious injury.

15.    Defendant, WALMART CLAIMS SERVICES, INC., individually and/or through its agents, servants, and/or employees, was negligent and careless and failed to properly inspect and/or maintain The Property; and that as the owner of said property the Defendant, WALMART CLAIMS SERVICES, INC., had a duty to keep the building and property so constructed, repaired, and maintained so as to render the same as safe as the nature of the premises will permit, to adopt and use methods and processes reasonable and adequate to render the premises safe, and to properly maintain, inspect and repair the premises in question pursuant to the provisions of Chapter 101, Wis. Stats.

16.    Defendant, WALMART CLAIMS SERVICES, INC., individually and/or through its agents, employees, and/or servants, breached said duty and also failed to inspect, repair and

maintain said property so as to render said property as safe as the nature of the premises would permit, in violation of Chapter 101, Wis. Stats.

17.     Defendant, WALMART CLAIMS SERVICES, INC., individually and/or through its agents, employees and/or servants, knew or in the exercise of reasonable care, should have known, that the premises were unsafe for those lawfully on The Property, and exposed such persons to unreasonable risks of injury.

18.     As a direct and proximate cause of the breach of said Defendant, WALMART CLAIMS SERVICES, INC., its agents, employees and/or servants, the Plaintiff, LEASA K. GRANT, was seriously injured, suffered great pain of body and mind, was obliged to expend monies for medical care and attention, and was prevented from engaging in her normal activities, all to her damage in an amount to be determined by the trier of fact.

**WHEREFORE**, Plaintiff, LEASA K. GRANT, demands judgment against the Defendants, QBE INSURANCE CORPORATION and WALMART CLAIMS SERVICES, INC., as follows:

1.     On the First Cause of Action, on behalf of the Plaintiff, LEASA K. GRANT, in an amount to be determined by the trier of fact together with the pre-judgment and post-judgment interest, costs, attorney fees and disbursements of this action;

2.     On the Second Cause of Action, on behalf of the Plaintiff, LEASA K. GRANT, in an amount to be determined by the trier of fact together with the pre-judgment and post-judgment interest, costs, attorney fees and disbursements of this action;

3.     In the event of settlement or verdict in favor of the Plaintiff, Plaintiff demands judgment for an Order declaring Plaintiff's rights to such settlement/verdict proceeds paramount to those of any subrogated party;

4.      In the event of any subrogated party's failure to respond to this Complaint in a timely manner, the Plaintiff requests this Court to grant an Order dismissing the subrogated party from this action and barring any claim for subrogation and/or reimbursement, and barring the subrogated party from participating in any judgment or settlement in this action; and

5.      Any and all other relief the court deems just and equitable.

**PLAINTIFF HEREBY DEMANDS THAT THE ABOVE ENTITLED
ACTION BE TRIED BY A JURY OF TWELVE (12) PERSONS**

Dated at Milwaukee, Wisconsin this 11th day of February, 2022.

GRUBER LAW OFFICES, LLC
Attorneys for Plaintiff, Leasa K. Grant

By: *electronically signed by Michael LoCoco*
         Michael A. LoCoco
         SBN: 1098069
         Richard B. Hess
         SBN: 1024672

**POST OFFICE ADDRESS:**
100 East Wisconsin Avenue, Suite 2800
Milwaukee, Wisconsin 53202
Telephone: 414.276.6666
Facsimile: 414.273.4047

# EXHIBIT

# QQ

Corporate Disclosure
Statement from Grant v.
Walmart Claims Services, Inc.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

---

LEASA K. GRANT,

       Plaintiff,

And

                                      Case No.:   22-cv-428

STATE OF WISCONSIN DEPARTMENT
OF HEALTH SERVICES and
UNITEDHEALTHCARE INSURANCE
COMPANY

       Involuntary Plaintiff,

vs.

WALMART CLAIMS SERVICES, INC.,

       Defendants.

---

**DEFENDANT WALMART CLAIMS SERVICES, INC.'S**
**CORPORATE DISCLOSURE STATEMENT**

---

The undersigned, counsel of record for Defendant Walmart Inc., incorrectly identified as Walmart Claims Services, Inc. hereby furnishes the following list in compliance with Fed. R. Civ. P. 7.1 and Civil L.R. 7.1:

1)     The correct name of Defendant in this matter is Walmart Inc.

2)     Walmart Inc. is a foreign corporation with its principal office located at 702 SW 8th Street, Bentonville, Arkansas.

3)     Walmart Inc. is a publicly traded company on the New York Stock Exchange and traded under the symbol WMT. No other publicly traded entity owns more than 10% of Walmart Claims Services, Inc. stock.

(4)    MWH Law Group LLP is the only law firm expected to appear for Defendant,

Walmart Inc.

Dated this 6th day of April, 2022.

                              **MWH LAW GROUP LLP**
                              Attorneys for Defendant, Walmart, Inc.

                              By: */s/ Electronically signed by Carlos R. Pastrana*
                              Carlos R. Pastrana
                              SBN: 1088286
                              735 North Water Street, Suite 610
                              Milwaukee, WI 53202
                              Telephone: (414) 436-0353
                              Facsimile: (414) 436-0354
                              *carlos.pastrana@mwhlawgroup.com*

# EXHIBIT

# RR

Stipulation of Dismissal from Grant v. Walmart Claims Services, Inc.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**

LEASA K. GRANT,

          Plaintiff,

And

UNITEDHEALTHCARE INSURANCE
COMPANY

          Involuntary Plaintiff,

vs.

WALMART CLAIMS SERVICES INC., p/k/a
WALMART, INC.,

          Defendant.

Case No:      2:22-CV-00428-LA

## STIPULATION FOR DISMISSAL

      **IT IS HEREBY STIPULATED** by and between the parties that this action may be

dismissed in its entirety, on the merits and with prejudice, and without further notice or costs to any

party.

      Dated:  5/1/23

                    By:   /s/ Geoffrey D. Wilber       
                        Geoffrey D. Wilber
                        State Bar No: 1041500
                        Attorney for Plaintiff(s)
                        GRUBER LAW OFFICES LLC
                        100 East Wisconsin Avenue, Suite 1650
                        Milwaukee, WI 53202
                        (414) 276-6666
                        Email:  gdw@gruber-law.com; CLH@gruber-
                        law.com

*Stipulation for Dismissal*
Case No.: 2:22-CV-00428-LA

Dated:  5/1/23

By:_____/s/Matthew S. Mayer_____
        Matthew S. Mayer
        State Bar No: 1001237
        Attorney for
        WELD RILEY, S.C.
        500 3rd St Ste 800
        PO Box 479
        Wausau, WI 54402-0479
        (715) 845-8234
        Email:  mmayer@weldriley.com;
        tschafer@weldriley.com

Dated:  May 2, 2023

By:_____s/Peggy E. Van Horn_____
        Peggy E. Van Horn
        State Bar No: 1001414
        Attorney for Defendants, Walmart Claims
        Services, Inc.
        LAW OFFICES OF THOMAS P. STILP
        Mailing:  P.O. Box 7217, London, KY 40742
        Physical:  11800 W Park Place, Suite 210,
        Milwaukee WI 53224
        Phone: (414) 577-4328 / Fax: (603) 334-7164
        Email:  peggy.vanhorn@libertymutual.com

# EXHIBIT

# SS

Docket Sheet from Williams v. Walmart Claims Services Inc.

Query    Reports    Utilities    Help    Log Out

RECAP Actions

ATTYOPEN,CLOSED

**United States District Court**
**Eastern District of Wisconsin (Milwaukee)**
**CIVIL DOCKET FOR CASE #: 2:21-cv-00580-SCD**

Williams et al v. Walmart Claims Services Inc et al
Assigned to: Magistrate Judge Stephen C Dries
Case in other court: Waukesha County Circuit Court, 21CV562
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 05/06/2021
Date Terminated: 11/08/2021
Jury Demand: Both
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

**Plaintiff**

**Timothy D Williams**                           represented by   **Jason S Richard**
                                                                  J Richard Law Offices LLC
                                                                  740 N Plankinton Ave - Ste 800
                                                                  Milwaukee, WI 53203
                                                                  414-232-1792
                                                                  Email: jason@jrichardlaw.com
                                                                  *LEAD ATTORNEY*
                                                                  *ATTORNEY TO BE NOTICED*

V.

**Involuntary Plaintiff**

**State of Wisconsin Department of Health Services**   represented by   **Dennis C Schuh**
                                                                        State of Wisconsin Department of Health Services
                                                                        Office of Legal Counsel
                                                                        1 W Wilson St
                                                                        PO Box 7850
                                                                        Madison, WI 53707-7850
                                                                        608-267-5067
                                                                        Fax: 608-267-1434
                                                                        Email: dennis.schuh@wisconsin.gov
                                                                        *TERMINATED: 05/10/2021*
                                                                        *LEAD ATTORNEY*

                                                                        **Jeremiah Streck**
                                                                        State of Wisconsin Department of Health Services
                                                                        Office of Legal Counsel
                                                                        1 W Wilson St
                                                                        PO Box 7850
                                                                        Madison, WI 53707-7850
                                                                        608-266-0885
                                                                        Email: jeremiah.streck@dhs.wisconsin.gov
                                                                        *ATTORNEY TO BE NOTICED*

**Involuntary Plaintiff**

**Blue Cross Blue Shield of Wisconsin**

**Involuntary Plaintiff**

**Compcare Health Services Insurance Corp**

V.

**Defendant**

**Walmart Claims Services Inc**                  represented by   **Eric L Andrews**
*doing business as*                                               MWH Law Group LLP
Sam's Club                                                        735 N Water St - Ste 610
                                                                  Milwaukee, WI 53202
                                                                  414-436-0353
                                                                  Fax: 414-436-0354
                                                                  Email: eandrews@dunklawyers.com
                                                                  *ATTORNEY TO BE NOTICED*

                                                                  **Vincent Vigil**
                                                                  MWH Law Group LLP
                                                                  150 N Michigan Ave - Ste 800
                                                                  Chicago, IL 60601
                                                                  312-734-1457
                                                                  Email: vincent.vigil@mwhlawgroup.com
                                                                  *ATTORNEY TO BE NOTICED*

**Defendant**

**ABC Insurance Company**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/06/2021 | 1 R | NOTICE OF REMOVAL by Walmart Claims Services, Inc. d/b/a Sam's Club from Waukesha County Circuit Court, Case Number: 20-CV-7565 with attached state court documents. (Filing Fee PAID $402 receipt number AWIEDC-3811298) (Attachments: # 1 R Complaint Exhibit A - Complaint, # 2 Civil Cover Sheet)(Vigil, Vincent) |

| 05/06/2021 | | NOTICE Regarding assignment of this matter to Magistrate Judge Stephen C Dries; Consent/refusal forms for Magistrate Judge Dries to be filed within 21 days; the consent/refusal form is available here. Pursuant to Civil Local Rule 7.1 a disclosure statement is to be filed upon the first filing of any paper and should be filed now if not already filed. (bx) |
| 05/06/2021 | 2 | DISCLOSURE Statement by Walmart Claims Services, Inc. d/b/a Sam's Club. (Vigil, Vincent) |
| 05/07/2021 | | Case Opening Modification(s); The following modification(s) have been made to your case entry: The county code has been modified - please remember to choose the county for the first named plaintiff. One or more party names have been modified - please remember to follow the Party Name Guidelines found on our website. ; Please refer to the attorney case opening instructions, the summons instructions and the party name guidelines found in the user manual for further guidance (kah) |
| 05/10/2021 | 3 | NOTICE of Substitution by Jeremiah Streck on behalf of State of Wisconsin Department of Health Services. Attorney Dennis C. Schuh to be termed. (Streck, Jeremiah) |
| 05/10/2021 | 4 | *State of Wisconsin Department of Health Service* ANSWER to Complaint by State of Wisconsin Department of Health Services. (Attachments: # 1 Certificate of Service DHS Certificate of Service)(Streck, Jeremiah) |
| 05/10/2021 | 5 | CLAIM Notice of Lien - DHS by State of Wisconsin Department of Health Services. (Streck, Jeremiah) |
| 05/13/2021 | 6 ℝ | *Defendant Walmart Claims Services, Inc.'s* ANSWER to Complaint with Jury Demand by Walmart Claims Services Inc.(Vigil, Vincent) |
| 06/30/2021 | | NOTICE from the clerk to ALL PARTIES requesting that the Consent/Refusal form to Magistrate Judge Stephen C Dries be filed within 14 days; the form is available here. (kah) |
| 09/08/2021 | | FINAL NOTICE from the clerk to ALL PARTIES requesting that the Consent/Refusal form to Magistrate Judge Stephen C Dries be filed within 7 days; the form is available here. (kah) |
| 11/05/2021 | | **FOURTH AND FINAL NOTICE** from the clerk to **ALL PARTIES** requesting that the Consent/Refusal form to Magistrate Judge Stephen C Dries be filed within 7 days; the form is available here. (kah) |
| 11/08/2021 | 7 ℝ | STIPULATION of Dismissal by Walmart Claims Services Inc. (Attachments: # 1 Text of Proposed Order Proposed Order for Dismissal)(Vigil, Vincent) |
| 11/08/2021 | | Case Terminated per 7 ℝ Stipulation of Dismissal with Prejudice (kah) (Entered: 11/09/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/28/2023 15:20:40 | | |
| **PACER Login:** | AdamTheLawyer | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:21-cv-00580-SCD |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# EXHIBIT

# TT

Original Complaint Williams v. Walmart Claims Services Inc.

EXHIBIT 1


CT Corporation

**Service of Process Transmittal**
04/08/2021
CT Log Number 539354027

TO:     Kim Lundy Service Of Process
        Walmart Inc.
        702 SW 8TH ST
        BENTONVILLE, AR 72716-6209

RE:     **Process Served in Wisconsin**

FOR:    Walmart Claims Services, Inc.  (Domestic State: AR)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Williams Timothy D., Pltf., State Of Wisconsin Department Of Health Services, etc., et al., Involuntary Pltfs. vs. Walmart Claims Services, Inc., etc. and ABC Insurance Company, Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, First Interrogatories |
| **COURT/AGENCY:** | Waukesha County Circuit Court, WI<br>Case # 2021CV000562 |
| **NATURE OF ACTION:** | Personal Injury - Slip/Trip and Fall - 12/06/2019 - Sam's Club Store #8164 - 600 North Springdale Road, Waukesha, Wisconsin 53186 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Madison, WI |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 04/08/2021 at 12:33 |
| **JURISDICTION SERVED :** | Wisconsin |
| **APPEARANCE OR ANSWER DUE:** | Within 45 days after receipt |
| **ATTORNEY(S) / SENDER(S):** | Jason S. Richard<br>J. Richard Law Offices, LLC<br>740 North Plankinton Avenue, Suite 800<br>Milwaukee, WI 53203<br>414-232-1792 |
| **REMARKS:** | The documents received have been modified to reflect the name of the entity being served. |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/09/2021, Expected Purge Date: 04/14/2021<br><br>Image SOP<br><br>Email Notification,  Kim Lundy Service Of Process  ctlawsuits@walmartlegal.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>301 S. Bedford Street<br>Suite 1<br>Madison, WI 53703<br>877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

Page 1 of  2 / DP



**Service of Process Transmittal**
04/08/2021
CT Log Number 539354027

**TO:**   Kim Lundy Service Of Process
Walmart Inc.
702 SW 8TH ST
BENTONVILLE, AR 72716-6209

**RE:**   **Process Served in Wisconsin**

**FOR:**   Walmart Claims Services, Inc.  (Domestic State: AR)

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Page 2 of  2 / DP

**FILED**
**04-06-2021**
**Clerk of Circuit Court**
**Waukesha County**
**2021CV000562**

STATE OF WISCONSIN            CIRCUIT COURT            WAUKESHA COUNTY

TIMOTHY D. WILLIAMS.
2913 North 50th Street
Milwaukee, Wisconsin 53210,

       Plaintiff,

STATE OF WISCONSIN
DEPARTMENT OF HEALTH SERVICES,            **SUMMONS**
A Governmental Agency
c/o Dennis C. Schuh, Chief Legal Counsel            Case No.:
Office of Legal Counsel
One West Wilson Street, Room 651            Case Code:   30107
Madison, Wisconsin 53703,            Personal Injury – Other

BLUE CROSS BLUE SHIELD OF WISCONSIN,
<u>c/o Registered Agent</u>: CT Corporation System
301 South Bedford Street, Suite 1
Madison, Wisconsin 53703, and

COMPCARE HEALTH SERVICES
INSURANCE CORPORATION,
<u>c/o Registered Agent</u>: CT Corporation System
301 South Bedford Street, Suite 1
Madison, Wisconsin 53703,

       Involuntary Plaintiffs,

v.

WALMART CLAIMS SERVICES, INC.,
d/b/a Sam's Club
c/o Registered Agent: CT Corporation System
301 South Bedford Street, Suite 1
Madison, Wisconsin 53703, and

ABC INSURANCE COMPANY,
Current Name Unknown
Current Address Unknown,

       Defendants.



SENT FOR STATE PROCESS SERVICE, INC.
ime of Service _____ am  pm
Date of Service
Served upon: _____

at _____

[  ] Personal Service  [  ] Substitute personal service
[  ] Corporate Service  [  ] Posting

THE STATE OF WISCONSIN

FILED
04-06-2021
Clerk of Circuit Court
Waukesha County
2021CV000562

To Each Person Named Above as an Involuntary Plaintiff or Defendant

YOU ARE HEREBY NOTIFIED that the Plaintiff named above has filed a lawsuit or other legal action against you. The Complaint which is attached states the nature and basis of the legal action.

Within forty-five (45) days after receiving this Summons, you must respond with a written Answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an Answer that does not follow the requirements of the statutes. The Answer must be sent or delivered to the Circuit Court for Waukesha County, whose address is Waukesha County Courthouse, 515 West Moreland Boulevard, Waukesha, Wisconsin 53188, and to the Plaintiff's attorneys, J. Richard Law Offices, LLC, whose address is 740 North Plankinton Avenue, Suite 800, Milwaukee, Wisconsin 53203.  You may have an attorney help or represent you.

If you do not provide a proper Answer within forty-five (45) days, the Court may grant Judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A Judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated at Milwaukee, Wisconsin this 6th day of April, 2021

J. RICHARD LAW OFFICES, LLC
Attorneys for Plaintiff, Timothy D. Williams

//Electronically Signed by Jason S. Richard//
By: Jason S. Richard
SBN: 1032068

**POST OFFICE ADDRESS**:
jason@jrichardlaw.com
740 North Plankinton Avenue
Suite 800
Milwaukee, WI 53203
Phone: 414.232.1792

2 | P a g e

FILED
04-06-2021
Clerk of Circuit Court
Waukesha County
2021CV000562

STATE OF WISCONSIN          CIRCUIT COURT          WAUKESHA COUNTY

TIMOTHY D. WILLIAMS.
2913 North 50th Street
Milwaukee, Wisconsin 53210,

       Plaintiff,

STATE OF WISCONSIN
DEPARTMENT OF HEALTH SERVICES,
A Governmental Agency
c/o Dennis C. Schuh, Chief Legal Counsel
Office of Legal Counsel
One West Wilson Street, Room 651
Madison, Wisconsin 53703,

BLUE CROSS BLUE SHIELD OF WISCONSIN,
c/o Registered Agent: CT Corporation System
301 South Bedford Street, Suite 1
Madison, Wisconsin 53703, and

COMPCARE HEALTH SERVICES
INSURANCE CORPORATION,
c/o Registered Agent: CT Corporation System
301 South Bedford Street, Suite 1
Madison, Wisconsin 53703,

       Involuntary Plaintiffs,

v.

WALMART CLAIMS SERVICES, INC.,
d/b/a Sam's Club
c/o Registered Agent: CT Corporation System
301 South Bedford Street, Suite 1
Madison, Wisconsin 53703, and

ABC INSURANCE COMPANY,
Current Name Unknown
Current Address Unknown,

       Defendants.

**COMPLAINT**

Case No.:

Case Code:   30107
Personal Injury - Other

3 | P a g e

**NOW COMES** the Plaintiff, TIMOTHY D. WILLIAMS, by attorneys, J. Richard Law Offices, LLC and as for causes of action against the above-named parties, alleges and states to the Court as follows:

1.      That at all times material, the Plaintiff, TIMOTHY D. WILLIAMS (hereinafter "TIMOTHY"), is an adult citizen of the State of Wisconsin residing at 2913 North 50th Street, Milwaukee, Wisconsin 53210.

2.      That the Involuntary Plaintiff, STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES, is a government agency, located at One West Wilson Street, Room 651, Madison, Wisconsin 53703; and at all times material herein, the Involuntary Plaintiff, STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES, was the administrator providing monies for health care services provided to the Plaintiff, TIMOTHY, as a result of the injuries said Plaintiff sustained in said accident, and therefore is joined as an Involuntary Plaintiff for the purpose of complying with the provisions of § 803.03, Wis. Stats.

3.      The Involuntary Plaintiff, BLUE CROSS BLUE SHIELD OF WISCONSIN (hereinafter "BLUE CROSS"), is a corporation authorized to and doing substantial business in the State of Wisconsin with the office of its registered agent, CT Corporation System, located at 301 South Bedford Street, Suite 1, Madison, Wisconsin 53703. Upon information and belief, the Involuntary Plaintiff, BLUE CROSS, may have paid medical bills on behalf of the Plaintiff, TIMOTHY, for injuries he sustained in the accident that is subject of this lawsuit and may be so obligated in the future; therefore, the Involuntary Plaintiff, BLUE CROSS, may have a subrogated interest to the extent of its payments subject to applicable federal and/or state laws. The Plaintiff, TIMOTHY, requests an extinguishment of any subrogation claims of the Involuntary Plaintiff, BLUE CROSS.

4.      The Involuntary Plaintiff, COMPCARE HEALTH SERVICES INSURANCE CORPORATION (hereinafter "COMPCARE"), is a corporation authorized to and doing substantial business in the State of Wisconsin with the office of its registered agent, CT Corporation System, located at 301 South Bedford Street, Suite 1, Madison, Wisconsin 53703.  Upon information and belief, the Involuntary Plaintiff, COMPCARE, may have paid medical bills on behalf of the Plaintiff, TIMOTHY, for injuries he sustained in the accident that is subject of this lawsuit and may be so obligated in the future; therefore, the Involuntary Plaintiff, COMPCARE, may have a subrogated interest to the extent of its payments subject to applicable federal and/or state laws.  The Plaintiff, TIMOTHY, requests an extinguishment of any subrogation claims of the Involuntary Plaintiff, COMPCARE.

5.      That upon information and belief, at all times material, the Defendant, WALMART CLAIMS SERVICES, INC. d/b/a Sam's Club (hereinafter "WALMART"), is a corporation, licensed to do and doing substantial business in the State of Wisconsin, with offices of its registered agent, Ct Corporation System, located at 301 South Bedford Street, Suite 1, Madison, Wisconsin 53703; that upon information and belief, the Defendant, WALMART, is self-insured.

6.      That the Defendant, ABC INSURANCE COMPANY, is a foreign or domestic corporation whose name, address, registered agent, registered offices and state of incorporation of which are presently unknown to the Plaintiff, TIMOTHY, and that in place of the actual name of the Defendant Insurance Company, a fictitious name is being used for the Defendant pursuant to § 807.12, Wis. Stats. That upon information and belief, the Defendant, ABC INSURANCE COMPANY, provided liability insurance to the Defendant, WALMART, and that by reason of said insurance policy and the alleged negligence of

5 | Page

the said Defendant, and the provisions of § 803.04(2), Wis. Stats., the Defendant, ABC INSURANCE COMPANY, is a proper party Defendant herein.

7.    That upon information and belief at all times material, the Defendant, WALMART, owned, operated and/or maintained the business, building, restrooms, and public areas at the property known locally as Sam's Club Store #8164 (hereinafter known as "the PROPERTY") and located at 600 North Springdale Road, Waukesha, Wisconsin 53186.

## BACKGROUND FACTS

8.    The Plaintiff, TIMOTHY, re-alleges and incorporates herein by reference paragraphs one through seven (1-7) of this Complaint.

9.    That on December 6, 2019, the Plaintiff, TIMOTHY, was a patron at the Defendant's, WALMART, d/b/a Sam's Club Store #8164 when he slipped and fell in the restroom, located at the PROPERTY, due to wet, slippery, and dangerous conditions that were not safeguarded or marked, which include but are not limited to water on the floor that had not been mopped up, causing him to sustain severe and even possible permanent injuries to his shoulders, back, and left leg.

10.    That at all times material to this action, the Defendant, WALMART, was the owner, landlord, operator, and/or maintainer of THE PROPERTY, and had control over THE PROPERTY, including the interior areas, such as the restrooms, walkways, and/or other areas open to the public, around where the Plaintiff, TIMOTHY, fell; said Defendant had a duty to maintain THE PROPERTY, including the public areas, in a condition that is reasonably safe for patrons and devoid of hazards.

## FIRST CAUSE OF ACTION – NEGLIGENCE:

## WALMART CLAIMS SERVICES, INC.

11.     The Plaintiff, TIMOTHY, realleges and incorporates herein, as though more fully set forth, all of the allegations contained in paragraphs one through ten (1-10) above with the same force and effect.

12.     The Defendant, WALMART, and their employees and agents, were negligent in the ownership, construction, inspection, maintenance and/or supervision of THE PROPERTY by, including but not limited to, failing to keep THE PROPERTY and the areas accessible to the public, including the restrooms, maintained in a safe manner and devoid of hazardous conditions, including water on the floor.

13.     The negligence of the Defendant, WALMART, and their employees and agents, was a direct and proximate cause of, meaning a substantial factor in bringing about the Plaintiff's, TIMOTHY, past injuries, past pain and suffering, and past medical and hospital expenses; that said Plaintiff's injuries may be permanent in nature, thereby causing him to suffer pain and disability in the future, and incur medical and hospital expenses in the future, in an unspecified amount pursuant to the Wisconsin Statutes and Wisconsin law.

## SECOND CAUSE OF ACTION – SAFE PLACE:

### WALMART CLAIMS SERVICES, INC.

14.     The Plaintiff, TIMOTHY, realleges and incorporates herein, as though more fully set forth, all of the allegations contained in paragraphs one through thirteen (1-13) above with the same force and effect.

15.     The Plaintiff, TIMOTHY, was at all times material to this Complaint, a frequenter as that term is defined in Wis. Stats. § 101.01, while in the public areas, including the restrooms, at THE PROPERTY.

16. The Defendant, WALMART, was the owner, landlord, operator, and/or maintainer of the property located at THE PROPERTY, which was a public place and place of employment, and said Defendant had a duty to maintain the public areas, including the restrooms, at THE PROPERTY in a manner so that it was as safe as its nature would reasonably permit and to provide a safe place for frequenters.

17. That, contrary to Wis. Stats. § 101.01, the Defendant, WALMART, failed to keep THE PROPERTY, and the areas accessible to the public properly maintained, and were therefore negligent by:

a. Failing to furnish a place for frequenters which was safe, as that term is defined in Wis. Stats. § 101.01;

b. Failing to furnish and use safety devices and safeguards and failed to adopt and use methods and processes reasonably adequate to render the subject property safe, as that term is defined in Wis. Stats. § 101.01;

c. Failing to do every other thing reasonably necessary to protect the health, safety and welfare of frequenters at the subject property where the Plaintiff, TIMOTHY, sustained injuries; and

d. Failing to inspect, maintain, repair, safeguard, and warn so as to render the public areas, including the restrooms, of THE PROPERTY safe, as those terms are defined in Wis. Stats. § 101.01.

18. The negligence/safe place violations by the Defendant, WALMART, its employees and agents, were a direct and proximate cause of, meaning a substantial factor in bringing about the Plaintiff's, TIMOTHY, past injuries, past pain and suffering, and past medical and hospital expenses; that said Plaintiff's injuries may be permanent in nature, thereby causing him to suffer pain and disability in the future, and incur medical

and hospital expenses in the future, in an unspecified amount pursuant to the Wisconsin

Statutes and Wisconsin law.

**WHEREFORE,** the Plaintiff, TIMOTHY D. WILLIAMS, hereby demands judgment

against the Defendants, WALMART CLAIMS SERVICES INC. d/b/a Sam's Club and ABC

INSURANCE COMPANY, jointly and severally, as follows:

a.   For compensatory damages in a monetary amount to be awarded by the judge and/or jury;

b.   For a hearing on the subrogation compensation due to the Involuntary Plaintiffs, STATE OF WISCONSIN DEPARTMENT OF HEALTH SERVICES, BLUE CROSS BLUE SHIELD OF WISCONSIN, and COMPCARE HEALTH SERVICES INSURANCE CORPORATION, if any.

c.   For the statutory costs, disbursements, and attorney fees; and

d.   For whatever other relief the court may deem just and equitable.

**PLAINTIFF HEREBY DEMANDS THAT THE ABOVE ENTITLED ACTION BY TRIED TO A JURY OF TWELVE (12) PERSONS.**

Dated at Milwaukee, Wisconsin this 6th day of April, 2021

J. RICHARD LAW OFFICES, LLC
Attorneys for Plaintiff, Timothy D. Williams

//Electronically Signed by Jason S. Richard//
By: Jason S. Richard
SBN: 1032068

**POST OFFICE ADDRESS**:
jason@jrichardlaw.com
740 North Plankinton Avenue
Suite 800
Milwaukee, WI 53203
Phone: 414.232.1792

9 | P a g e

# EXHIBIT

# UU

Stipulation of Dismissal from Williams v. Walmart Claims Services Inc.

**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION**

TIMOTHY D. WILLIAMS,

      Plaintiff,

and,

                                             Case No. 21-cv-00580

STATE OF WISCONSIN
DEPARTMENT OF HEALTH SERVICE,
BLUE CROSS BLUE SHIELD OF WISCONSIN,
COMPCARE HEALTH SERVICES,
INSURANCE CORPORATION

      Involuntary Plaintiffs,

v.

WALMART CLAIMS SERVICES, INC.,
ABC CORPORATION,

      Defendants.

---

**STIPULATION FOR DISMISSAL**

---

      **IT IS HEREBY STIPULATED AND AGREED** by and between the parties, through their respective counsel, that this action may be dismissed in its entirety, on the merits, with prejudice and without costs or further notice to any party.

      Dated this 8 day of November, 2021.

                              **J. RICHARD LAW OFFICES, LLC**
                              Attorneys for Plaintiff, Timothy D. Williams

                              By: */s/ Electronically signed by Jason S. Richard*
                              Jason S. Richard       SBN: 1032068
                              740 N. Plankinton Avenue, Suite 800
                              Milwaukee, WI  53203
                              jason@jrichardlaw.com

Dated this 8 day of November, 2021.

**STATE OF WI DHS – OFFICE OF LEGAL COUNSEL**
Attorneys for Involuntary Plaintiff, State of Wisconsin
Department of Health Services

By: /s/ *electronically signed by Jeremiah Streck*
Jeremiah Streck                    SBN: 1099754
1 W. Wilson Street
P.O. Box 7850
Madison, WI 53707--7850
*jeremiah.streck@dhs.wisconsin.gov*

Dated this 8 day of November, 2021.

**MWH LAW GROUP LLP**
Attorneys for Defendants, Walmart Claims Services, Inc.

By: /s/ *Electronically signed by Vincent Vigil*
Vincent Vigil                    SBN 1120981
735 N. Water Street, Suite 610
Milwaukee, WI 53202
*vincent.vigil@mwhlawgroup.com*